UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------  x

UNITED STATES OF AMERICA,                              Case No. 1:23-cr-00146-DG


                                                       **ORAL ARGUMENT**
          -v.-                                         **REQUESTED**

RACHEL CHERWITZ and
NICOLE DAEDONE,

                                Defendants.
-------------------------------------------------------  x


### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS NICOLE DAEDONE AND RACHEL CHERWITZ'S MOTION TO DISMISS THE INDICTMENT OR, IN THE ALTERNATIVE, FOR A BILL OF PARTICULARS

Julia Gatto                          Jenny R. Kramer
Reid H. Weingarten                   Rachel Finkel
STEPTOE & JOHNSON LLP                 ALSTON & BIRD LLP
1114 Avenue of the Americas          90 Park Avenue
New York, NY 10036                   New York, NY 10016
212-506-3900                         212-210-9400
jgatto@steptoe.com                   jenny.kramer@alston.com
rweingarten@steptoe.com              rachel.finkel@alston.com

*Counsel for Defendant Nicole Daedone*    *Counsel for Defendant Rachel Cherwitz*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ..........................................................................................................1

BACKGROUND ............................................................................................................2

    A.    OneTaste Inc. and Orgasmic Meditation ...........................................2

        1.    OneTaste's Business ...........................................................3

        2.    Staff, Employees, and Back of the House Participants..............4

        3.    OM Houses .......................................................................5

    B.    The Indictment ...............................................................................6

    C.    Discovery .......................................................................................9

ARGUMENT ................................................................................................................10

I.    The Indictment Must Be Dismissed...........................................................10

    A.    Legal Standard .............................................................................10

    B.    The Indictment Should be Dismissed Because it is Constitutionally Defective....13

        1.    The Indictment Violates the Sixth Amendment........................14

        2.    The Indictment Violates the Fifth Amendment. ......................17

II.    Alternatively, the Court Must Order a Bill of Particulars.................................19

CONCLUSION..............................................................................................................21

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bousley v. United States*,
523 U.S. 614 (1998)..................................................................................................9

*Cochran v. United States*,
157 U.S. 286 (1895)................................................................................................10

*Headley v. Church of Scientology Int'l*,
687 F.3d 1173 (9th Cir. 2012)...............................................................................16

*Muchira v. Al-Rawaf*,
850 F.3d 605 (4th Cir. 2017) .................................................................................15

*Russell v. United States*,
369 U.S. 749 (1962).......................................................................................*passim*

*Sira v. Morton*,
380 F.3d 57 (2d Cir. 2004)...............................................................................10, 13

*Taylor v. Rodriguez*,
238 F.3d 188 (2d Cir. 2001)...................................................................................10

*United States v. Agone*,
302 F. Supp. 1258 (S.D.N.Y. 1969)..............................................................11, 13, 17

*United States v. Awan*,
459 F. Supp. 2d 167 (E.D.N.Y. 2006), *aff'd*, 384 F. App'x 9 (2d Cir. 2010)..............10, 12, 18

*United States v. Bortnovsky*,
820 F.2d 572 (2d Cir. 1987) (per curiam)........................................................18, 19

*United States v. Cruikshank*,
92 U.S. 542 (1875)................................................................................................10

*United States v. Davidoff*,
845 F.2d 1151 (2d Cir. 1988).................................................................................19

*United States v. Gonzalez*,
686 F.3d 122 (2d Cir. 2012)....................................................................................9

*United States v. Gordon*,
641 F.2d 1281 (9th Cir. 1981) ...............................................................................17

*United States v. Hawit,*
No. 15 Cr. 252 (PKC), 2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) .....................................19

*United States v. Nachamie,*
91 F. Supp. 2d 565 (S.D.N.Y. 2000).................................................................................19

*United States v. Panzavecchia,*
421 F.2d 440 (5th Cir. 1970) ...........................................................................................12

*United States v. Peterson,*
544 F. Supp. 2d 1363 (M.D. Ga. 2008) ...........................................................................17

*United States v. Pirro,*
212 F.3d 86 (2d Cir. 2000)....................................................................................... *passim*

*United States v. Raniere,*
384 F. Supp. 3d 282 (E.D.N.Y. April 29, 2019).............................................................14

*United States v. Scully,*
108 F. Supp. 3d 59 (E.D.N.Y. 2015) ...............................................................................18

*United States v. Silverman,*
430 F.2d 106 (2d Cir.1970) *modified,* 439 F.2d 1198 (2d Cir.1970).................................9

*United States v. Solovey,*
2005 WL 1279228 (W.D.N.Y. May 31, 2005) ..........................................................11, 17

*United States v. Thompson,*
141 F. Supp. 3d 188 (E.D.N.Y. 2015), *aff'd*, 896 F.3d 155 (2d Cir. 2018) ..................9, 10, 18

*United States v. Tomasetta,*
429 F.2d 978 (1st Cir. 1970)...........................................................................11, 12, 13, 16

*United States v. Toviave,*
761 F.3d 623 (6th Cir. 2014) .....................................................................................15, 16

*United States v. Tramunti,*
513 F.2d 1087 (2d Cir. 1975)...........................................................................................10

*United States v. Urso,*
369 F. Supp. 2d 254 (E.D.N.Y. 2005) ..................................................................... *passim*

