JRS:GK/KCB/DEL/SF
F. #2018R01401

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                          Docket No. 23-CR-146 (DG)

RACHEL CHERWITZ and
NICOLE DAEDONE,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X


MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S
MOTIONS *IN LIMINE*

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Gillian Kassner
Kayla Bensing
Devon Lash
Sean Fern
Assistant U.S. Attorneys
    (Of Counsel)

1

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 2

I.   OneTaste, Inc. ............................................................................................................. 2

II.  The Defendants and Their Co-Conspirators and Agents ........................................... 4

III. The Forced Labor Conspiracy ................................................................................... 5

   A.   Targeting and Using Trauma, Counseling and Addiction ................................. 9

   B.   Aversion Practice ........................................................................................... 13

   C.   Collecting Sensitive Information and Surveilling ........................................... 14

   D.   Encouraging Incurring Debt ........................................................................... 17

   E.   Using Sex and Marriage to Participate in OneTaste ....................................... 20

   F.   Withholding Pay ............................................................................................. 20

   G.   Discouraging Reporting .................................................................................. 22

   H.   Subjecting Members to Deprivation ............................................................... 24

   I.   The Use of Micro-Regulation and Other Means of Control ........................... 25

   J.   Indoctrination ................................................................................................. 27

   K.   Isolation .......................................................................................................... 27

   L.   Use of Shame and Humiliation ...................................................................... 30

   M.   Labor and Services Performed ....................................................................... 32

   N.   Financial Motivations .................................................................................... 37

ARGUMENT .......................................................................................................................... 38

I.   The Victims' Names and Personal Identifiers Should Remain Confidential at Trial .......... 38

   A.   Relevant Background ...................................................................................... 38

   B.   Applicable Law .............................................................................................. 41

i

C.  The Limited Protections Requested for the Victim-Witnesses' Personal Identifiers Are Reasonable and Appropriate ........................................................... 44

II.  Evidence of and Argument Regarding the Victim-Witnesses' Involvement in Other Sexual Behavior Should Be Precluded ........................................................... 48

A.  Legal Standard ........................................................... 49

B.  Discussion ........................................................... 50

III.  The Court Should Preclude Evidence or Arguments that Are Irrelevant, Unfairly Prejudicial, Misstate the Law or Invite Jury Nullification ........................................................... 53

A.  Relevant Facts ........................................................... 53

B.  Applicable Law ........................................................... 55

C.  Discussion ........................................................... 55

IV.  Evidence of the Defendants' Tactics to Implement the Forced Labor Scheme Is Admissible at Trial ........................................................... 61

A.  Legal Standard ........................................................... 61

B.  The Proffered Evidence is Directly Relevant to, and Inextricably Intertwined With, Evidence of the Charged Forced Labor Conspiracy ........................................................... 64

C.  None of the Proffered Evidence is Unfairly Prejudicial ........................................................... 76

V.  Statements of the Defendants, their Agents and their Co-Conspirators Are Admissible ........................................................... 77

A.  The Defendants' Statements Should be Admitted as Party Admissions ........................................................... 77

B.  Statements of the Defendants' Agents Are Admissible Against the Defendants ........................................................... 78

C.  Statements of the Defendants' Co-Conspirators Are Admissible Against the Defendants ........................................................... 83

D.  Additional Portions of Defendants' Statements Are Inadmissible If Offered by Defendants ........................................................... 88

VI.  Instructions or Commands are Admissible as Non-Hearsay ........................................................... 89

VII.  Victims' Contemporaneous or Past Recorded Statements Detailing Experiences and Mental States while at OneTaste Are Admissible ........................................................... 92

A.  Applicable Law ........................................................... 93

1.  Then-Existing State of Mind – Rule 803(3) ........................................................... 93

2.  Present Sense Impression – Rule 803(1) ........................................................... 94

ii

3.   Excited Utterances – Rule 803(2) ......................................................................... 94

4.   Residual Exception – Rule 807........................................................................... 95

B.   Examples of Admissible Written Victim Statements ......................................... 96

VIII.  The Court Should Preclude Evidence and Argument of the Defendants' "Good Acts" or
Non-Commission of Other "Bad Acts" .......................................................................... 102

IX.  The Court Should Preclude Evidence and Argument of Purported Science Pertaining to
Orgasmic Meditation and Other OneTaste Practices or Public Endorsement of Such Practices 104

X.  The Court Should Limit the Scope of Cross-Examination to Preclude Improper
Questioning .................................................................................................................... 105

A.   The Court Should Preclude Cross-Examination ███████████ ...................... 106

B.   The Court Should Preclude Defense Counsel from Asking Questions of Witnesses for
Which There Is No Good Faith Basis or Relevance to Credibility ......................................... 109

C.   Defense Counsel Should Not Be Permitted to Cross-Examine Witnesses with Non-
Verbatim Reports That Have Not Been Signed or Adopted by the Witness or Suggest to the
Jury that the Contents of an Investigative Report are Statements of the Witness .................. 111

XI.  The Government Should Be Permitted to Authenticate Certain Video and Documentary
Evidence Based on Its Production by OneTaste or Other Circumstances Establishing
Authenticity.................................................................................................................... 113

A.   Materials Produced by OneTaste Pursuant to Grand Jury Subpoena ............................. 115

B.   Recordings and Records Downloaded from OneTaste's Servers .................................... 118

C.   Business Records Can Be Authenticated Pursuant to Fed. R. Evid. 902(4), 902(11)
and (13) ......................................................................................................................... 120

XII.  Defendants Must Disclose Rule 16(b) Discovery and Trial Exhibits To Be Introduced
During Their Case-in-Chief............................................................................................ 122

XIII.  Request for Sealing ......................................................................................... 126

CONCLUSION................................................................................................................ 127

## TABLE OF AUTHORITIES

**Cases**

Arista Recs. LLC v. Lime Grp. LLC,
  784 F. Supp. 2d 398 (S.D.N.Y. 2011) ....................................................113

Bourjaily v. United States,
  483 U.S. 171 (1987) ..................................................................... 83

Braswell v. United States,
  487 U.S. 99 (1988) .........................................................................115

Calderera v. Chandris, S.A.,
  No. 91-CV-8181 (KMW), 1993 WL 362406 (S.D.N.Y. Sept. 13, 1993) ............................. 79

Clark v. Ricketts,
  958 F.2d 851 (9th Cir. 1991) ............................................................... 41

Delaware v. Van Arsdall,
  475 U.S. 673 (1986) ................................................................ 41, 52, 105

DeNigris v. New York City Health & Hosps. Corp.,
  552 F. App'x 3 (2d Cir. 2013) ............................................................. 89

Giglio v. United States,
  405 U.S. 150 (1972) ...................................................................... 105

Guccione v. Hustler Magazine, Inc.,
  632 F. Supp. 313 (S.D.N.Y. 1984) .......................................................... 79

In re Reserve Fund Sec. Litig.,
  No. 09-CV-4346 (PGG), 2012 WL 12354233 (S.D.N.Y. Oct. 3, 2012) ................................ 80

In re United States,
  945 F.3d 616 (2d Cir. 2019) ............................................................... 55

John Paul Mitchell Sys. v. Quality King Distributors, Inc.,
  106 F. Supp. 2d 462 (S.D.N.Y. 2000) ...................................................... 116

Kaur v. New York City Health & Hosps. Corp.,
  688 F. Supp. 2d 317 (S.D.N.Y. 2010) ...................................................... 118

Leser v. U.S. Bank Nat'l Ass'n,
  No. 09-CV-2362, 2012 WL 6738402 (E.D.N.Y. Dec. 29, 2012) .......................................... 79

Linde v. Arab Bank, PLC,
    97 F. Supp. 3d 287, 338 (E.D.N.Y. 2015) ....................................................................117, 118

McLeod v. Llano,
    No. 17-CV-6062 (ARR), 2021 WL 1669732 (E.D.N.Y. Apr. 28, 2021) ............................ 108

Michelson v. United States
    335 U.S. 469 (1948) ........................................................................................................ 108

Melendez-Diaz v. Massachusetts,
    557 U.S. 305 (2009) ........................................................................................................ 119

Mutual Life Ins. Co. v. Hillmon,
    145 U.S. 285, 299-300 (1892) ........................................................................................... 93

Nat'l Commc'ns Ass'n, Inc. v. AT&T Co.,
    No. 92-CV-1735 (LAP), 1998 WL 118174 (S.D.N.Y. Mar. 16, 1998) ............................... 80

Old Chief v. United States,
    519 U.S. 172 (1997) .......................................................................................................... 62

Pappas v. Middle Earth Condo. Ass'n,
    963 F.2d 534 (2d Cir. 1992) ............................................................................................... 79

Park W. Radiology v. CareCore Nat. LLC,
    675 F. Supp. 2d 314 (S.D.N.Y. 2009) .............................................................................. 118

Pierce v. Rodriguez,
    No. 20-CV-1755 (SVN), 2023 WL 2646825 (D. Conn. Mar. 27, 2023)(2) .......................... 80

Redd v. N.Y. State Div. of Parole,
    923 F. Supp. 2d 393 (E.D.N.Y. 2013) .............................................................................. 108

Rodriguez v. Vill. Green Realty, Inc.,
    788 F.3d 31 (2d Cir. 2015) ............................................................................................... 115

Shannon v. United States,
    512 U.S. 573, 579 (1994) ............................................................................................ 57, 58

Siegfriedt v. Fair,
    982 F.2d 14, 18 (1st Cir. 1992) .......................................................................................... 42

United States v. Armstrong,
    517 U.S. 456 (1996) .......................................................................................................... 56

United States v. Addario,
    662 F. App'x 61 (2d Cir. 2016) .......................................................................................... 75

United States v. Aguilar,
    No. 20-CR-390 (ENV), ECF No. 238 (E.D.N.Y. Jan. 2, 2024) ...........................................125

United States v. Alamonte,
    956 F.2d 27 (2d Cir. 1992) ........................................................................ 111

United States v. Alimehmeti,
    284 F. Supp. 3d 477 (S.D.N.Y. 2018) ....................................................... 42

United States v. Ammar,
    714 F.2d 238, 252 (3d Cir. 1983) ............................................................. 86

United States v. Amodeo
    71 F. 3d 1044 (2d Cir. 1995) ................................................................... 125

United States v. Bagaric,
    706 F.2d 42 (2d Cir. 1983) ...................................................................... 118

United States v. Bello,
    No. 90 CR. 501 (CSH), 1991 WL 45046 (S.D.N.Y. Mar. 28, 1991) ................... 114

United States v. Bellomo,
    176 F.3d 580 (2d Cir. 1999) ..................................................................... 89

United States v. Benedetto,
    571 F.2d 1246 (2d Cir. 1978) ..................................................................103

United States v. Best,
    219 F.3d 192 (2d Cir. 2000) ..................................................................... 93

United States v. Bin Laden
No. 98-CR-1023 (LBS), 2001 WL 276714 (S.D.N.Y. Mar. 20, 2001) ..................... 113

United States v. Blume,
    967 F.2d 45 (2d Cir. 1992) ....................................................................... 57

United States v. Boustani,
    No. 18-CR-681 (WFK), ECF No. 120 (E.D.N.Y. July 31, 2019) ..........................124

United States v. Bowen,
    511 F. Supp. 3d 441 (S.D.N.Y. 2021) ........................................................109 , 110

United States v. Broomfield,
    591 F. App'x 847 (11th Cir. 2014) ............................................................ 119

United States v. Brown,
    254 F.3d 454 (2d Cir. 2001) ..................................................................... 94

United States v. Bryce,
    208 F.3d 346 (2d Cir. 1999) ............................................................... 95, 98, 99, 101

United States v. Caracappa,
    614 F.3d 30 (2d Cir. 2010) ............................................................................. 106

United States v. Carboni,
    204 F.3d 39 (2d Cir. 2000) ...............................................................................61

United States v. Cephus,
    684 F.3d 703 (7th Cir. 2012) ........................................................................... 50

United States v. Certified Env't Servs., Inc.,
    753 F.3d 72 (2d Cir. 2014) .............................................................................. 89

United States v. Chang,
    No. 18-CR-00681 (NGG), 2024 WL 3162950 (E.D.N.Y. June 25, 2024) ........................ 123

United States v. Cicale,
    691 F.2d 95 (2d Cir. 1982) ............................................................................... 92

United States v. Colon,
    880 F.2d 650 (2d Cir. 1989) ............................................................................. 63

United States v. Concepcion,
    983 F.2d 369 (2d Cir. 1992) ........................................................................ 63, 109

United States v. Coonan,
    938 F.2d 1553 (2d Cir. 1991) ...........................................................................62

United States v. Cruz,
    894 F.2d 41 (2d Cir. 1990) ............................................................................. 106

United States v. Dan Zhong,
    No. 16-CR-614 (DLI), 2018 WL 6173430 (E.D.N.Y. Nov. 26, 2018) ............................ 42

United States v. Dawkins,
    999 F.3d 767 (2d Cir. 2021) ........................................................................ 89, 95

United States v. Davidson,
    308 F. Supp. 2d 461 (S.D.N.Y. 2004) ................................................................. 88

United States v. Deluna,
    38 F. App'x 644 (2d Cir. 2002) ........................................................................ 87

United States v. Delvecchio,
    816 F.2d 859 (2d Cir.1987) ............................................................................. 93

United States v. Delvi
    275 F. Supp. 2d 412 (S.D.N.Y. 2003) ..................................................... 94

United States v. Desena,
    260 F.3d 150 (2d Cir. 2001) ........................................................... 84, 86

United States v. Devery,
    935 F. Supp. 393 (S.D.N.Y. 1996) ..................................................... 107

United States v. Dhinsa,
    243 F.3d 635 (2d Cir. 2001) ............................................................. 113

United States v. Diaz,
    176 F.3d 52 (2d Cir. 1999) ..........................................................62, 84

United States v. DiMarzo,
    80 F.3d 656 (1st Cir. 1996) ...........................................................58

United States v. Dupree,
    706 F.3d 131 (2d Cir. 2013) ............................................................. 89

United States v. Dupree,
    833 F. Supp. 2d 255 (E.D.N.Y. 2011) ............................................... 59

United States v. Edwards,
    101 F.3d 17 (2d Cir. 1996) ............................................................. 104

United States v. Everett,
    825 F.2d 658 (2d Cir. 1987) ............................................................. 68

United States v. Fama,
    No. 12-CR-186 (WFK), 2012 WL 6094135 (E.D.N.Y. Dec. 7, 2012) ............................... 108

United States v. Figueroa,
    548 F.3d 222 (2d Cir. 2008) ............................................................. 110

United States v. Fiumano,
    No. 14-CR-518 (JFK), 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016) ...................................102

United States v. Flaharty,
    295 F.3d 182 (2d Cir. 2002) ....................................................... 84, 107

United States v. Fridman,
    974 F.3d 163 (2d Cir. 2020) ............................................................. 116

United States v. Gagliardi,
  506 F.3d 140 (2d Cir. 2007) ................................................ 113

United States v. Garrity,
  No. 3:15-CV-243 (MPS), 2018 WL 2676891 (D. Conn. June 4, 2018) ............... 89

United States v. Geaney,
  417 F.2d 1116 (2d Cir. 1969) ................................................ 85

United States v. Gigante,
  166 F.3d 75 (2d Cir. 1999) .................................................. 83

United States v. Gillier,
  No. 23-CR-6280, 2024 WL 4344732 (2d Cir. Sept. 30, 2024) .................... 89

United States v. Gonzalez,
  110 F.3d 936 (2d Cir. 1997) ................................................. 61

United States v. Gotti,
  784 F. Supp. 1013 (E.D.N.Y. 1992) ..........................................102

United States v. Graziano,
  558 F. Supp. 2d 304 (E.D.N.Y. 2008) ......................................... 58

United States v. Greenfield,
  831 F.3d 106, 118 (2d Cir. 2016) ........................................... 117

United States v. Guerrero,
  882 F. Supp. 2d ............................................................. 68

United States v. Gupta,
  747 F.3d 111 (2d Cir. 2014) ............................................. 83, 84

United States v. Hardwood
  998 F.2d 91, 98 (2d Cir. 1993) .............................................. 95

United States v. Harris,
  501 F.2d 1 (9th Cir. 1974) .................................................. 42

United States v. Hernandez,
  588 F.2d 346 (2d Cir. 1978) ................................................. 75

United States v. Hon,
904 F.2d 803, 810 (2d Cir.1990)..............................................113

United States v. Hsia,
  2000 WL 195067 (D.D.C. Jan. 21, 2000) ...................................... 122

United States v. Hubbell,
    530 U.S. 27 (2000) ...............................................................................114

United States v. Inniss,
    No. 18-CR-134 (KAM), 2019 WL 6999912 (E.D.N.Y. Dec. 20, 2019) ............................ 103

United States v. Inserra,
    34 F.3d 83 (2d Cir. 1994) ........................................................... 62, 113

United States v. Jadusingh,
    No. 18-CR-257 (KAM), 2020 WL 207950 (E.D.N.Y. Jan. 14, 2020)................................... 88

United States v. Johnson,
    62 F.3d 849 (6th Cir. 1995) ........................................................... 57

United States v. Kelly,
    No. 19-CR-286 (AMD) (E.D.N.Y) ........................................................ 44, 45, 46

United States v. Khalil,
    No. 05-CR-0573 (DAB), 2005 WL 3117195 (2d Cir. Nov. 22, 2005) .............................. 108

United States v. King,
    No. 19-CR-287 (JNP), 2023 WL 571508 (D. Utah Jan. 27, 2023) ...................................... 114

United States v. Knox,
    687 F. App'x 51 (2d Cir. 2017) ......................................................... 56

United States v. Komasa,
    767 F.3d 151 (2d Cir. 2014) ........................................................... 120

United States v. Krug,
    No. 15-CR-157, 2019 WL 3162091 (W.D.N.Y. July 16, 2019) ......................................... 108

United States v. Kurland,
No. 20-CR-306 (S-1), (NGG) 2022 WL 2669897 (E.D.N.Y. July 11, 2022) ...................... 84, 85

United States v. Bin Laden,
    No. 98-CR-1023 (LBS), 2001 WL 276714 (S.D.N.Y. Mar. 20, 2001) ......................................

United States v. Langford,
    990 F.2d 65 (2d Cir. 1993) ............................................................. 63

United States v. Leonardi,
    623 F.2d 746 (2d Cir. 1980) ........................................................... 111

United States v. Levy,
    No. 11 Cr. 62, 2013 WL 815915 (S.D.N.Y. Mar. 5, 2013) .................................... 75

United States v. Levy,
    731 F.2d 997 (2d Cir. 1984) ................................................... 64

United States v. Lewis,
    110 F.3d 417 (7th Cir. 1997) ................................................. 58

United States v. Lights,
    No. 15-CR-721, 2016 WL 7098633 (S.D.N.Y. Dec. 5, 2016) ........... 59

United States v. Maldonado-Rivera,
    922 F.2d 934 (2d Cir. 1990) ................................................... 84

United States v. Malka, 19-CR-497
    (NSR), 602 F. Supp. 3d 510 (S.D.N.Y. 2022) ............................ 83, 84

United States v. Marcus,
    No. 05-CR-457 (ARR), 2007 WL 330388 (E.D.N.Y. Jan. 31, 2007) ............ 43, 44

United States v. Marin,
    669 F.2d 73 (2d Cir. 1982) .................................................... 87

United States v. Marti,
    421 F.2d 1263 (2d Cir. 1970) ................................................ 43, 45, 46

United States v. Maxwell,
    No. 20-CR-330 (AJN) (S.D.N.Y) ............................................ 44, 47, 48

United States v. McDonald,
    933 F.2d 1519 (10th Cir. 1991) ............................................. 58

United States v. Mejia-Valez,
    855 F. Supp. 607 (E.D.N.Y. 1994) .......................................... 93

United States v. Michel,
    879 F. Supp. 2d 291 (E.D.N.Y. 2012) ..................................... 120

United States v. Mickens,
    926 F.2d 1323 (2d Cir. 1991) ................................................ 63, 64, 77

United States v. Millan-Colon,
    836 F. Supp. 1022 (S.D.N.Y. 1993) ........................................ 110

United States v. Miller,
    626 F.3d 682 (2d Cir. 2010) ................................................. 55

United States v. Mitchell,
    502 F.3d 931 (9th Cir. 2007) ................................................ 87

United States v. Mohamed,
    727 F.3d 832 (8th Cir. 2013) ................................................................ 41

United States v. Morales,
    474 Fed. App'x 30 (2d Cir. 2012) ....................................................... 108

United States v. Motovich,
    No. 21-CR-497 (WFK) 2024 WL 3303723 (E.D.N.Y July 2, 2024) ........................... 57, 104

United States v. Napout,
    No. 15-CR-252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) .............................. 123

United States v. Navarro,
    737 F.2d 625 (7th Cir. 1984) ................................................................ 42

United States v. Nelson,
    365 F. Supp. 2d 381, 386 (S.D.N.Y. 2005) ......................................................... 107

United States v. One Feather,
    702 F.2d 736 (8th Cir. 1983) ................................................................ 52

United States v. Ortiz,
    857 F.2d 900 (2d Cir. 1988) ............................................................63, 64

United States v. Paulino,
    445 F.3d 211 (2d Cir. 2006) ................................................................ 64

United States v. Pedroza,
    750 F.2d 187 (2d Cir. 1984) ................................................................ 89

United States v. Pepe,
    747 F.2d 632 (11th Cir. 1984) ................................................................ 42

United States v. Persico,
    645 F.3d 85 (2d Cir. 2011) ................................................................ 93

United States v. Pitre,
    960 F.2d 1112 (2d Cir. 1992) ....................................................... 62, 64, 76

United States v. Qualls,
    613 F. App'x 25 (2d Cir. 2015) ......................................................... 120

United States v. Rahme,
    813 F.2d 31 (2d Cir. 1987) ......................................................... 84, 86

United States v. Raniere,
    No. 18-CR-204 (NGG) ................................................................ *passim*

xii

United States v. Raniere,
    384 F. Supp. 3d 282 (E.D.N.Y. 2019) ................................................................. 102

United States v. Rastelli,
    870 F.2d 822 (2d Cir. 1989) ............................................................................ 84

United States v. Reed,
    576 F. App'x 60 (2d Cir. 2014) ...........................................................................61

United States v. Reese,
    933 F. Supp. 2d 579 (S.D.N.Y. 2013) ............................................................... 60

United States v. Reevey,
    364 F.3d 151–58 (4th Cir. 2004) ...................................................................... 60

United States v. Regan,
    103 F.3d 1072 (2d Cir. 1997) ........................................................................... 56

United States v. Rembert,
    863 F.2d 1023 (D.C. Cir. 1988) .......................................................................119

United States v. Rioux,
    97 F.3d 648 (2d Cir. 1996) ............................................................................... 79

United States v. Rivera,
    799 F.3d 180 (2d Cir. 2015) ...................................................................... 49, 51

United States v. Rivera,
    No. 13-CR-149 (KAM), 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) ............................. 104

United States v. Rivera,
    No. 13-CR-149 (KAM), 2015 WL 1875658 (E.D.N.Y. Apr. 22, 2015) ............................... 63

United States v. Romanello,
    No. 22-CR-194 (EK), 2023 WL 8283435 (E.D.N.Y. Nov. 27, 2023) ................................ 111

United States v. Rom,
    528 F. App'x 24, 27 (2d Cir. 2013) ................................................................... 120

United States v. Romone,
    218 F.3d 1229 (10th Cir. 2000) ........................................................................ 50

United States v. Rosado,
    728 F.2d 89 (2d Cir. 1984) ...................................................................... 56, 104

United States v. Saldarriaga,
    204 F.3d 50 (2d Cir. 2000) ...................................................................... 56, 60

United States v. Scarpa,
  913 F.2d 993 (2d Cir. 1990) ................................................................. 102

United States v. Scott,
  No. 21 Cr. 429 (AT), 2022 WL 865861 (S.D.N.Y Mar. 23, 2022) ..................... 118

United States v. Shyne,
  No. 05-CR-1067 (KMK), 2007 WL 1075035 (S.D.N.Y. Apr. 5, 2007) ............... 75

United States v. Simmons,
  923 F.2d 934 (2d Cir. 1991) ................................................................. 84

United States v. SKW Metals & Alloys, Inc.,
  195 F.3d 83 (2d Cir. 1999) ................................................................. 83

United States v. Smothers,
  No. 20-CR-213, (KAM), 2023 WL 348870 (E.D.N.Y. Jan. 20, 2023) ...................... 122-123

United States v. Snype,
  441 F.3d 119 (2d Cir. 2006) ................................................................. 77

United States v. Spector,
  793 F.2d 932 (8th Cir. 1986) ................................................................. 41

United States v. Sperling,
  726 F.2d 69 (2d Cir. 1984) ................................................................. 93

United States v. Stewart,
  No. 03-CR-717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) ............................... 57, 60

United States v. Stratton,
  779 F.2d 820 (2d Cir. 1985) ................................................................. 89

United States v. Taylor,
  No. 10-CR-268 DLI, 2012 WL 5546835 (E.D.N.Y. Nov. 14, 2012) ..................... 73

United States v. Teller,
  412 F.2d 374, 380 (7th Cir. 1969) ................................................................. 42

United States v. Terranova,
  No. 23-CR-516 (KAM) (E.D.N.Y.) ................................................................. 44, 47

United States v. Thai,
  29 F.3d 785 (2d Cir. 1994) ................................................................. 62, 84

United States v. Thiam,
  No. 17 Cr. 47 (DLC) (S.D.N.Y. April 27, 2017) ................................................................. 75

United States v. Thomas,
   116 F.3d 606 (2d Cir. 1997) ................................................................... 58

United States v. Tocco,
   135 F.3d 116 (2d Cir. 1998) ................................................................... 94

United States v. Towne,
   870 F.2d 880 (2d Cir. 1989) ................................................................... 61

United States v. Urena,
   8 F. Supp. 3d 568 (S.D.N.Y. 2014) ....................................................... 42

United States v. Vayner,
   769 F.3d 125 (2d Cir. 2014) ................................................................. 117

United States v. Walia,
   No. 14-CR-213 (MKB), 2014 WL 3734522 (E.D.N.Y. July 25, 2014) ............................. 108

United States v. Walker,
   191 F.3d 326 (2d Cir. 1999) .................................................................102

United States v. Ware,
   399 Fed App'x 659 (2d Cir. 2010) ......................................................... 89

United States v. Warren,
   No. 22-CR-231 (DLI), Sept. 6, 2023 Minute Entry ECF Order (E.D.N.Y.) ...................... 123

United States v. Whitten,
   610 F.3d 168 (2d Cir. 2010 ................................................................... 41

United States v. Williams, No. 13-CR-419
   (S-2) (DLI), 2016 WL 4536864 (E.D.N.Y. Aug. 30, 2016) .................................... 63

Zaken v. Boerer,
   964 F.2d 1319 (2d Cir. 1992) ........................................................... 79, 80

**Statutes**

18 U.S.C. § 1589 .................................................................... *passim*

18 U.S.C. § 1594 ......................................................................... 2

18 U.S.C. § 3500 ................................................................. 111, 124

18 U.S.C. § 3771 ................................................................... 43, 50

**Rules**

Fed. R. Crim. P. 16 ................................................................................ 1, 121, 122, 123

Fed. R. Crim. P. 26.2 ................................................................................ 1, 111, 124

Fed. R. Evid. 104 ...................................................................................... 59, 83, 114

Fed. R. Evid. 401 ...................................................................................... 60, 61, 63 117

Fed. R. Evid. 402 ........................................................................................... *passim*

Fed. R. Evid. 403 ........................................................................................... *passim*

Fed. R. Evid. 404 ........................................................................................... *passim*

Fed. R. Evid. 406 ................................................................................................. 116

Fed. R. Evid. 412 ...................................................................................... 1, 49, 50, 51, 52

Fed. R. Evid. 613 ................................................................................................. 111

Fed. R. Evid. 804 ................................................................................................. 87

Fed. R. Evid. 901 ...................................................................... 113, 115, 116, 117, 118

Fed. R. Evid. 902 ...................................................................................... 114, 119, 120

Fed. R. Evid. 608 ...................................................................................... 106, 107, 109

Fed. R. Evid. 611 ...................................................................................... 41, 52, 106, 107

Fed. R. Evid. 801 ........................................................................................... *passim*

Fed. R. Evid. 803 ........................................................................................... *passim*

Fed. R. Evid. 807 ...................................................................................... 94, 95, 98, 99, 101

**Other**

U.S. Const. amend. VI ....................................................................................... 41

Weinstein's Fed. Evid. § 608.22[2][c][i] (2d ed. 1997)) ........................... 107

31 Wright & Miller, Fed. Prac. & Proc. Evid. § 7105 .......................... 115

<u>PRELIMINARY STATEMENT</u>

In advance of the January 13, 2025 trial in this case, the government respectfully moves for the following <u>in</u> <u>limine</u> rulings: (1) requiring the parties to refer to victim witnesses by their first names or pseudonyms only and keeping other personal identifiers confidential at trial; (2) precluding evidence of and/or argument regarding the victims' or other witnesses' sexual activity, pursuant to Federal Rule of Evidence 412; (3) precluding evidence and argument regarding the government's motives for prosecution or impugning the government's investigatory conduct; (4) admitting evidence of the defendants' tactics to implement the forced labor scheme; (5) admitting statements of the defendants, their agents and their co-conspirators made in furtherance of the conspiracy, under Federal Rule of Evidence 801(d)(2), and precluding the defendants from doing the same; (6) admitting non-hearsay and contemporaneous or past recorded statements, under Federal Rule of Evidence 803; (7) precluding evidence and argument of the defendants' "good acts" or non-commission of "bad acts"; (8) precluding evidence of purported health benefits of orgasmic meditation; (9) limiting the scope of cross-examination to preclude improper questioning; (10) allowed the government to authenticate certain video and documentary evidence; and (12) ordering the defendant to produce reciprocal discovery under Rule 16 and Rule 26.2 of the Federal Rules of Criminal Procedure.