*United States v. Walsh,*
194 F.3d 37 (2d Cir. 1999)..........................................................................................11, 13

*United States v. Wilson,*
493 F. Supp. 2d 364 (E.D.N.Y. 2006) .............................................................................19

*Wolff v. McDonnell,*
    418 U.S. 539 (1974).................................................................................................10

**Statutes**

18 U.S.C. § 1589.................................................................................................5, 7, 15

**Other Authorities**

Fed. Rule Crim. Proc. 7(c).....................................................................................9, 13

Fed. Rule Crim. Proc. 7(f)..........................................................................................18

U.S. Const. amend. V.........................................................................................9, 11, 16

U.S. Const. amend. VI.......................................................................................9, 13, 15

Nicole Daedone and Rachel Cherwitz respectfully submit this memorandum of law in support of their motion to dismiss the Indictment, or in the alternative, for a Bill of Particulars.

## INTRODUCTION

Despite an Indictment returned more than nine months ago and what is best described as a document dump of more than two terabytes of discovery, Ms. Daedone and Ms. Cherwitz remain in the dark as to how the government alleges they might have violated the law. In the Indictment, the government charges Ms. Daedone and Ms. Cherwitz with a single count of conspiracy to violate the forced labor statute. According to the government, Ms. Daedone and Ms. Cherwitz allegedly agreed to violate the forced labor statute when they were affiliated with OneTaste Incorporated—Ms. Daedone as the company's co-founder and CEO and Ms. Cherwitz, who in addition to other roles with the company, served as its head of sales. Remarkably, however, in this alleged *forced labor* case, the Indictment fails to identify either the "*force*" or the "*labor*" purportedly involved. Additionally, despite being the essential element of any forced labor charge, the Indictment fails to identify how any alleged "force" purportedly was used to induce any alleged "labor." The Indictment also fails to identify the people—among the tens of thousands of individuals who walked through OneTaste's doors—against whom Ms. Daedone and Ms. Cherwitz allegedly conspired. It fails to particularize when the violative conduct occurred within the sweeping 12-year conspiracy charged. And it fails to specify where it took place among the numerous cities and states in which OneTaste Inc. operated, independently-owned affiliates of OneTaste operated, and OneTaste practitioners resided.

The inscrutable Indictment falls grossly below what is constitutionally required of a charging instrument and, as such, the Indictment should be dismissed. If it is not, at a minimum, the Court should order the government to provide a Bill of Particulars, following which Ms.

Daedone and Ms. Cherwitz will seek leave to renew their motion to dismiss if the Indictment continues to fail to sufficiently allege a forced labor conspiracy.

## **BACKGROUND**

A.    OneTaste Inc. and Orgasmic Meditation

OneTaste Incorporated is a wellness business co-founded by Ms. Daedone in 2004 and at which Ms. Cherwitz worked. OneTaste Inc. promoted the practice of Orgasmic Meditation, also known as "OM," a meditative practice during which one practitioner (either male or female) strokes the other practitioner's clitoris for fifteen minutes. OM practitioners report—and peer reviewed, published studies by leading researchers and universities confirm—that the practice aids in stress management, mental health, and mindfulness. The paired practice also helps develop emotional and physical connectivity, or "connective resonance," between OMing partners.

OM shares many similarities with other spiritual mind-body practices, such as yoga. Just as in those disciplines, OMing can be a casual practice (like the individual who occasionally drops in for a yoga class) or it can be a larger part of a lifestyle (akin to a "yogi" who, in addition to participating in the physical act of yoga, also commits to a meatless diet, engages in silent meditation, and participates in residential yoga ashrams). For devoted OM practitioners, the lifestyle includes examining preconceived notions about sexuality and engaging in exploration and experimentation regarding sex and relationships. The idea at the center of the philosophy surrounding the practice is that women's sexuality is a source of power, strength, and liberation from oppressive social forces. Both genders, but women especially, are encouraged to explore their desires free from the stigmas, shame, and inhibitions that societal norms tend to impose in general, but especially on women when it comes to their sexuality.

## 1.    OneTaste's Business

The business that later became OneTaste Inc. was formed in 2004 by Ms. Daedone and her business partner. In its early days, the business operated out of a small center in San Francisco and offered yoga classes and low-priced courses in OM. It also operated a residential urban retreat center. The business existed alongside a community of people who were passionate about OM. At the time, the community was small, and the business was even smaller. It had a staff of four, including its two owners. It ran at a loss.

With time, however, the business grew, as did the community of people who practiced OM. Ms. Daedone and her business partner continually worked to professionalize their humble, grassroots business with the goal of building it into an ethical, inclusive global operation that could sustain itself financially and reach a larger audience. There were significant efforts in this regard beginning in at least 2010. OneTaste integrated new professional managers and outside consultants to help grow the business. Beginning in 2007, OneTaste expanded its presence into cities outside of San Francisco. Subsequently, it developed a presence in other cities by establishing operations in those locations or by partnering with independently-owned licensees in those locations.[1]

OneTaste Inc.'s business purpose was and always has been to introduce, inform, educate, and train interested individuals in the practice of OM and the philosophies and perspectives that surround it. To do so, the business hosted and sponsored various events at a range of price points, including many complimentary offerings. The events included speakers and presentations in lecture-like settings, social group gatherings where like-minded people mingled and connected,

---

[1] The Indictment incorrectly identifies independently-owned OneTaste licensees as "affiliated companies." Indictment, ¶ 1.1. These companies, including Texas Limbic Network LLC, OTBA Inc., The Next Right Thing LLC, and OneTaste NYC LLC, maintained their own staff, accounting records, and venues independent of OneTaste Incorporated.

and multi-day and multi-week training retreats. During the period of the Indictment, OneTaste Inc. and its affiliates or licensees hosted approximately 35,000 people at in-person events, including over 16,000 people at full-day or longer classes and 1,400 people at multi-month courses.