<u>STATEMENT OF FACTS</u>[1]

On April 3, 2023, a grand jury sitting in the Eastern District of New York

returned an indictment charging defendants Rachel Cherwitz and Nicole Daedone with forced

labor conspiracy, in violation of 18 U.S.C. § 1594. <u>See</u> ECF Dkt. No. 1 (the "Indictment"). The

Indictment alleges that from approximately 2004 through 2018 (the "Relevant Time Period"),

Daedone and Cherwitz, together with others, participated in a scheme to obtain the labor and

services of a group of OneTaste participants—<u>i.e.</u>, individuals who associated themselves with

OneTaste as employees, contractors, volunteers, or frequent participants in OneTaste courses—

"by subjecting them to economic, sexual, emotional and psychological abuse; surveillance;

indoctrination and intimidation." Indictment ¶ 6.[2]

I.      <u>OneTaste, Inc.</u>

OneTaste, Inc. was a privately-held sexuality-focused wellness education

company founded by Daedone and another individual in 2004 in San Francisco, California. The

company has operated through several affiliated entities, including but not limited to OneTaste

NYC LLC, OneTaste NY Acquisition LLC, Mirror Clan Inc., One Taste Investments LLC, One

Taste Holdings LLC, OneTaste Media LLC, Caravan Retreats Inc., OTBA Inc., Texas Limbic

---

[1]      The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce at trial. In addition, the proffer of facts as to any witness's anticipated testimony is a collection of the sum and substance of portions of the witness's anticipated testimony and does not purport to provide a complete statement of the respective witness's anticipated testimony.

[2]      The government alleges that the defendants' scheme targeted only a group of OneTaste participants and not all individuals associated with OneTaste.

Network LLC, The Next Right Thing LLC, the Institute of OM Foundation, the Institute of OM

LLC (the "Institute of OM") and The Land (collectively, "OneTaste" or the "Company"). At

various points in time, OneTaste maintained operations in, among other locations, San Francisco,

Las Vegas, Los Angeles, Austin, New York City, and London.[3] In New York City, OneTaste

leased residences and/or hosted events in several different locations, including in Brooklyn.

From 2004 through approximately 2018, OneTaste, among other things, offered

hands-on classes on "orgasmic meditation" ("OM"), a partnered practice typically involving the

methodical stroking of a woman's genitals for a period of fifteen minutes. OneTaste also

operated warehouses and residences where members and residents lived, worked and

experimented sexually. OneTaste generated revenue by charging residents rent and associated

housing fees, and providing courses, coaching sessions, events and "experiences" related to OM

and a variety of other sexual, interpersonal and "wellness practices" in exchange for fees.[4]

---

[3]    OneTaste and its participants maintained communal residences—at times referred
to as "OM houses"—in the cities where OneTaste operated. Some of the communal residences,
such as "the Warehouse" and "1080" in San Francisco and "the Morellino" in Harlem, New
York, were directly operated by OneTaste and its executives, who at times collected rent through
an affiliated entity known as Caravan Retreats. Other communal residences were leased and
maintained separately by OneTaste staff members and used by OneTaste executives in
connection with OneTaste's activities, courses and events.

[4]    Courses and events offered at various times by OneTaste included, among others,
"TurnON" courses; "How to OM"; "Ignited Man"; "Mastery"; "TurnedON Woman's Summit";
"Magic School"; "Taboo"; "Nicole Daedone Intensive"; coaching programs; teacher training
courses; male OM courses; communication courses; "community and leadership" courses;
"Play" courses; and "OMX." Courses and events ranged in price throughout the Relevant Time
Period from less than $100 to more than $35,000. OneTaste also offered an "Orgasm
Membership," which cost $55,000 or more. In addition, OneTaste also offered certain customers
the ability to participate in custom "scenes," i.e., experiences tailored to their specific desires, at

3

II.      The Defendants and Their Co-Conspirators and Agents

Daedone served as OneTaste Inc.'s Chief Executive Officer ("CEO") from approximately 2004 through 2017. Daedone officially resigned from her position as a director and CEO of OneTaste, Inc. on March 2, 2017, but remained involved in a variety of OneTaste events, courses and projects following her resignation at least until approximately July 5, 2018. Cherwitz[5] held senior positions at OneTaste from approximately 2009 through summer 2018, and served as OneTaste, Inc.'s Head of Sales.

Daedone and Cherwitz executed the charged conspiracy together with agents and co-conspirators who were members of OneTaste's "inner circle" and who each maintained senior positions at and acted as agents on behalf of OneTaste during the Relevant Time Period, including: Co-Conspirator 1, a Director of Strategic Execution for OneTaste, Inc. who previously served as the CEO, President, and Director of Marketing at OneTaste; Co-Conspirator 2, a senior executive at OneTaste whose responsibilities included, among other things, management of OneTaste's payroll; Co-Conspirator 3, a co-founder, former Chief Operating Officer and senior executive at OneTaste whose responsibilities included managing OneTaste's finances; Co-Conspirator 4, a senior sales executive at OneTaste; Co-Conspirator 5, a senior sales executive at

a variety of price points. Finally, OneTaste offered instructional videos and demonstrations, including but not limited to videos regarding traditional OMing, male OMing, and oral sex. In some OneTaste courses, students also submitted sex tapes that were subsequently displayed during class and critiqued by the defendants and their co-conspirators, and other OneTaste instructors.

[5]      Rachel Cherwitz was also known as Rachel Tayeb during a portion of the Relevant Time Period and is currently also known as Rachel Cherwitz Pelletier.

OneTaste; Co-Conspirator 6, a senior executive at OneTaste who for a time served as OneTaste's Head of Sales and oversaw a communal home in San Francisco; Co-Conspirator 7, a senior executive at OneTaste; and Co-Conspirator 8, a senior executive at OneTaste; Co-Conspirator 9, a senior executive at OneTaste; Co-Conspirator 10, OneTaste's current CEO and a OneTaste participant during a portion of the Relevant Time Period; and Co-Conspirator 11, a senior executive and participant at OneTaste during the Relevant Time Period.[6]

In the course of presenting its case-in-chief, the government expects to establish that the defendants and their co-conspirators were collectively responsible for OneTaste's sales practices, personnel decisions and course curricula, and were each involved in the agreement to provide or obtain the labor or services of OneTaste participants by means of serious harm or threats of serious harm to those members; abuse or threatened abuse of law or legal process; or by means of a scheme, plan or pattern intended to cause those members to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm; or in the agreement to benefit financially or otherwise from participation in a venture that was engaged in the provision of or obtaining of labor or services through the same means or in reckless disregard of the same.

III.     The Forced Labor Conspiracy

During the Relevant Time Period, as alleged in the Indictment and as the government expects to establish at trial, Daedone and Cherwitz, together with other members of

---

[6]     The government expects the trial testimony to establish additional agents and co-conspirators of the defendants.  The government has identified the individuals herein as relevant to the government's motions.

5

OneTaste's inner circle, conspired, through the use of multiple deceptive and abusive tactics, to

obtain the labor and services of a group of OneTaste participants, including:

- Jane Doe 1, a former OneTaste student and member of OneTaste's sales team who worked for OneTaste as an independent contractor from approximately 2013 through 2015, including in New York City;

- Jane Doe 2, a former OneTaste student and member of OneTaste's sales team who worked for OneTaste as an independent contractor from approximately 2010 through 2014, including in New York City;

- Jane Doe 3, a former OneTaste student and member of OneTaste's sales team who worked for OneTaste from approximately 2014 through 2015, including in New York City;

- Jane Doe 4, a former OneTaste student and part-owner of the OneTaste NYC affiliate who became involved in OneTaste beginning in approximately 2013;

- Jane Doe 5, a former OneTaste student and staff member who worked for OneTaste, including by serving as Co-Conspirator 2's apprentice, from approximately 2008 through 2012, primarily in San Francisco;

- Jane Doe 6, a former OneTaste student and staff member who worked for OneTaste beginning in approximately 2005, primarily in San Francisco;

- Jane Doe 7, a former OneTaste student and staff member who worked for OneTaste, including by serving in positions as an "errand girl" in the kitchen, and in video and event production, beginning in approximately 2005, primarily in San Francisco and Las Vegas;

- Jane Doe 8, a former OneTaste student and staff member who worked for OneTaste, including by serving positions in the kitchen, in event logistics, and in sales, from approximately 2008 through 2012, primarily in San Francisco and Colorado;

- Jane Doe 9, a former OneTaste student and staff member who worked for OneTaste, including by managing a website called the "OMHub,"[7] beginning in approximately 2010, primarily in New York City;

---

[7] The "OMHub" was a website managed by OneTaste employees where students and OneTaste participants could post and connect about their courses and other matters relevant to the OneTaste community.

- Jane Doe 10, a former OneTaste student and staff member who began working for OneTaste in approximately 2012, including by assisting with event production and sales, primarily in New York City;

- Jane Doe 11, a former OneTaste student and sales team member who worked at OneTaste from approximately 2016 through 2018, primarily in New York City;

- Jane Doe 12, a former OneTaste student and sales team member who worked for OneTaste, including by serving as Co-Conspirator 1's assistant and as a student coordinator, beginning in approximately 2009, primarily in San Francisco;

- Jane Doe 13, a former OneTaste student and staff member who worked for OneTaste, including by assisting with sales, from approximately January through November 2016, primarily in New York City;

- Jane Doe 14, a former OneTaste student and staff member who worked for OneTaste, including by performing work at a OneTaste café, beginning when she was 18 years old, primarily in San Francisco;

- Jane Doe 15, a former OneTaste student and staff member who worked for OneTaste, including by assisting with workshops and with sales and recruitment, from approximately 2013 through 2016, primarily in New York City;

- Jane Doe 16, a former OneTaste student and staff member who worked for OneTaste, including by assisting with sales and coaching, beginning in approximately 2013, primarily in New York City;

- Jane Doe 17, a former OneTaste student and staff member who worked for OneTaste, including by teaching and selling OneTaste courses, beginning in or around 2012 for a period of 16 to 18 months, primarily in San Diego;

- Jane Doe 18, a former OneTaste student and staff member, who worked for OneTaste, including by managing OneTaste's San Francisco space and center, from approximately 2005 or 2006 for a period of two years, primarily in San Francisco;

- Jane Doe 19, a former OneTaste salesperson who worked for OneTaste in or around 2018, primarily in Northern California;

- Jane Doe 20, a former OneTaste student and staff member who worked for OneTaste for a period of about one year, primarily in Northern California;

- Jane Doe 21, a former OneTaste participant who became involved in OneTaste beginning in at least approximately 2013 and later lived at a OneTaste communal home;

- Jane Doe 22, a former OneTaste participant who became involved in OneTaste beginning in approximately 2012 and later lived at a OneTaste Brooklyn communal home;

- John Doe 1, a former OneTaste student and staff member who worked for OneTaste from approximately 2006 through 2008, including by performing manual labor to improve a OneTaste residence, completing marketing and recruitment tasks, assisting in the development of OneTaste's curriculum, planning and executing sexual "scenes," and assisting with OneTaste's publication of and work associated with OneTaste's website, primarily in San Francisco; and

- John Doe 2, a former OneTaste student and contractor who worked for OneTaste from approximately 2014 through 2015, including by assisting with courses and recruitment, primarily in San Francisco, and who married Jane Doe 3 during the Relevant Time Period.[8]

Daedone, Cherwitz and their co-conspirators manipulated and exploited such OneTaste participants by causing them, and conspiring to cause them, serious harm—including psychological, financial and reputational harm sufficiently serious under the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or continue performing such labor and services, as detailed below.

---

[8]     The lists of witnesses contained herein is not intended to be, and is not, exhaustive, and the government reserves the right to, and intends to, identify and call additional witnesses at trial who are not expressly referenced in the government's motions. The government also may not call each individual identified herein and remains in the process of identifying its witnesses for trial. In addition, the defendants and their co-conspirators did not employ each of the identified tactics on each OneTaste participant; the combination of tactics used varied from individual to individual.

A.    <u>Targeting and Using Trauma, Counseling and Addiction</u>

One of the tactics by which the defendants carried out the forced labor conspiracy was by intentionally recruiting and targeting for labor individuals who had suffered prior trauma and/or who had a history of addiction or substance abuse disorders, including by advertising, such as through marketing materials, that OneTaste's courses and teachings, including its coaches and the practice of OM, could heal past sexual trauma and dysfunction.

For example, Daedone, Cherwitz and others encouraged OneTaste course attendees, including Jane Doe 1, Jane Doe 2, and Jane Doe 14, among others, to discuss their trauma, including familial loss, date rape, sex without consent, and/or other childhood sexual trauma. Daedone, Cherwitz and their co-conspirators then encouraged OneTaste participants, including Jane Doe 2, to use their personal trauma to sell courses. For example, Daedone, Cherwitz and their co-conspirators taught members of OneTaste sales teams, including Jane Doe 3, to employ a sales method which involved focusing on potential clients' sources of pain to sell courses. At times, individuals, including the head of OneTaste's so-called "Reconciliation Council," a OneTaste group tasked with monitoring disputes among OneTaste participants ("Individual-1"), expressed to Daedone, Cherwitz and their co-conspirators that OneTaste should not allow individuals flagged in a screening process to have been significantly impacted by trauma, or who were otherwise unstable or unable to afford OneTaste courses, to participate in OneTaste events. Daedone, however, disregarded the warning and informed Individual-1, in sum and substance and in part, that OneTaste's executives and other leaders would make decisions regarding sales.

9

Relatedly, the defendants and their co-conspirators used trauma services offered by OneTaste and/or addiction treatment programs to "treat" the preferences and desires of OneTaste participants that did not align with OneTaste's rules, rituals, mantras and commands, which the defendants deemed "addictions." For example, Cherwitz accused salespeople who she did not deem focused enough of being "foggy," and would direct people who were "foggy" to attend a 12-step program. In addition, OneTaste executives taught OneTaste participants, including Jane Doe 7 and others, that relationships were a form of "addiction" and people in relationships were "not sober." Cherwitz and others instructed or encouraged the OneTaste participants who were in committed relationships to attend 12-step programs as a means of discouraging committed relationships within OneTaste.

Further, the defendants taught and insisted in the adherence to an ideology in which victims of sexual assault or violence should not consider themselves, or be considered by others, to be victims and should not shame or blame those who commit sexual assault for their actions.[9] Daedone, Cherwitz and their co-conspirators labeled complaints about their manipulative tactics "victim consciousness," meaning that the people complaining were just being victims and not "surrendering" enough. See, e.g., Ex. A (transcript of 2013 speech delivered by Daedone during a OneTaste coaching program in New York City in which she stated, among other things, that a victim "is the nascent invitation to learn the deeper power of

---

[9] Daedone, Cherwitz and their co-conspirators imposed this ideology on OneTaste participants through oral and written statements, and in recorded OneTaste courses and speeches, ███████████████████████████ in furtherance of their message denouncing a "victim mentality."

10

surrender" and a perpetrator "is the nascent expression of learning how to heal others" and ████████████████████████████████████████████████████████ as "just so expansive and fourth dimensional that he couldn't confine himself into the arbitrary laws of the third dimension").

This ideology resulted in efforts to exact psychological and reputational harm. For example, in and around November 2013, a OneTaste participant posted on a OneTaste message board accusing another OneTaste participant of sexually groping her at a OneTaste residence without her consent and complaining that, because there was no lock on her bedroom door, she was unable to keep the alleged perpetrator out. Co-Conspirator 2, a OneTaste senior executive, subsequently responded on the message board that, following her own sexual experiences, "men became [her friends] instead of her perpetrators"; that men were "also learning how to communicate desires"; that in her mind "there is no victim; just places where we disengaged and disconnected because an experience became too much to feel"; and that "your power is in going back in to connect, to claim those parts of yourself that you disengaged from whether it was a desire that was too much to feel or a fear that didn't get expressed" which, she stated, was "a lot more powerful then calling someone out and blacklisting them, and calling yourself a victim." See Ex. B.

The defendants employed such "trauma-healing" tactics to attempt to control the testifying witnesses in this case. For example, Daedone and Cherwitz told Jane Doe 1 that she was responsible for the physical abuse of her then-boyfriend, who was a significant financial participant in OneTaste in New York City, because Jane Doe was subconsciously seeking to

11

"work out" Jane Doe 1's past trauma through him. Cherwitz also told Jane Doe 1 that Jane Doe 1's soul asked for this "game" of push and pull with her boyfriend; that her soul sent her boyfriend into a "red state" (i.e., a disassociated mental state which caused abuse); and that it was Jane Doe 1's "desire" that was the cause of discord in her relationship with her boyfriend. As another example, Daedone, Cherwitz and their co-conspirators employed a practice called "letting your beast out" based on the premise that everyone has a "beast" inside of them that should be embraced. As part of the practice of "letting your beast out," OneTaste participants vocalized their negative emotions, which, at times, included violent behavior. Such behavior was implicitly sanctioned.

Cherwitz and Daedone routinely encouraged sex as a means of working through trauma—which was intended to encourage victims to perform sex-based services and labor, as detailed below. For example, Daedone taught that sleeping with new sexual partners was a way to "clear energy." As another example, after observing Jane Doe 1 crying during a period when Jane Doe 1 became increasingly emotionally and physically unwell, Cherwitz told Jane Doe 1 that the tears were her "orgasm leaking out of [her] body" and that Jane Doe 1 needed to have her "lines blown clean," meaning to have more sex. As another example, Cherwitz participated in an exercise with Jane Doe 13 where she told Jane Doe 13 what she "saw in her," which, according to Cherwitz, was that Jane Doe 13 was a slut. Cherwitz told Jane Doe 13 that it was "irritating" that Jane Doe 13 did not realize this herself, and publicly shamed Jane Doe 13 for sexually taking the "safe route"—encouraging Jane Doe 13 to be more sexually promiscuous as

12

was in line with OneTaste's teachings and ideology (and which was necessary for obtaining Jane Doe 13's labor).

B.    Aversion Practice

The defendants employed as a tactic of the forced labor conspiracy overriding the OneTaste participants' sexual preferences and boundaries by teaching in courses and instructing individuals to expand their sexual energy by engaging in sexual acts they found uncomfortable or repulsive as part of so-called "aversion practice." Embracing their "aversion" was a requirement to obtain "freedom" and "enlightenment" and demonstrate their commitment to OneTaste and Daedone. As taught by the defendants, practicing "aversion" and engaging in sex with people they found "repulsive" would in turn permit OneTaste participants to "get off" in future sexual encounters. In fact, such teachings lowered OneTaste participants' barriers and in turn made it more likely that the OneTaste participants would have sex and OM with others.

For example, Daedone, Cherwitz and their co-conspirators taught OneTaste participants who were interested in individuals of the same sex that they needed to be "hungry for dick," or they were not "spiritually grown"—a means of ensuring that the OneTaste participants would continue to have sex with strangers for Daedone's financial benefit. As another example, Daedone, Cherwitz, and their co-conspirators instructed Jane Doe 15 to lean into her aversions because there could be a hidden desire to have sex with certain people underneath such feelings. Because of these teachings, Jane Doe 15 once engaged in sex with a man who was older and who she did not find physically attractive because her OneTaste coach suggested it.

13

C.     Collecting Sensitive Information and Surveilling

Another means by which the defendants exercised control over their intended victims was by collecting sensitive information about them, including but not limited to information pertaining to victims' sexual histories and relationships as a means of influencing and controlling victims.  OneTaste sales representatives (overseen by Cherwitz) initially collected information at "TurnON" events or during sales processes and organized such information in reports and spreadsheets.

Thereafter, Daedone, Cherwitz and their co-conspirators encouraged OneTaste participants and communal home residents to complete "Fear Inventories," in which they recorded their innermost fears and resentments on pieces of paper and electronically.  Such "Fear Inventories" were often read aloud in sales meetings or otherwise disclosed to the defendants and co-conspirators.  The defendants and their co-conspirators and agents also used games in which they put OneTaste participants in a "hot seat" and had other attendees ask personal questions or required attendees to share their feelings or desires.  OneTaste salespeople or other personnel took notes on personal information shared during such "games," which they later used to sell courses.  Daedone, Cherwitz and their co-conspirators at times also used personal disclosures to stage exercises or "scenes" in front of audiences of OneTaste participants.  For example, Jane Doe 4 participated in a OneTaste training during which a "re-rape" was staged in front of an audience that consisted of a scene reenacting a sexual assault of Jane Doe 4, and which included the performance of sex acts.

Daedone and Cherwitz, together with their co-conspirators, also subjected the OneTaste participants to surveillance—including by, among other things, overseeing the OneTaste participants' routines and activities, including in the communal homes where OneTaste participants slept in shared assigned beds and ate, worked, and traveled in groups—as a means of rendering the OneTaste participants dependent on OneTaste for their shelter and basic necessities and limiting the OneTaste participants' independence, privacy and control. For example, Daedone, Cherwitz, and their co-conspirators, including Co-Conspirator 6,[10] mandated that residents of OneTaste communal homes sleep with assigned bedmates, two per bed, with multiple beds per room so that the residents had no privacy. The bed assignments changed over time and some residents, including Jane Doe 1, had to sleep on the floor when "higher ups" from OneTaste came to their cities.

In addition to overseeing sleeping arrangements, Daedone, Cherwitz, and their co-conspirators discouraged the OneTaste participants from "unplugging from the orgasm," preached the necessity of remaining connected, and subjected the OneTaste participants to constant communication and check-ins via Slack, text messages, email and in-person meetings. Daedone, Cherwitz, and their co-conspirators encouraged the OneTaste participants to "hive," or to gather or perform activities in groups with other OneTaste participants. As an example, on one occasion, Cherwitz found out that Jane Doe 3 attended a yoga class without obtaining

---

[10] Co-Conspirator 6 served as a property manager for the "1080" residence.

permission in advance; Cherwitz became angry with Jane Doe 3 and told her that next time she would have to bring someone with the OneTaste community with her.

In addition to monitoring the OneTaste participants' whereabouts, the defendants also monitored their intimate romantic relationships, allegiances, and friendships—and instructed the OneTaste participants to secretly report on the behavior of other OneTaste participants. For example, Cherwitz directed Jane Doe 10 to spy on other residents of her OneTaste communal home. Daedone, Cherwitz and their co-conspirators exchanged emails and text messages updating each other on the OneTaste participants' relationship statuses and psychological and emotional states. They employed similar tactics when it came to identifying discontent among OneTaste participants, such as by employing the "Reconciliation Council" discussed above to monitor disputes among OneTaste participants and ensure that they remain engaged with OneTaste and to resolve issues within OneTaste in a manner that made it less likely that the OneTaste participants would resort to outside legal action.[11] Shortly before Individual-1's departure from OneTaste, Co-Conspirator 4 and Co-Conspirator 1 requested that Individual-1

---

[11] OneTaste participants could request a "reconciliation" with other members, or alternatively be referred to the reconciliation process by the defendants and their co-conspirators or other OneTaste participants. Cherwitz was frequently referred to the reconciliation process for her abusive behavior, as discussed herein and as will be further established by both exhibits and testimony at trial. The government intends to admit, among other things, records of complaints raised by OneTaste participants to Individual-1 as part of this process, including complaints about Cherwitz's abuse and aggression. Such complaints evidence both the tactics employed by the defendants and their co-conspirators in furtherance of the forced labor conspiracy as well as the defendants' awareness of such issues and states of mind.

disclose the names of people with whom he spoke in reconciliation sessions to identify

individuals who were "out of line" or individuals who had money.