As part of its business model, OneTaste ensured that only consenting, informed adults attended and participated in its events. For example, all participants reviewed and signed waivers confirming their desire and competency to participate in courses, and reminding them of their ability to withdraw from participation for any reason. And all events lasting longer than a couple of hours opened with instructions about consent, including the use of the words "red, yellow and green" to indicate a participant's level of comfort and to halt a class or experience at any time.

### 2.    *Staff, Employees, and Back of the House Participants*

OneTaste's staff and the people who helped run it were an overlapping mix of individuals who believed in the company's product and mission and people with particularized skills, such as Buddhist teachers, experts on relationships and sexuality, audiovisual technicians, and others. OneTaste Inc. employed a combination of salaried employees and independent contractors, as did the independently-owned affiliates. At all levels of classes, there were also opportunities for people to study and practice how to produce and host events as part of OneTaste's "Back of the House" program. Back of the House participants were able to attend a given class for free. At these classes, participants would engage in tasks like setting up the event space or running the event's microphones.

During the period of the Indictment, OneTaste Inc. employed at least 150 employees and more than 350 independent contractors. At least 600 people participated in the Back of the House program. Additionally, the independently owned and operated affiliates employed their own staff, engaged their own contractors, and had their own Back of the House participants.

### 3.    OM Houses

Like yoga or other wellness practices, OneTaste was designed to provide a wide range of levels at which students could engage. The vast majority of people took a small number of classes and adopted some aspects of the practice into their day-to-day lives. A fraction of practitioners—the "yogis" of the OneTaste world—elected to live together in homes where they made practicing OM a central part of their daily lives. The houses and apartments in which they chose to live were colloquially called "OM houses."

Importantly, OM houses were not a part of OneTaste's business (which was comprised of its courses, workshops, and trainings), but rather were an organic offshoot of those events. OM houses were occupied by adults who typically met through OneTaste events and then chose to live together. As OneTaste expanded outside of San Francisco starting in 2007, OM houses began to pop up in those cities as well, including one in Brooklyn, New York. The majority of these OM houses were entirely independent of OneTaste Inc. OneTaste Inc. employees did not reside in most of them. While the company, on rare occasions, would lease apartments when it established operations in a new city, the vast majority of OM houses independently organized their leases, finances, residents, and practice schedules.

In total, there were over 30 OM houses throughout the United States and the U.K. Around 420 people lived in an OM house at some point during the period of time charged in the Indictment.

B.    <u>The Indictment</u>

In the Indictment, the government alleges that, at some point in the 12-year time period spanning between 2006 and 2018, Ms. Daedone and Ms. Cherwitz agreed to violate 18 U.S.C. 1589—the forced labor statute. Tracking the language of that statute, the Indictment alleges:

> In or about and between 2006 and May 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NICOLE DAEDONE and RACHEL CHERWITZ, together with others, did knowingly and intentionally conspire to:
>
> (a) provide and obtain the labor and services of one or more persons by means of, and by a combination of means of: (i) force, threats of force, physical restraint and threats of physical restraint to a person; (ii) serious harm and threats of serious harm to a person; (iii) the abuse and threatened abuse of law and legal process; and (iv) one or more schemes, plans and patterns intended to cause a person to believe that, if he or she did not perform such labor and services, a person would suffer serious harm and physical restraint, contrary to Title 18, United States Code, Section 1589(a); and
>
> (b) benefit, financially and by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any such means, knowing, and in reckless disregard of the fact, that said venture had engaged in the providing and obtaining of labor and services by any such means, contrary to Title 18, United States Code, Section 1589(b).

Indictment, ¶ 12.

The Indictment is a scant 14 paragraphs, the substance of which is comprised almost entirely of stock language identifying the Defendants, related entities, and relevant statutes. *See id.*, ¶¶ 1-5; 11-14. Of the mere 14 paragraphs, only five purport to provide any factual support for a probable cause finding of "the Forced Labor Scheme." *See id.*, ¶¶ 6-10. These five paragraphs are as notable for what they fail to include (omitting any specific and particularized essential

facts) as for what they do include (collecting salacious and conclusory allegations that shed no light on the single charged offense).

In one of its most glaring omissions, the Indictment fails to define—and the government has refused to particularize—the nature of the labor or services at the center of its case. Is it Back of the House tasks provided by OneTaste event-attendees? Is it domestic chores shared among the consenting adult roommates who chose to organize and reside together in OM houses? Is it participation by one or both practitioners in OMing? Is it the sales jobs that many OneTaste employees had and for which they were compensated as contractors or employees? Is the relevant "labor or services" more traditional office work or something else entirely? Or is the "labor" not labor at all?