D.      Encouraging Incurring Debt

The defendants induced the OneTaste participants, including OneTaste

employees,[12] to relinquish their available assets or to incur debt, at times facilitating the

OneTaste participants' opening lines of credit to finance expensive OneTaste courses that the

defendants knew the OneTaste participants could not afford.  Daedone set sales quotes for

Cherwitz to fill, placing pressure on Cherwitz to bring in sales, which pressure filtered down to

sales teams.  For example, Daedone, Cherwitz and their co-conspirators trained members of

OneTaste's sales team, including Jane Doe 19, to employ coercive sales tactics,  including by

telling people who could not afford OneTaste courses to take out credit cards, take out loans, or

borrow money from friends, and by applying recurring payments to their accounts, including

PayPal accounts, without the account holders' permission.  The defendants and their co-

conspirators described financial issues as a "third-dimensional problem" and taught that money

was just an illusion, teaching that individuals with jobs "wear golden handcuffs."  OneTaste's

---

[12]      Some of the OneTaste participants served on OneTaste's sales team.  Those
individuals underwent training by Cherwitz and others which addressed how to pressure
potential clients into purchasing OneTaste courses by, among other things, eliciting potential
customers' sources of pain, trauma, fear and insecurity and insisting that OneTaste offered a
solution to their problems.  Such sales team members recorded information that customers
disclosed to them in detailed sales spreadsheets.  The OneTaste participants who served on
OneTaste's sales teams both executed high-pressure sales at the direction of Daedone, Cherwitz
and their co-conspirators and also were targets of such sales practices themselves as they were
pressured to purchase increasingly expensive courses in connection with their continued
employment at OneTaste.  OneTaste employees were also at times required to perform labor to
support the same courses they purchased and attended.

executives, including Daedone, received complaints about Cherwitz's sales practices, but Daedone ratified her actions, including by instructing people to support Cherwitz.

Numerous OneTaste participants are expected to testify that Cherwitz directed people to open credit cards and otherwise incur debt to pay for OneTaste courses. For example, on one occasion, Cherwitz invited Jane Doe 3 to her bedroom, told Jane Doe 3 about a Discover card that had no interest for a year, and opened her computer to have Jane Doe 3 fill out an application for the card so that Jane Doe 3 could use it to pay for a OneTaste Coaching Program. On another occasion, Jane Doe 4 could hear Cherwitz in a private coaching room instructing a potential client to open multiple credit cards due to a low credit score and paying for OneTaste courses as soon as the lines of credit were opened. Separately, Jane Doe 8 observed Cherwitz encourage individuals to go into debt to purchase OneTaste courses and indicate that spending the money was worth it in exchange for achieving personal freedom through OneTaste's protocol. Cherwitz and Co-Conspirator 6 directed Jane Doe 1 to put tuition for a OneTaste course on her credit card even after she indicated she could not afford it, because, according to Cherwitz, Jane Doe 1 would lose her "power" if she were "afraid" of debt. Jane Doe 17 likewise observed a OneTaste salesperson discussing opening a credit card to pay for OneTaste courses.

Others were pressured to pay for programs that they could not afford. For example, Cherwitz pressured John Doe 2 and Jane Doe 3 to purchase a OneTaste membership, which cost $55,000, on which John Doe 2 submitted a sizable down payment, arranging to pay the rest through a payment schedule and incurring debt. When Jane Doe 3 and John Doe 2 left OneTaste, Co-Conspirator 1 subsequently tried to convince John Doe 2 that he and Jane Doe 3

should not seek a refund, in part because Daedone gave them attention and was "energetically holding them in her thoughts." John Doe 2 ultimately, through an attorney, negotiated a settlement with Co-Conspirator 6 for a $21,000 refund from OneTaste. Another co-conspirator directed Jane Doe 13 to open a credit card or ask a family member to pay for additional OneTaste courses, asking her when she was "ready" to "get free"; Jane Doe 13 opened the credit card and went into debt paying for OneTaste courses. Cherwitz pressured Jane Doe 15 to purchase OneTaste courses while Cherwitz simultaneously served as Jane Doe 15's sponsor, assisting with her sobriety in Alcoholics Anonymous, with full knowledge that Jane Doe 15, who ultimately took out a high-interest loan, was in financial difficulty and could not afford the program. As yet another example, Cherwitz enrolled Jane Doe 16 in a OneTaste program knowing she had no money and, after Jane Doe 16 left OneTaste, OneTaste sent her debt to collections, ruining her credit.[13]

The defendants also offered predatory "work study" or "work trade" arrangements with the OneTaste participants, whereby the OneTaste participants worked for OneTaste to pay off debt owed to OneTaste for courses. As just one example, Jane Doe 7 attended OneTaste courses while working at OneTaste and became indebted to OneTaste, paying them back through work. When Jane Doe 7 did receive money, it was just enough to cover rent owed to stay in the communal home.

---

[13] Other members of OneTaste's sales team, who were trained by Cherwitz, employed similar tactics. For example, Co-Conspirator 8 directed Jane Doe 13 to walk to a bank around the corner to open a credit card to pay for OneTaste courses.

E.        Using Sex and Marriage to Participate in OneTaste

In addition to incurring debt, the defendants and their co-conspirators encouraged the OneTaste participants to recruit "sponsors" or to engage in illegal activities—including accepting money to engage in sexual relationships with "sugar daddies" or to participate in sham marriages with individuals seeking United States citizenship—to pay for OneTaste courses and/or have the financial backing enabling them to remain in the OneTaste community to provide services and labor that Daedone, Cherwitz, and their co-conspirators knew the OneTaste participants could not otherwise afford.  For example, Jane Doe 4 observed Cherwitz direct individuals who could not afford the courses to obtain a "sponsor" to pay the fees.  A co-conspirator, Co-Conspirator 8, helped set up an account on sugardaddy.com for Jane Doe 5, which Jane Doe 5 used to connect with an older man who covered her day-to-day living expenses, which permitted her to afford to still be involved with OneTaste.  Daedone, Cherwitz and their co-conspirators tasked Jane Doe 7 with asking men from the community to pay for higher-priced courses she attended.

F.        Withholding Pay

The defendants also engaged in abusive employment tactics to induce labor and services, including by promising to pay the OneTaste participants wages and commissions for work performed on behalf of OneTaste and subsequently declining to pay the OneTaste participants the amounts owed, or by changing the OneTaste staff members' employment

statuses or locations without advance notice,[14] as a means of rendering the OneTaste staff

members dependent on OneTaste for their livelihoods and financial wellbeing.[15]  For example,

Daedone, Cherwitz and/or their co-conspirators and agents prevented the OneTaste participants

who worked for commissions on the sales team, such as Jane Doe 1, from closing large sales,

instead awarding credit to salaried OneTaste staff.  Similarly, Jane Doe 11's employment

agreement provided that she would receive an hourly wage and a percentage sales commission;

however, she was never permitted to close sales for more expensive courses and was effectively

prevented from ever earning a commission.  Cherwitz and her co-conspirators also misled the

OneTaste participants about their anticipated salaries, indicating that their salaries, including

Jane Doe 19's, would be much higher than they were actually paid.

Daedone, Cherwitz and their co-conspirators also failed to pay employees

overtime in accordance with state and federal requirements, encouraged them to underreport

hours, and at times ceased payment to the OneTaste participants, including Jane Doe 1 and Jane

Doe 11, without warning.  This was particularly true for OneTaste sales team members, with

whom the defendants would "play games," such as firing and then hiring individuals back at a

later time.  The defendants and their co-conspirators also imposed "loyalty tests" by taking away

---

[14]     The defendants and their co-conspirators often relocated OneTaste staff members to locations where they lacked strong social ties with minimal notice to increase their control over them—a practice called "Rapidly Changing Realities," or "ROR."  For example, the defendants and their co-conspirators relocated Jane Doe 7 to Las Vegas, causing her to be separated from her then-girlfriend.

[15]     Relatedly, the government expects to establish at trial that OneTaste's accounting practices during the Relevant Time Period were incomplete, and, at times, inaccurate.  Witness testimony will also establish that individuals were at times paid "off the books."

an individual's status in the company and thereafter requiring them to work to earn it back, and held sessions where OneTaste participants voted on whether individuals could remain in the OneTaste community depending on whether their "energy" was rising or falling.

The defendants employed these tactics through payment distributed by OneTaste, Inc., but also through its affiliates, including OneTaste NYC. For example, Cherwitz offered Jane Doe 10 a job at OneTaste NYC, indicating that OneTaste NYC did not have money to pay her at that time but assuring her that she would later be paid. Jane Doe 10 worked numerous hours, including being required to participate in text message threads with Cherwitz and others from early in the morning until late in the evening, but was not paid. Cherwitz repeatedly told Jane Doe 10 not to worry about money since she had a "place to stay." Ultimately, Jane Doe 10 was paid a portion of the money she was owed.

Individuals who pushed back were pushed out of the OneTaste community. For example, Cherwitz approached Jane Doe 17 and offered her a "Director of Sales" position. Jane Doe 17 declined in light of the salary being too low. Cherwitz pressured Jane Doe 17 to accept the position again, and Jane Doe 17 again declined. Within an hour, Jane Doe 17 was pulled from the sales team and removed from group texts. Jane Doe 17 was thereafter excluded from the community.

G.    Discouraging Reporting

Another tactic by which the defendants effected the forced labor conspiracy was by instructing the OneTaste participants to refrain from reporting problematic behavior to law enforcement or individuals outside the OneTaste community, whom they referred to as

"muggles" or part of "the Matrix." For example, OneTaste executives told OneTaste participants, including Jane Doe 14, not to report mistreatment by other OneTaste participants to outside individuals.

The defendants and their co-conspirators also took significant lengths to ensure that OneTaste participants who had left OneTaste did not report information adverse to Daedone or the company. OneTaste executives attempted to maintain contact with individuals who left OneTaste, including by making so-called "amends," in an effort to prevent such individuals from reporting any activities at OneTaste. For example, Daedone and others reached out to Jane Doe 7 about a year after she left OneTaste to try to make amends with her, and Cherwitz sent Individual-1 an apology after he left his employment at OneTaste in which she expressed remorse for the way OneTaste executives tried to undermine him.

They also required certain OneTaste participants to sign non-disclosure agreements as a condition of receiving money owed to them. For example, Co-Conspirator 1 and other OneTaste executives negotiated a settlement agreement with Jane Doe 1 after she sent OneTaste a demand letter in which she alleged that OneTaste, Cherwitz, Co-Conspirator 6, Co-Conspirator 5, Co-Conspirator 4, and others had forced and manipulated her into having sex and OMing with OneTaste staff, supervisors and customers, and that when she refused to do so, she was publicly shamed, and threatened with reduced earnings and termination. Pursuant to the agreement, OneTaste agreed to pay Jane Doe 1 a significant sum, but required that Jane Doe 1

sign a non-disparagement provision requiring that Jane Doe 1 keep the actions of OneTaste confidential.[16]

H.    Subjecting Members to Deprivation

Daedone and Cherwitz, together with their co-conspirators, also subjected the OneTaste participants to deprivation, including by, among other things, requiring punishing time commitments from the OneTaste participants, including Jane Does 1, 2, 3, 6, 7, 8, 9 and 11, and John Doe 1, where they were expected to be available to work from early in the morning to late at night and discouraging the taking of vacations or breaks, including when they were sick,[17] thereby preventing the OneTaste participants from obtaining adequate sleep and rest.  They also subjected them to rigid schedules, which included a number of mandated meetings, events, tasks, and group activities beginning early in the morning with an OM practice and ending late at night. At various times, they required the OneTaste participants who were residents of OneTaste communal homes to (i) enroll in and complete OneTaste courses within specified time periods;

---

[16]    Relatedly, the government also expects to introduce evidence at trial that, at various points in the Relevant Time Period, including after Jane Doe 1's departure, OneTaste executives discussed changes in OneTaste practices that needed to occur in order to minimize complaints of significant abuse.  As another example, in or around 2016, Daedone, Cherwitz, and their co-conspirators imposed new rules to try to clean up OneTaste's practices because there were concerns of foul play or illegal activity.  On one occasion, Cherwitz announced in a sales meeting, which Jane Doe 2 attended, that OneTaste staff members could no longer do something they used to do because it could be considered prostitution.  Daedone, Cherwitz, and their co-conspirators also tried to distance OneTaste from the activities at OM communal homes.

[17]    When the defendants and their co-conspirators witnessed OneTaste participants crying or manifesting signs of illness or instability, they told the OneTaste participants that such physical effects were normal.  For example, Co-Conspirator 6 told Jane Doe 1 that her compulsive vomiting was her body expelling "the bad stuff."

(ii) volunteer in the production of OneTaste courses; (iii) participate in daily OM practice; and (iv) volunteer a specified number of hours per week toward maintaining the OneTaste center or the performance of other tasks for the benefit of OneTaste. Daedone, Cherwitz and their co-conspirators also required that many of the OneTaste participants respond immediately on text message threads or meet certain targeted sales goals. OneTaste participants who failed to meet those requirements faced intense criticism.

        I.        <u>The Use of Micro-Regulation and Other Means of Control</u>

Daedone and Cherwitz, together with their co-conspirators, also subjected the OneTaste participants to micro-regulation, <u>i.e.</u>, governing minute aspects of everyday life, including by, among other things, restricting access to mainstream activities and materials, along with larger methods of control, such as controlling sexual activities and relationships. Daedone, Cherwitz and their co-conspirators labeled the OneTaste participants who did things they were not supposed to do as "off stroke" or "unplugged" and told them they were not "going to the next level" both from an employment and a spiritual perspective. For example, Cherwitz, Daedone and co-conspirators discouraged watching TV and the consumption of alcohol. They also controlled how OneTaste participants who served on OneTaste's sales team or in client-facing roles, including Jane Doe 1, Jane Doe 2, and Jane Doe 15, dressed, instructing them to wear high heels, certain styles of clothing and makeup. For example, Cherwitz took Jane Doe 1 shopping for new clothes so that she could wear tight clothing and high heels after Jane Doe 1 joined the sales team.

In particular, the defendants regulated the OneTaste participants' sexual activities, including by assigning them sexual "research partners"; directing them to OM; directing them to complete sexual "assignments" (e.g., to engage in certain sex acts, with a certain number of individuals, in a specified time period); and/or directing them to participate in specified kinds of sexual relationships (e.g., to "open" or "expand" their "orgasms" by engaging in sexual relationships with numerous people or, alternatively, to commit to marriages). The defendants did this by "teaching" the OneTaste participants that OM was no different than meditating or drinking tea; OneTaste participants were expected to OM or would be shamed. OneTaste participants who also did not have enough sex were shamed, included being told they had a "golden pussy," and OneTaste participants who were too interested in specific sexual partners were told they were spiritually "asleep" or otherwise deficient.

Sex was also used as a means of encouraging productivity. Cherwitz, along with co-conspirators, also encouraged some of the OneTaste participants, including Jane Doe 3 and Jane Doe 10, to have sex if they were not doing well in sales—often referring to poor performers as being "tumesced," or as having too much "energy," that they needed to get out through sexual activity. On another occasion, Cherwitz stopped a sales meeting and told all the staff members who were present, including Jane Doe 10, that the sexual tension between Jane Doe 2 and another OneTaste staff member was affecting OneTaste's sales. Cherwitz then instructed Jane Doe 2 and the OneTaste staff member—in front of Jane Doe 9, who was in a committed relationship with the OneTaste staff member and who attended the same meeting—to go into another room and have sex, which they did at her direction.

Daedone, Cherwitz and others also prescribed other directives to the OneTaste participants, including, as to Jane Doe 14, being handcuffed to another OneTaste member who she believed had mistreated her; and Daedone, Cherwitz and their co-conspirators during certain periods encouraging the OneTaste participants to marry other OneTaste participants, including "unofficial" wedding ceremonies, and/or to have relationships with other OneTaste participants, including OneTaste executives.

J.    Indoctrination

Daedone and Cherwitz, together with their co-conspirators, also subjected the OneTaste participants to indoctrination by requiring that they ascribe to OneTaste's ideology, which involved a variety of rules, rituals, mantras and commands and the treatment of Daedone as a "guru." Such rituals at times included, among other things, participation in formal ceremonies in which Daedone named "priests and priestesses of Orgasm," and, at times, engaged in practices such as body piercing, role-playing, and exercises involving "witchery" and "magic." On a handful of occasions, OneTaste community members were carved with a scalpel and medical instruments.

K.    Isolation

Daedone and Cherwitz, together with their co-conspirators, also subjected the OneTaste participants to isolation, including by, among other things, encouraging the OneTaste participants to limit contact with people outside of the OneTaste community, including friends and family. For example, on one occasion, Cherwitz instructed Jane Doe 2 to stop speaking with her father after he was upset that Jane Doe 2 had signed up for an expensive coaching program.

On other occasions, Cherwitz became upset when Jane Doe 3 asked for permission to visit her family. On another occasion, when Jane Doe 3 complained that she had not seen her family for some time, Cherwitz directed Jane Doe 3 to leave until she was "clear" and told her that she did not want Jane Doe 3 to take attention away from a OneTaste event; Jane Doe 3 subsequently stopped seeing her family as often. As another example, Jane Doe 4 was told that she would be fired from OneTaste's executive team if she took a trip with her mother unless she made a deposit for a OneTaste course and helped Cherwitz reach her sales goal mark. When Jane Doe 4's father became ill, Jane Doe 4 was sent home to care for him with a OneTaste "handler" who ensured she continued to OM.

Daedone, Cherwitz, and their co-conspirators also monitored the OneTaste participants' activities while with people outside of the Company and taught the OneTaste participants that if they left OneTaste they would "cool off" or lose connection with the group. They also employed a lexicon unique to OneTaste.[18]

Daedone, Cherwitz and co-conspirators deliberately interfered with and broke up established relationships among the OneTaste participants as a means of rendering OneTaste

---

[18] Examples of some of OneTaste's specialized lexicon include use of the following terms and phrases: "up-stroke" (i.e., to build up or praise), "down-stroke" (i.e., to bring down to earth or criticize), "tumescence" (i.e., excess sexual energy), "blow your lines clean" (i.e., to cure tumescence through sex), "golden pussy" (i.e., having too many preferences with respect to sex), "make outs" (meetings involving sexual or intimate activities), to "witch" (i.e., to solve), to "hive" (i.e., to gather or do an activity in a group), to "fluff" (i.e., to sexually excite or, in the sales context, to conduct a range of activities with potential clients to increase the likelihood that they would purchase courses), to practice "unconditional sex" (i.e., to engage in sex without barriers or conditions), to "safe port" (i.e., to ground or make feel safe), to be within or outside "the container" (i.e. to be in or outside of a space for experimentation), "beast" (i.e., a wild

participants emotionally, socially, and psychologically dependent on OneTaste.  For example, Daedone, Cherwitz and co-conspirators interfered with Jane Doe 5's intimate relationships, telling her she should "pollinate more flowers" and inviting a boyfriend of Jane Doe 5 to move to Las Vegas to separate him from her.  As another example, Cherwitz separated Jane Doe 7 from her girlfriend by telling Jane Doe 7's girlfriend that she could stay at a OneTaste communal home, but Jane Doe 7 that she could not.  Cherwitz told Jane Doe 7 that if she wanted anything to do with OneTaste, she would have to live with a couple at another house until she was deemed "ready" to move in.  Later, when Jane Doe 7 was permitted to move into the communal home, OneTaste executives assigned her to share a bed with people other than her girlfriend.

       As another example, Daedone, Cherwitz and co-conspirators assigned Jane Doe 21 and her boyfriend, who were in a monogamous relationship, to make a pornographic video as part of their attendance at a OneTaste course.  Jane Doe 21 declined to complete the assignment.  However, when Jane Doe 21 arrived in class, a film of Jane Doe 21's boyfriend having sex with another woman—which occurred without Jane Doe 21's knowledge—was shown to everyone in the class.   Jane Doe 21 tried to leave the room; however, the doors were locked, and Co-Conspirator 4 told Jane Doe 21 that she could not leave, which resulted in Jane Doe 21 being forced to sit and watch hours of additional pornographic footage.  After the incident, Jane Doe 21 expressed that she felt suicidal and was upset; she was subsequently transported to a hospital.

---

sexual energy), offering "an adjustment" (i.e., offering a modification or correction), "OM circle" (a gathering of individuals to OM), "gender balancing" (ensuring an equal number of men and women in an OM circle, course, or event), engaging "spelunkers" (i.e., third-parties who monitor and offer guidance regarding romantic relationships), and being "in" or "out" of "the game" (i.e., agreeing to participate in an activity or order), or being in the "fourth dimension."

L.    Use of Shame and Humiliation

Finally, and significantly, Daedone and Cherwitz, together with their co-conspirators, also shamed and humiliated OneTaste participants as a means of demanding commitment to Daedone and OneTaste, including by subjecting them to public shaming at OneTaste events, humiliation, ostracization and workplace retaliation if they failed to adhere to the directives of Daedone, Cherwitz and their co-conspirators.  For example, Daedone, Cherwitz, and their co-conspirators called the OneTaste participants names, such as "virus" or "energy vampire" and stated they were "worthless," "asleep," or "infecting."  Daedone, Cherwitz and their co-conspirators at times directed people in the OneTaste community not to speak to the OneTaste participants when the OneTaste participants did not adhere to directives.  Cherwitz would threaten to kick people off the sales team, bar them from participation in a course, or not permit them to be part of a demonstration, which was considered prestigious, if OneTaste salespeople did not listen to her.  As another example of humiliation, Cherwitz screamed at Jane Doe 13 when she did not achieve the number of sales that Cherwitz wanted to achieve, and blamed Jane Doe 13 for clogging the "sexual energy system" because Jane Doe 13 did not want her boyfriend to have sex with other people in the OneTaste community.

On one occasion, Cherwitz announced that everyone in a OneTaste communal home was going to participate in an OM demonstration.  The residents were brought to Cherwitz's apartment and were instructed to demonstrate an OM while Cherwitz coached.  Cherwitz called Jane Doe 2 to the front of the room to demonstrate an OM with Jane Doe 2's ex-boyfriend.  Jane Doe 2 initially refused but relented after Cherwitz ordered her to the front,

where a table was set up for the demonstration. Cherwitz then called out another OneTaste staff member and ordered him to stand in the hallway outside. While Jane Doe 2 and her ex-boyfriend were OMing, Cherwitz called out to the OneTaste staff member in the hallway and asked if he could "feel" Jane Doe 2's orgasm. Cherwitz then pushed Jane Doe 2's ex-boyfriend out of the way and began OMing with Jane Doe 2 without her consent while berating her. Cherwitz eventually stopped but continued to mock and berate Jane Doe 2 in front of the other household members while Jane Doe 2 was on the table half dressed. Cherwitz then announced to the other house members that they were not to speak with Jane Doe 2 for a period of time. Jane Doe 2 later disclosed some of her issues with Cherwitz to Daedone, Co-Conspirator 2, Co-Conspirator 4 and others.

Such tactics also helped control the OneTaste participants who remained in the community. Daedone, Cherwitz and their co-conspirators referred to people who left as "lost" and did not permit people to talk about them again. For example, on one occasion, Cherwitz punished Jane Doe 4, who was crying, by telling her to leave, which Jane Doe 3 witnessed. After Jane Doe 4 left OneTaste, no one spoke about her, prompting Jane Doe 3 to understand that if she left, she would no longer be able to communicate with people in the OneTaste community.

Daedone also called meetings—which at times lasted multiple hours, and at least some of which Cherwitz attended—where she subjected OneTaste participants to a group vote regarding whether each individual's energy was "rising" or "falling," and whether they would be permitted to stay in OneTaste. If the OneTaste participants were voted out, they were permitted

to return only if they stood in the front of the room and disclosed the darkest parts of themselves to the group.

M.      Labor and Services Performed

The object of the conspiracy was to obtain labor and services from the group of OneTaste participants to financially benefit OneTaste, and, in turn, Daedone, Cherwitz, and their co-conspirators, including by increasing their power and status within and beyond the OneTaste community and increasing profits.  The labor and services performed by the group of OneTaste participants as a result of the aforementioned tactics included, among other things, domestic services (cooking, cleaning, caretaking) provided to Daedone and others; administrative and personal assistant services to Daedone, OneTaste and other OneTaste employees; sales, marketing, pitching and recruitment work on behalf of OneTaste; video and website production, and tasks associated with magazine and other publications on behalf of OneTaste; operation of certain OneTaste locations and services, such as massage parlors and cafes, and performance of physical labor to maintain OneTaste's properties.[19]

The labor and services also consisted of work of a sexual nature, including the provision of sexual services to customers and potential customers, investors and potential investors, as well as certain other members and employees of OneTaste;[20] instruction, tutorials,

_____

[19]     In addition to obtaining labor from the OneTaste participants, the defendants and their co-conspirators also made use of their assets, in some cases using tactics of coercive control to gain access to their private residences and cars, which they used for OneTaste-related tasks.

[20]     Daedone, Cherwitz and their co-conspirators referred to individuals important to OneTaste as "VIPs" or "marks."

presentations and coaching about OneTaste's philosophy and practices, to include orgasmic meditation and other sex acts; as well as the participation in event planning, operations and management relating to OneTaste courses, retreats, "scenes," "immersions," demonstrations, parties involving bondage, domination, sadism and masochism ("BDSM") hosted by OneTaste, and other events, including but not limited to so-called "Back of House" or "BOH" work.