Equally as critical, the Indictment fails to identify with any meaningful specificity the who, where, or when of the charged conspiracy. As for the "who," the Indictment identifies the alleged victims of the offense as "a group of OneTaste members" made up of unenumerated and unidentified OneTaste "employees" and "frequent participants in OneTaste courses and events"—a group that numbers in *the tens of thousands* over the time period alleged in the Indictment. *Id.*, ¶¶ 3, 6.[2]

As for the "where," the Indictment only provides that OneTaste operated "at variously [*sic*] points in locations within the Eastern District of New York and elsewhere, including but not limited to Brooklyn, New York; Manhattan, New York; San Francisco, California; Los Angeles, California; Denver, Colorado; Boulder, Colorado; Austin, Texas; and London, United

---

[2] The Indictment's reference to "members" is unintelligible in the context of OneTaste's business and is not a term used by OneTaste or understood by Ms. Daedone and Ms. Cherwitz to have any meaning. Like many companies, OneTaste had employees, contractors, volunteers, and customers—none of these groups, individually or collectively, were "OneTaste members." The Indictment's use of the term begs for particularization.

Kingdom," but fails to identify where, if anywhere within any of these cities, a crime was purportedly committed. *Id.,* ¶ 1.

As for "when," the Indictment avers a time frame of more than a decade "in or about and between 2006 and May 2018." *Id.,* ¶ 12.

The Indictment also fails to specify the alleged force used to compel the undefined labor. Notably, by parroting the text of the forced labor statute, the Indictment alleges Ms. Daedone and Ms. Cherwitz conspired to violate it by a combination of all four means contemplated by the statute, *i.e.,* (i) by physical force or threats of physical force; (ii) by serious harm or threats of serious harm; (iii) by abuse or threatened abuse of legal process; or (iv) by a scheme, plan, or pattern intended to cause a person to believe they would suffer violent retribution or other serious harm. *Id.,* ¶ 12(a). However, the Indictment's five factual paragraphs make clear that the government's theory of prosecution does not rely on any alleged acts or threatened acts of violence, physical restraint, or abuse of legal process. Rather, its case appears dependent on a showing that Ms. Daedone and Ms. Cherwitz conspired to compel laborers to work or continue working by subjecting them to "serious harm" if they refused; by threatening to subject them to "serious harm" if they refused; or by making them believe, through a scheme, plan, or pattern, that if they refused to work then they would suffer "serious harm." *See id.*, ¶¶ 6-10.

Nevertheless, the Indictment is impossibly opaque about what "serious harm," if any, the government alleges employees purportedly faced as part of the charged conspiracy. Stripped of its conclusory allegations, the Indictment merely lists salacious, irrelevant allegations relating to OM practitioners' philosophies and lifestyle choices without linking these descriptions to compelled labor. For example, the Indictment references OM houses, describing them as "communal homes" where adults "shared assigned beds." *Id.*, ¶ 7(c). The Indictment, however,

fails to aver how the government contends, if at all, these indisputably consensual living arrangements (which were entirely separate from OneTaste's business operations) were related to the provision of labor or services. The Indictment also alleges that Ms. Daedone, Ms. Cherwitz, and unnamed co-conspirators "demanded absolute commitment to [Ms.] Daedone, including by exalting [Ms.] Daedone's teachings and ideology," but fails to connect, or even attempt to connect, this amorphous claim to its allegations of forced labor. *Id.*, ¶ 7(d). Similarly divorced from the offense charged, the Indictment describes the sexual activities of individuals who adopted the OM lifestyle, averring "OneTaste members engaged in sexual activity at the direction of the defendants Nicole Daedone and Rachel Cherwitz . . . [and] engage[d] in sexual acts they found uncomfortable or repulsive ... ." *Id.*, ¶ 9. Again, the Indictment fails to make a connection to any purportedly forced labor.

      C.    <u>Discovery</u>

Nor does the government's discovery shed any meaningful light on the charge. Over the past seven months, the government has made 16 discovery productions amounting to more than two terabytes of data. But despite the volume of these productions, the Defense has gained no further insight into the government's theory of the case. Rather, the government's scattershot productions include *Cosmopolitan, Bloomberg*, *New York Times*, and other publicly-available news articles about OneTaste; video files pulled from a Netflix documentary; and tens of thousands of pages of bank records. The government has produced only three seizure warrants— two for documents related to Ms. Daedone's bank accounts, and one for Ms. Cherwitz's cell phone records. Most of the files produced bear no apparent relationship to Ms. Daedone or Ms. Cherwitz at all, and none of the files implicate Ms. Daedone or Ms. Cherwitz in a forced labor conspiracy.

Although the discovery is void of inculpatory evidence, it is replete with exculpatory material. In two single-spaced *Brady* letters (totaling 38 pages) dated October 2, 2023 and October 20, 2023, the government disclosed more than 70 witnesses who have provided exculpatory testimony and/or materials to the government during its investigation.

In short, far from illuminating for Ms. Cherwitz and Ms. Daedone what the Indictment is missing, the government's discovery leaves Ms. Cherwitz and Ms. Daedone with more questions as to what they are alleged to have done wrong and how they are alleged to have done it.