Daedone, Cherwitz, and others directed the OneTaste participants who served on OneTaste's sales team to "fluff" potential OneTaste customers for sales by, among other things, OMing with them or inviting them to "make out" sessions (i.e., meetings consisting of sex or some form of sexual contact) as a sales tactic to either generate sales or get clients to purchase higher-priced courses. Some of the OneTaste participants were also instructed to, and did, have sex with potential clients.[21] For example, on one occasion, OneTaste executives directed Jane Doe 1 to perform oral sex on a male student in a OneTaste course when the male student did not have a partner. On another occasion, Cherwitz suggested that Jane Doe 2 perform OM with potential clients to set them up to buy courses. After Jane Doe 2 completed an OM on one occasion, Cherwitz praised Jane Doe 2, indicating that "your pussy got him in." Cherwitz, Co-Conspirator 4 and Co-Conspirator 6 directed Jane Doe 4 and OneTaste sales team members to OM or have "a make out" with potential clients with the goal of having wealthier clients purchase higher-priced courses. Similarly, Cherwitz and Daedone both informed Jane Doe 5 that

---

[21]     Refusal to do so meant being subjected to any combination of the tactics described above, including having pay suspended, being excommunicated from the OneTaste community or otherwise excluded from events, or being subject to shaming sessions.

they wanted her to act like a sex worker, and instructed her on numerous occasions to "make out," OM and/or have sex with prospective clients and other OneTaste employees and/or members, including performing oral sex and using sex toys.[22]  Cherwitz and others praised the OneTaste participants who performed such acts, calling them "huntresses" and "fairies." Daedone and Cherwitz instructed other OneTaste participants, including Jane Doe 7, Jane Doe 8, Jane Doe 10, Jane Doe 12, Jane Doe 14 and John Doe 1 to perform similar acts, which they did, including to fill in on courses involving OMing and/or other sex acts where there were unequal gender ratios or with OneTaste staff.[23]  As just one of many examples, on one occasion, Co-Conspirator 4, a senior member of OneTaste's sales team, instructed Jane Doe 10 to engage in OM with him, which she felt compelled to do.

Cherwitz, Daedone and others would sometimes refer to these as "playing games," instructing that if the OneTaste participants wanted to "be here, you have to play the game."  These "games" included participation in "scenes" for "VIPs," or high-paying clients or people Daedone viewed as assets to expand OneTaste.  Daedone and Cherwitz arranged "scenes"

_____

[22]     In March 2021, Jane Doe 5 called the FBI National Threat Operations Center to report she had been the victim of sexual exploitation.

[23]     Other witnesses at trial are expected to testify that they were recipients of extra attention, including sexual services, by OneTaste salespeople, as a sales tactic to induce them to spend more money.  Some witnesses are also expected to testify that they were the recipients of sexual services as part of OneTaste's "aversion practice," as described above.

for VIPs, which were typically sensual or sexual in nature. "Scenes" could last from a few days to a week, and at times involved costumes, scenery, themes, decorated locations and music.

Numerous of the OneTaste participants are expected to testify about work they performed, including work sexually pleasing or serving as a "handler" for Daedone's former romantic partner and one of OneTaste's largest early investors (the "Investor"), including by living in his house and engaging with him in OMing and sexual acts.[24]  For example, Daedone asked a OneTaste employee to collect background information on the Investor and stated that she was interested in the Investor because the Investor was a billionaire and OneTaste needed money.  Daedone subsequently entered into a relationship with the Investor, and thereafter exchanged sex for money in that relationship, including by supplying women to the Investor, including Jane Doe 5 and Jane Doe 6, by, among other things, directing them to go see him.[25]

In addition to the provision of sexual services, Daedone also organized elaborate "scenes" for the Investor.  Some of the scenes included BDSM.  In one, the Investor had lunch with a woman who gave the Investor a duffel bag of clothing from Goodwill and the Investor subsequently panhandled in Union Square.  In another scene, the Investor performed oral sex on

---

[24]     The Investor loaned OneTaste substantial sums of money and advised OneTaste executives during the company's early stages.  For a significant length of the Relevant Time Period, OneTaste was in debt to the Investor.  OneTaste executives designated multiple OneTaste participants to live with the Investor in his house and to perform a variety of acts to please him to keep him engaged with OneTaste and Daedone.  Cherwitz, Co-Conspirator 2, and others also served as the Investor's "handlers" before designating others for the role.

[25]     The government anticipates that witnesses at trial will testify that Daedone at one point prior to the Relevant Time Period worked as a prostitute and understood and used sex as a financial transaction.

a woman. In another scene, Daedone whipped the Investor while he was bound up in the middle of a room. Other scenes included a "seven deadly sins" scene, an "Alice in Wonderland" scene, and a "Wizard of Oz" scene, each of which involved elaborate role play and/or sexual activity, among other scenes.

The OneTaste participants who performed work or services for the Investor included Jane Doe 5, Jane Doe 6, Jane Doe 7 and Jane Doe 18,[26] among others. The government anticipates that it will establish that Daedone, Cherwitz and multiple of their co-conspirators, including Co-Conspirator 2, performed sexual services for the Investor and, together with others, recruited their "surrogates" who served as the Investors' "handlers." For example, Daedone, Co-Conspirator 2, and Co-Conspirator 3 arranged and participated in an "interview" between Jane Doe 5 and the Investor to see how well Jane Doe 5 and the Investor would connect. After the "interview," Jane Doe 5 was instructed to stay at the Investor's residence for approximately three to six months, during which time Jane Doe 5 ensured the Investor's house was clean, prepared breakfast for the Investor, and engaged in "make outs" and sexual activity with the Investor, including BDSM on a regular basis. Co-Conspirator 2 instructed and oversaw Jane Doe 5 in her care of the Investor. Jane Doe 5 also coordinated with other women, including Jane Doe 7, who

---

[26] Jane Doe 18 performed oral sex on the Investor in the bathroom of a OneTaste center at Daedone's direction after she expressed reluctance to do it but ultimately capitulated to pressure.

had previously performed similar tasks for the Investor after being recruited by Daedone to serve as his handler.

N.    Financial Motivations

As a result of the above tactics exercised by Daedone, Cherwitz and their co-conspirators, numerous of the OneTaste participants upon leaving OneTaste were in poor physical, psychological and emotional health, were in debt or had little to no funds to support themselves and underwent years of therapy to address the tactics of coercive control they endured while at OneTaste. By contrast, the government expects the trial evidence to show that Daedone lived in relative luxury from her receipt of significant payments from OneTaste and, in March 2017, selling her interest in OneTaste for approximately $12 million—and thereafter continuing to obtain financial benefits from OneTaste. Evidence of wealth Daedone obtained from the forced labor conspiracy include her spending on expensive plastic surgeries, wearing designer clothing, financing multiple real estate purchases and extensive international travel. The trial evidence will also establish that Cherwitz received money from OneTaste.

* * *

The government anticipates presenting evidence of the aforementioned evidence through victim and witness testimony; email, text and chat communications; phone records; screen shots; victim and witness journals and contemporaneous writings regarding OneTaste; bank and other financial records; OneTaste course materials and recordings; records, scripts and recordings relating to the performance of "scenes," "experiences," or events; corporate records;

sales records; residential records; employment and payroll records; legal filings; social media posts; and other corroborating documents.

ARGUMENT

I.    <u>The Victims' Names and Personal Identifiers Should Remain Confidential at Trial</u>

The government moves <u>in</u> <u>limine</u> to allow certain testifying victims to testify in open court under a nickname, first name or pseudonym only, and to not be required to disclose uniquely identifying information, such as their addresses, names of family members, exact place of education or employment.[27]  These measures are necessary to protect victims from potential harassment from the media and others, undue embarrassment and other adverse consequences.

A.    <u>Relevant Background</u>

As detailed above, the government has identified certain of the defendants' alleged victims and other additional potential witnesses as Jane Doe 1 through Jane Doe 22, John Doe 1 and John Doe 2 (collectively, the "Victim-Witnesses"),[28] and will refer to those witnesses by those designations for purpose of this motion.  As further detailed above, the Victim-Witnesses are expected to testify at trial about the means of coercive control the defendants

---

[27]    The government does not object to the jury being provided with a copy of the victim-witnesses' names during voir dire, to remain under seal and non-public.  The government seeks the same ruling for exhibits that reference the such names and personal identifying information and specifically, that such exhibits remain under seal or redacted as appropriate.

[28]    As set forth above, the government remains in the process of identifying its trial witnesses.  Further, certain of the Victim-Witnesses may wish to testify using their full names.  The government will inform defense counsel and the Court whether this motion becomes moot as to any of the Victim-Witnesses, but so moves in an abundance of caution, as several of the Victim-Witnesses have indicated to the government concerns with testifying publicly, as outlined herein.

employed on them, and the labor they subsequently provided or were asked to provide—including domestic chores, the provision of sexual services and recruitment and sales activities, including through nontraditional and potentially embarrassing methods.

On July 31, 2024, the government requested, in the context of the defendants' pretrial motions, to limit references in court filings to Jane Doe 1 and other individuals by pseudonyms. See ECF No. 112. On August 9, 2024, the defendants opposed that request, in which they asserted that the request should be denied because the press had already reported on Jane Doe 1's name in connection with certain of her experiences at OneTaste. ECF No. 114 at 2. As the government observed in its August 13, 2024 reply, the defendants did not cite to any public statement Jane Doe 1 made or authored about her experience at OneTaste or any media interviews about OneTaste in which she directly participated. ECF No. 116 at 2. To the contrary, many of the defendants' citations were to articles about a lawsuit that OneTaste filed against her. Id.

On August 15, 2024, the government wrote to inform the Court of violations of the protective order in this case as well as Eastern District of New York Local Criminal Rule 23.1. See ECF No. 119. As detailed at length in that letter, which is incorporated by reference herein, OneTaste's counsel and agents, with whom defendants' counsel have indicated they have a joint defense agreement in the above-captioned criminal case, have directly or indirectly used information obtained in the government's discovery productions to contact potential witnesses, including to threaten lawsuits or otherwise retaliate against them. See ECF No. 119, at 4-6.

They have also used civil litigation as an improper vehicle to subpoena multiple government witnesses in this case for sensitive and highly personal information.  See id. at 7.

Since the filing of that letter, a publicly-available website indicated that OneTaste retained it to "investigate the prosecution" of the defendants.  See ███████████████████ ████████████████████████████████  Records indicate that OneTaste executives— members of the defendants' apparent defense team[29]—first began speaking with that investigator in or around April 2024.  See Ex. C (redacted Apr. 8, 2024 communication).  Beginning in April 2024, the website has since variously called the individuals whom it labels "the OneTaste accusers," including potential witnesses[30], "little victim," "fragile creature," "devil," "foolish," "tiny," "petty," "greed[y]," and "infantile," among other things.  See, e.g., ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[29]    For example, among the individuals copied on correspondence with the investigator is Kevin Williams, OneTaste's former general counsel, who, in a recent submission by the defendants, identified counsel for OneTaste as members of the "defense team" and who, among other things, indicated that OneTaste counsel reviewed Rule 16 discovery governed by the protective order in the above-captioned case.  See Decl. of Kevin Williams, Ex. B to Aug. 1, 2024 Mot. to Dismiss, ECF No. 113-3; Decl. of Rachel Caine, Ex. D to Aug. 1, 2024 Mot. to Dismiss, ECF No. 113-5.

[30]    The defendants (and thus their apparent defense team) have known that many of these individuals are potential witnesses since at least October 2023, when the government identified them as such in a letter.

████████████████████████████████

████████████████████

B.     <u>Applicable Law</u>

The Sixth Amendment's Confrontation Clause guarantees defendants the right to cross-examine adverse witnesses.  U.S. Const. amend. VI.  This right, however, is not absolute.  "[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986).  Federal Rule of Evidence 611(a) provides that the Court "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to [inter alia] . . . protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611(a); <u>see also</u> <u>United States v. Whitten</u>, 610 F.3d 168, 183 (2d Cir. 2010 (citing <u>Van Arsdall</u> and Rule 611)).

"[T]here is no absolute right of an accused to have a jury hear a witness's true name and address."  <u>Clark v. Ricketts</u>, 958 F.2d 851, 855 (9th Cir. 1991).  Rather, "only where the lack of a witness's name and address denies a defendant an opportunity to effectively cross-examine a witness . . . is [a defendant] denied his Sixth Amendment right to confrontation."  <u>United States v. Mohamed</u>, 727 F.3d 832, 838 (8th Cir. 2013) (citing <u>United States v. Spector</u>, 793 F.2d 932, 937 (8th Cir. 1986) and <u>United States v. Teller</u>, 412 F.2d 374, 380 (7th Cir. 1969)).  Where a defendant is aware of a witness's true name—but where that information is not disclosed to the public—he will be "able effectively to investigate and impeach the declarant" on

41

cross-examination.  <u>Siegfriedt v. Fair</u>, 982 F.2d 14, 18 (1st Cir. 1992).  Courts regularly permit

the government to call victims and other witnesses using pseudonyms where doing so does not

infringe on a defendant's Sixth Amendment rights.  <u>United States v. Dan Zhong</u>, No. 16-CR-614

(DLI), 2018 WL 6173430, at *2 (E.D.N.Y. Nov. 26, 2018) (granting government's motion to

have victim witnesses testify using pseudonyms); <u>United States v. Alimehmeti</u>, 284 F. Supp. 3d

477, 490 (S.D.N.Y. 2018) (permitting government to call witnesses using pseudonym where "the

information that [the government seeks to] preclude the defense from publicly eliciting – a UC's

identity – is neither exculpatory . . . nor evidently relevant at trial").  <u>United States v. Urena</u>, 8 F.

Supp. 3d 568, 573 (S.D.N.Y. 2014) ("Moreover, nothing about UC-188's real name goes to his

credibility or knowledge regarding the subject of his testimony.  The limitation imposed on the

defense is therefore negligible.").  The same is true of other identifying information.  <u>See, e.g.</u>,

<u>United States v. Pepe</u>, 747 F.2d 632, 656 n.33 (11th Cir. 1984) (finding no error in precluding

cross-examination regarding witnesses' home addresses); <u>United States v. Navarro</u>, 737 F.2d

625, 633-34 (7th Cir. 1984) (cross-examination of an informant about his home address and

current place of employment precluded); <u>United States v. Harris</u>, 501 F.2d 1, 9 (9th Cir. 1974)

("If the answer may subject the witness to harassment, humiliation, or danger, then nondisclosure

of the witness' home address may be justifiable.").

       Though courts must balance the government's reasons for requesting limitations

against a defendant's interest in the full cross-examination of a witness, courts have found that

the potential for reprisals, humiliation, or annoyance are sufficient to justify nondisclosure of

personal identifying information by a witness.  <u>See, e.g.</u>, <u>United States v. Marti</u>, 421 F.2d 1263,

1266 (2d Cir. 1970) ("We agree that the government should come forward with its reason for wanting to prevent the revelation in open court of the witness' address; the reason may be that the answer may subject the witness to reprisals or that the question is being used to humiliate or annoy the witness.").  Once the government identifies a need to protect the witness' full identity, the defendant must demonstrate a "particularized need" for the information, which the Court weighs against the harm to the witness.  United States v. Marcus, No. 05-CR-457 (ARR), 2007 WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007).

In the context of victim witnesses, compelling reasons justify limiting public disclosure of not only victims' names, but also other sensitive information offered at trial. Indeed, the Court has its own independent obligation in this regard: the Crime Victims' Rights Act, 18 U.S.C. § 3771, requires district courts to implement procedures to ensure that crime victims are accorded, among other rights, "[t]he right to be reasonably protected from the accused," in addition to "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy."  Thus, courts in this Circuit routinely grant motions for victim-witnesses to testify using pseudonyms in cases involving explicit subject matters or where victims have legitimate fears of media harassment or employment consequences from trial publicity.  See, e.g., Sept. 26, 2024 Order, ECF No. 56, United States v. Terranova, 23-CR-516 (KAM) (E.D.N.Y.), at 20-22 (allowing John Does and their parents to testify using first names or pseudonyms to "spare the John Does needless embarrassment, anxiety, potential harassment, and social stigma, and will avoid chilling their testimony in the instant case"); Nov. 1, 2021 Tr. of Proc., ECF No. 465, United States v. Maxwell, 20-CR-330 (AJN) (S.D.N.Y.), at 6-8 (ruling in

43

case with sex trafficking and related charges that "limiting disclosure here would protect the alleged victims from potential harassment from the media and others, undue embarrassment and other adverse consequences," and further noting that "[i]t is quite common for alleged victims, both in cases that have garnered media attention and those involving allegations of sex abuse, to testify or be referred to by pseudonyms or first names." (collecting cases)); Aug. 3, 2021 Tr. of Proc., United States v. Kelly, 19-CR-286 (AMD) (E.D.N.Y.), ECF No. 255, at 19-21 (allowing victims to testify using pseudonyms or first names only where victims were expected to testify about "degrading and humiliating treatment" and where case had garnered media attention with "significant risk of humiliation and reprisals"); United States v. Raniere, No. 18-CR-204 (NGG), ECF No. 622, at 29-35 (holding that "forcing victims to openly identify themselves" could "chill their willingness to testify" and "cause other victims to fear seeking help from law enforcement as that could subject them to further harassment and embarrassment"); Marcus, 2007 WL 330388, at *1-2 (ruling that potential harassment, potential loss of employment, and the explicit nature of anticipated testimony are legitimate reasons to protect witnesses' full identity and to exclude mention of witnesses' home addresses, and current places of employment).

      C.      <u>The Limited Protections Requested for the Victim Witnesses' Personal Identifiers Are Reasonable and Appropriate</u>

The limited protections requested by the government are reasonable, necessary and appropriate to protect the safety and well-being of the Victim-Witnesses, prevent them from being harassed by the press and others, and prevent undue embarrassment and other adverse consequences, such as loss of employment. Because the defendants will know the true identify of all of the Victim-Witnesses, to require the Victim-Witnesses to provide full identifying

information does not serve any of the legitimate purposes identified by the courts. Rather, requiring them to provide identifying information would serve only to harass, embarrass and "humiliate or annoy" the Victim-Witnesses, <u>Marti</u>, 421 F.2d at 1266, purposes that are directly at odds with the rights that victims are to be afforded under the Crime Victims' Rights Act. Indeed, requiring victims of a forced labor conspiracy, where those victims were coerced to provide degrading services, to provide their names in public could chill their willingness to testify, for fear of having their personal histories publicized, and the embarrassment and humiliation that such publicity could cause them as they rebuild their lives.

Indeed, that fear and attendant chilling effect are not speculative or mere risks in this case. OneTaste, in a joint defense agreement with the defense team in this case, has retained an investigator who has not only been publicizing the personal histories of potential witnesses in this case but, as outlined above, has been resorting to petty name-calling. That same entity (OneTaste) has been threatening litigation against potential witnesses. Thus, the risk of "humiliation and reprisals" that have led numerous courts to protect victims' identities are demonstrably present here. <u>Kelly</u>, 19-CR-286 (AMD) (E.D.N.Y.), ECF No. 255, at 20.

Insofar as the defendants may renew some argument—as they argued previously with respect to Jane Doe 1—that because some of the Victim-Witnesses' names may already be in the public sphere, that somehow means the above analysis is inapplicable, <u>see</u> ECF No. 114— any such argument is untethered to the applicable legal analysis, even setting aside that the majority of the Victim-Witnesses have never spoken to the press nor sought to have their experiences at OneTaste, which uniformly involve sensitive conduct, be publicly aired. Rather,

the Second Circuit has identified "two central interests" in limiting cross-examination as to witness identifiers on cross-examination: (1) to obtain "information which may be helpful in investigating the witness out of court or in further cross-examination"; and (2) "because knowledge of [such information] by the jury might be important to its deliberations as to the witness' credibility or his knowledgeability." Marti, 421 F.2d at 1265-66. Whether a case has already received media attention has no bearing on those concerns, and numerous courts having considered that factor have rejected it. See, e.g., Aug. 3, 2021 Tr. of Proceedings, Kelly, No. 19-CR-286 (AMD), at 53 (overruling objection to victim testifying using first name only "based on the fact that apparently some of these witnesses . . . have spoken in other forums" because "I'm not sure that's a reason to force them to testify about these particular thigs using their full names"); Raniere, No. 18-CR-204 (NGG), ECF No. 622, at 34 n.17 (rejecting argument that there was no need to protect victim identities where "the names of several victims are already publicly available, and that some victims have made themselves public 'by choice'" because "[w]hether true or not, these facts are irrelevant; just because some victims' names are publicly available does not mean that the details of their experience are already available" and "the choice of a victim to publicly discuss a crime is not analogous to being put on the stand about it, as, in court, the victim will not be able to choose how and to what level of detail she discusses the crime."); Maxwell, No. 20-CR-330 (AJN), ECF No. 465, at 9-10 (holding same, and observing that "[n]ot all accusations and public statements are equal. Deciding to participate in or contribute to a criminal investigation or prosecution is a far different matter than simply making

a public statement relating to Ms. Maxwell or Jeffrey Epstein."); Sept. 26, 2024 Order, ECF No. 56, United States v. Terranova, 23-CR-516 (KAM) (E.D.N.Y.), at 22-23 (holding same).

Finally, the government expects that the defendants will be unable to articulate any legitimate "particularized need" for the disclosure of the Victim-Witnesses' identity information in open court. The defendants in this case either know who the Victim-Witnesses are or the government will identify the them for the defendants' attorneys in advance of trial. Accordingly, the defendants will not be prevented from presenting a defense in the event that they are referred to by only their first names and limiting other specific identifying information during the trial. The Victim-Witnesses' current addresses, family members' names and schools or places of employment (if any) are entirely irrelevant to their testimony, while there is a risk that disclosure of that information would identify the Victim-Witnesses with particularity, and thus subject them to harassment and embarrassment, or additional consequences. See Bennett, 409 F.2d at 901 (district court did not err in allowing government witness not to identify place of employment where defense failed to demonstrate a "particularized need" for the information).[31]

---

[31] The government would consent to an appropriate jury instruction explaining that the reason for the precautions is regard for the victims' privacy, and that no inference should be drawn against the defendant because of those precautions. See, e.g., Raniere, ECF No. 622, at 33-34 ("[T]he court is confident that any prejudice can be cured with a jury instruction explaining that the reason for the anonymity is regard for the witnesses' and non-witness victims' privacy"); Maxwell, 20-CR-330 (AJN), ECF No. 465, at 9 ("any potential prejudice in this regard can be cured with an appropriate instruction explaining that the reason for the precaution is regard for the witnesses' and alleged victims' privacy, and that no interference can or should be drawn against the defendant because of these precautions").

For all of these reasons, the government respectfully requests that the Court limit the disclosure at trial of the Victim-Witnesses' personal identifying information and allow them to testify by pseudonym or first name only.

II.   Evidence of and Argument Regarding the Victim-Witnesses' Involvement in Other
       Sexual Behavior Should Be Precluded

As outlined above, the government expects the trial evidence to demonstrate that the defendants deployed a number of abusive tactics to obtain the labor and services of the Victim-Witnesses including, in certain instances, collecting information about Victim-Witnesses' and others' prior trauma, sexual histories and relationships as a means of drawing them into OneTaste and then influencing and controlling them.  Thus, some Victim-Witnesses may testify about prior sexual experiences in the context of explaining why they became or remained involved in OneTaste, and what the defendants and other co-conspirators knew of their sexual histories.

For the reasons explained below, the Court should preclude the defendants from offering evidence of and argument about any Victim-Witnesses' involvement in sexual behavior outside of their experiences at OneTaste, including but not limited to any argument that any prior or subsequent prostitution or other sexual behavior outside of their experiences at OneTaste is evidence that the defendants did not compel the Victim-Witnesses to perform labor of a sexual nature in this case.  Further, to the extent the Victim-Witnesses testify about such sexual behavior in the context of explaining their experiences at OneTaste, the Court should limit cross-examination about those sexual experiences.

A.    Legal Standard

Federal Rule of Evidence 412 expressly provides that, in a criminal proceeding involving sexual misconduct, "evidence offered to prove that a victim engaged in other sexual behavior" or "evidence offered to prove a victim's sexual predisposition" is not admissible, except in three narrow circumstances.  Fed. R. Evid. 412(a), (b).  Rule 412 "aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details" and to "encourage[ ] victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders."  Fed. R. Evid. 412 advisory committee note.  The provisions of Rule 412 apply in a "civil or criminal proceeding involving alleged sexual misconduct," Fed. R. Evid. 412(a), including in forced labor cases brought pursuant to 18 U.S.C. § 1589, like this one, that so involve, see United States v. Rivera, 799 F.3d 180, 185 n.3 (2d Cir. 2015) (rejecting argument that Rule 412 was inapplicable to forced labor counts pursuant to 18 U.S.C. § 1589 where the "'labor' the victims were forced to provide was, in part, prostitution, and some of the means by which Appellants compelled the victims' forced labor was through sexual assault and the threat of sexual assault," thus finding that "this was a 'criminal proceeding involving alleged sexual misconduct'" (citing Fed. R. Evid. 412(a)).

Rule 412 imposes clear limits on a defendant's ability to introduce evidence that a victim engaged in other sexual behavior or has a propensity to engage in sexual acts.  In the context of criminal cases, the Rule prescribes very limited exceptions to this inadmissibility:

> The court may admit the following evidence in a criminal case:
> (A) evidence of specific instances of a victim's sexual behavior, if

49

> offered to prove that someone other than the defendant was the
> source of semen, injury, or other physical evidence; (B) evidence of
> specific instances of a victim's sexual behavior with respect to the
> person accused of the sexual misconduct, if offered by the defendant
> to prove consent or if offered by the prosecutor; and (C) evidence
> whose exclusion would violate the defendant's constitutional rights.

Fed. R. Evid. 412(b). If a defendant intends to introduce evidence of a victim's other sexual behavior or alleged sexual predisposition under one of these exceptions, the rule requires the filing of a sealed motion no less than fourteen days before trial that "specifically describes the evidence and states the purpose for which it is to be offered," with notice to the victim or her representative. Fed. R. Evid. 412(c)(1). Failure to do so without good cause should result in automatic exclusion. United States v. Romone, 218 F.3d 1229, 1235-36 (10th Cir. 2000).

  As Judge Posner has explained, the policy rationale behind the rule encourages victims of sex offenses to come forward: "If admissible, such evidence would deter many victims of sexual abuse from testifying . . . ." United States v. Cephus, 684 F.3d 703, 708 (7th Cir. 2012) (Posner, J.) (finding that evidence of victim's prior prostitution was irrelevant to charge of sex trafficking); see Fed. R. Evid. 412 advisory committee note ("Rule 412 has been revised . . . to expand the protection afforded alleged victims of sexual misconduct."); see also 18 U.S.C. § 3771(a)(8) ("A crime victim has . . . [t]he right to be treated with fairness and with respect for the victim's dignity and privacy.").