## ARGUMENT

### I.    The Indictment Must Be Dismissed.

#### A.    Legal Standard

The first requirement of a fair trial is notice of the offenses for which a defendant is indicted. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . "); *Bousley v. United States*, 523 U.S. 614, 618 (1998) ("real notice of the true nature of the charge" against the defendant is "the first and most universally recognized requirement of due process"). Rule 7(c) of the Federal Rules of Criminal Procedure thus requires the indictment to contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged ... ." Fed. R. Crim. P. 7(c)(1); *Russell v. United States*, 369 U.S. 749, 762-63 (1962); *United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012).

An indictment must contain enough information to: (1) fulfill the Sixth Amendment right to be informed of the nature and cause of the accusation; (2) prevent a person from being subject to double jeopardy as required by the Fifth Amendment; and (3) serve the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury. *United States v. Thompson*, 141 F. Supp. 3d 188, 193 (E.D.N.Y. 2015), *aff'd*, 896 F.3d 155 (2d

Cir. 2018) (quoting *United States v. Silverman*, 430 F.2d 106, 110 (2d Cir.1970) *modified,* 439 F.2d 1198 (2d Cir.1970)).

Consistent with these principles, courts have recognized that there are "limitations" to the oft-cited mantra that an indictment that merely tracks statutory language is sufficient. *United States v. Pirro*, 212 F.3d 86, 92-93 (2d Cir. 2000); *see also United States v. Awan*, 459 F. Supp. 2d 167, 175 (E.D.N.Y. 2006), *aff'd*, 384 F. App'x 9 (2d Cir. 2010). To satisfy the Sixth Amendment's guaranty of a defendant's right "to be informed of the nature and cause of the accusation" against him, an indictment "must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *Pirro*, 212 F.3d at 92-93. While the Constitution does not demand that an indictment identify all facts in "painstaking[] detail," "there must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." *Sira v. Morton*, 380 F.3d 57, 72 (2d Cir. 2004) (citing *Wolff v. McDonnell*, 418 U.S. 539, 564 (1974); *Taylor v. Rodriguez*, 238 F.3d 188, 192–93 (2d Cir. 2001). At a minimum, an indictment must "state, at least approximately, 'the time and place of the alleged crime.'" *Sira,* 380 F.3d at 73 (summarizing Second Circuit jurisprudence relating to due process requirements for indictments) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).

As for the other "essential facts," "the quantum and type of factual specificity required in an indictment varies according to the charges alleged against the defendant." *United States v. Urso,* 369 F. Supp. 2d 254, 266 (E.D.N.Y. 2005). Where, as here, a statutory offense "includes generic terms, it is not sufficient that the indictment [] charge the offense in the same generic terms as in the definition." *Pirro*, 212 F.3d at 93 (quoting *Russell*, 369 U.S. at 765); *see also Thompson*, 141 F. Supp. 3d at 195. Rather, the indictment "must descend to the particulars" such

that it "apprises the defendant of what he must be prepared to meet." *Russell*, 369 U.S. at 763-65 (citations omitted).

To satisfy the Indictment Clause of the Fifth Amendment, an indictment also must "contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Pirro*, 212 F.3d at 92 (quoting *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999)); *see also Russell*, 369 U.S. at 768 (an unparticularized indictment leaves the prosecution "free to roam at large" at trial). If the indictment does not state the essential elements of the crime with sufficient particularity, "the defendant cannot be assured that he is being tried on the evidence presented to the grand jury, or that the grand jury acted properly in indicting him." *Pirro,* 212 F.3d at 91 (citations omitted).

When an indictment fails to meet these standards, the remedy is its dismissal. *See, e.g., Urso*, 369 F. Supp. 2d at 265-66 (dismissing multiple counts of indictment that failed to alleged criminal conduct "with sufficient particularity to meet the constitutional requirements of the Indictment Clause of the Fifth Amendment"); *United States v. Tomasetta,* 429 F.2d 978, 980-81 (1st Cir. 1970) (reversing conviction holding that indictment was deficient because it failed to particularize means by which alleged crime was committed, victims of the alleged offense, and location of the alleged offense); *United States v. Agone,* 302 F. Supp. 1258, 1261-62 (S.D.N.Y. 1969) (dismissing extortion indictment holding that its failure to specify the victims of the alleged offense was a "constitutionally grave" deficiency in violation of the Indictment Clause of the Fifth Amendment); *United States v. Solovey*, 2005 WL 1279228, at *4 (W.D.N.Y. May 31, 2005) (dismissing indictment that was "defective as a matter of law" because it "fail[ed] to contain an essential fact, *i.e.,* the identity of the victim or victims allegedly threatened").

A bill of particulars cannot save a constitutionally deficient indictment. *See Russell*, 369 U.S. at 770 ("[I]t is a settled rule that a bill of particulars cannot save an invalid indictment."). A bill of particulars that is drafted by the prosecutors, not the grand jury, cannot assure that the allegations contained in it are those on which the grand jury voted to indict. *See Pirro*, 212 F.3d at 92 ("If the indictment does not state the essential elements of the crime, the defendant cannot be assured that he is being tried on the evidence presented to the grand jury, or that the grand jury acted properly in indicting him") (citations omitted). As the Supreme Court explained in *Russell*:

> To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.