  B. Discussion

  Any evidence of the Victim-Witnesses' sexual behavior with anyone other than persons involved in OneTaste or at the defendants' direction would be irrelevant to the charges against the defendant, except insofar as the Victim-Witnesses may testify to their having

disclosed to the defendants or other members of OneTaste information about their sexual histories that the defendants then used to coerce the labor in this case.  As the Second Circuit has held, "[e]vidence of victims' prior acts of" sexual behavior—in that case, commercial sex acts— was "irrelevant to whether those victims were <u>coerced into</u> working as prostitutes."  <u>Rivera</u>, 799 F.3d at 185 (emphasis in original) (rejecting defense argument that a victim's "experience in the sex industry, and knowledge of its practices, [was] relevant to whether she was coerced or whether, on the other hand, she knew precisely what she was getting into and accepted it as part of a money-making endeavor.").  Rule 412 thus squarely prohibits defense cross-examination or other evidence or argument as the Victim-Witnesses' sexual behavior outside of their experiences at OneTaste at the direction of the defendants.  <u>See id.</u> ("The very purpose of the Rule is to preclude defendants from arguing that because the victim previously consented to have sex—for love or money—her claims of coercion should not be believed.").

Here, as to certain of the Victim-Witnesses, the defendants' knowledge of the Victim-Witnesses' prior sexual behavior was one of the means through which the defendants attempted to recruit the Victim-Witnesses into OneTaste—indeed, the evidence will show that it was a sales tactic employed by the defendants—and then, once in the OneTaste community and more susceptible to the defendants' influence, control them.  Importantly, none of the Victim-Witnesses' testimony as to the defendants' knowledge of prior sexual behavior will include descriptions of that sexual behavior outside what the defendants' and/or their agents and co-conspirators were told.  Thus, cross-examination on such instances of prior sexual behavior should be accordingly limited as it would have no probative value and, in any event, only serve

51

to confuse the issues, waste time, and harass the Victims.  See Van Arsdall, 475 U.S. at 679

("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose

reasonable limits on . . . cross-examination based on concerns about, among other things,

harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

repetitive or only marginally relevant."); Fed. R. Evid. 611(a); Fed. R. Evid. 403; United States

v. One Feather, 702 F.2d 736, 739 (8th Cir. 1983) ("The policy of Rule 412, to guard against

unwarranted intrusion into the victim's private life, may be taken into account in determining the

amount of unfair prejudice under Rule 403.").

Accordingly, the Court should preclude the defendants from introducing evidence

regarding the Victim-Witnesses engaging in sexual acts or contact with anyone other than at the

defendants' direction and/or such sexual behavior that they were coerced into performing while

at OneTaste, or otherwise referencing such inadmissible evidence at any other phase of the jury

trial.  In addition, to the extent that the defendants intend to introduce such evidence, they should

be required to file a motion with the Court in accordance with Rule 412(c) no less than two

weeks prior to trial, with notice to the Victim-Witnesses.

III.     The Court Should Preclude Evidence or Arguments that Are Irrelevant, Unfairly Prejudicial, Misstate the Law or Invite Jury Nullification

The defendants and their counsel should be precluded from introducing evidence or making arguments before the jury that urge nullification, put the government on trial, smear victims, and otherwise seek to impugn or put at issue the government's conduct or motive in its prosecution of this matter or invite the jury to render its decision based on improper legal and factual considerations.

A.      Relevant Facts

The defendants have given clear signals in their pretrial filings, discovery requests and public statements about how they intend to try this case: by attempting to divert the jury's attention from their own conduct and to improperly put the government on trial. These arguments, which are irrelevant, unfairly prejudicial, misstate the law, confuse the issues, and invite jury nullification, include: (a) the length and nature of the government's investigation, that OneTaste at times took a purportedly cooperative posture with the government and is not a defendant, and that the forced labor conspiracy charge is the sole count of the Indictment somehow are indicia of a lack of evidence in the case; (b) law enforcement's purported improper use of the term "victim" when interviewing potential witnesses; (c) the government based the investigation and indictment on media reports or otherwise somehow conspired with members of the media; (d) the forced labor conspiracy charge is novel and the government is "uncomfortable" or has feelings or opinions regarding the defendants' "practice and culture of OM"; (e) references to the potential punishment the defendants face should they be convicted; and (f) arguments recycled from the defendants' motions to dismiss, including pertaining to the

government's possession of a purportedly privileged document and the defendants' inaccurate characterizations of a law enforcement agent's communications with Jane Doe 1 regarding Jane Doe 1's deletion of an email account. See, e.g., July 5, 2023 Def. Ltr., ECF No. 32, at 2 (asserting that the force labor conspiracy charge is "the culmination of a five-year government investigation into Ms. Cherwitz, Ms. Daedone, and OneTaste, suggesting that the reason for the Indictment's insufficiencies is not simply poor Indictment drafting but a lack of evidence to support the single charge within it"); September 20, 2023 Def. Ltr., ECF No. 44, at 1 n.1 ("Before indicting Ms. Daedone and Ms. Cherwitz, the government engaged in a five-year investigation during which Steptoe lawyers, both on behalf of Ms. Daedone and the Institute of OM, were exceedingly cooperative and communicative with the government, [including by] repeatedly reach[ing] out to the government offering their clients' full cooperation," and citing to purportedly "unreturned" phone calls and "in-person meetings with the government at which counsel made substantive factual presentations"); March 1, 2024 Def. Ltr., ECF No. 80, at 1 (asserting that the government is "uncomfortable" or "disapproves" of the defendants' "practice and culture of OM"); "Feds are 'criminalizing sex' in NYC case against alleged 'orgasm cult' OneTaste: lawyers," available at https://nypost.com/2024/07/03/us-news/feds-are-criminalizing-sex-in-nyc-case-against-alleged-orgasm-cult-onetaste-lawyers/ (defense attorney for defendant Daedone suggesting that the government is attempting to put the defendants "in prison for funsies"); Defs.' Mots. to Dismiss, ECF Nos. 95, 96, 98, 99, 104, 105, 113, 141 (urging dismissal based on attorney-client privilege and spoliation); see also ECF No. 96, at 5-6 (alleging

"egregious errors" committed by law enforcement agents in informing potential victims of their rights and asserting that the government was somehow "victim shop[ping]").

Such arguments are improper, irrelevant to innocence or guilt and should be categorically precluded.

B.      Applicable Law

Under Federal Rule of Evidence 402, "irrelevant evidence is not admissible" at trial, Fed. R. Evid. 402, and under Federal Rule of Evidence 403, a court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence," Fed. R. Evid. 403; see also United States v. Miller, 626 F.3d 682, 689-90 (2d Cir. 2010). Further, a defendant is not entitled to advance an argument or introduce evidence to obtain an acquittal or mistrial through jury nullification. A defendant's attempt to focus the jury on sympathy, prejudice or public opinion in coming to a verdict, rather than on the evidence and facts before it, "subverts the jury's solemn duty to 'take the law from the court, and apply that law to the facts of the case as they find them to be from the evidence.'" See In re United States, 945 F.3d 616, 627 (2d Cir. 2019) (quoting Sparf v. United States, 156 U.S. 51, 102 (1985)).

C.      Discussion

The Court should preclude such improper arguments here, including those identified above and any variations on those arguments.

First, the Court should preclude any evidence or argument as to the length, scope or nature of the government's investigation in this case, as well as any potential arguments that the government has colluded with the media or otherwise improperly relied on media reports concerning OneTaste, or that the government has improperly used the term "victim" when speaking with witnesses.  Courts have consistently held—and often give jury instructions reflecting—that arguments regarding the government's decisions during an investigation and its motives and timing in bringing charges are irrelevant, unduly prejudicial and improperly invite jury nullification.  See, e.g., United States v. Knox, 687 F. App'x 51 (2d Cir. 2017) (instructing jury that "government is not on trial" is "appropriate"); United States v. Saldarriaga, 204 F.3d 50, 52 (2d Cir. 2000) (affirming jury charge stating that "[t]he government's function is to give enough evidence to satisfy you beyond a reasonable doubt that the charges are true, and the fact that there are a thousand[] other things they could have done is wholly irrelevant"); United States v. Rosado, 728 F.2d 89, 93 (2d Cir. 1984) (criticizing admission of evidence about the propriety of a prosecution "for turning the trial away from a determination of whether the elements of the offense charged had been proved beyond a reasonable doubt into a wide-ranging inquiry into matters far beyond the scope of legitimate issues in a criminal trial").  That is so because such claims are "not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."  United States v. Armstrong, 517 U.S. 456, 463 (1996).  The Second Circuit has explained that claims of purported government misconduct must be "directed to the court rather than jury."  United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997).

Second, defense counsel should be prohibited from arguing, suggesting, hinting or presenting evidence to the jury that the charge is a novel or unusual application of the forced labor statute, including any argument that the government is overstepping or has some kind of discomfort with the defendants' practices, or that convicting the defendants may lead to a "slippery slope," as such arguments are either legal matters within the province of the Court or otherwise have no probative value and would only serve to confuse and mislead the jury, whose sole role is to consider the evidence and defendants before it.  See, e.g., Fed. R. Evid. 402; Fed. R. Evid. 403; United States v. Stewart, No. 03-CR-717 (MGC), 2004 WL 113506, at *2 (S.D.N.Y. Jan. 26, 2004) (precluding defense counsel from arguing that government's charging theory was a novel application of securities law); United States v. Motovich, No. 21-CR-497 (WFK), 2024 WL 3303723, at *6 (E.D.N.Y. July 2, 2024) ("The novelty or unusualness of the bank fraud charges is irrelevant to the question presented to the jury—whether or not Defendant committed bank fraud.").

Third, evidence or argument concerning sentences and the possible punishment the defendants might face if convicted is irrelevant to the jurors' fact-finding task.  It is well-settled law that "juries are not to consider the consequences of their verdicts" and should reach their verdicts "without regard to what sentence might be imposed."  Shannon v. United States, 512 U.S. 573, 579 (1994); see United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992).  Thus, "as a general matter, jurors are not informed of mandatory minimum or maximum sentences." Shannon, 512 U.S. at 586; see also, e.g., United States v. Johnson, 62 F.3d 849, 850-51 (6th Cir. 1995) ("every circuit to address this issue has held that a defendant is not entitled to an

57

instruction about a mandatory sentence").  The possible punishment a defendant might face is simply not the jury's concern and is entirely irrelevant.  Moreover, providing information about possible punishment to the jury would create a danger of unfair prejudice and confusion that would substantially outweigh its null probative value.  Such information "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."  Shannon, 512 U.S. at 579.  In particular, information about possible punishment poses the obvious danger that the jury will decide guilt not on the evidence presented but on whether the jury believes that the punishments fit the alleged crimes.  In other words, such information would serve to facilitate jury nullification, a danger that this Court has an affirmative "duty to forestall or prevent."  United States v. Thomas, 116 F.3d 606, 614-16 (2d Cir. 1997) (jury nullification is a violation of a juror's oath and courts may not permit jury nullification to occur "when it is within their authority to prevent").  For this reason, courts have repeatedly precluded evidence and argument about potential punishment on the grounds that it is irrelevant and unduly prejudicial.  See, e.g., United States v. Graziano, 558 F. Supp. 2d 304, 326-27 (E.D.N.Y. 2008) (reference to mandatory minimum sentence should be precluded under Rule 403 because such information "creates a substantial danger that the jury will consciously or subconsciously allow knowledge of such punishment to impact on their deliberations on the question of the defendant's guilt or innocence" and thereby presents a "danger of unfair prejudice"); see also United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996); United States v. McDonald, 933 F.2d 1519, 1526 (10th Cir. 1991).

Fourth, the defendants should not be permitted to seek to relitigate the Court's determinations on their pretrial motions to dismiss, including pertaining to the government's possession of purportedly privileged documents and their assertions of spoliation. As the Court has already determined, such motions were not bases to dismiss the above-captioned indictment or evidence of government misconduct. Sept. 27, 2024 Tr. of Proc., at 18-28. In light of the Court's rulings, the defendants cannot seek to inject into trial arguments or evidence that are contrary to court rulings, relate to legal issues required to be raised pretrial or concern legal questions that are otherwise within the sole province of the courts. See United States v. Lights, No. 15-CR-721, 2016 WL 7098633, at *1-2 (S.D.N.Y. Dec. 5, 2016) ("The stop and subsequent searches were all based on valid probable cause. This issue has been litigated and decided. No reference to the illegality of the stop or subsequent searches will be permitted at trial . . ."); cf. United States v. Dupree, 833 F. Supp. 2d 255, 272 (E.D.N.Y. 2011) ("The court cannot and will not permit this case to become a referendum before the jury on the appropriateness or legality of government conduct that has already been found appropriate and lawful and which has no bearing on the reliability of evidence offered against defendants. Therefore, the court grants the government's motion to preclude defendants from presenting evidence or eliciting testimony during direct or cross-examination regarding their allegations of prosecutorial misconduct."), rev'd and remanded on other grounds, 706 F.3d 131 (2d Cir. 2013). Furthermore, Rule 104 of the Federal Rules of Evidence makes clear that the Court decides "preliminary questions" outside the presence of the jury when justice so requires, including whether evidence is admissible. See Fed. R. Evid. 104. Accordingly, the defendants should be precluded from recycling arguments from

their pretrial motions before the jury.  To permit such arguments would, in essence, invite nullification by asking the jury to acquit on a basis not supported by the law.

In brief, the jury's attention belongs on "the evidence or lack of evidence that had been presented at trial," Saldarriaga, 204 F.3d at 52, not on the government's purported motives, investigation or other improper arguments.  Evidence concerning such matters is irrelevant, and introduction of evidence or argument concerning the same would present an unacceptable risk of confusing the issues and misleading the jury.  The Court should therefore preclude any such evidence or argument, including the arguments identified above.  See, e.g., Stewart, 2004 WL 113506, at *1 (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]"); United States v. Reese, 933 F. Supp. 2d 579, 583-84 (S.D.N.Y. 2013) ("[A] defendant may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case.").[32]

---

[32]    Relatedly, the Court should preclude reference or argument pertaining to the circumstances of the defendants' arrests, including precluding any commentary or elicitation of testimony about such circumstances, including, but not limited to, the government's means of effecting the Cherwitz's arrest and Daedone's surrender, or the timing of the defendants' arrests and initial appearances.  As with arguments pertaining to the government's motives or investigation, such references or argument are inadmissible because they are relevant—they say nothing to make a fact of consequence in this case, such as whether the defendants conspired to commit forced labor, more or less true.  See Fed. R. Evid. 401; see also United States v. Reevey, 364 F.3d 151, 157–58 (4th Cir. 2004) (evidence of circumstances of defendant's arrest was inadmissible as confusing and misleading because the defendant "was not charged with any offense arising out of the circumstances surrounding his arrest").  The only purpose in introducing evidence about the circumstances of the defendants' arrests would be to attempt to invoke sympathy from the jury, an improper purpose for which any conceivable probative value (of which there is none) would be substantially outweighed by the unfair prejudice of such a ploy for sympathy.  See Fed. R. Evid. 403.

IV.    Evidence of the Defendants' Tactics to Implement the Forced Labor Scheme Is
       Admissible at Trial

        The government seeks to offer the evidence outlined in the Statement of Facts,

supra at 2-37, at trial.  As explained below, this evidence is relevant and admissible at trial.

First, the evidence is admissible because it is directly relevant to and inextricably intertwined

with the evidence of the charged offense.  In the alternative, evidence of the defendants' acts is

also admissible under Rules 404(b).

        A.      Legal Standard

        Although Rule 404(b) generally governs the admission of evidence regarding a

defendant's other crimes, wrongs or acts, it is well settled that "'evidence of uncharged criminal

activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the

same transaction or series of transactions as the charged offense, if it is inextricably intertwined

with the evidence regarding the charged offense, or if it is necessary to complete the story of the

crime on trial.'"  United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (quoting United States

v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997)); see also United States v. Towne, 870 F.2d 880,

886 (2d Cir. 1989) (same); accord United States v. Reed, 576 F. App'x 60, 61 (2d Cir. 2014)

(same).  The Second Circuit has explained that, "[t]o be relevant, evidence need only tend to

prove the government's case, and evidence that adds context and dimension to the government's

proof of the charges can have that tendency."  United States v. Gonzalez, 110 F.3d 936, 941 (2d

Cir. 1997).

        Accordingly, "[r]elevant evidence is not confined to that which directly

establishes an element of the crime."  Id.; see also Fed. R. Evid. 401, 402.  Evidence that

61

"provide[s] background" for the alleged events may be admitted to show "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."  United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991); United States v. Diaz, 176 F.3d 52, 80 (2d Cir. 1999) (evidence of uncharged acts admitted to show "how illegal relationships and mutual trust developed" between individuals); United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between participants in the crime developed.").  Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case."  Old Chief v. United States, 519 U.S. 172, 183 (1997); see also United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ("[E]vidence of other bad acts may be admitted to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense.").

When the indictment contains a conspiracy charge, "uncharged acts may also be admissible as direct evidence of the conspiracy itself."  United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994).  As the Second Circuit has explained, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule

404(b); rather, it is part of the very act charged." Id. (quoting United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992)). Uncharged conduct may be admissible even if it occurred prior to the charged conspiracy if it allows the jury to understand the origin of the defendants' participation in the charged conspiracy, as well as relationships between the co-conspirators. See United States v. Langford, 990 F.2d 65 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."); United States v. Williams, No. 13-CR-419 (S-2) (DLI), 2016 WL 4536864, at *7 (E.D.N.Y. Aug. 30, 2016) (quoting Carboni, 204 F.3d at 44)); United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 1875658, at *3 (E.D.N.Y. Apr. 22, 2015) (finding that acts by co-conspirators prior to the start of the conspiracy elaborate the relationship between the defendants).

Where evidence of other acts is not permissible as background evidence or direct evidence of a substantive crime or conspiracy, it nonetheless is admissible pursuant to Rule 404(b) if offered for permissible purposes, including to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, among other uses. Fed. R. Evid. 404(b)(2); see United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988). A party must satisfy three requirements in order for evidence of "other crimes, wrongs or acts" to be admitted under the rule. First, the evidence must be offered for a purpose other than to prove a defendant's bad character or criminal propensity. United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991); United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989). Second, the evidence must be relevant under Rules 401 and 402 and not run afoul of Rule 403. See Mickens,

926 F.2d at 1328; Ortiz, 857 F.2d at 903; United States v. Levy, 731 F.2d 997, 1002 (2d Cir.

1984).

Third, if the defendant requests that the jury be instructed as to the limited

purpose for which the government's evidence is being admitted, the court must furnish such an

instruction. See Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002. The Second Circuit

"has long adopted an 'inclusionary' approach to the admission of uncharged crime evidence,

under which evidence of prior crimes, wrongs, or acts 'is admissible for any purpose other than

to show a defendant's criminal propensity.'" United States v. Paulino, 445 F.3d 211, 221 (2d

Cir. 2006) (quoting United States v. Pitre, 960 F.2d 1112, 1118-19 (2d Cir. 1992) (emphasis

added)).

B.    The Proffered Evidence is Directly Relevant to, and Inextricably Intertwined
      With, Evidence of the Charged Forced Labor Conspiracy

For the following reasons, certain evidence of other acts is direct evidence of, and

inextricably intertwined with, the evidence of the charged forced labor conspiracy and thus

admissible to complete the story of the charged crime. In the alternative, such evidence is

admissible pursuant to Rule 404(b).

1.    OneTaste's Sales and Employment Practices and Payments

a.    Facts

The government anticipates that it will establish at trial that OneTaste engaged in

predatory sales and employment practices to obtain the labor and services of the OneTaste

participants for the financial benefit of OneTaste, the defendants, and their co-conspirators, as

described at length above and which included, among other things, encouraging and assisting the

OneTaste participants to incur debt or use other means, including marriage, romantic partnerships and "work trade" agreements to pay for OneTaste's courses. Through the use of such practices, the defendants and their co-conspirators extracted hours of services and labor from the OneTaste participants in exchange for their enrollment in courses. Over time, the defendants and their co-conspirators pressured the OneTaste participants to continue to enroll in additional, more expensive courses—as an explicit or tacit condition of their continued employment at OneTaste or residence at a OneTaste communal home—which resulted in the accumulation of additional debt. To justify the exorbitant costs of participating in OneTaste courses, the defendants and their co-conspirators exalted the necessity of attending the courses as a means of obtaining enlightenment and dismissed the OneTaste participants' concerns about their finances by insisting that debt was an illusion and focusing on debt was a limit to personal freedom.

Further, and as also detailed at length above, the defendants and their co-conspirators simultaneously employed abusive employment tactics which drove the OneTaste participants further into debt and dependence on OneTaste and inhibited their ability to cease performing labor and services for OneTaste. As a result of such tactics, many of the OneTaste participants—who relied on OneTaste for their livelihoods and, in many cases, for housing and other basic necessities—had little to no savings or were in significant debt at the time they left OneTaste. In the limited cases where the OneTaste participants subsequently demanded that OneTaste repay money owed to them, the defendants and their co-conspirators attempted to

evade making the payments or required the OneTaste participants to threaten lawsuits or sign non-disclosure agreements before receiving any funds.

Furthermore, the government anticipates that it will establish that the primary beneficiaries of OneTaste's pyramid-like structure and coercive employment tactics were the defendants and their co-conspirators, who earned substantially more money than the OneTaste participants, and Daedone in particular, who, in 2017, sold her interest in OneTaste for approximately $12 million.

b.  Admissibility

Evidence of defendants' and co-conspirators' involvement in the practices described above is admissible, direct evidence of the charged forced labor conspiracy, as it establishes that defendants' and co-conspirators' intent and agreement to obtain the labor and services of the OneTaste participants by means of serious harm or threats of serious harm to the OneTaste participants, and by means of a scheme, plan or pattern intended to cause the OneTaste participants to believe that, if they did not perform such labor or services, they would suffer serious harm.  18 U.S.C. § 1589(a)(2) & (4).  Furthermore, such evidence establishes that the defendants agreed to benefit from participation in a venture which engaged in obtaining labor or services through such means, with knowledge or in reckless disregard of the fact that such means would be used.  18 U.S.C. § 1589(b).

Consideration of such evidence is central to the jury's determination because the definition of "serious harm" in the forced labor statute includes, among other things, financial harm, and requires consideration of whether the harm was sufficiently serious "under all of the

66

surrounding circumstances" to cause a reasonable person "in the same background in the same circumstances" to perform or continue performing labor or services to avoid incurring that harm. See 18 U.S.C. § 1589(c)(2) (defining "serious harm" as "any harm, whether physical or nonphysical, including psychological, <u>financial</u>, or reputational harm, that is sufficiently serious, <u>under all the surrounding circumstances</u>, to compel a <u>reasonable person of the same background and in the same circumstances</u> to perform or to continue performing labor or services in order to avoid incurring that harm" (emphasis added)).   Accordingly, the defendants' imposition of financial harm on the OneTaste participants, and the OneTaste participants' financial states at the time that they were victims of the charged conspiracy, are plainly relevant to the charged offense.  See Raniere, 384 F. Supp. 3d 282, 326 (E.D.N.Y. 2019) (observing that the forced labor statute defines serious harm based on "all the surrounding circumstances").

In addition, the sales and employment practices set forth above are admissible because they are inextricably intertwined with the forced labor conspiracy.  An understanding of the victims' experience with the defendants' predatory sales and employment practices and the financial impact they had on the OneTaste participants is crucial to understanding their states of mind when defendants and co-conspirators coerced them into performing labor and services for OneTaste, particularly as their financial burden accumulated over time.  Indeed, the victims will be unable to recount their experiences with the defendants and at OneTaste without explaining why they were there, the work performed there and the employment arrangements, if any, that they had.

In the alternative, evidence of the defendants' and co-conspirators' predatory sales and employment practices are also admissible pursuant to Rule 404(b) because they demonstrate the knowledge, motive, intent, lack of mistake, common scheme or plan, and modus operandi of the defendants and their co-conspirators, all senior executives at OneTaste who were well-aware of the OneTaste participants' financial dependence on OneTaste and who collectively executed elaborate trainings to perpetuate OneTaste's predatory sales practices.

Finally, several of the OneTaste participants, in addition to falling victim to OneTaste's aggressive sales and employment tactics, also perpetuated such tactics themselves as members of OneTaste's sales team or, in the case of Jane Doe 4, as an owner of OneTaste NYC. Accordingly, evidence of these practices is also admissible for the proper purposes of corroborating their testimony and to blunt the expected cross-examination of these witnesses. See United States v. Everett, 825 F.2d 658, 660 (2d Cir. 1987), United States v. Guerrero, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011).

### 2. OneTaste's Teachings, Rituals and Practices

#### a. Facts

The government anticipates that it will establish that the defendants and their co-conspirators used OneTaste's teachings, rituals and practices, which the defendants and their co-conspirators created and promoted, to increase and maintain power and control over the OneTaste participants, as set forth in detail above, and which include promulgating a philosophy and ethos in which Daedone served as a "guru"-like leader who oversaw a community with its

own rules, lexicon, mantras, commands and ceremonies[33] and taught that the OneTaste participants should sacrifice themselves and their bodies in service of "the Orgasm." Among the central tenants that defendants and their co-conspirators preached was the idea that OneTaste participants should engage in "unconditional sex" as a path to fulfilment and enlightenment. To that end, the defendants and their co-conspirators offered a variety of courses and recordings addressing interpersonal relationships and how to perform various sexual acts, including "male OM," "Oral Sex for Her Pleasure," and courses where course participants were invited to submit their own recorded sexual acts for subsequent critique and commentary, engaged in "aversion practice" to break down resistance to the performance of unwanted sexual acts, promulgated the concept of the "fourth dimension" in which there were no perpetrators and victims and shamed or blamed individuals who identified themselves as victims—including victims of the defendants and other OneTaste executives.[34] In connection with these teachings, the defendants and their co-conspirators instructed the OneTaste participants to complete a variety of "assignments," including participation in the reconciliation processes described above, the practice of completing "fear inventories," and assignments of a sexual nature (some of which constituted the labor and services performed or sought to be performed in this case); and taught the OneTaste

---

[33]     As also set forth above, ceremonies at times involved clothing associated with priests and priestesses, nudity, candles and other props, and often involved OM demonstrations and/or sexual acts.

[34]     As described above, ██████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

participants that a primary way to spread OneTaste's teachings and promote the "Orgasm" was through sales, including sales obtained through sexual activity.