*Russell*, 369 U.S. at 770; *see also United States v. Panzavecchia,* 421 F.2d 440, 442 (5th Cir. 1970) (a bill of particulars "cannot unlock the Grand Jury's mind and cure a defective indictment."); *see, e.g.*, *Awan*, 459 F. Supp. 2d at 175 n.7 (finding that the deficiencies in the indictment "cannot be 'cured' by a bill of particulars or statement in papers on this motion since those filings will not reveal what the grand jury found").

B.    The Indictment Should be Dismissed Because it is Constitutionally Defective.

Based on these legal principles, the Indictment is insufficient to satisfy both the Fifth and Sixth Amendments. The Indictment fails to provide Ms. Cherwitz and Ms. Daedone with notice of the charges sufficient to permit them to effectively mount their defense. *See Tomasetta,* 429 F.2d at 979-80; *Urso,* 369 F. Supp. 2d at 266-67. The Indictment's deficient pleadings also create the "constitutionally grave" possibility that at trial the prosecution may "roam at large," "free to fill in [] vital missing element[s]" that were "not found by, and perhaps not even presented to, the

grand jury." *See Russell*, 367 U.S. at 770; *Agone,* 302 F. Supp. at 1261. For these reasons, the Indictment should be dismissed.

### 1.    *The Indictment Violates the Sixth Amendment.*

First, in connection with Ms. Cherwitz and Ms. Daedone's Sixth Amendment right to notice for trial preparation purposes, the Indictment's vague and unspecified allegations are meaningless. Specifically, the Indictment alleges a 12 year-long conspiracy, the purported object of which was to compel unidentified individuals to perform unidentified labor in an unidentified manner at unidentified locations. Without notice of the essential details of the charged offense—the who, what, where, when, and how—Ms. Cherwitz and Ms. Daedone are paralyzed in gathering relevant evidence and preparing their defense.

When faced with a similarly deficient indictment, the First Circuit in *United States v. Tomasetta* held that it violated the Sixth Amendment and Fed. R. Crim. P. 7(c) because it failed to provide defendant with adequate information to prepare for trial. 429 F.2d at 979-80.[3] In fact, the indictment at issue in *Tomasetta* was far more particularized than the Indictment against Ms. Cherwitz and Ms. Daedone. Like here, the defendants in *Tomasetta* were accused of making threats, although not as part of a conspiracy to compel labor, but in connection with the collection of a debt. *Id.* at 979. The indictment was specific as to date and location of the crime, identifying a particular day and a particular city. *Id.* It was silent, however, as to the nature of the threats and the victims of the threats. *Id.* The latter omissions, standing alone, rendered the indictment constitutionally defective. *Id.*

---

[3] The Second Circuit has cited *Tomasetta* court's analysis and holding approvingly. *See, e.g., Walsh*, 194 F.3d at 45; *Sira,* 380 F.3d at 73 ("[W]e have not upheld indictments that merely tracked statutory language prohibiting threats when more specific pleading was necessary to permit the accused to prepare his defense and defend against double jeopardy.") (citing *Tomasetta*); *see also Urso,* 369 F. Supp. at 267 (*Tomasetta* merely applies the same principle that the Second Circuit and the Supreme Court have consistently stated—that an indictment must contain some factual particularity in order to withstand constitutional scrutiny.").

Similarly, in *Urso*, Judge Garaufis, collecting relevant authority, held that while an Indictment may withstand constitutional scrutiny if it is missing one or two essential details, an indictment—like the instant one—that is silent as to nearly all factual details must be dismissed as "unconstitutionally vague." 360 F. Supp. 2d at 265-67 (dismissing "skimpy allegations" in two counts of a multi-count indictment because they "fail[ed] to plead the government's allegations with sufficient particularity to meet [] constitutional requirements."); *see also United States v. Raniere,* 384 F. Supp. 3d 282, 311 (E.D.N.Y. April 29, 2019) (Judge Garaufis acknowledging as a "good argument" defendants' complaint that the forced labor count failed to provide requisite notice of the charged offense where count alleged a broad time frame and failed to identify either the purported victims of the offense or the "labor and services" allegedly coerced).

In *Urso,* the two dismissed counts, which alleged that defendant participated in extortionate activities, did little more than track the language of the relevant statutes. 360 F. Supp. 2d at 265. In connection with "factual particularity," the indictment merely alleged a two-year time frame and gave only a general location of the Eastern District of New York. *Id.* at 265-66. It failed, however, to name the alleged victim or victims, the exact locations of the extortionate acts, their dates and times, or how and by whom the extortionate acts were committed. *Id.* Without sufficient notice of the who, where, when, and how, defendants could not possibly be "able to prepare to meet the government's charges," and the counts were dismissed as constitutionally insufficient. *Id.* at 267.

The allegations here are even "skimpier" than the unconstitutionally "skimpy allegations" in the *Urso* indictment. While the *Urso*-indictment at least provided a two-year time frame and a general location of the Eastern District of New York in which the offense allegedly was

committed, the government here alleges that the offense was committed sometime within a 12-year time span and somewhere—really anywhere—across the continental United States and/or in the U.K. And, as in *Urso* (and *Tomasetto*) it is entirely silent as to the "who" and the "how" of the offense. Since Ms. Cherwitz and Ms. Daedone's ability to prepare for trial is even more difficult than the defendants in *Tomasetto* or *Urso,* the Indictment should be dismissed on Sixth Amendment grounds.