As a result of OneTaste's teachings—and a fear of being publicly shamed and humiliated, or facing workplace retaliation, for disregarding them—the OneTaste participants OMed or performed such sex acts even when they were otherwise repulsed by the people they were instructed to sexually please. The OneTaste participants also performed other non-sexual labor and services to benefit OneTaste based in part on the ethos that it was necessary to sacrifice for the "Orgasm."

b. Admissibility

Evidence of defendants' and co-conspirators' endorsement of the teachings and practices described above and in the Statement of Facts is direct evidence of the charged forced labor conspiracy. Their collective involvement in formulating and promoting these teachings and practices, over the course of many years, evidences their agreement to use such teachings to obtain financial benefits for themselves by participating in a venture which engaged in obtaining labor or services by means of serious harm or threats of serious harm to the OneTaste participants, or by means of a scheme, pattern, or plan intended to cause the OneTaste participants to believe that, if they did not perform labor or services for OneTaste, they would suffer serious psychological and/or reputational harm. 18 U.S.C. § 1589(a)(2) & (4), (b). Furthermore, an understanding of OneTaste's teachings and practices—and their negative

psychological effects on the OneTaste participants[35]—is essential to the jury's determination of whether the harm imposed or threatened constituted "serious harm," which requires an assessment from the perspective of a reasonable person "of the same background and in the same circumstances" as the OneTaste participants. See 18 U.S.C. § 1589(c)(2); United States v. Raniere, No. 18-CR-204 (NGG), ECF No. 622, at 12 ("Involvement with Nxivm's teachings will provide context for the jurors to evaluate the relevant background and circumstances of the alleged victims of forced labor . . . . This is particularly true given the Government's allegations that [the defendant] and his co-conspirators used Nxivm to obtain work in exchange for classes, and that they used Nxivm's teachings to 'increase and maintain power and control over Nxivm members.'").

Furthermore, OneTaste's teachings and practices are also inextricably intertwined with the charged forced labor conspiracy because an understanding of the OneTaste participants' exposure to those teachings and the psychological impact they had on the OneTaste participants is essential to understating both the nature of the labor and services performed—which included OMing, sexual services, and labor to support sexual events and scenes—and the means and methods the defendants and their co-conspirators used to coerce the OneTaste participants to perform them. An understanding of such teachings and practices is also necessary for the jury to comprehend the serious harm contemplated if the OneTaste participants failed to perform such labor and services.

---

[35] The government intends to present evidence that the harm was sufficiently serious that many of the OneTaste participants underwent years of therapy after participating in OneTaste to recover from its psychological toll.

Finally, in the alternative, such evidence is admissible pursuant to Rule 404(b) because it establishes the knowledge, motive, intent, lack of mistake, common scheme or plan, and modus operandi of defendants and co-conspirators regarding their coercion of the OneTaste participants into performing labor and services—including labor and services of a sensitive or sexual nature—to benefit OneTaste, and, by extension, themselves.

        3.   Evidence of Recruitment and Grooming of Sexual Partners for the Investor

            a.   Facts

At trial, the government expects to prove that Daedone, Cherwitz and their co-conspirators recruited and groomed multiple sexual partners for the Investor, one of OneTaste's most significant investors and advisors, who was also in a romantic relationship with Daedone. Some of the recruited individuals resided in the Investor's home and served as his "handlers," who performed domestic tasks, watched over the Investor, OMed with the Investor, and satisfied him sexually, including by performing BSDM-style sexual acts, such as walking him on a leash. Some of the other OneTaste participants were enlisted to perform isolated sexual acts for the Investor. Many of these acts occurred in connection with themed "scenes" organized on his behalf, described in more detail above, which often involved the performance of sensual and sex acts with or in front of the Investor, often with props and involving BDSM.

The government additionally anticipates that it will prove that in addition to the OneTaste participants, Daedone, Cherwitz, and some of their co-conspirators also engaged in sexual relationships or acts with the Investor and used their experience to subsequently instruct

the OneTaste participants regarding how to domestically and sexually please the Investor and oversee the OneTaste participants' performance as the Investor's "handlers."

      b.  <u>Admissibility</u>

Evidence of the defendants' and their co-conspirators' recruitment of OneTaste participants to serve as the Investor's "handlers" or sexual partners is directly relevant to the forced labor conspiracy charge. First, it constitutes the labor and services performed by the OneTaste participants—which included sexual and domestic tasks performed for the Investor for the benefit of Daedone, Cherwitz and OneTaste. Moreover, because the defendants and their co-conspirators presented serving as the Investor's "handler" as both a condition of obtaining a promotion within OneTaste and also as a way of demonstrating favor with Daedone, evidence regarding the grooming the OneTaste participants to serve as the Investor's "handler" establishes one of the coercive means used to obtain the OneTaste participants' labor and services.

Furthermore, evidence of the defendants' and co-conspirators' own relationships with the Investor establishes their collective participation in a conspiracy and shows the "relationship [among the] . . . alleged coconspirators" and the "mutual trust between the coconspirators." <u>See, e.g.</u>, <u>United States v. Taylor</u>, No. 10-CR-268 DLI, 2012 WL 5546835, at 3 (E.D.N.Y. Nov. 14, 2012). Accordingly, such evidence is admissible "to establish the existence and progression of a relationship of trust among the defendants and their co-conspirators." <u>Raniere</u>, No. 18-CR-204 (NGG), ECF No. 622, at 5.

In the alternative, such evidence is admissible pursuant to Rule 404(b) because it provides evidence of motive, intent, plan, lack of accident, lack of mistake, common scheme or

plan, and modus operandi as to the defendants and their co-conspirators, who actively participated in the recruitment and oversight of the OneTaste participants who were assigned to keep OneTaste's primary investor happy and engaged with OneTaste by sexually and domestically serving him. And the defendants' and co-conspirators' own intimate relationships with the Investor are relevant to establish their knowledge and intent when they enlisted the OneTaste participants to serve as Daedone's "surrogates" and perform similar services for the financial benefit of OneTaste and, by extension, themselves.

4.  Evidence of Cherwitz's and Daedone's Receipt and Use of Funds from OneTaste

   a.  Facts

The government intends to establish through corporate records, financial records, and witness testimony that Daedone, Cherwitz and their co-conspirators used OneTaste as a corporate vehicle through which they executed the charged forced labor conspiracy. For example, the government will present evidence that Cherwitz earned a severance payment of approximately $70,000 when she left OneTatse in 2018, and that Daedone received hundreds of thousands of dollars from OneTaste during her employment and, in 2017, sold her interest in the Company for approximately $12 million, after which she continued to financially benefit from OneTaste. The government further intends to establish that Daedone directly benefitted from coerced labor that OneTaste participants performed on her personal behalf, including cleaning her room, purchasing food for her, dropping off and picking up her dry cleaning, and driving her

to get coffee and go to tanning salons, and that she also used OneTaste funds for her own personal use.

a. Admissibility

Evidence regarding the defendants' use of proceeds from the forced labor conspiracy—including their control, receipt, transfer, and use of funds from OneTaste—is admissible as it is directly relevant, highly probative and not unfairly prejudicial. First, the defendants' receipt of funds from OneTaste is direct evidence of an element of the charged offense, namely, their knowing benefitting "financially or by receiving anything of value" from "participation in a venture which has engaged in" forced labor. 18 U.S.C. § 1589(b). Here, the defendants knowingly benefitted financially and otherwise from their participation in OneTaste.

In the alternative, evidence of the defendants' receipt and use of funds from OneTaste is admissible pursuant to Rule 404(b) because it provides evidence of defendants' motives and intent to commit the conspiracy. See, e.g., United States v. Hernandez, 588 F.2d 346, 349 (2d Cir. 1978) ("[The Second Circuit] has long recognized the admissibility of [financial condition evidence] to establish motive in money-related offenses"); United States v. Shyne, No. 05-CR-1067 (KMK), 2007 WL 1075035, at *34 (S.D.N.Y. Apr. 5, 2007) ("Details of a defendant's financial history are often relevant to the motive of a defendant to commit a crime, especially if that crime involves pecuniary gain."); see also United States v. Addario, 662 F. App'x 61, 63 (2d Cir. 2016) (admitting evidence of defendant's "spending habits," including "records of his personal expenditures, such as expensive automobiles, trips and country club fees" as relevant to the defendant's "motive for committing the fraud"). For example, the

government intends to present evidence that Daedone used funds from OneTaste to fund a lavish lifestyle, including the purchase of designer clothes, extensive international travel, and multiple elective cosmetic procedures.  Such evidence is plainly admissible to establish her motive for engaging in criminal conduct.  See, e.g., United States v. Levy, No. 11-CR-62, 2013 WL 815915, at *2 (S.D.N.Y. Mar. 5, 2013) (finding that evidence of how defendants spent their money was admissible to show, among other things, their motive for engaging in criminal conduct); United States v. Thiam, No. 17 Cr. 47 (DLC) (S.D.N.Y. April 27, 2017) (Tr. 392-93) (finding that evidence that defendant used bribe money to buy and renovate a home "in a luxurious manner," was "highly relevant," and would not cause unfair prejudice under Rule 403).

      C.      <u>None of the Proffered Evidence is Unfairly Prejudicial</u>

There can be no real argument that the evidence described herein is unfairly prejudicial because the vast majority is no "more sensational or disturbing" than the charged crimes or the other evidence that will be presented at trial.  While some of this evidence is sexual in nature, it is no more sensitive than OneTaste's own products and services which necessarily will be a subject of the trial.  For example, Daedone and Cherwitz used their own backgrounds, including sensitive experiences in childhood, in espousing OneTaste's teachings—such as aversion practice and denying the concept of victims and perpetrators—that constitute a means of effecting the instant conspiracy.  As another example, some of the BDSM and roleplaying used in "scenes" constitute the labor in this case.  Thus, in light of the defendants' choice to market these experiences to OneTaste patrons, admission of them at trial is not unfairly prejudicial.  And the evidence the government seeks to introduce regarding the defendants' use

76

of criminal proceeds consists of financial records, summary charts, and limited testimony regarding routine expenditures (as distinct from purchases of illegal goods or services). Moreover, because these acts involve the defendants' own conduct, any minimal prejudice they might suffer is not "unfair" and does not outweigh, let alone substantially outweigh, the probative value of this evidence. Pitre, 960 F.2d at 1120.

In any event, any potential prejudice to the defendant can be effectively mitigated by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered. See, e.g., United States v. Mickens, 926 F.2d 1323, 1328-29 (2d Cir. 1991); United States v. Snype, 441 F.3d 119, 129 (2d Cir. 2006) (the law presumes that juries follow limiting instructions).

V.     Statements of the Defendants, their Agents and their Co-Conspirators Are Admissible

The government respectfully moves to admit the prior statements of the defendants, their agents and their co-conspirators if those statements are offered at trial by the government.

A.     The Defendants' Statements Should be Admitted as Party Admissions

The government intends to offer numerous statements made by the defendants in its case-in-chief in the form of email, text and chat messages; video and audio recordings; financial and business records; and witness testimony.

The government generally may introduce a defendant's statements into evidence because a statement is not hearsay if it is "offered against an opposing party and . . . was made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A). Each of the above statements will be offered against the opposing party (i.e., by the United States against

the defendants), and was made in an individual capacity by one of the defendants. The statements are thus within the purview of Rule 801(d)(2)(A) and are admissible.

B.    Statements of the Defendants' Agents Are Admissible Against the Defendants

The government also intends to introduce statements made over the course of the Relevant Time Period by the defendants' employees on matters within the scope of their employment as agent or employee statements under Rule 801(d)(2)(D). In particular, the government intends to offer statements made by various OneTaste executives who worked for Daedone during the Relevant Time Period, including but not limited to statements made by Cherwitz, Co-Conspirators 1 through 11, Individual-1 and several other OneTaste executives, among others. In addition, the government intends to offer certain statements by other non-executive OneTaste employees within the scope of their employment who answered to Daedone and/or Cherwitz.[36] Such statements are admissible as they do not constitute hearsay.

_____

[36]    For example, the government may seek to admit statements by the OneTaste participants and other individuals made within the scope of their employment. OneTaste's employees all answered to Daedone, who served as the ultimate decisionmaker regarding OneTaste's business, messaging and content. In addition, individuals who served on OneTaste's sales team, including but not limited to Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 10, Jane Doe 11 and Jane Doe 12 were direct subordinates of Cherwitz during the Relevant Time Period. Although some of the individuals who served as subordinates for Daedone and Cherwitz were employed as independent contractors for OneTaste, they nonetheless served as the defendants' agents. Notably, OneTaste in its legal filings has repeatedly maintained that such individuals served as the "functional equivalent" of employees and that they both represented OneTaste and were also central to its business. See, e.g., In Re Grand Jury Subpoena Dated February 21, 2023, 23-MC-715 (PKC) (Dkt No. 4) ("As OneTaste was beginning to build out its program offerings and operations, the company relied on independent contractors to prepare for and implement the various workshops and classes that it offered participants throughout the year in various cities across the country. . . . These individuals not only represented OneTaste, but were core to its business model.") (emphasis added).

78

Federal Rule of Evidence 801(d)(2)(D) carves out from the definition of hearsay statements offered against an opposing party and "made by the party's agent or employee on a matter within the scope of that relationship and while it existed."  Fed. R. Evid. 801(d)(2)(D). To establish a "sufficient foundation to support the introduction of vicarious admissions" under Rule 801(d)(2)(D), the offering party must establish: (1) the existence of the agency relationship; (2) that the statement was made during the course of the relationship; and (3) that it relates to a matter within the scope of the agency.  Leser v. U.S. Bank Nat'l Ass'n, No. 09-CV-2362, 2012 WL 6738402, at *4 (E.D.N.Y. Dec. 29, 2012) (quoting Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 537 (2d Cir. 1992)).  Although the statements themselves "are not alone sufficient" to establish these predicates, see id., "admissibility under this rule should be granted freely," Pappas, 963 F.2d at 537.

Under Second Circuit precedent, an agency relationship exists for purposes of Rule 801(d)(2)(D) where the declarant is a subordinate who is "answerable and directly responsible" to a defendant.  United States v. Rioux, 97 F.3d 648, 660 (2d Cir. 1996).  In Zaken v. Boerer, 964 F.2d 1319, 1322-23 (2d Cir. 1992), the Court considered the circumstances under which statements of one corporate employee could be introduced against another.  Noting that it "depends on the relationship between the declarant and the defendant," the court held that "[w]hen the factors proving an agency relationship are present, the testimony should not be excluded simply because it is offered against a corporate employee rather than the company itself."  Id. at 1322-23.

Among other factors, courts consider whether the declarant was "answerable" to the defendant, and whether the matter was "within the scope of [the declarant's] agency." Id. at 1323 (concluding that vice president's statements were admissible against the company's owner); see also Calderera v. Chandris, S.A., No. 91-CV-8181 (KMW), 1993 WL 362406, at *1 (S.D.N.Y. Sept. 13, 1993) (statements of a ship's assistant food manager were admitted as statements by defendant's agent against the owner and manager of the ship); Guccione v. Hustler Magazine, Inc., 632 F. Supp. 313, 320 (S.D.N.Y. 1984), rev'd on other grounds, 800 F.2d 298, 304 (2d Cir. 1986) (statements made by defendant's chief executive were admissions); Nat'l Commc'ns Ass'n, Inc. v. AT&T Co., No. 92-CV-1735 (LAP), 1998 WL 118174, at *38 (S.D.N.Y. Mar. 16, 1998) ("[I]t is enough that a declarant be 'answerable and directly responsible' to a supervisor."); Pierce v. Rodriguez, No. 20-CV-1755 (SVN), 2023 WL 2646825, at *5 (D. Conn. Mar. 27, 2023) ("The statements of corrections officers have been deemed admissible under Rule 801(d)(2)(D) in cases involving individual defendant wardens and supervisory prison officials." (collecting cases)).

Here, the Court should permit the government to introduce statements of former OneTaste employees within the scope of their employment at OneTaste—including internal communications and statements to third parties—because during the time the statements were made they each were "answerable" to Daedone, who, as OneTaste's Chief Executive Officer, "directed" the company's business. Zaken, 964 F.2d at 1323. Former OneTaste employees who were involved in sales were likewise "answerable" to Cherwitz, who "directed" the company's sales. Id.; In re Reserve Fund Sec. Litig., No. 09-CV-4346 (PGG), 2012 WL 12354233, at *7-8

(S.D.N.Y. Oct. 3, 2012) ("Where an individual defendant controls the entity that employs the declarant, and is the declarant's ultimate supervisor, the employee is an agent of the defendant for purposes of F.R.E. 801(d)(2)(D), and his statements are admissible against that individual defendant.").

For example, in Exhibit B (referenced above), Co-Conspirator 2 responded to a 2013 complaint by a OneTaste member of being sexually assaulted by providing OneTaste's response, at a time when Daedone was the CEO and Co-Conspirator 2 and Cherwitz were senior executives, indicating that "we are doing what we can to talk to the parties involved and to educate and repair this," and that "RC [i.e., Rachel Cherwitz] will be contacting you directly to see what you need." Ex. B. After additional critical posts were made, Co-Conspirator 2 responded again by "invit[ing]" the woman who had been assaulted to stop "bludger[ing] and blam[ing]." Id. Shortly thereafter, another OneTaste executive, Individual-1, who is expected to testify at trial, was retained by Daedone and OneTaste shortly after and in response this incident, and Cherwitz all participated in the response to the allegation, including by discussing responses by OneTaste to the claim. Id. Such statements are thus admissible as agency statements (and, on Cherwitz's part, as a party admission).[37]

---

[37]     The government will seek at trial to admit the copy of Exhibit B with the presently-applied redactions to messages of other OneTaste community members that otherwise might constitute hearsay. Names of co-conspirators and testifying witnesses at trial will, however, be unredacted. The remainder of the unredacted portions are admissible either as agency statements, as set forth herein, and context necessary to understand the agency statements. For example, the initial post by the individual claiming to have been sexually assaulted is not being admitted for its truth as to whether anyone was assaulted or not, but rather

As another example, the government anticipates seeking to admit at trial a number of emails and chats discussing OneTaste's sales practices. For example, on October 3, 2014, Co-Conspirator 11 (then-OneTaste Chief Operating Officer) wrote to Daedone and Co-Conspirator 1 an "Operations Update 20141002," in which he indicated that "[t]omorrow is going to be a day of making the [sales] goal no matter what." Ex. D. Later in the email, he wrote to Daedone as to Jane Doe 1 that "NY (at the suggestion of RC [i.e., Rachel Cherwitz] put [Jane Doe 1] on probation for 30 days where she has to make 30K in those 30 days. . . . I told [Jane Doe 1] that she felt like a dry drunk to me. RC has told [Jane Doe 1 and her then romantic partner] that she thinks something significant needs to change possibly that they don't live together." Id. These statements are admissible pursuant to Federal Rule of Evidence 801(d)(2), including as statements made by the defendants' agent or employee on a matter within the scope of that relationship. As the email itself established, the Co-Conspirator 11 was providing Daedone with an "operations update," which included reporting on sales goals, including using Jane Doe 1 to perform labor for Daedone's benefit and at Cherwitz's suggestion.[38]

---

for its effect on the defendants and their co-conspirators, and for context to understand the defendants' and co-conspirators' reactions.

[38] The government acknowledges that some statements admissible against Daedone pursuant to Fed. R. Evid. 801(d)(2)(D), though not hearsay, may not in certain circumstances be permitted to be offered against Cherwitz, and thus the government would not object to a limiting instruction as appropriate. This exhibit, however, is also admissible as a co-conspirator statement and otherwise pursuant to Fed. R. Evid. 801(d). And the hearsay-within-hearsay—namely, Cherwitz's statements to Jane Doe—are also admissible as statements of a party opponent. See Fed. R. Evid. 801(d)(2)(A).

These are two examples of numerous exhibits that the government will seek to admit at trial after establishing that the statements of these individuals were made in their capacity as agents of Daedone and Cherwitz, and that the statements related directly to their positions as their subordinates. The statements, accordingly, are admissible under Rule 801(d)(2)(D).

     C.     <u>Statements of the Defendants' Co-Conspirators Are Admissible Against the Defendants</u>

In addition to admitting the statements of the defendants and their agents as party admissions, the Court should also admit the prior statements of the defendants' co-conspirators—including but not limited to Co-Conspirators 1 through 11—made in furtherance of the charged conspiracy.

A statement is not hearsay if "the statement is offered against an opposing party and . . . was made by the party's co-conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit a statement under this rule, a district court must find two facts by a preponderance of the evidence: (1) that a conspiracy that included the defendant and the declarant existed; and (2) that the statement was made during the course of, and in furtherance of, that conspiracy. <u>Bourjaily v. United States</u>, 483 U.S. 171, 175 (1987); <u>United States v. Gigante</u>, 166 F.3d 75, 82 (2d Cir. 1999). "In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." <u>United States v. Gupta</u>, 747 F.3d 111, 123 (2d Cir. 2014). Both written and oral statements of a co-conspirator, if made during and in furtherance of the conspiracy, are admissible under Rule 801(d)(2)(E). <u>See, e.g.,</u>

United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 88 (2d Cir. 1999) (citing Fed. R. Evid. 801(a)). In determining whether a party has established a proper foundation for admission of co-conspirator statements, a court may consider hearsay and other evidence not admissible at trial. See Fed. R. Evid. 104(a), 1101(d)(1); Bourjaily, 483 U.S. at 178-81.

"The requirement that the challenged statement be 'in furtherance of' the conspiracy is satisfied if the statement's objective is 'designed to promote or facilitate achievement of the goals of the conspiracy.'" United States v. Malka, 602 F. Supp. 3d 510, 533 (S.D.N.Y. 2022). Courts in this District have repeatedly held that this standard is "is not very restrictive." United States v. Kurland, No. 20-CR-306 (NGG), 2022 WL 2669897, at *3 (E.D.N.Y. July 11, 2022). "It permits, for example, introduction of any co-conspirator statement that 'reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy.'" Malka, 602 F. Supp. 3d at 553-34. Thus, statements are in furtherance of the conspiracy if they, for example: (1) inform or provide an update as to the status or progress of the conspiracy, see United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a co-conspirator's assistance," Desena, 260 F.3d at 158; (4) "provide reassurance," id.; (5) "serve to foster trust and cohesiveness," id.; United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, United States v. Diaz, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a coconspirator of "the identity and activities of his coconspirators,"

United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989); United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987).  A narrative description of a past event is admissible as long as it serves "some current purpose in the conspiracy."  United States v. Thai, 29 F.3d 785, 813 (2d Cir. 1994); see also Desena, 260 F.3d at 159; Maldonado-Rivera, 922 F.2d at 958; United States v. Flaharty, 295 F.3d 182, 199-200 (2d Cir. 2002).  Further, "so long as a coconspirator statement was in furtherance of the conspiracy, there is no requirement that it have been in furtherance of the interests of the defendant himself or of any particular coconspirator."  Gupta, 747 F.3d at 124.

Pursuant to so-called Geaney protocol, see United States v. Geaney, 417 F.2d 1116, 1121 (2d Cir. 1969), "[t]he statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence establishing the requirements of Rule 801(d)(2)(E)."  Kurland, 2022 WL 2669897, at *4.

At trial, the government intends to introduce statements of the defendants' co-conspirators through witness testimony and documentary evidence (including email, chat messages and audio/video recordings, as well as other documentary evidence).  Such statements include, among other things, statements by the co-conspirators to each other, including by regularly providing internal updates to the defendants and other members of the conspiracy about the topics identified in the Statement of Facts above in emails, text messages, and chat messages, as well as to victims and witnesses, including the OneTaste participants.

For example, on November 15, 2015, within the Relevant Time Period, Co-Conspirator 1 emailed another OneTaste executive (Co-Conspirator 11 identified above),

indicating that she was "sitting with nic," <u>i.e.</u>, Daedone, and that she "ha[d] to tell [Co-Conspirator 11] something and it's confidential." Ex. E. Co-Conspirator 11 indicated that "Rachel" was looking at his screen but would "look away." <u>Id.</u> Co-Conspirator 1 then informed Co-Conspirator 11 that "[Jane Doe 1] has sent a demand letter to us," alleging claims that "we forced her to have sex with wealthy clients, we forced her to go to 12 step meetings, forced her to have sex for the job . . . and, out of context, some of that may be true." <u>Id.</u> Co-Conspirator 11 responded, "I'm sure there are places [Jane Doe 1] felt coerced in some way, that I don't deny," to which Co-Conspirator 1 stated, "totally." <u>Id.</u> Co-Conspirator 1 then informed Co-Conspirator 11 that "we aren't telling people," that "on some level, this is our wake up . . . that we can't play like that anymore even to people we think are 'in.'" <u>Id.</u> The two then agreed that they were "not clean," acknowledging that "none of us stopped" what was happening "and even used it at times." <u>Id.</u> Co-Conspirator 1 then informed Co-Conspirator 11 that she had "collected [Jane Doe 1's] OM hub posts" and requested that Co-Conspirator 11 provide her with "any texts with [Jane Doe 1] that are still on your phone . . . that show she was having a great time . . . and happy as a clam." <u>Id.</u> Co-Conspirator 1 made the request clear: "we are trying to get stuff that would show she was not perfect herself." <u>Id.</u> This chat is plainly admissible as a co-conspirator statement. Co-Conspirator 1, sitting with Daedone, informed a co-conspirator as to a status or update of the conspiracy, sought to foster trust and cohesiveness with the co-conspirator and then sought to induce his assistance.

These and similar co-conspirator statements are admissible against the defendants under Rule 801(d)(2)(E) of the Federal Rules of Evidence. As the government will establish at trial through witness testimony and documentary evidence, at the time these and other statements

were made, the defendants and the identified members of OneTaste's "inner circle" were co-conspirators. The statements outlined above, and others like them, were made, among other reasons, to keep members of OneTaste who collectively participated in the forced labor conspiracy informed about actions of other co-conspirators, the state of the conspiracy, and the conspiracy's victims. See, e.g., Rahme, 813 F.2d at 35-36 (quoting United States v. Ammar, 714 F.2d 238, 252 (3d Cir. 1983)) (statement admissible where its purpose is "inform[ing] [co-conspirators] of the current status of the conspiracy"); see also Desena, 260 F.3d at 158 (statement admissible where it provides "an update as to the status of . . . the conspiracy"). The government anticipates that it will further establish that some of the statements outlined above were used to perpetuate the conspiracy by collectively executing tactics of coercive control of the OneTaste participants to ensure they continued to perform labor and services for OneTaste.