Moreover, the indictments in *Tomasetto* and *Urso* both charged straightforward violations of the extortion statute and, nonetheless, the courts determined that their lack of particularization mandated their dismissals. Here, the Indictment's charge is anything but straightforward, heightening its constitutional defects. In other words, even more so than in *Tomasetto* and *Urso,* dismissal is especially warranted here because of the indiscernible nature of the government's theory of prosecution. Although the government alleges a forced labor conspiracy, this is far from a "paradigmatic forced labor case" where the government's theory of liability is obvious. *See United States v. Toviave,* 761 F.3d 623, 626 (6th Cir. 2014) (describing prostitution, forced sweatshop work, and forced domestic service as "paradigmatic forced labor"); *Muchira v. Al-Rawaf,* 850 F.3d 605, 618-19 (4th Cir. 2017) (describing typical forced labor situations, none of which apply here). Rather, the government's allegations involve consensual participation in and endorsement of a lifestyle which has nothing to do with employment, work, or labor. The government's case is, at best, a novel—but, more accurately, a misplaced—attempt to stretch 18 U.S.C. § 1589 to conduct not intended to be criminalized by the statute. Additionally, the government's apparent reliance on the "threats of serious harm" prong of the forced labor statute, which itself is unusually vague for a criminal statute, makes

even more urgent the need for the Indictment to inform the defendants what "force" was used to obtain what "labor."

In light of the insufficiency of the Indictment, unilluminated by the government's discovery, Ms. Daedone and Ms. Cherwitz cannot even venture a guess as to how it is the government alleges they violated the forced labor statute. Against this backdrop, effective trial preparation is impossible.

### 2.    *The Indictment Violates the Fifth Amendment.*

The Indictment also fails to satisfy the Indictment Clause of the Fifth Amendment. There is no way to ensure, as is required by the Constitution, that the evidence presented at trial is the evidence that was presented to the grand jury. *See, e.g., Urso*, 369 F. Supp. 2d at 266 (dismissing unparticularized counts because "these charges fail to adequately tie the government to the evidence presented to the grand jury . . ."); *Tomasetta,* 429 F.2d at 980 (dismissing unparticularized indictment because on "an indictment as vague as that at bar, it is possible, however unlikely, for a prosecutor to obtain a conviction based wholly on evidence of an incident completely divorced from that upon which the grand jury based its indictment.").[4]

---

[4] Nor can the Court, in the first instance, determine whether the grand jury acted properly in returning the Indictment. Where, as here, the Indictment does not specify the essential elements of the crime, the court cannot determine whether the government's theory of liability is legally sufficient. *See Pirro*, 212 F.2d at 92 ("An important corollary purpose of requirement that indictment state elements of offense is to allow court to evaluate whether facts alleged could support conviction"). By way of just two examples, because the Indictment is silent as the nature of the "labor" involved, the Court cannot determine whether it is the type of "work" that the forced labor statute is intended to regulate. *Cf. Toviave,* 761 F.3d at 625-26 (holding that a parental figure's requirement that children do household chores or otherwise face assaultive retribution did not constitute forced "labor or service" under the forced labor statute). Likewise, because the Indictment is silent as to the nature of the "serious harm", the Court cannot determine if the facts establish this essential element, as well. *Cf. Headley v. Church of Scientology Int'l,* 687 F.3d 1173, 1180 (9th Cir. 2012) (holding that threatening Scientology members with excommunication that could result in the potential loss of contact with their Scientology family and friends did not qualify as threatening "serious harm" under the forced labor statute). Accordingly, if the Court does not dismiss the Indictment for factual insufficiency, Ms. Daedone and Ms. Cherwitz reserve their right to file a motion to dismiss for legal insufficiency. *See Pirro*, 212 F.3d at 88 (a motion to dismiss an indictment where the government's theory of liability is legally insufficient can be addressed by the trial court "at any time").

Here, this concern is particularly pronounced in light of what little is known, if anything, about the grand jury proof regarding the alleged victims of the charged offense. The Indictment identifies the purported victims simply as "members" of OneTaste, a group that potentially includes tens of thousands of individuals. Accordingly, it is impossible to protect against the constitutionally grave possibility that the "victims" contemplated by the grand jury are different than the "victims" that will be presented to the petit jury.

The only remedy, therefore, is dismissal. The analogous case of *United States v. Agone* makes the point. When faced with an indictment that identified the "victim" of the charged offense simply as a "member" of a local labor union, the district court dismissed the indictment as constitutionally defective. 302 F. Supp. at 1258. As the judge explained:

> [Where] the grand jury has neither said nor explained its failure to say who among a substantial number of possibilities is supposed to have been the targets of the alleged crime[, the indictment leaves] the prosecution free to fill in this vital missing element—free, in a way which is constitutionally grave . . . A prosecutorial power "to roam at large" in this fashion is not allowable.