In sum, co-conspirator statements made in furtherance of the conspiracy are probative of the way in which the conspiracy operated and were designed to facilitate the achievement of the goals of the conspiracy—namely, obtaining forced or coerced labor and services from the OneTaste participants. Thus, the statements outlined above—and those similar—are subject to the hearsay exception in Rule 801(d)(2)(E).[39]

---

[39] Some of the anticipated statements may also qualify as statements against penal interest which are thus admissible pursuant to Rule 804(b)(3). The government anticipates that each identified declarant would likely invoke his or her Fifth Amendment privilege against self-incrimination, thus satisfying Rule 804's unavailability requirement. See, e.g., Fed. R. Evid. 804(a) (noting that declarant "is considered to be unavailable as a witness" pursuant to Rule 804(b)(3) where a privilege applies); United States v. Deluna, 38 F. App'x 644, 645 (2d Cir. 2002) (upholding admission of coconspirator statement where coconspirator "was unavailable to testify as he would have invoked his Fifth Amendment privilege against self-incrimination").

D.    Additional Portions of Defendants' Statements Are Inadmissible If Offered by Defendants

It is well established that "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982); see also United States v. Mitchell, 502 F.3d 931, 964 (9th Cir. 2007) (defendant was properly precluded from eliciting, on cross-examination of government agents, exculpatory statements that he had made during interviews with agents, since those statements were inadmissible hearsay); United States v. Jadusingh, No. 18-CR-257 (KAM), 2020 WL 207950, at *2 (E.D.N.Y. Jan. 14, 2020) (precluding defendant "from introducing her own post-arrest statements to prove the truth of the matter(s) asserted" (emphasis omitted)); United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004) (a defendant may not "attempt to get [his] side of the . . . story in front of the jury without him testifying and opening him up to cross-examination").

Accordingly, the defendants should be precluded from seeking to introduce their own statements for the truth of the matters asserted in the form of prior out-of-court statements, or from seeking to elicit from government witnesses any of the defendants' prior exculpatory statements, unless they are offered pursuant to a proper exception to the rule against hearsay. Jadusingh, 2020 WL 207950, at *2 ("The rule against hearsay would not bar the Government from introducing [the defendant's] statements because a statement offered against an opposing party and that was made by the party' is not hearsay.  It would, however, bar [the defendant] from

---

Many of the admissions detailed above—pertaining to the defendants' and co-conspirators' participation in a forced labor conspiracy—are against each declarant's penal interest.

introducing her own post-arrest statements to prove the truth of the matter(s) asserted." (internal citations omitted)).

VI.     Instructions or Commands are Admissible as Non-Hearsay

The government moves to admit testimony and documents containing various commands, threats, directives and requests the defendants and their co-conspirators issued to the OneTaste participants and others, including those regarding OneTaste's sales practices; OneTaste's ideology and code of conduct; and the performance of labor and services by the OneTaste participants.

Out-of-court statements offered as evidence of commands rather than for the truth of the matter stated are not hearsay.  United States v. Bellomo, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay") (citing United States v. Stratton, 779 F.2d 820, 830 (2d Cir. 1985)); United States v. Dawkins, 999 F.3d 767, 789 (2d Cir. 2021) ("The statement 'do not accept money from these people' was an order, i.e., an imperative rather than a declarative statement, and it was offered not for its truth, but for the fact that it was said.  It was therefore not hearsay."); United States v. Gillier, No. 23-CR-6280, 2024 WL 4344732, at *2 (2d Cir. Sept. 30, 2024) (commands are not hearsay); United States v. Ware, 399 F. App'x 659, 662 (2d Cir. 2010) (evidence offered not for its truth but to demonstrate that requests were received is not hearsay (summary order)).  A command is properly understood as any order, directive or request.  United States v. Garrity, No. 3:15-CV-243 (MPS), 2018 WL 2676891, at *2 (D. Conn. June 4, 2018).

Similarly, out-of-court statements offered not for their truth but for their effect on the listener are not hearsay. United States v. Dupree, 706 F.3d 131, 136 (2d Cir. 2013); United States v. Certified Env't Servs., Inc., 753 F.3d 72, 89 (2d Cir. 2014). Likewise, statements introduced merely for the purpose of demonstrating that such statements were made, DeNigris v. New York City Health & Hosps. Corp., 552 F. App'x 3, 6 (2d Cir. 2013), and statements offered to show the circumstances under which subsequent events occurred, are also not hearsay, United States v. Pedroza, 750 F.2d 187, 200 (2d Cir. 1984).

The evidence of commands that the government will seek to admit at trial are relevant and not hearsay. Among other things, the government intends to seek the admission of records and statements regarding the defendants' and their co-conspirators' directions to the OneTaste participants to engage in various aggressive sales practices. For example, the government will seek the admission of sales team group chat messages, such as Exhibit F. Such chat messages contain directives by Cherwitz and other OneTaste executives instructing OneTaste employees to, among other things, "SELL AWAY BABY SELL AWAY"; "GET THOSE SG's [sales goals]"; and to "Get [a sales target's] deposit RIGHT FUCKING NOW." Ex. F. In one instance, when a member of the sales team was on the phone with a potential customer who was "hot for CP," i.e., OneTaste's coaching program, "but needs to find the money only had $500 now," Cherwitz directed the sales member to "Get the deposit RIGHT FUCKING NOW . . . GET IT FOR $500." Id. at 3-4. Such evidence is not hearsay because it is not offered for its truth but

rather to show that the commands were issued to the OneTaste sales team members, including from early in the morning to late and night.[40]

Additionally, the government will move to admit testimony and documents regarding instructions given in connection with OneTaste courses or events. For example, the government will seek to admit fear inventories, homework assignments and contemporaneous notes taken during OneTaste courses containing instructions about OneTaste's rules of "play," directing participants to, for example, hire or have someone break the participants' rules. As another example, the government will seek to admit directives from Daedone espoused by her and her inner circle, such as statements in the enclosed chat exhibit:

> Just a quick update from the intensive world. Things off to a great start. Nicole laid out a good clear strong stroke last night basically slicing through the idea of staying connected inside an experience so the [sic] when you leave you don't say you were 'violated' or things were done to you but that you actually show up as adults and play. Dude she even said some of you in this room have said some crabby thins about OneTaste and that shows that you're not doing the work to stay inside the experience. So it was that level of play.

Ex. G. Again, these assignments, statements and commands are not being offered to prove their truth—they are not, for example, being offered for the truth that the "highest play" is "surrender" or that a way of staying "connected" is to not say you were "violated"—instead, they are being introduced to demonstrate the assignments were issued, or a philosophy taught, and to demonstrate their effect on the participants who received them.

---

[40] In the alternative, such statements are admissible as agency statements, co-conspirator statements and statements by defendant Cherwitz, as outlined herein.

Such commands and non-hearsay statements are patently relevant with significant probative value not outweighed, much less substantially outweighed, by any of the dangers set forth in Federal Rule of Evidence 403, as they were the means by which the defendants and their co-conspirators effected the forced labor at issue in this case.  See Fed. R. Evid. 402; 403.

VII.    Victims' Contemporaneous or Past Recorded Statements Detailing Experiences and Mental States while at OneTaste Are Admissible

The government seeks to introduce the prior recorded statements of multiple victims and witnesses detailing their experiences and mental states while performing labor and services for OneTaste.  Such statements exist, among other things, in the form of handwritten and typed journals, "Fear Inventories;" notes and documents; text message, chat and email communications; and statements in connection with OneTaste's reconciliation process.  The Court should allow the admission of such recorded statements because they are probative of the serious harm and threats of serious harm the defendants and their co-conspirators imposed upon the victims, as well as such victims' fears of the serious harm they would suffer if they did not perform labor or services for OneTaste and the defendants.  18 U.S.C. § 1589(a).  Further, the contents of the statements are probative of the surrounding circumstances under which the victims provided labor and services.  18 U.S.C. § 1589(c)(2) (defining "serious harm" based on "all the surrounding circumstances" and from the perspective of a reasonable person "of the same background and in the same circumstances").  In addition, the statements are admissible under numerous exceptions to the prohibitions against hearsay—as statements as instructive of

the victims' then-existing state of mind and future intent, excited utterances, and present sense impressions, and, in the alternative, under the residual exception.

A.      Applicable Law

1.      Then-Existing State of Mind – Rule 803(3)

Federal Rule of Evidence 803(3) provides that the following type of statement does not constitute hearsay, regardless of the out-of-court declarant's availability:

> [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . .

Fed. R. Evid. 803(3).

Rule 803(3) also permits the admission of out-of-court statements "reflecting a declarant's intentions or future plans" and allows such statements to be introduced, where relevant, "to prove subsequent acts." United States v. Cicale, 691 F.2d 95, 103 (2d Cir. 1982). Under Rule 803(3), "if relevant, a declarant's statement of his intent may be introduced to prove that the declarant thereafter acted in accordance with the stated intent." United States v. Persico, 645 F.3d 85, 100 (2d Cir. 2011); see also Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 299-300 (1892) (stating principle that statements of intent are reliable, competent evidence).

Further, "[a] declarant's statement of intent may . . . be admitted against a non-declarant when there is independent evidence which connects the declarant's statement with the non-declarant's activities." United States v. Delvecchio, 816 F.2d 859, 863 (2d Cir.1987); see also Persico, 645 F.3d at 100-01; United States v. Best, 219 F.3d 192, 198 (2d Cir. 2000) (collecting cases upholding the admission of statements of intent regarding future illegal transactions, where corroborated by circumstantial evidence, as evidence of the non-declarant defendant's

participation in such transactions); <u>United States v. Sperling</u>, 726 F.2d 69, 73-74 (2d Cir. 1984) (holding admissible declarant's statement of intent against non-declarant where corroborated by independent evidence); <u>Cicale</u>, 691 F.2d at 103-04 (same).

      2.    <u>Present Sense Impression – Rule 803(1)</u>

"The theory behind this exception is essentially twofold. First, the immediacy requirement reduces the opportunity for reflection, and thus minimizes the likelihood of deception or fabrication on the part of the declarant." <u>United States v. Mejia-Valez</u>, 855 F. Supp. 607, 613 (E.D.N.Y. 1994) (internal citations omitted). "Secondly, immediacy also greatly reduces the likelihood that the declarant will have inaccurately remembered the event in question." <u>Id.</u> "By its own terms, application of Rule 803(1) has three distinct requirements: [1] the statement must describe or explain the event perceived; [2] the declarant must have in fact perceived the event described; and [3] the description must be 'substantially contemporaneous' with the event in question." <u>Id.</u> (citing Fed. R. Evid. 803(1)).

      3.    <u>Excited Utterances – Rule 803(2)</u>

Rule 803(2) of the Federal Rules of Evidence provides an exception to the rule against hearsay for excited utterances. An excited utterance is a statement "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). To qualify as an excited utterance, the proponent of an out-of-court statement must establish the following: (i) that a startling event occurred; (ii) that the declarant made the statement while under the stress of the excitement caused by the startling event; and (iii) that the declarant's statement relates to the startling event. <u>See</u> <u>United States v. Brown</u>, 254 F.3d 454, 458 (3d Cir. 2001); <u>see also</u> <u>United States v. Delvi</u>, 275 F. Supp. 2d 412, 415 (S.D.N.Y. 2003). "The

94

rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability. An excited utterance need not be contemporaneous with the startling event to be admissible under Rule 803(2)." United States v. Tocco, 135 F.3d 116, 127 (2d Cir. 1998).

4.    Residual Exception – Rule 807

Federal Rule of Evidence 807 provides that otherwise inadmissible hearsay may be admitted, where the statement is (1) "supported by sufficient guarantees of trustworthiness—after considering the circumstances under which it was made and evidence, if any, corroborating the statement," and (2) "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. The Second Circuit breaks this exception down to five requirements: hearsay evidence is admissible if (i) it is particularly trustworthy; (ii) it bears on a material fact; (iii) it is the most probative evidence addressing that fact; (iv) its admission is consistent with the rules of evidence and advances the interests of justice; and (v) its proffer follows adequate notice to the adverse party. United States v. Dawkins, 999 F.3d 767, 791 (2d Cir. 2021) (citing United States v. Bryce, F.3d 346, 350-51 (2d Cir. 1999)); see also United States v. Harwood, 998 F.2d 91, 98 (2d Cir. 1993). Where statements indicate a high degree of trustworthiness, and circumstances indicate that there is little or no reason to believe the declarant had a motive to lie, the statements may be properly admitted under Rule 807. See Bryce, 208 F.3d at 351.

B.    Examples of Admissible Written Victim Statements[41]

1.    Jane Doe 1's Handwritten and Typed Journal

Jane Doe 1 wrote multiple handwritten journal entries both during and after she

served as a student and staff member of OneTaste.  The journal entries, among other things,

detail Jane Doe 1's relationships with the defendants and their co-conspirators, financial

condition, and psychological state during and shortly after the time she performed labor and

services in connection with the charged conspiracy.  For example, in her journal entries, Jane

Doe 1 discussed the effect of her accumulated debt on her mental state:

> God I am resentful at acquiring debt because I have fear then I
> cannot escape.  I have fear it can be used to control me, I have others
> want be good on their word [sic].  I have fear it means I don't work
> hard enough.  I have fear ill [sic] be judged as lazy.  I have fear I
> won't be able to stop thinking about it, I have fear I won't pay it
> back . . .

Jane Doe 1 also wrote about her physical and emotional condition shortly after

leaving OneTaste.  Below are sample excerpts:

> I officially left January 2015.  It feels surreal and impossible that
> after almost three years of insanity it's now over a great numbness
> that has swallowed me.  My hands still shake and I am only able to
> eat a small amount of soup without becoming sick.  Paranoia lurks
> around me, fearing at any moment somebody will pop out from

---

[41]    The government intends to seek to introduce additional written victim statements
and communications beyond those outlined below.  The government will seek to admit many
such statements based on their effect on the listener rather than for their truth.  To the extent that
the government intends to offer the messages for their truth, the government will do so through
the application of one of the exceptions to the prohibition against hearsay.  Further, the
government remains in the process of identifying its trial exhibits, including the particular
portions of prior recorded statements it will seek to admit at trial.  The government can provide
full copies of the documents containing the referenced statements upon request by the Court.

behind me to drag me back. The logical part of me knows this is not possible, but if I had learned anything, it's that we are not logical creatures. I do not know the extent to which they broke me but I am afraid of what I will find over the coming months.

. . .

The pain is there. The tension in my joints, the popping of my jaw, the pain in my gut, and the pain I cannot physically pinpoint. It permeates every aspect of me. It feels like my soul has been ripped apart, shattered into a thousand shards of glass. As I sit here I look down at the shards, scattered around my feet in a dark room. Thousands and thousands of them. My reflection broken and jagged staring back at me. I know that if I ever want to be whole again, I will need to pick up those pieces and put them back together. It is not a single crack though, or even a few pieces. Shattered is the only way I can describe it. Like my very being has broken apart and I stand here an empty shell looking around wondering who I am, what I am, and what is real.

. . .

My psyche is breaking. I have no other way of describing it. It comes in waves. Something triggers a memory or a moment, my vision begins to swim and it feels like my mind is being pulled apart. Giant hands have grabbed each side of my mind and are tearing it in opposite directions . . . Is this what it feels like as your mind fractures? Is this what the edge of sanity feels like?

The Court should permit the admission of the contents of Jane Doe 1's journals because they constitute relevant evidence and fall within are admissible under numerous exceptions to the prohibitions against hearsay.

First, Jane Doe 1's journals include various statements of her then-existing state of mind and future intent, including statements regarding her ongoing physical and psychological pain, and her intent to obtain employment, stability, and a support network in an effort to rebuild her life. Fed. R. Evid. 803(3).

Second, Jane Doe 1's journals include statements that constitute present sense impressions of experiences that she recorded at or near the time they occurred, including records of her daily activities and disturbing dreams.  Fed. R. Evid. 803(1).

Third, Jane Doe 1's journals also include excited utterances written while Jane Doe 1 was still under the stress and excitement of her departure from OneTaste—e.g., "[m]y psyche is breaking . . . my vision begins to swim and it feels like my mind is being pulled apart." Fed. R. Evid. 803(2).

Finally, and in the alternative, Jane Doe 1's journals are admissible under the residual exception.  Jane Doe 1 recorded the journals much closer in time to her experiences at OneTaste as part of her own personal healing process, indicating a high degree of trustworthiness.  The journals constitute the best evidence of Jane Doe 1's then-existing psychological and emotional state; accordingly, their admission would be consistent with the rules of evidence and the interest of justice.  Fed. R. Evid. 807; see Bryce, 208 F.3d at 351.

2.    Jane Doe 5's Journal

Jane Doe 5 also maintained a journal during a portion of the time that she served as a student and staff member at OneTaste.  Jane Doe 5's journal entries contain statements about, among other things, her emotional state and her relationships with the defendants and their co-conspirators, including in particular Co-Conspirator 2's oversight of Jane Doe 5's caretaking of the Investor and in Jane Doe 5's relationship with another OneTaste member.  Below are sample excerpts:

> I'm so fucking tired.  I was up so late last night w/ [Co-Conspirator 8], which was great but it means I'm not taking care of myself.  And

then [Co-Conspirator 8] tells me it's only in my mind, because she's not tired. That's a load of crap. A healthy person needs at least 6-8 hours of sleep at night, not 3. I guess that's a resentment I have about the staff at OT. They don't sleep. They're fucking nuts. I can only do it for so long until I die.

. . .

[Co-Conspirator 2] texted me this morning, before I even woke up. She told me to spend more time w/ [the Investor]. I don't <u>HAVE</u> more time to spend w/ [the Investor]. I already feel like I spend all my spare time w/ him & I haven't even done much lead gen, so I might not get my hours in for coaching. But, I did something I usually wouldn't do. I texted [another OneTaste participant] & told her I needed help w/ him.

. . .

Whoa shit. I got a chargey as shit text from [Co-Conspirator 2] about [another individual] this morning. She started off saying, "Let's talk straight, woman to woman" & then goes into the most passive communication ever. Asking if I wanted to marry [the other individual], saying that if I do then "they can set that up for me, just say the word." WTF. Why can't she just be straight, like she said. Because she wasn't genuinely asking, at all. It would have felt good & she wouldn't 'offer to set it up" if it were. And then she says "Because anything less is keeping him from awakening."

The Court should permit the admission of the contents of Jane Doe 5's journals because, like Jane Doe 1's journals, they are relevant evidence and fall within are admissible under numerous exceptions to the prohibitions against hearsay.

<u>First</u>, Jane Doe 5's journals include various statements of her then-existing state of mind and future intent, including statements regarding her emotional state and her plans for her future. Fed. R. Evid. 803(3).

<u>Second</u>, Jane Doe 5's journals include present sense impressions of experiences that she recorded at or near the time they occurred, including her receipt of various text messages

from Co-Conspirator 2 that prompted Jane Doe 5 to have a strong emotional reaction. Fed. R. Evid. 803(1).

Third, Jane Doe 5's journals include various excited utterances written while Jane Doe 5 was still under the stress and excitement of various startling events, including, among other things, her observations of the Investor's serious intoxication while she was charged with caring for him. Fed. R. Evid. 803(2).

Finally, and in the alternative, Jane Doe 5's journals—written in private, for her own personal benefit, at or near the time the events she described occurred—offer evidence indicating a high degree of trustworthiness which should be admitted under the residual exception. Fed. R. Evid. 807; see Bryce, 208 F.3d at 351.

3.    Jane Doe 4's Document

In approximately January 2015, following Jane Doe 4's departure from OneTaste, Jane Doe 4, a former co-owner of OneTaste NYC, drafted a document entitled "[Jane Doe 4's] Thoughts," which she subsequently emailed to Co-Conspirator 3 for his review.[42] See Exs. H & I (attachment hereinafter referred to as "Jane Doe 4's List").

The document includes observations from both Jane Doe 4 (in black) and Co-Conspirator 3 (in red) regarding the negative effect of OneTaste's teachings and employment practices on OneTaste members and a list of perceived necessary and aspirational improvements for the company. For example:

---

[42]At the time he reviewed the document, Co-Conspirator 3 had left his employment at OneTaste.

100

- "We have reached a point where the shaming and beating up on people has to end . . . [people] need to be able to date and make out with who they want, they need to be able to take vacation when they want, and they need to feel safe to say what they want."

- "The people who have left the organization get massively ostracized and . . . are thought of as 'dead' 'off' and that they 'didn't make the turn' . . . They are avoided like lepers and people are encouraged not to talk to them, make out with them, or otherwise interact with them."

- "People get massively hurt and their lives are deeply impacted for months and years by that pain."

- "People are wrecked after they leave [OneTaste] . . . especially around money . . . Some, after leaving over a year ago, are just starting to live in some semblance of sanity."

The Court should permit the admission of the Jane Doe 4's List, as it contains statements of Jane Doe 4's then-existing state of mind; namely, her motive, intent and plan to raise issues with OneTaste's executives to rectify some of the issues she had observed at OneTaste by changing the actions of OneTaste's executives. Fed. R. Evid. 803(3).

Jane Doe 4's List should also be admitted under the hearsay exception for present sense impressions. In particular, Jane Doe's observations fall under a general note stating, "this is what I see," indicating that her statements concern ongoing problematic and destructive actions and practices at OneTaste that she was actively observing as of the time she drafted the document. Fed. R. Evid. 803(1).

In the alternative, Jane Doe 4's List should be admitted under the residual exception because the circumstances under which it was written indicate a high degree of trustworthiness. Fed. R. Evid. 807. In particular, Jane Doe 4 circulated Exhibit I to another former OneTaste member in an effort to escalate issues to OneTaste's executives with the ultimate goal of resolving them and improving the company's treatment of employees and

participants going forward. Accordingly, there is no reason to believe that Jane Doe 4, herself a OneTaste NYC co-owner, had a motive to lie. See Bryce, 208 F.3d at 351. Furthermore, Jane Doe 4's List is the most probative evidence of her particular observations of OneTaste's troublesome practices and their effect on OneTaste participants. Accordingly, the document's admission advances the interest of justice and is consistent with the rules of evidence.[43]

VIII. The Court Should Preclude Evidence and Argument of the Defendants' "Good Acts" or Non-Commission of Other "Bad Acts"

The Court should preclude evidence and argument of the defendants' "good acts"—including their work as businesspeople, their roles as job creators or any charitable giving—or offer proof of their non-commission of "bad acts"—including evidence and argument that some OneTaste customers, employees and/or contractors were not subject to forced labor and/or had only positive experiences with OneTaste, or the defendants' lack of prior criminal histories—to seek to disprove the defendants' guilt of the crime charged.

"[S]tatements by individuals who were not allegedly directed to [perform the forced labor] . . . have no bearing on whether the alleged victims were so directed or threatened," and should be precluded. United States v. Raniere, 384 F. Supp. 3d 282, 325 (E.D.N.Y. 2019). Accordingly, the defendants should not be permitted to introduce evidence or argument regarding individuals who were not subject to forced labor to establish the defendants' guilt or innocence. See also, e.g., United States v. Scarpa, 913 F.2d 993, 1011 (2d Cir. 1990) ("A

---

[43]     The government may also seek to admit these materials as recorded recollections, see Fed. R. Evid. 803(5), and prior consistent statements, see Fed. R. Evid. 801(d)(1)(B), as appropriate at trial.

defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific [other] occasions."); United States v. Gotti, 784 F. Supp. 1013, 1017 (E.D.N.Y. 1992) ("[A] defendant cannot establish that he did not commit a crime as to A because he did not commit a crime as to B."); United States v. Walker, 191 F.3d 326, 336 (2d Cir. 1999) ("Whether [the defendant] had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent."); United States v. Fiumano, 14-CR-518 (JFK), 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016) ("The principle is rather elementary. A defendant charged with robbing a bank in Manhattan on April 22 cannot offer as evidence to disprove the charged crime that he did not rob the bank's branch on April 20, 21, 23, and 24, because this evidence is irrelevant to the charge that he robbed the Manhattan bank on April 22.").[44]

And, while a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait," or the witness' opinion of the defendant regarding that trait, see Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. See, e.g., United States v. Benedetto, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (finding defense-

---

[44] Indeed, the defendants appear to agree that such evidence or argument as to other individuals who may have felt positively about their OneTaste experiences would be irrelevant, but the government so moves in abundance of caution. See Mar. 1, 2024 Def. Ltr., ECF No. 80, at 7 (acknowledging that analysis of what constitutes "serious harm" under the forced labor statute is "highly individualized" and that "'serious harm' used against one person in one situation may violate the statute, while the exact same 'serious harm' used against a different person in a different situation may not").

proffered character evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); United States v. Inniss, No. 18-CR-134 (KAM), 2019 WL 6999912, at *7-8 (E.D.N.Y. Dec. 20, 2019) (precluding "evidence or argument concerning [the defendant's] prior commission of 'good acts' or non-commission of other bad acts"); United Rivera, 2015 WL 1725991, at *2 (precluding evidence of unrelated charitable giving). Accordingly, the Court should preclude defense counsel from offering evidence or argument, including in their opening statements, concerning the defendants' work as businesspeople, their roles as job creators, their charitable giving, or any other specific instance of prior good acts, or the lack of commission of other bad acts.[45]

IX.    The Court Should Preclude Evidence and Argument of Purported Science Pertaining to Orgasmic Meditation and Other OneTaste Practices or Public Endorsement of Such Practices

In pretrial filings, the defendants have touted purported "peer reviewed, published studies by leading researchers and universities" that the practice of orgasmic meditation "aids in stress management, mental health, and mindfulness," among other scientific claims.  See Def.

---

[45]    Relatedly, a defendant's "good" motive to commit a crime does not negate his criminal intent and is not a defense; rather, evidence of purported good motive or explanation is geared to engender jury sympathy and nothing more.  It should therefore be precluded.  Cf. United States v. Edwards, 101 F.3d 17, 19 (2d Cir. 1996) (affirming trial court's decision not to adjourn trial to allow defendant additional time to prepare defense because the "defense was rooted in 'the erroneous assumption that good motive for committing a crime is inconsistent with criminal intent'" (quoting United States v. Rosado, 728 F.2d 89, 93 (2d Cir. 1984)); see also Motovich, 2024 WL 3303723, at *6 (distinguishing between good faith belief and good motive, and holding that "good motive is irrelevant to Defendant's guilt or innocence and the Court therefore precludes such evidence").