*Id.* at 1261 (citing *Russell,* 369 U.S. at 768-771); *see also Solovey*, 2005 WL 1279228, at *3 (dismissing indictment as "excessively and prejudicially uncertain" where it identified the victims of the offense as belonging to a "class of possible victims" with a "substantial membership"); *United States v. Gordon,* 641 F.2d 1281, 1286 (9th Cir. 1981) (acknowledging a constitutional problem when "the grand jury was thinking of one [victim] and the petit jury of another").

For similar reasons, short of dismissal, there is no way to protect against a trial where the prosecution "roams at large" regarding other "vital" "elements" that are missing from the Indictment, most crucially the "force" and the "labor" allegedly at issue. It is not enough that the Indictment uses the generic term "forced labor." *See United States v. Peterson*, 544 F. Supp. 2d

18

1363, 1375 (M.D. Ga. 2008) (dismissing as factually insufficient a forced labor count that merely recited one of the prohibited means under Section 1589(3), a generic term which "does not sufficiently apprise Defendant of what he must be prepared to meet"); *see also Pirro*, 212 F.3d at 93 ("[W]here the definition of an offense ... includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species, it must descend to particulars.") (quoting *Russell*, 369 U.S. at 765). Because the force and the labor are obviously at "the very core of criminality" and "central to every prosecution under" the forced labor statute, the Indictment's failure to particularize them mandates the Indictment's dismissal. *Russell*, 369 U.S. at 764; *see, e.g., Thompson*, 141 F. Supp. 3d at 196-97 (dismissing charge of "sexual abuse" because indictment failed "to allege a particular sexual activity for which any person [could] be charged with a criminal offense"); *Awan*, 459 F. Supp. 2d at 174-75 (dismissing charge of a conspiracy to provide "material support or resources" to be used in a conspiracy to murder, kidnap, or maim a person outside the United States because the indictment did not specify the kind of "material support").

## II.    Alternatively, the Court Must Order a Bill of Particulars.

If the Indictment is not dismissed, at a minimum, Ms. Cherwitz and Ms. Daedone are entitled to a bill of particulars. [5] Where, as here, an indictment fails to provide adequate notice to a defendant, Rule 7(f) empowers the Court to "direct the government to file a bill of particulars" with respect to the allegations in the Indictment. Fed. R. Crim. P. 7(f). The purpose of a bill of particulars is "to apprise a defendant of the essential facts of the crime for which he has been

---

[5] As required under EDNY Local Criminal Rule 16.1, undersigned counsel affirms that defense counsel and the government have conferred in an effort in good faith to resolve Ms. Daedone and Ms. Cherwitz's motion for further particularization of the Indictment. Attached as Exhibit A is defense counsel's July 13, 2023 letter to the government requesting a bill of particulars. In subsequent conversations between counsel, the parties were unable to agree to a resolution.

charged." *United States v. Scully*, 108 F. Supp. 3d 59, 125 (E.D.N.Y. 2015). For the reasons articulated above, a bill of particulars is necessary to "identify with sufficient particularity the nature of the charges" against Ms. Cherwitz and Ms. Daedone to enable them "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should [they] be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam).

As it stands now, the government has left open the possibility of alleging at trial a nearly infinite universe of conduct attributable to Ms. Daedone and Ms. Cherwitz. Without the particularization requested in Exhibit A attached hereto, there is simply no way to prepare to defend against charges that span more than a decade in time; implicate nearly all of the continental United States, as well as cities abroad; and involve unspecified conduct that potentially targeted an unidentified subset of tens of thousands of individuals. If ever there were an Indictment that requires particularization, it is this one. *See, e.g., Bortnovsky*, 820 F.2d at 574-75 (bill of particulars necessary for defendants to discern which among twelve burglaries were alleged to be fabricated); *United States v. Hawit*, No. 15 Cr. 252 (PKC), 2017 WL 663542, at *11 (E.D.N.Y. Feb. 17, 2017) (requiring the government to provide "a bill of particulars specifying the transactions—for example, the marketing contracts, broadcasting contracts, tournament hosting designations, etc.—that the government will seek to prove were tainted by an unlawful conspiracy"); *United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000) (bill of particulars necessary where the government produced more than 200,000 documents relating to 2,000 Medicare claims); *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (reversing and remanding for new trial because "the trial judge exceeded his discretion . . . by denying a bill of particulars identifying at least the victims of . . . schemes that the prosecution

intended to prove); *United States v. Wilson*, 493 F. Supp. 2d 364, 374 (E.D.N.Y. 2006) (ordering the government to turn over the identities of the alleged victims of the crimes charged).

<u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Indictment or, alternatively, order the government to provide Ms. Daedone and Ms. Cherwitz with a Bill of Particulars.

Dated:          January 16, 2024
                New York, New York

Respectfully submitted,

*/s/ Julia Gatto*                            */s/ Jenny R. Kramer*
Julia Gatto                                  Jenny R. Kramer
Reid H. Weingarten                           Rachel Finkel
STEPTOE & JOHNSON LLP                         ALSTON & BIRD LLP
1114 Avenue of the Americas                  90 Park Avenue
New York, NY 10036                            New York, NY 10016
212-506-3900                                  212-210-9400
jgatto@steptoe.com                            jenny.kramer@alston.com
rweingarten@steptoe.com                       rachel.finkel@alston.com

*Counsel for Defendant Nicole Daedone*       *Counsel for Defendant Rachel Cherwitz*