Mot. to Dismiss, ECF No. 69, at 2. Whether or not true, any evidence or argument about such scientific or research studies is irrelevant to the defendants' agreement to commit forced labor and should be precluded under both Rules 402 and 403. Likewise, the endorsement of OM or OneTaste by any well-known public figures, journalists, scientists, business professionals, or medical professions is wholly irrelevant to the charged offense. In particular, the Court should preclude any evidence or argument that the practice of OM provided scientifically-proven health benefits, and any evidence or argument about any endorsements of OM or OneTaste by individuals outside of the company, as such would have no relevance to the defendants' guilt and could mislead the jury.[46]

X.      The Court Should Limit the Scope of Cross-Examination to Preclude Improper Questioning

As set forth above, numerous witnesses are expected to testify at trial, including some who are victims of the defendants' criminal conduct. The Court should limit cross-examination of these victims and other witnesses to avoid, "among other things, harassment,

---

[46]      The government may call an individual at trial employed by OneTaste as its "First Scientific Advisor" to conduct scientific research on the effects of Oxytocin on the human body who reported certain findings to Daedone as to the negative effects of Oxytocin, and subsequently was removed from his position after Daedone stated his research "did not feel right." Likewise, other witnesses may testify about statements made by OneTaste about the health and social benefits of OM to describe certain actions they took in light of such information. However, such testimony will not be for the truth of the matter, i.e., that the practice of orgasmic meditation did or did not have proven health benefits, and instead will be offered for its effect on the listener, i.e., why that individual left his OneTaste position.

prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679.

A.     The Court Should Preclude Cross-Examination █████████████████

Consistent with its obligations under Giglio v. United States, 405 U.S. 150 (1972), the government hereby provides notice to the Court and to the defendants of material regarding certain government witnesses and moves to preclude and limit cross-examination of these witnesses regarding certain of the information below.[47]



---

[47]     The government is still in the process of identifying its witnesses and identifying material that may be subject to disclosure pursuant to Giglio and its progeny, which may require the government to seek additional rulings from the Court. The government has made every effort to identify such material in advance of the Court's motions in limine schedule, but the government respectfully requests permission to file additional motions as such information becomes available.

       Further, in addition to the information provided below, the government anticipates that it will cover the costs of travel and accommodations of witnesses who travel to the Eastern District of New York to testify at trial and/or for meetings with the government in advance of trial, on which the government does not seek to preclude cross-examination.







B.    <u>The Court Should Preclude Defense Counsel from Asking Questions of Witnesses for Which There Is No Good Faith Basis or Relevance to Credibility</u>

The individuals identified as victims and witnesses above, and others like them, will be testifying at this trial because they were either victims to or witnesses of the defendants' forced labor scheme. These individuals should not be further victimized by unfounded attacks based on rank speculation and fishing expeditions for misconduct and defense counsel should be

precluded from questioning them about purported bad acts for which defense counsel has no

good-faith basis to believe occurred and/or do not relate to the witnesses' credibility.

The trial court may properly preclude cross-examination that is rhetorical,

argumentative, cumulative or lacking a good faith basis.  See Stewart, 433 F.3d at 313;

Concepcion, 983 F.2d at 391 ("The trial court may, in its discretion, preclude questions for

which the questioner cannot show a good faith basis."); see also United States v. Bowen, 511 F.

Supp. 3d 441, 452-53 (S.D.N.Y. 2021) (precluding defense questioning as to truthfulness in

witness's employment application where there was no good-faith basis any falsehoods existed);

United States v. Figueroa, 548 F.3d 222, 227 (2d Cir. 2008) (affirming trial court's preclusion of

defense counsel asking witness about possible gang affiliation when he had no information as to

whether witness was affiliated with gang); United States v. Millan-Colon, 836 F. Supp. 1022,

1024 (S.D.N.Y. 1993) (precluding defense from cross-examining government witness about

allegations that corrupt police officers may have stolen money from trunk of car where proposed

line of questioning based on pure speculation and hypothesis).

For example, the government anticipates that defense counsel may ask questions

of these witnesses without any good-faith basis to either intimidate, harass or embarrass them, or

to advance improper nullification arguments to the jury, including questions about their current

or prior sexual preferences, habits, or dysfunctions; current or prior issues with addictions or

mental health disorders (including eating disorders); religious beliefs; political affiliations;

employment histories; or current romantic partners.  Even assuming such actions are relevant to

a witness's credibility (which they are unlikely to be), the Court should preclude defense counsel

from pursuing such lines of inquiry without a good-faith basis.[48] See Bowen, 511 F. Supp. 3d at 452-53; Figueroa, 548 F.3d at 227; Millan-Colon, 836 F. Supp. at 1024.

Moreover, cross-examination of witnesses should be limited to inquiring about relevant facts within the scope of direct examination or to test a witness's credibility or bias, and should not be used by defense counsel to advance an irrelevant defense. Thus, to the extent the Court permits defense counsel to ask a witness about specific conduct, defense counsel should not be permitted to use the witness's response to advance improper arguments; rather, any cross-examination must only be used to argue lack of credibility or bias, and not an otherwise illegitimate defense.

C. Defense Counsel Should Not Be Permitted to Cross-Examine Witnesses with Non-Verbatim Reports That Have Not Been Signed or Adopted by the Witness or Suggest to the Jury that the Contents of an Investigative Report are Statements of the Witness

In accordance with its obligations under Fed. R. Crim. P. 26.2 and 18 U.S.C. § 3500, the government will produce summaries of witness interviews prepared by law enforcement, including reports summarizing investigators' interviews with government witnesses. The government has also throughout the pendency of this case periodically produced to defense counsel certain summaries of statements of witnesses that may be helpful to the defense. These reports and summaries were not reviewed or adopted by any of the government

---

[48] To be clear, the government is unaware whether the witnesses discussed herein engaged in these and other practices. They are merely examples of lines of inappropriate inquiry the government anticipates defense counsel attempting absent court intervention. Should the government learn of a witness's conduct that relates to his/her credibility or bias, it will notify defense counsel ahead of trial and the parties can seek a ruling from the Court as appropriate.

witnesses.  Moreover, they were finished after the interviews were completed and reflect the

thought processes and interpretations of the agents and/or the government; they do not constitute

verbatim recitals or transcripts of any of the witnesses' statements.  As a result, the statements in

these reports are not statements of any of the government's witnesses and therefore cannot be

used for impeachment and should not be read aloud or shown to the jury.  See United States v.

Romanello, No. 22-CR-194 (EK), 2023 WL 8283435, at *2 (E.D.N.Y. Nov. 27, 2023) (granting

motion to preclude use of agent reports of witness interviews to impeach witnesses: "A witness

may only be impeached by his or her own statements, see Fed. R. Evid. 613(b), not notes made

by other parties about what they said, unless the witness has adopted or approved those notes."

(citing United States v. Leonardi, 623 F.2d 746, 757 (2d Cir. 1980) ("[T]he written statement of

[an] FBI agent was not attributable to the [interviewee]" and thus was "properly rejected as a

prior inconsistent statement."))); United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992)

(concluding that the trial court did not err in refusing to admit prosecutor's notes taken during

debriefing of witness and explaining that a "third party's characterization" of a witness's

statement does not constitute a prior statement of that witness "unless the witness has subscribed

to that characterization" and observing that the problem with using a third party's summary or

characterization of a witness's statement to impeach is "one of relevancy": "If a third party's

notes reflect only that note-taker's summary characterization of a witness's prior statement, then

the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.").

The Court should therefore preclude defense counsel from quoting, publishing or suggesting to

the jury in any way that the content of an agent report constitutes a statement of the witness

(other than the reports' authors, if called to testify at trial).[49]

XI.     The Government Should Be Permitted to Authenticate Certain Video and Documentary Evidence Based on Its Production by OneTaste or Other Circumstances Establishing Authenticity

"Evidence is admissible under Rule 901(a) so long as the Government provides a

'rational basis' from which to conclude that the evidence sought to be admitted is indeed what

the Government claims it to be."  United States v. Bin Laden, No. 98-CR-1023 (LBS), 2001 WL

276714, at *1 (S.D.N.Y. Mar. 20, 2001) (citing, among others, United States v. Inserra, 34 F.3d

83, 90 (2d Cir. 1994)).  "The standard for authentication is not rigorous." Arista Recs. LLC v.

Lime Grp. LLC, 784 F. Supp. 2d 398, 419-20 (S.D.N.Y. 2011).  "Once the Government has met

the low bar of 'rational basis,' the problem is no longer one of admissibility to be determined by

a judge, but one of credibility to be measured by a jury."  Bin Laden, 2001 WL 276714, at *1

(citing, among others, United States v. Hon, 904 F.2d 803, 810 (2d Cir.1990)); United States v.

Gagliardi, 506 F.3d 140, 141 (2d Cir. 2007) (standard for authentication is "one of 'reasonable

likelihood' and is 'minimal'").

---

[49]     The government acknowledges that the defense may ask a witness whether he or she made a statement that is reflected in a law enforcement report.  However, if the defense is not satisfied with the witness's answer, the defense may not publish or introduce the report's contents as a prior inconsistent statement.  Additionally, if a witness says that he or she does not remember a fact, the defense may attempt to refresh a witness's recollection by showing the witness the report, but only if the defense does so in a manner that does not imply that the report is the witness's own statement or publish in any manner, including reading into the record, its contents to the jury.

Authenticity may be established through a variety of means, including based on extrinsic and circumstantial proof, such as the testimony of a witness with knowledge of the document's authenticity, see Fed. R. Evid. 901(b)(1), or based upon "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," Fed. R. Evid. 901(b)(4); United States v. Dhinsa, 243 F.3d 635, 659 (2d Cir. 2001) (authentication methods outlined in Rule 901 are not exhaustive). "One method of authenticating a document is showing that it was produced pursuant to a subpoena. 'A person complying with a . . . subpoena in a criminal case implicitly avers that the matter produced is the evidence requested.'" United States v. King, No. 19-CR-287 (JNP), 2023 WL 571508, at *2 (D. Utah Jan. 27, 2023) (quoting Weinstein & Berger, Weinstein's Fed. Evid. § 900.07[2][a])).

Like other questions related to admissibility, authenticity is a "preliminary question" of law to be determined in the first instance by the Court pursuant to Federal Rule of Evidence 104. See United States v. Bello, No. 90-CR-501 (CSH), 1991 WL 45046, at *2 (S.D.N.Y. Mar. 28, 1991) (holding that "[t]he Federal Rules of Evidence require that the district court determine preliminary questions of admissibility," including as to authentication). Under Rule 104(a), "the Court may make preliminary determinations concerning the admissibility of evidence and is not bound by the Rules of Evidence except those with respect to privilege."

A.    Materials Produced by OneTaste Pursuant to Grand Jury Subpoena[50]

At trial, the government will seek to admit numerous corporate records, including electronic communications, financial statements, employment documents, course materials, and video and audio recordings produced by OneTaste pursuant to grand jury subpoenas.

As the Supreme Court has recognized, when a party produces documents in response to a subpoena, that act of production itself "may implicitly communicate" certain information, including a statement that the produced documents are "authentic." United States v. Hubbell, 530 U.S. 27, 36 (2000). "By producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic." Id. Thus, a "jury may draw from [a] corporation's act of production the conclusion that the records in question are authentic corporate records, which the corporation possessed, and which it produced in response to the subpoena" so as to meet the requirements of Rule 901(a). Braswell v. United States, 487 U.S. 99, 118 (1988); cf. Rodriguez v. Vill. Green Realty, Inc., 788 F.3d 31, 47 (2d Cir. 2015) (observing that authenticity of medical records was supported by their "appearance, contents, and substance" as well as the fact that the records were produced from the third-party medical providers themselves) (citing Fed. R. Evid. 901(b)(4)); 31 Wright & Miller, Fed. Prac. & Proc. Evid. § 7105 ("Authentication also can be accomplished through judicial admissions such as

---

[50]    The government will also seek to obtain a business records certification for these documents from OneTaste, which would self-authenticate them. See Fed. R. Evid. 902(11).

stipulations, pleadings, and production of items in response to subpoena or other discovery request.").

Here, to the extent that the defendants intend to contest the authenticity of materials produced by OneTaste in response to grand jury subpoenas, in the absence of a business records certification from OneTaste, the government submits that the authenticity of those records is established by OneTaste's production of them pursuant to subpoena, a fact that the government intends to establish either through a OneTaste representative witness and/or testimony from a witness who is familiar with the document-management system used by the U.S. Attorney's Office (the "Office"), who will describe the Office's routine practice for filing grand jury returns and identify particular documents produced by OneTaste, based on the locations where the documents are stored in the Office's files, as materials produced by OneTaste in response to grand jury subpoenas. This witness may also introduce certain relevant email or letter communications by OneTaste's attorneys stored in the Office's files identifying specific documents produced by OneTaste. Such testimony would be sufficient to establish that the proffered documents and materials were produced by OneTaste in response to grand jury subpoenas, see Fed. R. Evid. 406 (admissibility of an organization's routine practice to prove that "on a particular occasion the . . . organization acted in accordance with . . . routine practice"), 803(6) (admissibility of records of regularly conducted activity), 901(b)(4) (authentication by characteristics of items), which in turn is sufficient to authenticate the records as authentic OneTaste records. See King, 2023 WL 571508, at *2 (observing that "[o]ne method of authenticating a document is showing that it

was produced pursuant to a subpoena" and finding that evidence of members of FBI's support staff regarding their service of subpoenas to Verizon and Kick, receipt of the requested documents through a secure portal, and retrieval of the responsive records was "sufficient to authenticate the records"); see also John Paul Mitchell Sys. v. Quality King Distributors, Inc., 106 F. Supp. 2d 462, 472 (S.D.N.Y. 2000) (finding "the act of production implicitly authenticated the documents").

Furthermore, the authenticity of the materials produced by OneTaste is bolstered by their distinct characteristics. Fed. R. Evid. 901(b)(4); United States v. Fridman, 974 F.3d 163, 175 (2d Cir. 2020) (observing that documents may be implicitly authenticated if an individual complies with a summons demanding production of documents, and observing that the government "can 'independently establish' authenticity in several ways: 'a) through the testimony of third parties familiar with that type of document, b) by comparison to a prior version of the document, or c) by comparison to other related documents'") (citing United States v. Greenfield, 831 F.3d 106, 118 (2d Cir. 2016)). For example, certain documents and recordings are made on OneTaste letterhead, feature OneTaste teachers, reference OneTaste courses, employ OneTaste's unique lexicon and discuss nonpublic facts. See United States v. Vayner, 769 F.3d 125, 132 (2d Cir. 2014) (the contents or distinctive characteristics of a document can sometimes alone provide circumstantial evidence sufficient for authentication); Linde v. Arab Bank, PLC, 97 F. Supp. 3d 287, 338 (E.D.N.Y. 2015) (authenticity established by document's language, facts, seals and watermarks), vacated on other grounds, 882 F.3d 314 (2d Cir. 2018). Some of the materials also discuss events that will be corroborated by witness

testimony at trial. Accordingly, the Court should find that such materials are properly

authenticated. Fed. R. Evid. 901(b)(4).

B.    Recordings and Records Downloaded from OneTaste's Servers

The government will additionally seek the admission of various materials that

one or more OneTaste participants downloaded from OneTaste's servers and subsequently

provided to the government.[51]  Such materials include electronic communications, video and

audio recordings; corporate documents, OneTaste course materials; business records; and

other materials maintained by OneTaste's executives.

The government will seek to authenticate such materials through, among other

things, (i) witness testimony regarding how the materials were stored and obtained;

(ii) witness testimony by individuals familiar with the materials, featured or quoted in the

materials, or who attended events discussed or captured in the materials; and (iii) the

materials' distinctive appearance, contents, substance, and characteristics. Fed. R. Evid.

901(b)(4); see also Kaur v. New York City Health & Hosps. Corp., 688 F. Supp. 2d 317,

324-25 (S.D.N.Y. 2010) (finding circumstantial evidence established documents'

authenticity); Park W. Radiology v. CareCore Nat. LLC, 675 F. Supp. 2d 314, 334 (S.D.N.Y.

2009) (testimony about the document from employees familiar with it sufficient to

---

[51]    The government seeks the preclusion of any cross examination or argument regarding the circumstances under which the witnesses downloaded the referenced materials and the legality of such conduct. Such evidence is irrelevant to the witnesses' credibility and the charged offense. Fed. R. Evid. 401. Furthermore, its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, and wasting time. Fed. R. Evid. 403.

authenticate a document); <u>United States v. Bagaric</u>, 706 F.2d 42, 67 (2d Cir. 1983) (admissibility established by a document's language, facts, seals and watermarks).

As to video recordings in particular, the Second Circuit "does not have a rigid formula for evaluating the authenticity of video tapes, [and] the requisite indicia of authenticity can be created by presenting witnesses who recall the events depicted, testimony as to the chain of custody, testimony of the person recording the events, or any other evidence tending to show the accuracy of the depictions." <u>United States v. Scott</u>, No. 21-CR-429 (AT), 2022 WL 865861, at *3 (S.D.N.Y. Mar. 23, 2022); <u>Linde</u>, 97 F. Supp. 3d at 338 (video authenticated by a witness who recognized the logo of the television station on which it was broadcast). Here, the government will seek to authenticate video footage in the same manner as the other materials obtained from OneTaste's servers, including but not limited to through witnesses who are familiar with the events, locations, and individuals captured in the recordings, as well as other indicia that the recordings constitute authentic recordings. <u>See</u> <u>United States v. Broomfield</u>, 591 F. App'x 847, 851 (11th Cir. 2014) (location of YouTube video established by testimony that a witness recognized individual in the video, where and when it was recorded and location); <u>United States v. Rembert</u>, 863 F.2d 1023, 1028 (D.C. Cir. 1988) (observing photographs obtained from surveillance video footage "can be admitted as evidence independent of the testimony of any witness as to the events depicted").

C.     Business Records Can Be Authenticated Pursuant to Fed. R. Evid. 902(4), 902(11) and (13)

At trial, the government intends to authenticate certain certified business and electronic records pursuant to Fed. R. Evid. 902(11) and (13).  The government has been producing, and will continue to produce, such certifications in discovery as they become available.[52]

The Supreme Court has held that admitting business records that have been authenticated by affidavit or certificate does not violate a defendant's right to confrontation.  See Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).  The Court has explained that "[b]usiness and public records are generally admissible absent confrontation . . . because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial."  Id. at 324.  Relying on Melendez-Diaz, the Second Circuit has concluded that certifications authenticating records are not testimonial and therefore are permissible.  See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015).

Consistent with this understanding of the confrontation right, federal law permits the authentication of business and electronic records by certification and sets forth specific requirements for their admission.  Federal Rule of Evidence 902(11) expressly permits the authentication of domestic business records by certification, and Rule 902(13) expressly permits the authentication of electronic records by certification.  Courts in the Second Circuit have

---

[52]     To the extent the defendants oppose admission of any of these records, the government is prepared to provide any or all of the certifications to the Court upon request.

routinely applied these provisions to admit certified business records at trial. <u>See, e.g.</u>, <u>United States v. Komasa</u>, 767 F.3d 151 (2d Cir. 2014); <u>Qualls</u>, 613 F. App'x at 28 (affirming district court decision to allow government to offer into evidence foreign business records based upon a certification, absent a live witness to authenticate the documents). Similarly, Rule 803(6)(D) provides that a document may be qualified as a record of a regularly conducted activity "by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification." Fed. R. Evid. 803(6)(D); <u>see also</u> <u>United States v. Michel</u>, 879 F. Supp. 2d 291, 304 n.13 (E.D.N.Y. 2012) (bank representative's signed declaration under penalty of perjury sufficiently laid foundation for admission of bank records). Thus, "Rule 902(11) extends Rule 803(6) by allowing a written foundation in lieu of an oral one." <u>United States v. Rom</u>, 528 F. App'x 24, 27 (2d Cir. 2013) (citations omitted).

The government should therefore be permitted to authenticate the business and electronic records to be marked as exhibits at trial using certifications because it is proper under the law. As noted, the government has provided the defendants, and will continue to provide as they become available, the certifications and underlying records in discovery, and the defendants are hereby informed of the government's intention to offer them as evidence at trial. Such a process would eliminate unnecessary witnesses and help the case proceed in an efficient manner without the need for wasteful sidebars. Accordingly, the government seeks a pretrial ruling that

these records may properly be authenticated as self-authenticating business and electronic records.[53]

XII.     Defendants Must Disclose Rule 16(b) Discovery and Trial Exhibits To Be Introduced During Their Case-in-Chief

The government respectfully request that the Court order the defendants to disclose defense exhibits, including exhibits they intend to introduce through cross-examination of government witnesses, no later than the exhibits deadline set by the Court.  See Order, ECF No. 86.

Federal Rule of Criminal Procedure 16(b) governs a defendant's disclosures in a criminal case.  In relevant part, it requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A).  The Rule's purpose "is to avoid surprise and gamesmanship" and "it definitely contemplates reciprocity in the production of evidence that both parties intend to introduce in their case-in-chief at trial."  United States v. Hsia, No. 98-CR-0057 (PLF), 2000 WL 195067, at *1 (D.D.C. Jan. 21, 2000).

Rule 16 does not require a defendant to disclose documents he intends to use for purposes of impeaching a government witness (just as Rule 16 does not require the government to disclose documents it intends to use to impeach defense witnesses).  But to the extent that a defendant seeks to admit into evidence a document while cross-examining a witness during the

---

[53]     In addition to authentication, the government will also need to establish relevancy prior to admitting documents at trial.  The government anticipates that the relevancy of each record will be plain at the time they are moved into evidence.

government's case-in-chief in order to affirmatively support the defendant's theory of the case, such a document falls within the ambit of Rule 16 and must be produced.  As the District Court for the District of Columbia has explained:

> A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense."  Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense . . . . The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case.

Hsia, 2000 WL 195067, at *2 (quoting Black's Law Dictionary 207 (7th ed. 1999)).  The Hsia court distinguished documents introduced by a defendant via a government witness—which do fall within Rule 16 and should be disclosed—from documents used by a defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, [which] is not part of [the defendant's] case-in-chief."  Id. at *2 n.1.

Courts in this district have repeatedly recognized this distinction, ordering the production of defense exhibits "that will not be used solely for impeachment purposes," even if the defense intends to introduce such exhibit during cross-examination.  United States v. Smothers, No. 20-CR-213 (KAM), 2023 WL 348870, at *22 (E.D.N.Y. Jan. 20, 2023); see also United States v. Chang, No. 18-CR-00681 (NGG), 2024 WL 3162950, at *1 (E.D.N.Y. June 25, 2024) ("[T]o the extent that Chang intends to use any of the materials which are subject to disclosure under Rule 16(b)(1)(A), Chang shall disclose and produce these materials to the Government no later than [a set date]. . . . Should Chang fail to produce Rule 16 material by this date, he will be precluded from using such evidence during his case-in-chief."); United States v.

<u>Warren</u>, No. 22-CR-231 (DLI), Sept. 6, 2023 Minute Entry ECF Order (E.D.N.Y.) (ordering disclosure of defense exhibits in felon-in-possession trial six days prior to jury selection); <u>United States v. Napout</u>, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) (holding that "Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness or a witness called by a Defendant.").  That obligation extends to material produced by the government in discovery that the defense intends to use as an exhibit.  <u>See</u> <u>Smothers</u>, 2023 WL 348870, at *22 (requiring advance production of defense exhibits "regardless of whether such an exhibit is in the defense's sole custody").

   Here, the government first requested defendants' Rule 16 materials with its first discovery letter on June 28, 2023, and has renewed that request since; to date, the defendants have not disclosed a single document.  The defendants' failure to provide reciprocal discovery may be a result of having none to produce; they may not intend to introduce any evidence at trial, as is their right.  The defendants, however, cannot rely upon an undefined defense strategy to avoid producing documents in compliance with the spirit and letter of Rule 16.

   Accordingly, to avoid gamesmanship, unfair surprise and undue delay during the trial, the government respectfully requests that the Court order the defendants to identify any defense exhibits they intend to introduce during the government's case (but not those documents

to be used for impeachment purposes only) or any defense case no later than the exhibit deadline set by the Court.[54]

The government further respectfully submits that, to avoid gamesmanship and delay during the trial, the Court should set a schedule for disclosure of the statements of any defense witnesses other than the defendants themselves.  See Fed. R. Crim. P. 26.2.  The government proposes that the Court order that government and defense Rule 26.2 material be exchanged simultaneously on a date agreed-upon by the parties.  See United States v. Boustani, No. 18-CR-681 (WFK), ECF No. 120 at 1-2 (E.D.N.Y. July 31, 2019) (ordering simultaneous exchange of Rule 26.2 material).  The parties are in the process of meeting and conferring regarding disclosure deadlines and hope to be in a position to provide a joint proposed schedule for trial deadlines to the Court, including the disclosure of § 3500 and 26.2 material.  However, in the absence of an agreement among the parties, the government respectfully requests a mutual deadline approximately 60 days in advance of trial.[55]

Finally, to avoid any unnecessary objections or delays during opening statements, the government respectfully requests that the Court order that the parties mutually exchange any demonstratives each party intends to use during opening statements no later than January 6,

---

[54]     To the extent the defendants identify any exhibits at trial that should have been produced pursuant to this request but were not (or to the extent the defendants attempt to use such exhibits for impeachment), the government respectfully submits that use of such exhibits should be forbidden.  The defendants should not be permitted to gain a tactical advantage by flouting the rules.

[55]     As the government continues to identify 3500 material, including, for example, during the course of continuing to prepare its witnesses, it will continue to produce such material.  The defendants should be required to do the same.

2025.  See <u>United States v. Aguilar</u>, No. 20-CR-390 (ENV), ECF No. 238 at 1-2 (E.D.N.Y. Jan. 2, 2024) (ordering exchange of opening-statement demonstratives after completion of jury selection).  The government respectfully submits that such demonstratives should not include any exhibits, as exhibits generally may not be shown to the jury during opening statements. <u>See</u> <u>id.</u> at 1 ("Aguilar may not during his opening statement show or reference by exhibit number exhibits marked for use at trial.").

XIII.    <u>Request for Sealing</u>

CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court

grant the government's motions in limine in their entirety.


Dated: Brooklyn, New York
       October 11, 2024

                                    Respectfully submitted,

                                    BREON PEACE
                                    UNITED STATES ATTORNEY
                                    Eastern District of New York

                   By:      /s/
                                    Gillian Kassner
                                    Kayla Bensing
                                    Devon Lash
                                    Sean Fern
                                    Assistant United States Attorneys
                                    (718) 254-7000