UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 23-CR-146(DG)

Plaintiff , :

-against- : United States Courthouse
Brooklyn, New York

RACHEL CHERWITZ and
NICOLE DAEDONE, :

Defendant. : May 9, 2025
9:30 a.m.

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR FURTHER JURY TRIAL
BEFORE THE HONORABLE DIANE GUJARATI and a JURY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: JOSEPH NOCELLA, JR.
Interim United States Attorney
BY: KAITLIN T. FARRELL
KAYLA C. BENSING
NINA C. GUPTA
SEAN M. FERN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, New York 11201

For Defendant Cherwitz: BALLARD SPAHR LLP
1675 Broadway, 19th Floor
New York, New York 10019
BY: CELIA COHEN, ESQ.
MICHAEL P. ROBOTTI, ESQ.
KELLY LIN, ESQ.
SCHUYLER LA BARGE, ESQ.

(Appearances continued on the next page.)

Court Reporter: Annette M. Montalvo
Official Court Reporter

Appearances: (Cont'd)

For Defendant Daedone: BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
BY: JENNIFER A. BONJEAN, ESQ.
KELSEY KILLION, ESQ.

Also Present:

Liam McNett, Paralegal, US Attorney's Office
Marlane Bosler, Paralegal, US Attorney's Office

Keith Garland, Paralegal, Ballard Spahr LLP

Galila Assefa, Paralegal, Bonjean Law Group
Sophia Moazed, Paralegal, Bonjean Law Group

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

---

Court Reporter: Annette M. Montalvo, CSR, RDR, CRR
Official Court Reporter
United States Courthouse, Room N375
225 Cadman Plaza East
Brooklyn, New York 11201
718-804-2711

(Proceedings commenced at 9:30 a.m., in open court, outside of the presence of the jury, to wit:)

THE COURTROOM DEPUTY: The Honorable Diane Gujarati is now presiding.

You may be seated.

Your Honor, this is *United States of America against Rachel Cherwitz and Nicole Daedone*.

Is the Government ready?

MS. BENSING: Yes, the Government is ready.

Kayla Bensing, Kaitlin Farrell --

THE COURT: Can you turn on your microphone, please?

MS. BENSING: I'm sorry.

Kayla Bensing, Kaitlin Farrell, Nina Gupta, Sean Fern, joined by Paralegal Specialists Liam McNett and Marlane Bosler and FBI Special Agent Tricia Quintero, for the Government.

THE COURT: Good morning.

MS. COHEN: Good morning, Your Honor.

Celia Cohen, Michael Robotti, Kelly Lin, Schuyler La Barge on behalf of Rachel Cherwitz.

THE COURT: Good morning, everyone.

MS. BONJEAN: Good morning.

Jennifer Bonjean, B-o-n-j-e-a-n, along with Kelsey Killion, Ashley Cohen, and Sophia Moazed on behalf of Ms. Daedone.

THE COURT: Good morning to all of you as well.

The jury is here, so we will bring them out now.

MS. COHEN: Oh. Your Honor --

THE COURT: You can grab the witness.

MS. COHEN: Oh, we have just a couple --

MS. BONJEAN: We have some --

THE COURT: No. I'm going to bring the jury out now.

Let's get the jury.

MS. BONJEAN: Your Honor, what are we doing about evidentiary issues then?

THE COURT: I didn't receive anything other than some videos, which I was upstairs watching.

We're bringing out the jury. We can take up anything at the first break.

MS. BONJEAN: We were here at 9:00 to discuss those things, so.

THE COURT: Nobody informed my deputy that there was an issue to raise, which is the procedure that should be followed. So, we'll take a break at an appropriate time and that's how we're going to proceed.

The jury is here. I will not keep them waiting. We kept them waiting too long yesterday with some questioning that I said was a lot of long pauses. They are here. We are going to start. That's enough on this topic. I will hear

everybody out at an appropriate time.

And I did watch the videos that were handed up about 20 minutes or so ago.

MS. BONJEAN: They were provided yesterday, actually.

THE COURT: No, I watched the videos that were provided yesterday. I believe there was -- and there were some transcripts that were provided today.

MS. BONJEAN: Yes. As a courtesy, we provided transcripts to make it easier.

Clearly, we wanted to address those.

MS. BENSING: Would the Court like us to bring the witness now?

THE COURT: Sure.

MS. BENSING: Okay.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

Good morning, all. I really appreciate the jurors all being here promptly and I hope everyone had a good evening.

Ms. Cohen, you may resume your cross-examination.

MS. COHEN: Thank you, Your Honor.

THE COURTROOM DEPUTY: Ms. Halpern, the Court reminds you that you are still under oath.

THE WITNESS: Yes.

Thank you.

REBECCA HALPERN,

called as a witness herein by the Government, having been previously duly sworn and having testified, was examined and testified further as follows:

CROSS-EXAMINATION

BY MS. COHEN: (Continuing)

Q Good morning, Ms. Halpern.

A Good morning.

Q Just a few additional questions.

You testified yesterday about, we were talking about the beast, that it often creates a lot of emotions that come out, right?

A Yes.

Q And when you are doing an OM, an OM also creates lots of emotions, right?

A Sometimes, yes.

Q Right?

Sometimes it can make you cry, correct?

A Sometimes, yeah.

Q Sometimes it could make you feel very happy, right?

A Sure. Yes.

Q And sometimes it can make you feel very vulnerable as well, right?

A Yes.
Q Now, you testified also on direct examination, the day before yesterday, that in the latter half of your time at OneTaste, that you were tired and that you were foggy and had dark circles under your eyes and you felt often sluggish.
Is that fair?
A Yes.
Q And you also testified that --
MS. COHEN: Well, withdrawn. Sorry.
Q The time frame by which you were there, really 2012 is when you would say beyond the classes that you started working at OneTaste, right, 2012 to February 2014?
A Correct.
Q So by 2013 was, would you say, the latter half of your time at OneTaste, correct?
A Sure. Yes.
MS. COHEN: Your Honor, at this time we already have in evidence DX 21-AO-1, which is a still.
THE COURT: Yes.
MS. COHEN: I would like to offer DX 21-AO, which is the video of that still, which does not contain -- contains laughing and singing, does not contain any out-of-court -- I mean, hearsay statements. We offer it as this witness's then-emotional state at the time to contradict testimony about the latter half of what was going on in her latter half at

OneTaste.

THE COURT: Any objection?

MS. FARRELL: Same objection that we had yesterday, Your Honor.

THE COURT: Repeat your objection.

MS. FARRELL: Relevance.

THE COURT: I'm going to sustain it, but I will allow you to lay a foundation if you think there is a proper foundation.

MS. COHEN: Sure.

If I could show the witness -- we have a laptop -- for identification.

THE COURT: Just let me know what you're doing with the laptop.

MS. COHEN: Oh, sorry.

THE COURT: You can come up, sir.

MS. COHEN: Thank you, Your Honor.

Just so the witness can listen to it and establish a foundation.

THE COURT: Go ahead.

And she has some headphones; is that right?

MS. COHEN: Yes.

THE COURT: Okay. And for the record, you're playing, to the witness only, Defendant's Exhibit 21 A-O, which is a video?

Is that right?

MS. COHEN: Correct.

THE COURT: And how long is the video?

MS. COHEN: It is 25 seconds.

THE COURT: And you're playing the entirety for her?

MS. COHEN: Yes.

THE COURT: Okay.

MS. COHEN: Ms. Halpern, did you get a chance to open -- sorry. I know you may have some other -- is it easier for you to leave that?

THE COURT: No, I don't want him to stay there unless he's doing something.

MS. COHEN: No, I didn't know if it was easier to leave the laptop.

THE COURT: He can leave the laptop, but I don't need anybody else other than the witness there.

MS. COHEN: Oh, okay. Sorry, Your Honor.

THE COURT: Unless he's actively playing it for her.

MS. COHEN: It's fine. Whatever is easier.

We can take it back. Sorry.

BY MS. COHEN:

Q Ms. Halpern, do you recognize that video?

A Yes.

Q And do you recall that that was in the summer of 2013?

A That sounds about right. Sure.

Q Actually, it was when you were at The Morellino?
A Yes.
Q And is that a video of the photo, the still we saw yesterday?
A Yes.
Q And who was in that video?
A Myself and Chelsea Hunter and Ruwan Meepagala.
Q And what were you doing in the video?
A We were singing.
Q Were you happy in the video?
A I was.

MS. COHEN: Your Honor, for again the same reasons I said, to show the witness's mental state of mind at the time, we offer Government Exhibit DX 21-AO.

MS. FARRELL: No objection.

And just so I'm clear, is the full exhibit coming in, including the material --

THE COURT: That's what is being offered or no?

MS. COHEN: That's what's being...

THE COURT: Only a -- it's a video? There should be no text, correct?

MS. COHEN: There's no text. It was redacted.

MS. FARRELL: We're actually fine with the whole thing coming in.

THE COURT: Yes.

Defense Exhibit 21-AO, which is a video, is admitted.

(Defense Exhibit 21-AO received in evidence.)

MS. COHEN: Can you play that?

THE COURT: And again, there's no text, correct?

MS. COHEN: Correct.

THE COURT: Okay, go ahead. You can publish it.

MS. FARRELL: Sorry, I just want to be clear, we're agreeing -- we're not objecting to the whole thing coming in, including the social media post on the right?

THE COURT: I don't see any social media post, so I'm not sure -- let me make clear what is being offered.

MS. COHEN: I think we redacted that from yesterday. We redacted the social media, that --

THE COURT: Well, let's not -- just tell me what you're offering.

MS. COHEN: I'm just offering the video.

THE COURT: Is there any objection?

MS. FARRELL: No.

THE COURT: The video, which I understand is DX 21-AO, is admitted, to the extent there is any text on it which should not be shown.

MS. COHEN: There is not.

THE COURT: Okay, good. It's admitted.

(Exhibit published.)

(Video played; video stopped.)

BY MS. COHEN:

Q And, Ms. Halpern, that was again Ruwan, correct?

A Ruwan and Chelsea, yeah.

Q And Chelsea?

A Yeah.

THE COURT: Could you take down what is on the screen now, please?

Thank you.

Q You also testified yesterday that you were very close with Chelsea and not quite as close with who you referred to as Pix or Pixley?

A Yeah. There were certainly times that we were close and times that we were less close. It was just a little less consistent.

Q Now, in August of 2013, you went to an OMX event, correct?

A Yes.

Q And what's an OMX event?

A That event was like a bigger, a little bit more sort of, like, theatrical, I would say, event for OneTaste. It was a newer event at the time that I was there. So instead of being, of course, in a smaller venue where it's just like a few participants, this was in sort of more a theatre setting.

Q And that was in August of 2013, right?

A That sounds right.
Q And Pixley would have been at OMX as well?
A I assume so.

MS. COHEN: Your Honor, at this time I offer DX 21-CX into evidence. I can have the --

THE COURT: Where is it?

MS. COHEN: Sorry. Let me -- I would like to have the witness listen to it and then offer.

It's a video, DX 21-CX. It is 20 seconds.

THE COURT: Is this something that you provided to the Court this morning?

MS. COHEN: No, yesterday.

THE COURT: Okay.

MS. COHEN: And it's from August 2nd, 2013.

And again, on the same grounds, referring to the same testimony about the latter half at OneTaste. This is from August 2nd, 2013.

THE COURT: And you're asking the witness just to listen to it?

MS. COHEN: First to listen to it and then I will offer it, yes.

THE WITNESS: It has different numbers. DX?

MS. COHEN: 21-C, as in cat, X.

THE COURT: I'm sorry, is this your paralegal?

He can certainly help when something needs to be

played. I just didn't want anyone standing there when the testimony is going on.

MS. COHEN: Got it. Thank you.

THE COURT: But she doesn't have to work the computer herself.

THE WITNESS: Yeah. These are just labeled differently.

MS. COHEN: It's not working?

THE COURT: Move on to something else. We're not going to wait. You can come back to this, certainly.

MS. COHEN: No problem.

BY MS. COHEN:

Q So at the OMX event --

MS. COHEN: Can you just show just the witness DX 21-BF?

THE COURT: Sorry, I didn't hear the letters.

MS. COHEN: Sorry. B as in boy, F as in Frank.

THE COURT: Video or paper?

MS. COHEN: This is just paper. It's a photo.

There are two photos, Your Honor. I will just have her identify them together, if that's okay.

THE COURT: I only have one that was given to me as BF. Is there a different number? I have 21-BF as one photograph.

MS. COHEN: Yes. And another one that's 21-AS.

THE COURT: AS, okay.

MS. COHEN: Yes. And they're from the same time period.

THE COURT: Go ahead.

MS. COHEN: Please show those one by one to the witness.

THE WITNESS: I have it.

MS. COHEN: Oh, you have it.

THE WITNESS: I'm seeing them on mine.

MS. COHEN: Are you looking at 21-BF?

THE WITNESS: I am.

BY MS. COHEN:

Q Do you recognize that?

A I do.

Q And do you recognize anyone in the photograph?

A Yes.

Q Who do you recognize?

A I recognize Maray (ph.) on my right.

And I can't remember her name on my left.

Q And you also see yourself in the photo?

A Yes. Correct.

Q And do you know where you were at that time?

A At the OMX.

Q And the OMX, again, was in August 2013?

A Correct.

MS. COHEN: Your Honor, at this time we offer 21-BF into evidence.

THE COURT: Any objection?

MS. FARRELL: No objection, Your Honor.

THE COURT: Defense Exhibit 21-BF is admitted.

(Defense Exhibit 21-BF received in evidence.)

MS. COHEN: And before we publish it, let me just do 21-AS and just ask you the same questions.

THE WITNESS: Sure.

Q Do you recognize that?
A Yes.
Q And what is it?
A The OMX.
Q And do you recognize yourself in the photo?
A Yes.
Q And do you -- is that at the same event as the other photograph?
A Yes.

MS. COHEN: Your Honor, at this time we offer 21-AS into evidence as well.

THE COURT: And it's a photograph as well as some text. Is that what you're offering? AS?

MS. COHEN: AS.

THE COURT: My version has text.

MS. COHEN: Oh. That has been redacted. And I can

hand up Your Honor a new copy.

THE COURT: Okay. Because what I'm looking at is what was given to me today.

Is there something different?

MS. COHEN: No, I didn't realize it.

THE COURT: Do you have it, Government?

MS. FARRELL: I cannot find it. Admittedly, they're numbered very strangely. But I don't see it on my computer where we have saved them and I don't think see it in my hard copies.

MS. COHEN: Okay. Your Honor, it's redacted on trial direct. And I have a copy here for Your Honor redacted. Sorry, I thought your copy was redacted.

THE COURT: No, it's not.

Okay. So you're offering 21-AS, redacted, which means only the photograph.

MS. COHEN: Only the photograph.

THE COURT: Does the Government have it?

I will just give them a moment to take a look.

MS. FARRELL: No objection.

THE COURT: Okay. Defense Exhibit 21-AS, which is just a photograph, is admitted.

(Defense Exhibit 21-AS received in evidence.)

THE COURT: Let me just -- Ms. Cohen, I shouldn't have two exhibits with the same number that look differently.

So going forward -- I have two different versions now of AS. So let's be clear: The AS that I'm admitting is the one that's just the photograph, but this should not happen again.

MS. COHEN: Okay.

THE COURT: Go ahead.

MS. COHEN: If you could just publish those two to the jury.

(Exhibit published.)

Q And this photo, 21-AS that we're looking at, what are you doing in that photo, Ms. Halpern?

A I am singing on -- they were playing a song and everybody was singing the song. I think that was probably the end of the OMX.

I freely admit, I had a great time in between the terrible times. Like, that's easy to see.

Q Yeah. I'm just clearly asking what was happening here.

And this was August 2013, correct?

A I believe so.

MS. COHEN: And showing 21-BF.

Can we pull up 21-BF.

BF. The one that we had before. B as in boy, F as in Frank.

THE COURT: The one we just looked at, right?

MS. COHEN: Yeah.

(Exhibit published.)

Q And were you helping out in OMX as well?
A I was working the event.
Q You were working the event.
And this is a photo of you working, correct?
A Correct.
Q Now, in September of 2013, you posted about, on the OM website, that OM has changed your life, right?
A No specific memory, but I posted all the time.
MS. COHEN: Let me show you what has been marked for identification, only for the witness, 21-DA.
Just take a moment.
THE COURT: The Government has it?
MS. FARRELL: Yes.
THE COURT: It was handed to me today, so perhaps you have it today, too.
MS. FARRELL: I have it, Your Honor.
MS. COHEN: I'm not seeking to admit it.
THE COURT: But I still need to be able to see it.
MS. COHEN: Yes, sure.
THE COURT: So does the Government.
By MS. COHEN:
Q Does that refresh your recollection that you said OM has changed your life?
A Yes. This looks like my sort of speaking voice.
Q And that before OM, you were never content and always

lonely; is that what you said?
A That's what I wrote.
Q And that OM taught you to stay connected no matter what, which is all you ever wanted in the first place but didn't think you could have, right?
A That's exactly how I felt.
Q And that was September of 2013, right?
A Mm-hm. Yes.
Q And then at that same time, you testified on direct examination again the day before yesterday, that you took the Mastery class.
Do you remember that?
A Yes.
Q And you talked about the Mastery class being more hardcore sexual.
Do you remember that?
A I don't know if I used that word, but sure. Yeah, that sounds right.
Q Talked about male OM?
A Right.
Q You talked about maybe anal plugs?
A Not plugs. But yes, I remember.
Q Well, we can pull up the testimony.
But you described that there's a lot more sexual nature in the Mastery class, correct?

A Correct.
Q And you signed up for that in September of 2013, correct?
A Not specifically remembering, but that's about right, sure.
Q Well, showing you what has been marked for identification as 21-D, as in dog, B as in boy.
And after you've looked at that, let me know.
A Yes.
Q And does that refresh your recollection that you had signed up around the time of September 2013?
A It just says that I'm excited for Mastery.
Q Well, my question was that you signed up in September of 2013, around that time?
A I -- that sounds about right. I don't know exactly.
Q I guess, sorry, I should say maybe not exactly when you signed up, but that by the time of September 2013, you were excited for Mastery; is that fair?
A Yes.
Q And, in fact, you were so excited, you wrote, "Fucking hell, I'm so excited for Mastery," right?
A I was.
Q And that you also couldn't remember being such a resounding yes, right?
A I was.
Q And you knew what Mastery was about, correct?

A I had an idea, yeah.
Q And you also posted, thanking, "thank you for creating a course that answered my call," correct?
A Yes. That's what I said.
Q Okay. Now, in November of 2013, you graduated from the CP6 class -- course, correct?
A Yeah. Yes.
Q And again, that was a ten-month course?
A It was.
Q And that takes a lot, right? A lot of work in that course? You do a lot?
A Certainly.
Q And at graduation, you make a graduation speech, correct?
A Oh, yeah. Yeah, I remember that.
Q And I'm going to show you what has been marked for identification.

MS. COHEN: If we could bring up the laptop.

Oh, sorry, if you could go help her. Thanks.

DX 21-B, as in boy, U.

THE COURT: I don't think I have that.

Did you say 21-BU?

MS. COHEN: Yes.

THE COURT: B, as in boy?

MS. COHEN: B, as in boy.

I also have a transcript of it.

THE COURT: I don't have -- oh, is it -- sorry, it's something you handed this morning. I do.

MS. COHEN: Well, that's the transcript. But we had provided the video yesterday.

THE COURT: Oh, okay. I didn't realize it was the video.

Go ahead.

MS. FARRELL: May I have a copy?

MS. COHEN: Oh, sure, of the transcript. Just for you guys.

THE COURT: Sorry, are they marked the same, the video and the transcript?

MS. COHEN: The transcript was just for the Court and --

THE COURT: Okay, I understand. Okay.

But the video itself is BU?

MS. COHEN: Yes.

Your Honor, for the record, this video is 1 minute and 27 seconds. We're seeking to offer the whole video.

THE COURT: Okay, I don't have a transcript for 1 minute and 27 seconds, do I?

Maybe it is, it's just there's pauses. But it's a very short transcript.

MS. COHEN: Very short.

I thought it said 1 minute and 27, but it is very

short.

THE COURT: Unless people are --

MS. COHEN: There's nothing more than that, so it may be that the time stamp is...

BY MS. COHEN:

Q Did you have a chance to listen to that?

A Yes.

Q And did you recognize that video?

A Yes.

Q And what is it a video of?

A It's my -- I think it's my graduation speech at CP.

Q CP6?

A Yes.

Q And that would have been in November of 2013, correct?

A Right.

MS. COHEN: Your Honor, at this time we offer Exhibit DX 21-BU. Again, not for the truth of the matter asserted, but to show this witness's state of mind at the time, the latter part of OneTaste.

THE COURT: Any objection?

MS. FARRELL: Yes. I think it's hearsay and relevance.

MS. COHEN: Your Honor, one --

THE COURT: Give me one moment.

MS. COHEN: Yes, sure.

THE COURT: Sustained.

MS. COHEN: Your Honor, we also -- just one other rationale for offering this is, again, in light of the testimony about the witness's state of mind in the latter half of OneTaste.

THE COURT: Do you want to lay more of a timing foundation.

MS. COHEN: Sure.

BY MS. COHEN:

Q Ms. Halpern, once again, you testified yesterday, or the day before, that the latter half of your time at OneTaste, that you were -- you could see dark circles, you felt very sluggish, fatigued all the time, that you were sleeping quite a lot from the stress and just from the hours.

Do you recall that testimony?

MS. FARRELL: Objection. I don't think that fairly recounts the testimony.

THE COURT: Yes, take your time. If you are going to be asking about specific testimony, it has to be accurate. And I'm not suggesting it is not. You just have to make sure you have the transcript.

MS. COHEN: Yes.

Q So on page 252 -- actually, I'll skip to the -- withdrawn on that part of it. We can go back, but to the same, same idea.

You were asked, and you described lack of sleep earlier.

How, if at all, did lack of sleep affect sort of your mental health at the time?

Answer: I was, you know, like, sort of like, towards the -- in the latter, like, half of my time there. I just remember feeling really, really foggy all the time. Like needing to drink more and more coffee and tea and stuff. And I just -- like, I remember trying to sort of steal naps from -- you know, for ten minutes --

THE COURT: Just slow down when you're reading.

MS. COHEN: Sure.

THE COURT: For the court reporter's benefit.

Q And just, like, I remember trying to sort of steal naps from -- you know, for ten minutes here or there to kind of get by.

Do you remember being asked that question?

MS. FARRELL: Just to be clear, my objection was her question was you were sleeping all the time, which is not at all consistent with the testimony that was just read, so I just want to make my objection clear as to the first --

THE COURT: Okay. No, it is clear.

And again, now she's reading from a transcript.

So, go ahead.

MS. FARRELL: Thank you.

Q Do you remember being asked that question and giving that answer?
A Yes.
Q And do you also remember being asked: So my question was, how did all of this affect your health?
And you said: It got worse over time.
And my question was: So -- so can you explain to the jury how your physical health worsened over time and in what way?
Answer: Sure. I -- it was really hard to -- I mean, primarily, I was not getting enough sleep. Like, not even close. And I was young, so I could handle it. But it just -- it really accumulated over time. And, you know, I could see the dark circles and I felt really sluggish and fatigued all the time because I was sleeping quite little from the stress and also just from the hours.
Do you recall being asked those questions and giving those answers?
A Yes.
Q And you already testified that your graduation from CP6 was in November of 2013, correct?
A Correct.
Q And you would agree with me that that is the latter half of your time at OneTaste?
A That's right.

Q In fact, you left OneTaste in February of 2014, so it was only a few months before you left?
A I believe I left in March, yes.
MS. COHEN: Your Honor, once again, at this time we offer this video to directly contradict the statements about how the witness's physical and emotional state was at the time that she was at OneTaste in the latter half.
THE COURT: Any objection?
MS. FARRELL: Same objections, Your Honor.
THE COURT: Sustained.
Next question.
Q Well, in --
THE COURT: You could question about this.
MS. COHEN: Yeah. Yeah, thank you, Your Honor.
Q In your CP6 video, right, you talked about something sort of extraordinary happened to you recently, right? Do you remember saying that?
A Yes.
Q And you were telling the whole course about someone, a person that you loved very deeply, right?
A Yes.
Q And who was that person?
A I believe I was talking about my now-husband.
Q And you said that that person that's your now-husband, that you love very deeply and that something hit you hard,

right?
A Yes.
Q And that was what you got out of the program, right?
A Yes.
Q And it was because of this practice that you suddenly realized that you were withholding your love from him, correct?
A Correct.
Q And you were holding it because you were trying to be cool. Do you recall saying that?
A Yes.
Q To be a woman, you also said, right?
A Yeah. Yes.
Q And because of the class, you called him up and you figured things out, right?
A Yes.
Q And you decided not to withhold your love from him anymore?
A That's right.
Q And you were just going to love him and you were going to pour it on him, correct?
A Yes.
Q And you were scared by that, right?
A Yes.
Q And you thought he wasn't going to be okay, but he was,

right?
A Right.
Q And, in fact, you ended up getting married to him, right?
A That's right.
Q And you said in your -- and you told the whole class that you never would have gotten to that place if it hadn't been for OM, right?
A I think that's true.
Q And for the program?
A That's right.
Q And you wanted the world, right, to tell other people that they can have the same thing, right?
A Yes.
Q And to not hijack connections to other people because those connections are so important?
A Right.
Q And finally, you also testified on direct examination that yoga was something that was expected, correct?
A Yes.
Q And everyone in the OM house was either asked, you testified about, or directed to go to Bikram yoga pretty much every day, correct?
A Right.
Q And that that was a lot for you, correct?
A That I said that it was a lot for me?

Q No, that -- well, yes, you said it was too much.
I can pull up the actual testimony.
THE COURT: What is the question?
MS. COHEN: That she complained about going to Bikram.
THE COURT: You're asking her if she did that?
MS. COHEN: Yes.
THE COURT: Okay. Just ask the question again.
Q Did you complain about having to do too much Bikram?
A There's just a -- there's a difference between complaining overall about Bikram and complaining about specific instances. And also, being happy one day and an overall picture, it's different.
Q So my question is, you believed that you were expected to go to yoga, correct?
A Yes.
Q And that you were directed to do so?
A Correct.
Q And you were -- in the same question that I had asked before, how your physical health worsened, this is page 252 of the transcript:
So, can you explain to the jury how your physical health worsened over time and in what way?
I already read part of your answer, but you also testified: And food was also a thing. I think wrapped up at

my time at OneTaste was a lot of expectation of thinness, a lot of expectation of eating healthily or, like, eating clean and going to, you know, yoga all the time. Which on its face sounds like a good thing, but I think I really overdid it and got very into a kind of -- like, a kind of disordered eating territory where I dropped a ton of weight and got really in my head about it.

Do you recall that?

A I do.

Q And in January of 2014, you were in San Francisco, correct?

A Correct.

Q And that was January '14, about maybe a month -- it was a month more. Maybe more because you said March. A month and a half left at OneTaste?

A That's right.

THE COURT: Sorry, you're saying January 14th or 2014?

MS. COHEN: 2014. I'm sorry. January, yes, 2014.

THE COURT: Okay. Go ahead.

Q And do you recall identifying yesterday -- actually, let me show you, for identification, DX 21-BR. It's a video.

THE COURT: Tell me what you're showing, please.

MS. COHEN: 21-B, as in boy, R as in Ralph.

THE COURT: And what is it?

MS. COHEN: This is a video.

THE COURT: Do I have a transcript?

MS. COHEN: There's just singing.

THE COURT: Okay. And this is the one you gave yesterday?

MS. COHEN: Yes.

THE COURT: Okay.

Q Do you recognize that video?

A Yes.

Q And where was that video taken?

A In a car.

Q And what were you doing in that car?

A It seems like we were all heading to Bikram yoga.

Q And what were you doing while heading to Bikram yoga?

A Singing and having a good time.

MS. COHEN: Your Honor, I offer DX 21-BR -- oh, sorry, let me lay one other foundation.

Q You said this was in January -- or sometime when you were in San Francisco, correct?

A Right.

Q And do you remember exactly when, what month it was?

A No.

Q But it would have been at least the latter half of December all the way up to March at some point, in that period of time, correct?

A That's right.
Q And that was your latter, your end of time at OneTaste, right?
A That's right.
MS. COHEN: Your Honor, I offer DX 21-BR into evidence both for, again, the same grounds, on emotional and physical state at the time and also regarding the state --
THE COURT: Which she just testified to, right?
MS. COHEN: Yes, concerning Bikram.
MS. FARRELL: Objection. It's not proper impeachment, given the witness's testimony.
THE COURT: Sustained. Sustained.
MS. COHEN: I'm not necessarily offering just for impeachment.
THE COURT: I know. I understand why you're offering it.
The objection is sustained.
MS. COHEN: Okay.
Q Lastly, I just want to show -- or I just want to ask you one other question.
You also, right before you left OneTaste, in February 2014, you had been at the Mastery program by then, right?
A That sounds right.
Q And you posted about your time at the Mastery program,

right?
A I assume so.
Q And in February of 2014, you posted that you love this life, right?
A I did.
Q And that the weekend at the Mastery program, you were listening to lectures and it hit you that you were pioneers, right?
A That's how I felt.
Q And being someone out in the world who talks openly about sexuality is rare; you felt that, right?
A I did.
Q And that you were sitting at a TurnON and you heard certain words, charged words, right, and that was exciting, right? That struck you?
Do you remember that?
A I don't specifically remember, but that -- yes, that's all of the concepts. That's how I felt.
Q And you said simply by being who you are, you are giving other permission -- people permission to be who they are, right?
A That's how I felt.
Q And that simply by stroking or being stroked, that you show other human beings that intimacy is something that we all want, right?

A Yes.
Q And that was right before you left OneTaste, right?
A Yeah, absolutely.

MS. COHEN: No further questions, Your Honor.

THE COURT: Ms. Bonjean, do you have cross-examination?

MS. BONJEAN: I do.

THE COURT: Go ahead. I'll give you a minute to set up.

THE WITNESS: Is it possible to take a really quick break? Just, like, a minute.

THE COURT: Yes.

A five-minute break, we'll take.

THE WITNESS: Thank you.

THE COURT: Mr. D'Agostino, you can bring the jury out.

Five minutes, really, for everybody.

(Jury exits.)

(Recess taken.)

THE COURT: Okay. We're going to bring both the witness and the jury back.

(Witness resumes the stand.)

(Jury enters.)

THE COURT: Everyone may be seated.

Ms. Bonjean, you may start your cross-examination.

MS. BONJEAN: Thank you, Your Honor.

THE COURT: And again, Ms. Bonjean, if there's something you need on the computer, I'm happy to have whoever is helping you come up to set it up whenever you need it and then just to go back.

MS. BONJEAN: I appreciate that. Thank you.

CROSS-EXAMINATION

BY MS. BONJEAN:

Q Good morning, Ms. Halpern.

A Good morning.

Q My name is Jennifer Bonjean and I am one of Ms. Daedone's attorneys.

I will try to move this along for you because I know you've been here a while. Okay?

A Thank you.

Q Now, just to orient us, you attended a TurnON event in San Francisco in and around 2010, right?

A Yes.

Q How many people attended that event?

A Roughly a dozen, maybe.

Q And fair to say that these TurnON events are sort of introductions to OneTaste, right?

A Yes.

Q And they're designed to give people an understanding about the work that OneTaste did, fair?

A That's right.
Q It was interactive?
A It was.
Q It was also a sales event, right?
A Yes.
Q There was a sales table right there in the room, correct?
A Um, no, it was not clear to others that it was a sales event. But to those working it, certainly.
Q There was a sales pitch at some point during the event, right?
A At the end. That's right.
Q And the product, if you will, or the courses that OneTaste offered were discussed during the TurnON event, right?
A That's right.
Q And when you went to that event, you understood that this company, OneTaste, was in the business of selling courses on relationships and sexuality, fair?
A Of course.
Q And, of course, you learned when you worked there that that was also the purpose of these TurnON events, right?
A Yes.
Q Was that a yes?
A Yes, yes.
Q You would agree, also, that OneTaste isn't the only

company that sells courses regarding self-help, correct?
A Correct.
Q How many of the people that you attended that event with, if you remember, went on to work for OneTaste?
A Oh, that I don't know.
Q Any of them that you can recall?
A I'm -- I, I don't know.
Q Do you know if any of the people that you attended that TurnON event with actually ended up joining the OneTaste community in an OM house?
A I'm not sure.
Q And you would agree, of course, if what -- this TurnON event didn't resonate with you, you were free to leave and go about your business?
A Absolutely.
Q All right. And then about a month later, while in San Francisco, you took an introductory course about OneTaste and OMing, right?
A That's right.
Q And at that course you watched an OM demonstration; you testified to that?
A Correct.
Q And correct me if I have this wrong, but it was exciting, right?
A Sure. Yes.

Q Intriguing to you?
A It was.
Q And you testified that you were kind of the type of person who that would resonate with, right?
A That's right.
Q You were young, right?
A Mm-hm.
Q You said you had some confusion, at least, about your own sexuality, right?
A Sure.
Q And you were open though?
A I was.
Q Correct?
Curious?
A Yes.
Q And people came to that course also as couples, right?
A They did.
Q And not just married couples, but dating couples, fair?
A Correct.
Q People looking for intimacy?
A Right.
Q Learning how to improve communications in the sexual arena, correct?
A Right.
Q And that's one thing OneTaste offered through its

courses?
A Yes.
Q And some women, as I'm sure you know from working at OneTaste, have reported that they never experienced and orgasm, right?
A Right.
Q And some of those people came there, women came there to try to understand why that was, right?
A Yes.
Q And sometimes with their partners so that they could achieve orgasm, correct?
A Correct.
Q And this was done in an open and bright space, right?
A Yes.
Q And that was kind of some part of the complex, is to take it out of the darkness and bring it into open, bright space, right?
A Right.
Q And that was appealing to you as a concept?
A Very much.
Q And this concept was a positive thing in your mind, right?
A Right.
Q And it still is, correct?
A It is.

Q Now, do you recall, that introductory course that you took in San Francisco, approximately how many people participated in it?
A It's a little bit small. Maybe eight. I'm not exactly certain.
Q So a fairly intimate class?
A Correct.
Q How many of the people that you took that introductory course with in San Francisco ended up working for OneTaste?
A That I'm not sure.
Q Can you recall anybody who did?
A I don't remember anybody I took it with.
Q Okay. What about -- how many of those people, if you recall, ended up joining an OM house?
A Not sure.
Q Can you remember anyone?
A No.
Q Fair to say that people who took the introductory course could go off on their own journey as it related to OneTaste, right?
A Right.
Q Some people could get more immersed, correct?
A Correct.
Q Some people walked away after an introductory course and said that is not for me, right?

A Right.
Q Now, after that introductory course in San Francisco, I think you said you moved to New York pretty quickly, right?
A Yes.
Q And we're still in -- just for the timeline, we're still in 2011?
A Yes.
Q But you were from New York. Do I have that right?
A That's right.
Q Were you just living in San Francisco for -- prior to that?
A Yeah, I had been there for a little while before that.
Q Got it.
Were you working there?
A I was.
Q What type of work were you doing in San Francisco?
A I was teaching yoga and working at the gym where I taught.
Q Okay. What type of gym was it?
A It was one of those big ones. It was a JCCSF.
Q Okay. Did it sell courses?
Did they sell memberships at the gym?
A Memberships, yes.
Q People would come in and come for a tour and a sample class and then there would be some pitch to sell them a gym

membership?
A I wasn't on sales, but yeah.
Q Okay. Now, once you got to New York, you took a second introductory course, correct?
A Right.
Q Did you move to New York to get more engaged in the New York OneTaste community or for reasons apart from that?
A Apart from that.
Q And your family was in New York, right?
A That's right.
Q And again, you moved back to New York all of your own volition, right?
A Correct.
Q And did you already have your bachelor's degree at that point?
A I did.
Q And so you come back to New York, you get an apartment with friends?
A Right.
Q Working for your dad, right?
A Right.
Q And you took this second introductory course. Where did that course take place?
A That was at an event space, I believe in lower Manhattan.
Q Okay. And again, how many people were in that course?

A That one was bigger. Maybe 25.
Q Did they do an OM demonstration there as well?
A Yes.
Q Do you recall how many of the people you did that second introductory course with that ultimately ended up working for OneTaste, if any?
A I don't.
Q What about, did any of those 25 or so people who took that introductory course that you took in lower Manhattan, did any of them end up moving into an OM house, as far as you know?
A I'm not sure.
Q But you don't remember ultimately living with anybody at The Morellino that attended that introductory course, right?
A They were strangers to me then, so, yeah, the context wasn't there.
Q Well, I mean, do you remember meeting any of your friends that became good friends after that introductory course?
A Entirely possible, but I don't.
Q But you don't remember where you met those good friends?
A No. Because it was all sort of -- a lot was happening.
Q Okay. But again, you left that second introductory course and no one made you stay, right?
A Correct.
Q No one cast a spell on you, correct?

A Not that I know of.

Q And again, at this point you had been to an event, now you've done two introductory courses, and still this curriculum is resonating with you, right?

A That's right.

Q And you began practicing OM, correct?

A I did.

Q And this was something you could do kind of on your own time if you had a partner to do it with, right?

A Yes.

Q But it's also something you could do in, I think they call them, OM circles?

A Right.

Q Can you tell me where -- and we'll put some time period on this.

After you took the second introductory course in New York, I think we're still in 2011; is that right?

A I think so.

Q So you were going to OM circles to practice OM, right?

A Yes.

Q Can you give me or give the jury an idea of where these things took place, these OM circles?

A Sure.

So there were OM circles that happened once a week at TurnON introductory events. And I believe, if I'm

remembering right, that the OM circle happened prior to the TurnON event for those who had already been trained in OM. And so it was at a -- an event space like the one that we used frequently on Broadway.

Q And just again for clarity's sake, to show up to an OM circle and OM, you had to be actually trained in OM, right?

A That's right. For the most part.

Q Somebody that just meandered off the street couldn't come in and be like, hey, I want to OM, I don't know what this is about, but let me give it a whirl, right?

A There were some exceptions made from time to time, but for the most part.

Q Okay. Do you know how frequently you were OMing in 2011 in these OM circles? Like once a week, twice a week?

A In the very beginning -- in the very beginning I assume it was probably around once a week at those TurnON events.

Q Okay. Not too dissimilar to someone who is going to yoga once a week, right?

A Right.

Q And this was when you were living with your girlfriends in the West Village, I think you said?

A No. I was living with -- not girlfriends, but just people, roommates on the Upper East Side.

Q My bad. That was my assumption.

A No problem.

Q But these were roommates that you had in some way; is that right?
A That's right.
Q And this was when you were working for your father in the family business, right?
A Right.
Q You didn't like that family business, right?
A No.
Q You also didn't -- you didn't really like living with these roommates either, I think, correct?
A It was fine.
Q You had previously testified that during this period of time, you were sort of lonely, fair?
A Um, yeah.
MS. BONJEAN: Okay. I would like to pull up, if we could, Government Exhibit 3120, which is already in evidence.
Q And I just have a couple of questions.
A Sure.
Q We won't be on this for long.
We've looked at this OM manual, if you will, right?
A Yes.
Q And on page 2 of this document, the first thing to know about OM is that it's a practice, right?
A Yes.
THE COURT: Sorry, do you want the jury to be able

to see it as well?

MS. BONJEAN: Oh, yes. It is in evidence. My apologies.

And if you can pull out, on page 2, No. 1.

(Exhibit published.)

Q This is a basic question: What is a practice?

A Yeah, fair enough.

A practice is something that a person does usually on a regular basis. So, it could be every day or every week. So meditation is an example or yoga is an example, running. Things like that.

Q Okay. And would you agree that a practice is something that require -- that it's an attention-focused practice, right?

A Usually, yes.

Q Usually?

A Mm-hm.

Q Now, we looked at some of the sort of things that are associated with OM. We're not going to go through any more of them; I think the jury has seen enough of those and they'll have the benefit of this. But I'd also like to turn your attention, if I could, to page 8. If you would go there, please.

And you were asked questions previously about the safeporting concept, right?

A Right.
Q And that's basically a -- it's a way of giving and asking for consent to do this, correct?
A It's saying what you're going to do before you do it.
Q Right.
And there's also a tenet associated with OM related to just -- to more than that, just the communication around it, right?
A Right.
MS. BONJEAN: If you could pull out Section 9 for Ms. Halpern and for the jury, please.
Q So during the process of OM, there is a communication between the stroker and the strokee, right?
A Right.
Q And the stroker is asking questions about, you know, would you like me to do this or would you like me to do that, more pressure or, you know, different types of things, right?
A Right.
Q And also part of the process is that both the stroker and the strokee are communicating their sensations during the process, right?
A Correct.
Q And that's part of process, correct?
A Yes. In a normal OM, yes.
MS. BONJEAN: Now going to the next page.

Q There is also OM etiquette, correct?
A Yes.
Q And part of OM etiquette is you ask first: Would you like to OM?
Correct?
A Right.
Q And I think you compared it to at least one of the teachings you received that it should be as simple as asking: Would you like a cup of tea?
Right?
A Right.
Q And in the OM community, if you will, OM etiquette says it's always accept --
MS. BONJEAN: The second bullet point, if you could pull it up, Keith, please. Thank you.
Q Do you see it right there, Ms. Halpern?
A I do.
Q Okay. Let me know if you don't.
It's always acceptable to ask and it's always acceptable to decline, correct?
A When the rules are followed, that's how it goes.
Q Right.
That's the design behind OM, correct?
A That's the design.
Q Yes, that's the -- this is how it's taught and how it's

meant to go, correct?
A That's how it's meant to go. Certainly.
Q And at the bottom there of OM etiquette, at the -- another --
MS. BONJEAN: Do you want to go to that one, Keith, the bottom one, please. Thank you.
Q And it warns: Be careful not to use OM in exchange for something or as to preclude to something or the -- I'm sorry.
My apologies. I can read.
Or as a prelude to something or contingent on something. Each person engages in OM for its own experience.
Right?
A That's the rule when it's followed.
Q Right.
Well, that's the rule as set forth in the book, right?
A That's what it says.
Q In the world, people, I guess, don't always follow rules. But I'm asking specifically about the tenet of OM, right?
A Yes. That's what it says in the book.
Q It's not just what was said in the book, that's what was taught, correct?
A Absolutely.
MS. BONJEAN: You can take that down. Thank you.
Q I want to turn a little bit to your interactions with

Ms. Cherwitz when she signed you up or tried to pitch you the coaching program. All right?

A Okay.

(Continued on the next page.)

BY MS. BONJEAN:
Q Fair enough. We're in the spring of 2012 at this point, correct?
A Right.
Q At some point you testified that you literally walked away for about a year from the OM practice to the time you signed up with the coaching program, right?
A Right.
Q During that period of time when you walked away for a year, you still lived with your roomies, right?
A I lived with the other partner that I was with.
Q Did you have a boyfriend at the time?
A Yes.
Q So you moved in with your boyfriend, correct?
A That's right.
Q And also working with the parents still?
A No.
Q What were you doing then?
A I was in, I was back in San Francisco and working at that yoga and gym that we discussed.
Q You have this experience with OM, or orgasmic meditation, OneTaste in New York then you move back to San Francisco and you are cohabitating with your boyfriend or partner at the time, right?
A Correct.

Q And working outside of OneTaste contest, correct?
A Correct.
Q Were you OMing still?
A No.
Q So you literally, completely walked away, right?
A That's right.
Q Then you came back?
A I did.
Q And you moved back to New York, right?
A Right.
Q And went back to the job that your family offered, correct?
A The timeline is bouncing, I think so.
Q If I have it wrong, just correct me, okay?
A Sure.
Q So you reengaged, sort of, with the OneTaste community back in New York, right?
A Right.
Q Did you move back with your boyfriend too?
A In New York?
Q Yes.
A No.
Q So you, of course, knew at that time that Rachel Cherwitz was the head of sales for OneTaste, right?
A Right.

Q And no surprise to you that she invited you out to coffee to sell you on the coaching program, right?
A Sure.
Q You didn't have to accept your invitation, of course; I think you'd agree?
A Right.
Q But you did, because you were interested.
A That's right.
Q And not everyone who takes introductory courses in OneTaste goes on to take the coaching program, right?
A That's right.
Q You were in sales for quite sometime. Do you have an estimate of how many people do an introductory program and go on to the coaching program, a percentage?
A Gosh, I don't know, less than half.
Q You said, very frankly, that you really couldn't afford it, right?
A That's right.
Q But you really wanted to take the course.
A I did.
Q And you believed in the practice.
A I did.
Q Not only did you believe in the practice you wanted to learn how to teach and coach other people to OM?
A That's right.

Q Because that's what the coaching program is.
A Exactly.
Q You also really wanted to get immersed into the community at a deep level, fair?
A Right.
Q And in June of 2012 when you were considering the coaching course, the simple math told you you really can't afford it, right?
A Right.
Q But you went ahead and did it any way, correct?
A Right.
Q I know you testified on direct examination, I think you sort of blamed Rachel for that by saying that, you know, she kind of suggested there is always a way to afford it.

MS. FARRELL: Objection to the form.

THE COURT: Sustained as to the form.

BY MS. BONJEAN:

Q Did you testify, quote, that Rachel told you there is always a way to make it happen. Right?
A Yes.
Q And at this point you've been away from OneTaste for a whole year, right?
A Right.
Q And you understood that that sort of attitude, you can always make something happen, is just not unique to

OneTaste, right?
A I don't know what exactly -- I'm confused. Can you rephrase?
Q I'll rephrase, happy to.
Sometimes people want to buy things they can't afford, correct?
A Sure.
Q Sometimes people buy cars they can't afford, right?
A Yes.
Q Go on vacations they can't afford?
A Sure.
Q They make it happen by putting it on credit cards?
A They do.
Q People borrow money sometimes?
A People do.
Q They do layaway plans, correct?
A Right.
Q Sometimes they save money first before they go buy it, correct?
A Yes.
Q So there are ways to buy things that you really can't afford in the moment, not just a OneTaste coaching course, but all types of other services and products and so forth, correct?
A Yes.

Q And Ms. Cherwitz told you that OneTaste accepted credit cards, right?
A Right.
Q She suggested maybe your parents can give you the money or something like that, right?
A Right.
Q That was a hard no for you.
A Right.
Q She said also we can offer you a payment plan?
A Yes.
Q And she came up with some ideas for how you can afford it, correct?
A Yes.
Q This isn't just a sales tactic in OneTaste, those are sales tactics that are used in all types of context, right?
A I assume.
Q Have you ever bought a car?
A Yes.
Q So sometimes sales tactics by car salesmen can be pretty intense, right?
A I've been lucky enough not to experience that, but yes.
Q Have you ever gone on a vacation where someone tries to sell you a condo?
A No.
Q Okay. But you signed up with the understanding

eventually of a payment plan, right?
A Right.
Q But also you really want to do it.
A That's right.
Q It's not just that Rachel had ideas for you, but you would agree when you really want to do something in your head you're like I want to make this happen, right?
A Right.
Q When it sinks in you're like, I wish I didn't buy those $500 shoes, right?
A Sure.
Q So at some point it kind of sank in like, oh, my gosh look at this payment plan, I don't know how I'm going to afford this, correct?
A Yes.
Q You still wanted to do the program but you were concerned about your ability to pay for it?
A Right.
Q So you wrote some emails to Rob and Rachel about your concerns?
A That's right.
MS. BONJEAN: Counsel, is Government Exhibit 3501-03 in evidence?
I'm going to ask that you look at Government Exhibit 3501-three in evidence.

THE COURT: Give me a moment. I'm not sure that it is. I don't believe it is.

MS. FARRELL: It is in evidence.

THE COURT: Sorry.

MS. FARRELL: 3501-03.

THE COURT: 03 or 30?

MS. BONJEAN: 3501-03.

MS. FARRELL: I believe it is.

THE COURT: I'm not sure it is. Give us a moment, please.

Yes. Go ahead.

MS. BONJEAN: Thank you.

BY MS. BONJEAN:

Q I think we looked at 3501-03 previously. Ms. Halpern, these were these email exchanges you provided to the Government, correct?

A Yes.

Q You didn't provide them in this format though, right?

A No.

Q I'd like to go to page four of this document. We can pull out the first paragraph, please. Thank you.

Are you able to see that okay?

A Yes, thank you.

Q That makes one of us. This is sort of post-freak out, right?

A Yes.
Q And you communicated with Rob and Rachel that when you actually looked how the numbers were broken down, it was a little bit much and it was an aggressive financial plan, right?
A Yes.
Q You said: I will not take out a loan and I will not borrow. Right?
A Right.
Q In fact, you never did, correct?
A I didn't borrow from a credit card or from a family member.
Q Right. You said these are very real boundaries. You were clear what your boundaries were?
A Correct.
Q And you also were clear on the sales pitch, right?
A Right.
Q You said: I know you've heard this sob story before. And then you even quote them, you're almost like, you know the game, right?
A Right.
Q I know stepping into the fear that masks my desire, I've heard it all before?
A Right.
Q Doesn't change the fact that I really can't afford

this.
A Exactly.
Q And then down you said: I felt like I was panicked or manipulated. But in the end you said: I really do want to take this course, though. Correct?
A Yes.
Q You wanted to talk to them about some other alternatives?
A That's right.
Q And I want to learn and grow through OneTaste so bad but I need to go through my own pace. Please meet me there.
A Yes.
Q You were pretty good at asserting yourself, right?
A Yes.
Q You can take that down.
You did ultimately negotiate even a fairly deep discount for yourself, correct?
A I was a little confused yesterday about what the prices actually were; but yes, I did get a discount I believe.
Q Right. The price was 12 grand and you got it for I think we looked at it -- let's look at DX21L in evidence, if we could. In the end your full tuition was a little over half that, correct?
A There were different prices for different people not advertised.

Q Right. You got a deep discount, correct?
A Correct.
Q I think you even testified on direct you're not even sure if you ended up paying all of it off, right?
A I don't know what the numbers came out to when I, on the day I left.
Q Okay. You actually did start CP5, right?
A Right.
Q That's coaching program five.
A Correct.
Q That's this ten-month program where you have at least one weekend a month that is fully immersive, correct?
A That's right.
Q And the CP5 that you started was in San Francisco?
A Yes.
Q And to be fair, it wasn't unusual for people to do coaching programs outside of cities where they lived, right?
A As far as I know.
Q Because you went for the weekend, you immersed yourself, it was like a conference, then you came back, right?
A Right.
Q And in fact, you actually attended the first two weekends of CP5 in-person, right?
A I know I attended at least one, yes.

Q So when you testified on direct that you did it remotely -- I don't remember the word you used -- but that wasn't entirely true. You did at least one of the weekends in-person in San Francisco?
A The idea was that I was going to do the rest of the program remote.
Q Fair enough. But just so the jury is clear, when you started CP5 you had done at least two of them, or at least one of them as you recall, in-person in San Francisco, correct?
A Correct.
Q Nothing prohibited you from doing the rest in-person, except maybe it was expensive to get there?
A That's what prohibited me.
Q You knew it was in San Francisco when you signed up for it, though?
A Stupidly, yes.
Q Do you recall being in San Francisco in September 2012 for one of these immersion weekends?
A Can you say that again?
Q Sure. Do you recall you said you remembered at least one time you went in-person in San Francisco, right?
A Yes.
Q That was the coaching program five, correct?
A Right.

Q I'm assuming that was one of the earlier weekends, correct?
A The first weekend.
Q You remember you received an email from Rachel saying, why do you want to do CP6 you already done three? Do you remember that?
A Right.
Q You had already done at least three immersion weekends, one at least was in-person, correct?
A Yes.
Q Could have been two, correct?
A I'm not entirely sure.
Q During one of those immersion weekends for the coaching program, you got on the stage with Rachel and made an admission, right?
MS. FARRELL: Objection.
THE COURT: As to conversation?
MS. FARRELL: Yes.
THE COURT: Sustained. You can ask a different question on the topic.
BY MS. BONJEAN:
Q You called it an admission, right?
A This was new to me yesterday, I'm not sure.
Q We'll look at it in a second. I want to back up.
The word admission isn't how the lawyers use it; this

is a word that OneTaste used, right?
A That's right.
Q It's a word that you used, right?
A I believe so.
Q Over the course of your three and-a-half years at OneTaste, you used the word admission before, right?
A Sure.
Q We looked yesterday, you looked yesterday, at this document you prepared in connection with your CP6 course that has a whole section on admissions, right?
A Yes.
Q Tell the ladies and gentlemen what an admission is in the context of OneTaste?
A Sure. So what we were looking at yesterday, admissions I believe in the sort of OneTaste context, is like things that, things about yourself that maybe you're not as proud of, or things that you're trying to kind of work on, things that you maybe want to be better at or do better.
Q Okay. This is not an unusual concept within the context of OneTaste, correct?
A Right.
Q And in September of 2012 when you were at this weekend in San Francisco, isn't it true that at one point you --
THE COURT: Do you need a minute, Ms. Bonjean, to consult with your team?

MS. BONJEAN: They were -- but I can't read it so I'm going to go forward.

THE COURT: Go ahead.

BY MS. BONJEAN:

Q When you were in-person at CP5 during this early part of this, you in fact asked to get on stage, asked to declare an admission to the group. Do you remember that?

A I don't have strong memories of this, but I know we saw a clip yesterday.

Q Would a video help refresh your recollection about that?

A It would, thank you.

MS. BONJEAN: Okay, great. I'm going to ask that my friend Keith over here bring the laptop for Ms. Halpern to look at Defense Exhibit 21-CT.

Your Honor, it is about a three-and-a-half minute video.

THE COURT: Is this one that was given to me at some point?

MS. BONJEAN: Yes, we gave you the transcript as well.

THE COURT: Yes, okay. So the transcript that was handed to me today?

MS. BONJEAN: Yes, ma'am.

(Witness watching video to herself.)

BY MS. BONJEAN:

Q Did you have an opportunity to look at that?

A Yes.

Q Does it refresh your recollection about this admission that you made at CP5 during one of your weekends in San Francisco for the CP5 immersion program?

A Yes.

Q That was you, correct?

A It was.

Q And you were on stage with Rachel, right?

Let me know if you need a second.

A I'm fine, thank you. Sorry.

Q No worries. There was an audience there, right? This was an intense sort of moment, even still intense, but intense then as well, right?

A Yes.

MS. BONJEAN: Your Honor, I would actually offer this into evidence to the extent that I'd like to play it for the jury because of the juxtaposition on her direct examination testimony.

THE COURT: Any objection?

MS. FARRELL: Yes. I don't think it's proper impeachment given the witness's --

THE COURT: Sustained.

BY MS. BONJEAN:

Q I'm going to ask you some questions about it, okay?
A Sure.
Q Okay. If you need to look at any portion of it again, let me know to refresh your recollection.
A Okay, thank you.
Q You were fairly exuberant on that?
A I really was.
Q You got on the stage, you gave Rachel a hug and a kiss, right. And at one point you started to put your shoes back on she says, you don't have to put your shoes on come on up here, right?
A Right.
Q You told the audience a story about how you were so excited --

MS. FARRELL: Objection.

THE COURT: Basis?

MS. FARRELL: I think the question is hearsay. I think she can ask the questions about what happened.

THE COURT: Sustained.

MS. BONJEAN: I can't lead?

THE COURT: Are you asking her -- ask the question again.

MS. BONJEAN: Okay.

BY MS. BONJEAN:
Q You got on the stage, right?

A Yes.
Q And you told the audience a story about how Rachel -- you ended up signing up for CP5?
MS. FARRELL: Objection.
THE COURT: Objection overruled.
A Correct.
THE COURT: Continue.
MS. BONJEAN: Thank you.
BY MS. BONJEAN:
Q And you talked about this freak out that you had that we've already talked about on direct examination, right?
A Yes.
Q And you told the audience that you actually closed your bank account so your check would bounce, right?
A That's right.
Q And everybody laughed about that, correct?
A Yes.
Q Including Rachel?
A Yes.
Q And you also said basically she didn't even have to sell that hard, right?
A That's right.
Q You used the word "hard stroke," that's sort of OneTaste language, right?
A Correct.

Q And you joked about, I think you said, hard stroke. And you said, no, that's a lie. She didn't even have to hard stroke me. Right?
A That's right.
Q You meant by that, she didn't have to do much of a sell, a hard sell?
A Exactly.
Q Because you were so excited about the program.
A I absolutely was.
Q You freaked out, you canceled, you closed your account so the check would bounce, right?
A That's right.
Q And then you went back and put another deposit down, right?
A Yes.
Q And then Rachel joked, you closed yourself?
A She said what?
Q You closed yourself, like you closed the sale on yourself.
A I didn't hear about that part, but sure.
Q But that's how it went down, right?
A Yes.
Q Now, we looked at a lot of pictures yesterday -- strike that.
At some point you did not believe that you were sort of

getting the maximum out of this very expensive course that you took, right?
A Of CP5?
Q Yes.
A Yes.
Q Understandably you said I want to switch to CP6, correct?
A Yes.
Q In the end, you were able to switch to CP6, right?
A Right.
Q We'll going to get back to CP6. But for the moment I want to talk about around this time you began to immerse yourself into the community itself, right?
A Yes.
Q You really wanted to get more immersed into the community of OneTaste, right?
A Yes.
Q Not just the taking of the courses, but also sort of living in a way with like minded people, correct?
A Right.
Q And that's when you ultimately decided you want to move into the Morellino, right?
A Yes.
Q The Morellino was an intense place, right?
A It was.

Q You knew that beforehand, correct?
A Yes.
Q It was sort of, everybody kind of knew, like, the Morellino was like an intense place to go live in community with other people, right?
A Right.
Q One of the reasons it was so intense is because you're living with the sort of executive people or some of them the executive staff of OneTaste, right?
A Right.
Q In fact, it's the building where the founder of OneTaste occasionally comes and stays?
A Right.
Q These are the people that are the most committed to the life of OM and the life of OneTaste, correct?
A Right.
Q And that's the community you wanted to live in.
A Yes.
Q And these are the people that believed wholeheartedly in this philosophy of life, right?
A Yes.
Q You had to apply to live in the Morellino, correct?
A Correct.
Q To be clear, the Morellino was not just an OM house for employees, right?

A Right.
Q I mean, it may be that most of the people who lived in the Morellino ultimately got even further immersed by working for OneTaste, but it wasn't a precondition to living in the Morellino, correct?
A Correct.
Q And whether you were an employee or not, there were rules to living in the Morellino, fair?
A Yes.
Q This was a place where -- it was competitive to get into the Morellino, wasn't it?
A I'm not sure.
Q But this was sort of -- it was a private kind of club in a way, you had to apply?
A Right.
Q And there were specific criteria for membership, correct?
A Yes.
Q Insofar as you had to share the interests and values of the people who were living there, correct?
A Right.
Q You've also lived in like a yoga ashram, right?
A Yes.
Q I don't know if I said that correctly. But it's called ashram?

A Yes.
Q That's a yoga community, correct?
A Yes.
Q When you join a yoga ashram, the expectation is that you have the shared belief in yoga and you'll do yoga, correct?
A Right.
Q You don't join a yoga ashram to lay in bed and play video games, right?
A Correct.
Q This OM house was not terribly different insofar as people applied to live in one of the OM houses because they wanted to immerse themselves into the OneTaste community?
A That's right.
Q The application process was to ensure that whoever was applying sort of was a fit, right?
A Right.
Q And by a fit, I mean to make sure that whoever was living there wanted to live a life that was rooted in the practice and philosophy of OM, right?
A Right.
Q And you not only believed in that, but you were a fit for that, correct?
A Yes.
Q At the time, correct?

A Yes.
Q You also moved there to live alongside people who sort of had the same outlook and philosophy, correct?
A Yes.
Q But you would agree, I think we talked a little about this, living in community presented challenges, right?
A Absolutely.
Q That would be really any where, whether it's OneTaste or any other come community, living amongst people that closely is a challenge.
A Of course.
Q We looked at a document yesterday, I'm going to ask, it's in evidence, I'm going to ask that we pull it up, it's Government Exhibit 3500-RW-12. We looked at some of this. I'm going to try really hard not to do a repeat.
This section regarding: Stay connected no matter what. Do you see that?
A Yes.
Q Part of staying connected wasn't just because that was an important value of the community, but also I'll point you directly to the sentence that says: You don't get to check out from the house for a week without telling your house manager and house maids what is going on. Right?
A Yes.
Q Because the community wanted consistency, right?

A Yes.
Q And if somebody had like an issue with somebody else, we don't want to you flee off and leave it unresolved, correct?
A Right.
Q Also that creates drama, right?
A Yes.
Q I'm guessing living in community, there is a lot of drama, right?
A True.
Q I've seen those reality shows where people live in close quarters with each other, and you see a lot of drama unfold.
A It's a little different than that, but yes.
Q I'm trying to make a comparison. When you live in close quarters with people who are not your family or partners, there are sure to be hiccups along the way. Would you agree?
A Of course.
Q Okay. If we could go to the second page of this. On the second page of this document there is a section called: Be responsible for your own journey. Right? And you remember reading this at the time, right?
A No, I don't.
Q But --

A I'm sure I did see it.
Q The concept that is reflected in be responsible for your own journey is something that you understood at the time and you understand today, right?
A I mean, it says your house manager is not to shame or punish you into doing anything.
Q And your house manager was Kim Howerton?
A Sure.
Q Again, I'm asking you whether or not you understood going into living in this OM house that you were sort of responsible for your own path while you were there, right?
A That's what this booklet says.
Q If somebody didn't follow the booklet, that included leaving if you didn't like -- if you didn't feel that people were abiding, this isn't what the rules forth, I'm out of here. Right?
MS. FARRELL: Objection to the compound question.
THE COURT: Sustained. Just rephrase your question.
BY MS. BONJEAN:
Q Being responsible for your own journey means be responsible for your own decisions, in part.
A That's what that means.
Q And you mentioned your house manager is not here to shame or punish. You are you saying Kim Howerton shamed and

punished you at some point?
A Everyone shamed or punished everybody at some point. I don't know how to parse that.
Q You nonetheless stayed.
A Oh, I did.
Q Go on to the second, the little section under that if you could, Keith.
I just wanted to point out that one of the application procedures for moving to an OM house was having training in OM, right?
A Right.
Q And then there is a section underneath there that's called the residential practice, correct? Do you see that section?
A I do.
Q These were expectations of those who chose to be part of a community, centered really at the Morellino, we're talking specifically for you, right?
A Right.
Q And when you agreed, when you filled out your application you were agreeing to abide by the residential practice, correct?
A I'm sorry. Say that again?
Q When you applied to be part of this Morellino commune, OM house is what it's called, part of that is agreeing to

abide by the residential practice, correct?
A Sure.
Q That included doing OM, right?
A Yes.
Q And making that part of sort of a daily ritual, correct?
A Right.
Q We talked about doing a service project, that was another piece of it, correct?
A Yes.
Q That was something that you could chose to do yourself but it was one of the values that you shared and one of the reasons you chose to live with each other, correct?
A Right.
Q And another obligation for joining the community was to engage in like, it's called movement, but could be yoga or Bikram yoga, right?
A Right.
Q To do these fear inventories, right?
A Yes.
Q Journaling was a big part of it, right?
A Yes.
Q Also to go to these TurnON events?
A Yes.
Q These activities were part of the rules for living at

the Morellino, right?
A That's right.
Q Had nothing to do with employment, correct?
MS. FARRELL: Objection.
THE COURT: Overruled.
A That's not how I would categorize it.
BY MS. BONJEAN:
Q There were people that had to abide by these rules who didn't work for OneTaste, right?
A Sure.
Q These rules that are laid out in the OM residential handbook were rules for people who lived in at the Morellino, whether they worked at OneTaste or not, right?
A That's correct.
Q Of course, there is other things like the cleanliness of the community space, correct?
A Right.
Q That's an obvious one; people who work in offices have to keep the cafeteria area clean, right?
A Yes.
Q Everyone pitched in to do that, right?
A Yes.
Q You didn't want to live in a pigsty, correct?
A That's right.
Q And no drugs and alcohol in the house, fair?

A Right.
Q If you broke the rules, the consequences are we want you to leave, right?
A That could happen.
Q It's a fair rule, isn't it?
A Sure.
Q When people agree amongst themselves we're going to live under these conditions, if someone breaks it, it's fair they be asked to leave, potentially, correct?
A Uh-huh.
Q No one forced you to move into the Morellino, right?
A No, they did not.
Q It was your choice to immerse yourself in the culture, that's what you testified to on direct, right?
A Correct.
Q You also testified on direct -- you can take that down -- you also testified on direct that you gave it a lot of thought?
A I did.
Q You understood the intensity of it?
A That's right.
Q You knew it wasn't just a trivial decision you were making, correct?
A Right.
Q I'm not talking about hindsight, 13 years later, I'm

talking about then; you really loved the practice and wanted to be part of that culture?
A Very much.
Q You talked about Ms. Daedone would sometimes come to the Morellino, right?
A Yes.
Q She didn't live there, though, right?
A No.
Q She was building a company, correct?
A Right.
Q So sometimes she would stay there when she was in New York, right?
A Yes.
Q She stayed in this commune with the rest of you, right?
A Yes.
Q She didn't check into the Four Seasons, correct?
A I don't know, but she often stayed with us.
Q You testified that she came and stayed there, right?
A She did.
Q You had no reason to believe she was staying anywhere else when she came into New York, right?
A I don't know if she stayed anywhere else, but she did stay in the Morellino, yes.
Q I think you answered this question. When you did your fear inventories, as far as you know, you ripped up your

fear inventories and put them or through them in the garbage, right?
A Yes.
Q Nobody came around and collected them?
A No.
Q The purpose was to write it down for yourself get it out and tell somebody else?
A Yes.
Q It's not only that you did fear inventories, everybody did fear inventories, correct?
A Yes.
Q That included Rachel and Nicole this did fear inventory, right?
A Yes.
Q They were walking the walk, right?
A Yes.
Q Some the questioning on direct examination from the Government centered on the lack of privacy in a community, right?
A Yes.
Q You didn't move into this commune expecting too much privacy, did you?
A No.
Q You were moving into a commune where you were going to share a bed with somebody, right?

A Right.
Q So it wasn't an expectation that you would have all this time without other people in your space, right?
A That's very context-dependent, but generally yes.
Q Let's talk about this context. In this context you weren't really expecting privacy even before you moved in, right?
A In general, no.
Q If you wanted privacy you could have stayed with your roomies and had your own bedroom, right?
A Correct.
Q Also, living in such close proximity to people you knew their business, right, that's just sort of the nature of living in that type of proximity with someone?
A That's right.
Q There is a whole other layer or your experience as well, you actually started working for OneTaste while you're also living in community, correct?
A Correct.
Q Those are actually two different things, fair?
A Yes.
Q So we had this complexity where now you're actually living with your bosses and your colleagues, correct?
A Right.
Q And I think you said on direct, that creates some very

blurred lines, doesn't it?
A Exactly, yes.
Q So like, when you're cleaning up after the group meal, is that a job for OneTaste or is that because you're part a community that you chose to part of?
A Right.
Q Hard to figure those things out, correct?
A Yes.
Q It feels like you're working 24/7, but in reality you're also living there, correct?
A That's different at different times. That's not -- the expectations of an employee and the expectations of someone living in the Morellino are different, even though they both live in the Morellino.
Q Okay. So when you cleaned up after -- when you cleaned up after the group meal at dinner time, was that work or was that just part of your responsibilities in living in a commune?
A That was just cleaning up.
Q Okay. Of course could you have lived in the Morellino and worked outside of OneTaste?
A Yes.
Q As some people did; is that fair?
A Yes.
Q Some people went to their nine-to-five and still lived

in the Morellino, correct?
A Not anyone that I lived with, but that is hypothetically possible.
Q You're not saying it didn't happen.
A I don't think it happened while I was there, but again, it is a part that is allowed.
Q Part of your wanting to live specifically at the Morellino is you wanted proximity to the executive levels of OneTaste, right?
A I wanted proximity to the people I was on the same level with certainly.
Q That included the upper echelon of OneTaste, right?
A No, I did not actually want proximity to them; but I knew that was part of the deal.
Q Do you remember writing your desires for CP6?
A It depends when we're talking about. In the beginning probably that's true, yes.
Q So it is true that you wanted proximity to sort of the people at the top of this hierarchy, if you will?
A I think in the beginning that is true, yes.
Q One of the things you did -- strike that.
You wanted to be part of the sales team, which was a prestigious position within OneTaste, correct?
A I did at the time.
Q That was a job, right?

A Yes.
Q That was separate from whatever responsibilities you had in terms of living at the Morellino, correct?
A Right.
Q But you told this story about how Rachel would text you if you didn't show up for the Bikram yoga, right?
A Yes.
Q Sometimes you just didn't want to go to the Bikram yoga, right?
A For various reasons.
Q Right. That's a yes, right?
A Yes.
Q Okay. Whatever the reasons were, there were times you didn't want to do it, fair?
A Sure.
Q And part of living in that the OneTaste community was to be pushed to do the things you signed up to do, correct?
A Yes.
Q That included the movement or the Bikram yoga, right?
A Yes.

THE COURT: For scheduling purposes, I think because we were a little bit off schedule taking the short break earlier, I'm intending to go to noon then let the jury have the lunch break at noon. Just for your planning purposes I wanted to let you know that.

MS. BONJEAN: I'm moving through it pretty quickly.

THE COURT: You take the time you need. I just wanted to let you know that I know we're looking at the clock, I'm planning to take a break for lunch at 12.

MS. BONJEAN: Thank you.

BY MS. BONJEAN:

Q You also told a story on or gave some testimony on direct examination about how when Nicole would come into town there was this flurry of activity, right?

A Right.

Q And people were running around the commune cleaning up, et cetera, correct?

A Right.

Q Including the space where she might stay in, right?

A Right.

Q And she was the CEO of OneTaste, right?

A I'm only pausing because the titles, she was the leader, yes.

Q You said president, can we agree she was the president of OneTaste?

A Yes.

Q You said she was the founder of OneTaste?

A Correct.

Q On direct you were pretty clear about her role, right?

A I only pause because I think technically Joanna was CEO.
Q We'll call her founder of OneTaste, right?
A Yes.
Q And Kim Howerton, who is the house manager, right?
A Right.
Q Not atypical to say, hey, our CEO, our boss, whatever you want to call her, is coming to town, let's get this place cleaned up, right?
A Right.
Q Let's make sure it's nice, correct?
A Yes.
Q Put some flowers in her room, right?
A We did.
Q You didn't really know the titles of certain people within the company, right?
A It's just foggy now.
Q You understood that OneTaste was a startup company, right?
A Yes.
Q Do you have any idea the average time it takes for a startup company to show a profit?
MS. FARRELL: Objection.
THE COURT: Overruled.
A No.

BY MS. BONJEAN:

Q So you don't know whether OneTaste was running in the black or the red back in 2012, right?

A I have no idea.

Q You don't know what Ms. Daedone's salary was at the time, right?

A No.

Q You didn't even know if she was taking a salary, correct?

A I have no idea.

Q Right. You made some comment about her being in designer clothing and jewelry, but you don't, that's just sort of your perception, right?

A She was wearing those things.

Q What clothing was designer that she wore?

A Specific garments?

Q Yes. You said she wore designer clothing, what did you see her in?

A It's trivial stuff. It's overall, like designer handbags or taking car services or having Pellegrino instead of tap. It's the trivial things.

Q She liked Pellegrino water, that's one of your examples?

A It is.

Q And when she was traveling in and out of New York to

build her company, she took a car service, right. That's another example?
A It is.
Q You saw her with a designer handbag, is that another example?
A It is.
Q Do you know what the designer was?
A I don't recall.
Q Do you know whether it was a gift?
A I do not.
Q Do you know how long she had it?
A I do not.
Q Do you know whether she thrifted it?
A I do not.
Q Didn't know where she shopped, right?
A Don't know.
Q You understood that she was the face of a startup company, correct?
A Yes.
Q You knew she had written a book called Slow Sex?
A Yes.
Q I wasn't clear on this, did you read it or not?
A I certainly read portions of it.
Q Part of the job of someone, part of the job of a president of a company or CEO or founder is to build the

company, right?
A Yes.
Q Promote the company, right?
A Correct.
Q You knew when you were living in the Morellino that she had been on a highly popular Ted Talk. Do you remember that?
A Yes, I do.
Q Have you watched that Ted Talk?
A I'm sure I have.
Q Where did that Ted Talk took place?
A Don't know.
Q Do you know what she was wearing at this highly publicized Ted Talk?
A No.
Q Any reason to believe she was wearing designer clothes at her Ted Talk?
A I don't remember what she was wearing.
Q I do want to talk about CP6 but I'm going to jump ahead on a different subject matter.
From the time of your first TurnON event that you attended until the time you were terminated from the company it was about three, three and-a-half years. Do I have that approximately, right?
A I think so.

Q In the process, you did become a certified coach in the practice of OM?
A Right.
Q Did you ever coach outside of OneTaste when you left?
A No.
Q You knew that there were like collectives of people doing OM outside of OneTaste after you left, right?
A Yes.
Q In fact, you were on some of those mailing lists, fair?
A Mailing lists for what?
Q You would get notifications for other people holding OM circles unrelated to OneTaste?
A That's possible, I don't recall that.
Q But do you recall that apart from OneTaste there were other collectives of people doing OM. You agree with that?
A Yes.
Q You testified on direct examination that OneTaste had a unique vocabulary, correct?
A Right.
Q And you used that vocabulary during your time when you were immersed into the community there, right?
A Of course.
Q When you were teaching you used that community (sic), correct?
A Yes.

Q You taught the same terms and concepts that OneTaste coached you to teach, correct?
A Yes.
Q And some of these terms came from other self-help style curriculums, right?
A I'd say so.
Q Like, for example, 12-Step programs?
A Right.
Q And some of the terms were unique to OneTaste because, of course, OneTaste is unique?
A Yes.
Q The term "TurnON," okay, correct me if I'm wrong, "TurnON" means something more than just getting sexually aroused or horny, right?
A Correct.
Q TurnON is really about something called the state of flow, fair?
A Yes.
Q And the state of flow is not something unique to Nicole Daedone or OneTaste, this is a principle that is used really widely, correct?
A Yes.
Q As a yoga instructor that is that's a term that's used in yoga, fair?
A Sometimes, yes.

Q Ms. Daedone didn't coin that term, correct?
A No.
Q And correct me if I'm wrong, I'm sure you know better than me, but a flow state is like a mental state of intense focus, fair?
A Yes.
Q Kind of like being in the zone, correct?
A Right.
Q And people get into flow states in all types of scenarios, right?
A Yes.
Q When they are playing in athletic game?
A Right, uh-huh.
Q When I'm up here doing my thing as a lawyer, potentially?
A You tell me.
Q When you're doing a performance on the stage in the theater?
A Sure.
Q And so OneTaste had a little twist on it, called a TurnON, like turning a switch on or off, but that's really what TurnON meant, right?
A It's part of the definition, surely.
Q I guess there is a sexual kind of component to it?
A It's broad.

Q It's broad, though, correct?
A Right.
Q You testified that the words that you used when in OneTaste were sort of, in some ways, metaphors?
A Often, yes.
Q I think the OneTaste philosophy was that OM could lead to this flow state, right?
A Yes.

(Continued on the next page.)

(Cross-examination, cont'd)

BY MS. BONJEAN:

Q We discussed the "release your beast." I don't know if I want to talk about it anymore, but I do want to ask you a couple questions about it, okay?

A Okay.

Q The beast is a metaphor, right?

A Yes.

Q And according to sort of OneTaste philosophy, we all have a beast in us, right?

A Yes.

Q It's not just men, it's not just women, it's really everybody?

A Right.

Q And the beast is sort of this -- at least according to the teachings of the OneTaste, I will get scolded if I get this wrong, but our -- sort of this primal voice in all of us that sometimes we try to hide, right?

A Yes.

Q And at its core, it's fundamentally an expression for a desire for creativity and connection; fair?

A Um, yeah, that could be said. Sure.

Q Okay. And people suppress it because they fear being judged, right?

A Sure. Yes.

Q So when you did the beast exercise, it was sort of like trying to tap into that primal voice and release it, right?
A I think that's the idea.
Q We talked about the third and fourth dimension. Again, this is not a concept that originated with Ms. Daedone either, right?
A As far as I know.
Q This is also actually a 12 step concept, correct?
A I wasn't aware of that.
Q Okay. That's fair.
But the third dimension, as you described, is sort of this physical world that constrains us, right?
A Yes.
Q The world that we need to live in that has social order, right?
A Yes.
Q And then the fourth dimension is more of the spiritual world, correct?
A Right.
Q And it goes beyond the physical and sort of like what your connection is to this higher power, right?
A Right.
Q And this is not just, again, in the context of OneTaste, but for anyone who has any spiritual views, they may -- they connect you on sort of a different dimension than in the

physical world, right?
A Sure.
Q Okay. We talked about -- I think you talked on direct about sort of aversion practice; do you remember that?
A I do.
Q And that's another sort of, say, a practice that was utilized in the context of OneTaste, right?
A Yes.
Q Again, not a practice they developed; fair?
A I don't know.
Q Okay. And aversion practice is, again, just dumbing it down, is partially about challenging your views about what your -- what you're averse to, right?
A Right.
Q I look at an oyster, it looks disgusting. But maybe if I give it a try, I'll like it, right?
A Sure.
Q And part of OneTaste's teaching was to challenge your preconceptions about things, right?
A Yes.
Q And that was specifically true to relationship; fair?
A Yes.
Q So if you're someone who's like, I only want to marry someone who's rich and handsome and six feet tall, and someone says to you, hey, but this other guy likes you. Oh, no, he's

not cute enough. But they say, give it a try. You might really like dating him, right? It's a form of aversion practice, correct?
A You could think of it that way, sure.
Q You discussed the fact that there was this idea of sharing trauma, you know, people's trauma, right?
A Yes.
Q People share trauma all over the place, right?
A Sometimes. Yes.
Q Yeah. Social media, correct?
A Yeah.
Q Okay. But you'd agree that people who were coming to OneTaste to take classes were looking -- and I don't want to make too much of a generalization, but many people who came there were looking to understand something about themselves, right?
A Yes.
Q And many people came there with preexisting trauma that they wanted to try to understand, right?
A Yes.
Q And some of that trauma centered around sort of sexual experiences that they were trying to make sense of, correct?
A Yes.
Q The organization didn't need to sort of reel those people in, those people were seeking out OneTaste because of what

OneTaste was, right?
A Exactly.
Q OneTaste didn't need to stand outside and hand out flyers outside a psychiatrist's office, you know, it was sort of a natural scenario where people that were struggling to find meaning because of things in their life that had happened would seek out OneTaste, right?
A Right. Instead, we did that at speed dating events.
Q Right. But it is about sex and relationships, correct?
A It is.
Q Would make sense to do it at a speed dating event, correct?
A You could say that.
Q You testified on direct examination that -- well, strike that.
You looked -- we looked at some video of Ms. Daedone's CP6 -- the CP6 discussion or presentation?
A Presentation.
Q Right?
A Uh-huh.
Q Okay. So I do want to -- again, these things are overlapping. I want to talk about CP6 just for a few minutes here.
A Yep.
Q I am going to ask -- we'll look at a document here. I

think it is in evidence as 3234.

3234. I think 3224 is in, too, but I'm looking for 3234.

Okay. Do you see this document, Ms. Halpern?

A I do.

Q Okay. And I think you previously identified it, but just since it's been a long few days, can you tell us what it is again?

A Yes. This is the OneTaste Coaching & OM Training Program manual.

Q All right. And was this something that was distributed at the beginning of CP6?

A As far as I know.

Q And this was the training program for the coaching programs that we've talked about already, right?

A Correct.

Q And on the second page --

MS. BONJEAN: If we could just go to the very top where -- can we pull out the very top paragraph that says "in an innovative educational experience."

Q Okay. Can you read that for me?

A Sure.

In an innovative educational experience, unlike any other in the world, learn the art and skill of guiding clients into an OM lifestyle philosophy, where connection, intimacy,

and TurnON become their fundamental orientation to the world.
Q And there we see that word "TurnON," right?
A Yes.
Q And, again, to be clear, in this context it is really talking about something more than just like being horny, right?
A Of course.
Q And going -- these aren't numbered, but I think it's the fourth page.
And you were -- when you finished this program, you would become a certified coach and advanced OM trainer, right?
A Right.
Q So as an advanced OM trainer, you would be -- the point was to be able to support people through these different types of experiences in their lives, right?
A Yes.
Q And to help them with these different things, correct?
A Yes.
Q And did you ever coach as a -- did you ever coach OM?
A Yes.
Q As we already know, Ms. Daedone did make an appearance at this coaching program, right?
A Right.
Q I think she typically did at every coaching program, correct?

A I think so.
Q And that was an exciting time to hear her speak, correct?
A Yeah.
Q And just for some context, if we can go to page 10.
All right. We looked at this, but February 21 -- that weekend of February 21 through 24 in 2013 is when there was the opening reception and CP6 started, right?
A Right.
Q And then it went for ten months?
A Yes.
Q Okay. And it closed the weekend of November 15 through 17, correct?
A Yes.
Q And yesterday we looked at a bunch of pictures of you and your friends through the course of this where, you know, seemed like you were having a nice time, right?
A Right.
Q It was fun, right?
A It was.
Q All right.
And on one -- do you know how many -- do you know what day Nicole actually did her presentation?
A I don't.
Q And I think you were asked some questions on cross by Ms. Cohen about your graduation statement, right?

A Yes.
Q And that would have been on that November date, right?
A Right.
Q Where you said, you know, this is really -- in the past I was really just sort of playing games with this person that I really love and it allowed me to take risks and open up, right?
A Right.
Q And that's the person you ended up marrying, right?
A That's right.
Q Okay.

MS. BONJEAN: Now, Your Honor, I don't know if we want to -- I am ready to move into video, but it is going to be longer than five minutes. So I don't know if you wanted to --

THE COURT: How much longer?

MS. BONJEAN: This is the video. I think -- it's the video of the speech.

THE COURT: Yes. How much time?

MS. BONJEAN: Might be 10 or -- at least ten minutes, maybe. I don't know if you want to -- I'm happy to do it. It is up to you. I just wanted to --

THE COURT: I think we should take a break then.

MS. BONJEAN: Okay.

THE COURT: Take a lunch break. Again, we got off

schedule a little bit with the morning break, but I am going to ask the jury to come back at 1:00. And I hope it is sunny out, but I suspect it's not.

Enjoy your lunch. Don't talk about the case with anyone. Don't let anyone talk about the case with you.

Enjoy your lunch.

(Jury exits the courtroom.)

THE COURT: And the witness can also step down.

I'm going to keep the parties for a few minutes.

(Witness exits the courtroom.)

THE COURT: Everyone may be seated.

Okay. The witness is no longer here.

Couple things I want to mention.

One is that the defense was offering certain evidence by way of video evidence and referenced 803.

Ms. Cohen?

MS. COHEN: Yes.

THE COURT: So I just want to make sure that everybody understands that to the extent that you're offering something like a video, which has many, many, many statements in it, some of which may be admissible and some are not, if you are offering the whole video, I am not going to be able to admit it, unless it is all properly admissible. So I just wanted to make sure that you understood that. Sometimes parts of it will be admissible for context, but I just want to make

sure that everybody is thinking about particular statements, when the rule calls for an analysis of a statement.

MS. BONJEAN: You want to respond?

MS. COHEN: Sure.

I was just going to say, Your Honor, for example, the CP6 video, we would offer the entire video to show her physical and emotional state.

Now, I crossed her on it, but seeing the video is very different than just asking her the questions because it goes to that. It also goes to the effect on listener. Ms. Cherwitz was in that audience --

THE COURT: Okay. But that's not what you are proffering. You were proffering that -- I believe you were proffering that it was 803(3). You can correct me if I am wrong, and not every statement in there for sure would be 803(3). Anyway, you can take a look at that over the break again, but I just wanted to make sure you understood that there has to be -- if it is a video or something, you know, an entire document, obviously, the whole thing has to be properly admissible. And that's just what I wanted to raise.

I also wanted to come back to Ms. Bonjean's comment this morning. And I know that not all attorneys, and maybe not on the government side either, but on the defense side were at every conference. But just so everybody knows, if there is an issue that the parties want to raise before the

jury comes in, Mr. D'Agostino is down here around 9:00. You're welcome to come then. I usually say 9:15 you should come, but you can come at 9:00. And just let him know. And then I will take the bench. Because I think you had told him you wanted to talk about something, but it was about 9:24 and 9:25, and I am not going to keep the jury waiting.

So perhaps -- you know, I just want to make sure everybody understands, government and both defense counsel. Also, to give me something in the morning for me to watch or to look at, I can't both be doing that and be on the bench. So just keep that in mind. I do want to hear the parties out, and I appreciate you raising things outside the presence of the jury. I think we had talked about this, and I am not sure everybody was at every conference where this was addressed.

Go ahead, Ms. Bonjean.

MS. BONJEAN: Your Honor, back to the video, I mean, I think we just fundamentally disagree. And I obviously -- again, we respect the Court's rulings, and I think perhaps we are going to do some thinking on this. But we believe on a number of occasions videos -- it's not just about statements. It is about the observations.

THE COURT: Okay. But that's not what's being proffered. So I hear you. I would --

MS. BONJEAN: I think it is, though. I mean, I don't know -- I think it is being proffered for that purpose.

That's --

THE COURT: But the first I'm hearing about I think -- correct me if the term is not exactly what you just used, but body language. I don't know that that's been raised.

MS. COHEN: Well, I said physical and emotional, and I talked about the testimony about her eyes and being tired and --

THE COURT: But that was her testimony. I think we're talking about the video now.

MS. COHEN: Right. But the video shows that, in fact, she was not tired and emotional.

THE COURT: But the other issue, and I think you were laying a foundation, but the events at issue are over a long period of time, and so you were -- the timing matters as well. I am just raising these, you know, because I want you to understand that it is not that certain parts of this may not be admissible, just that foundation -- proper foundation needs to be laid, and it was.

There's also an issue of cumulativeness on certain things, if a witness has already testified, but I hear you are making a different point now.

MS. COHEN: I just want to point out one thing, Your Honor. That's why I focused on the latter half of OneTaste. The four videos --

THE COURT: When you say the latter half of OneTaste --

MS. COHEN: I asked her to testify specifically. I said that would be 2012 to 2014.

THE COURT: Right. You were making the record -- not initially, though. I just want to flag this for you.

MS. COHEN: Okay. But I did establish that 2013 was halfway through, was in the latter half, which she agreed to.

The four videos, one was June 2013, August 2013, November 2013, and January 2014. Those videos show a very different, and over the course of that six months, where she's saying I hid in the bathroom crying, I was tired, I was emotional, I didn't want to be there, I was crying all the time.

And it is the cumulative effect of looking at four instances throughout that time. Now, we could pull many more, but I am trying to be efficient here and getting a fair representation of what was going on during that time. And that specifically goes to the heart of our defense here. She wasn't psychologically manipulated into doing these things. That she wanted to do them. That she was happy. And we have to be able to show that. To confront her about her feelings.

THE COURT: I think she did testify today, though, I'm just looking at my notes here, that she was happy and enjoying -- during the -- I don't want to -- I think she said

this was great -- she was having a great time in between the terrible times.

Anyway, I am leaving you with these thoughts to think about because I'm not saying that a particular statement within a video might not be admissible. But you have to be thinking about particular statements, and now you're raising a separate issue, which I am understanding.

MS. COHEN: Sorry. I just want to say one other thing --

THE COURT: Go ahead.

MS. COHEN: -- about the physical, though.

THE COURT: Yes.

MS. COHEN: Unless you see that, right, the jury doesn't -- yes, sure, she might be laughing in a moment, and maybe that --

THE COURT: Okay. But you were referencing 803, which is talking about statements. To the extent you are talking about something else, it's not 803 then, right? Because 803 is a hearsay exception -- 803(3), let me be more specific, is a hearsay exception based on statements. That's what I thought you were referencing. I think that's what you said.

So that's a different -- that's a different offer than what you are telling me now.

MS. COHEN: Okay.

THE COURT: So I am hearing you, I want you to be hearing me, too.

MS. COHEN: I got you.

THE COURT: Okay. Go ahead, Ms. Bonjean.

MS. BONJEAN: Yes. And I do want to specifically address Defendants' Exhibit 21-C2.

THE COURT: Give me a moment to get it.

MS. BONJEAN: Yes.

THE COURT: Sorry, is that one of the videos or something else?

MS. BONJEAN: Yes. It's a video. I'm sorry, CT.

THE COURT: Okay. That's the one with -- do I have -- that's the one with the long transcript?

MS. BONJEAN: Yes, Your Honor. And I wanted to point out that this was partially about statements because --

THE COURT: Okay. But, again, you are asking to put in a video.

MS. BONJEAN: Yes.

THE COURT: But you are not asking then to put in parts of the video. I just need you to focus on if there's a smaller clip that you think is for one of these exceptions, I may very well allow you to do it. But to --

MS. BONJEAN: You need context, though. I mean, you --

THE COURT: But then that's a different issue,

right? I mean, I look at -- I am looking at the transcript that you gave me today.

MS. BONJEAN: Uh-huh.

THE COURT: And, to me, not all of it would be admissible. But if you have arguments on it, you can make arguments. But I am going to leave you to talk to the government about this as well.

And do you have the ability, technologically, to extract portions, if you want to offer certain portions? Do you have the ability to do that sort of on the fly, or no?

MS. BONJEAN: I mean, we probably do.

THE COURT: Okay. Okay.

MS. BONJEAN: Again, I think that -- I just want the record to be clear.

THE COURT: Yes.

MS. BONJEAN: I looked at that video very closely, and I understood, going home yesterday, that you are saying like the whole thing doesn't necessarily come in.

But, you know, this particular account that she gives is all about how she got sold. And there was a whole direct examination that, frankly, is contradictory.

THE COURT: Okay. But that's the part that -- I don't think you've made that showing particularly clearly. But, look. You are still on cross-examination.

MS. BONJEAN: Saying I was forced by Rachel

Cherwitz, and then saying, no, she didn't force me. She actually wasn't even that hard of a stroke or a hard sell.

THE COURT: I think the problem is time frame matters, specifics matter here. But, listen --

MS. BONJEAN: I laid that foundation.

THE COURT: -- you can make your --

MS. BONJEAN: I laid that foundation.

THE COURT: All right. Well, the Court made its rulings --

MS. BONJEAN: I know.

THE COURT: -- but what I am telling you now is you might want to revisit some of what you are trying to get in, and do it in a more targeted way. But I leave it to you. You don't have to. I have already sustained the objection. But as a courtesy to everybody here, I am letting you know more. We can leave it at that.

I do think that if there are portions of these videos that the government does not have an issue with, you should talk to each other.

But in any event, I also would like the technology set up so that I can do what the witness is doing, is to listen to the videos and watch the videos. Because, otherwise, I mean, I'm looking at them in my chambers, and then I'm coming down on the bench, and you've got a witness looking at this, and then you're asking me to make an

admissibility determination.

MS. BONJEAN: You want your own computer? Is that what you are asking for?

THE COURT: In the way that you are playing it for the victim here --

MS. BONJEAN: Not a victim.

THE COURT: Well, the government's victim witness, okay.

MS. BONJEAN: She's an intended victim, at best.

THE COURT: There's no jury here.

The way you are playing it for this witness, I'd like to have it simultaneously. I can, you know, pull it up on my own computer, but you're playing certain portions for her, or you're playing it for her.

So in any event, we will return at 1:00.

And is there anything else that I haven't heard from the government?

MS. FARRELL: Just so I don't surprise you, we obviously now have a better understanding of what their theories of admissibility are on these various documents, which were not apparent to us previously.

THE COURT: Yes. They weren't necessarily apparent based on what was said earlier.

MS. FARRELL: Just as one example, I may on my redirect seek to introduce some of the photographs that are

already in evidence that are defense exhibits with the date and who posted it. The reason being is I believe they are all posted like by OneTaste, publicly, to show, like, here's CP6, which is consistent to what she testified about. I had to be turned on and public facing and look really happy.

And so I just don't want to surprise Your Honor. I plan to do that on redirect. I will talk about it with the defense. But now that we understand more sort of the theory here, I think, hopefully, too, now that we, I think, both understand each other's theories more, it will speed things up moving forward.

THE COURT: Right. I would imagine that the government may not have an issue with certain portions of what the defense is trying to put in. I think that it wasn't made clear the basis that they were seeking to put some of this in, and I think the government now understands better and may not have an issue with some of this.

MS. FARRELL: Correct.

THE COURT: Okay.

MS. BONJEAN: We also have to make sure that these videos get made part of the record either way.

THE COURT: What do you mean made part of the record either way?

MS. BONJEAN: Your ruling on the admissibility, they should be made part of the record. Because I don't know --

they should be made part of the record for appellate reasons.

THE COURT: You have identified them on the record, right? I mean --

MS. BONJEAN: I understand, but we need to make --

THE COURT: That's okay. We can take this up later. That is a basic kind of fundamental thing that happens all the time. You identify an exhibit, some come in, some don't.

MS. BONJEAN: As someone who does appeals, it is not that basic. Sometimes there's --

THE COURT: You know what, let's go to lunch, everybody. 1:00.

(Lunch recess taken.)

(Continued on the next page.)

A F T E R N O O N S E S S I O N

(Proceedings continue in open court; no jury present.)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Okay. The jury is here, but I do want to talk to the parties for a minute.

I understand from my team that Mr. Robotti and Ms. Bonjean had an issue to raise, but I understand that it has to do with the next witness, correct?

MR. ROBOTTI: That's correct.

THE COURT: Okay. How much more time do you have on cross-examination of this witness?

MS. BONJEAN: 20 minutes maybe.

THE COURT: Okay. And then?

MS. FARRELL: Brief redirect.

THE COURT: Okay. Brief meaning how long? Roughly.

MS. FARRELL: Under 15 minutes. Probably closer to 10.

THE COURT: Okay. Do you want to then flag for me what the issue is with the next witness?

Sorry. Is it the same issue that both of you want to raise?

MR. ROBOTTI: I believe so.

MS. BONJEAN: I mean, there are factually a little

different, but similar in concept.

THE COURT: Okay.

MR. ROBOTTI: I think there's two primary issues. We are objecting on relevance and 403 grounds.

THE COURT: Okay.

MR. ROBOTTI: One, this witness is expected to testify about certain BDSM activity that involves scratching the skin. Our understanding is that this was done consensually between Ms. Daedone and another individual, and we don't see how that has any bearing on labor in any way whatsoever, considering it was an entirely consensual experience.

The second issue --

THE COURT: Tell me the relationship between the witness and this event?

MS. BONJEAN: Hold on. Let me address this, also.

THE COURT: Go ahead.

MS. BONJEAN: It's not just -- yes, it was a consensual event, but this witness didn't see it. He --

THE COURT: Oh. Okay.

MS. BONJEAN: That's sort of an important point. He didn't see the event. What he would testify to, according to the 302, is that he's -- the person who was -- the woman who alleged -- who apparently had some sort of marking on her, he saw the marking.

And this is not -- these are not alleged coconspirators, by the way. And we are talking about --

THE COURT: I'm sorry, who is the "we"? Just be more specific for me. Do you mean the witness or --

MS. BONJEAN: Chris Hubbard and a woman named Alisha Price. And this is the partner or the woman with whom Ms. Daedone had this experience, who --

THE COURT: Okay.

MS. BONJEAN: And so the way it goes, as I understand the statement, is that Mr. Hubbard sees this marking. He's -- I don't know if he's troubled by it. I mean, even though -- well, whatever. He says something about it now 25, 30 years later. And in order --

THE COURT: 30 years ago? Is that what you said?

MS. BONJEAN: 2006 -- this is 2008. So, whatever. It is --

THE COURT: But within the period charged?

MS. BONJEAN: Yeah, it's in the period charged --

THE COURT: Okay.

MS. BONJEAN: But, again, it's consensual activity, which --

THE COURT: Okay. No, no. I just want to hear the rest of it. Go ahead.

MS. BONJEAN: And beyond that -- so anything that he would have to offer would be hearsay if Alisha Price told him

about what happened, right. So like that's her saying -- if she says, "oh, Nicole Daedone and I did this in this sexual experience," that would be hearsay.

All he can say is, "I observed this." And then I don't know what the relevance of it is under the best of circumstances. Certainly without context there's no relevance. He cannot -- he will not say it wasn't consensual. He has no basis to believe it. In fact, he says in his 302 he never saw anything not consensual.

So I -- whatever probative value that has, that there's BDSM tactics used, this is not relevant, particularly for a forced labor charge, which the government, you know, points out when it's convenient and then forgets when it's convenient. So that's my position on that particular event.

THE COURT: Okay. Did Mr. Robotti want to be heard further?

MR. ROBOTTI: There's a second issue, Your Honor.

THE COURT: Okay.

MR. ROBOTTI: I don't know if you want to address that.

THE COURT: If it's with the -- yes. Might as well.

MR. ROBOTTI: Same witness.

So my understanding is this witness may testify that while he was living at the OneTaste residence called the Warehouse, individuals there called him the "Antichrist." You

know, there's no indication in the 302s that either Rachel or Nicole did that. So it's not clear to us how that is relevant here. And, you know, to the extent that other unnamed persons may have called him the Antichrist, you know, there's a real 403 problem here with use of such an inflammatory term, with very minimal probative value, given that it's not directly tied to the defendants.

THE COURT: Okay. Government?

MS. BENSING: So I can start maybe with Ms. Bonjean's issue first.

THE COURT: Okay.

MS. BENSING: So we do not expect the witness -- we do not intend to elicit hearsay statements. We expect the witness to solely be testifying about his own observations.

THE COURT: What's the relevance?

MS. BENSING: The relevance is with respect to Daedone's leadership role and the power position that she held at that point in time. So the scratching or the carving, the mark is "ND," which is the defendant's initials. And so that is the relevance of it, that she was holding the role of a spiritual guru and leader.

THE COURT: All right. What else do you have? I'm not persuaded by this.

Go ahead.

I mean, if there's no testimony around it, it is

not, per se, relevant just on its face, if you're going to show a photograph or something or have him say what he saw. There's going to be no testimony sounding this?

MS. BENSING: Well, his testimony is what he personally observed about the marking and what the marking was and the initials of the marking. And his testimony generally will be that Daedone was leading this group at the time and leading it in a way that involved power dynamics and abuse.

THE COURT: Okay. I am not going to allow it based on that proffer. What else did you want to raise?

MS. BENSING: So then just to respond to Mr. Robotti.

So we do have a good faith basis to believe that it was the defendants who were calling him the Antichrist. Again, this is -- he is going to be asked why he left OneTaste, and as part of that answer he may discuss part of this name calling. It is not something that we are specifically intending to elicit, but it's possible that he would answer the question with reference to this because it potentially played some role in his departure. And so --

THE COURT: But your representation is that you expect that it would be his testimony that one or both of the defendants used the term "Antichrist" to refer to him? Is that what you're proffering?

MS. BENSING: Yes.

THE COURT: Okay.

MS. BENSING: And, also, we're not eliciting it for its truth in any way. It's --

THE COURT: It would almost be impossible to.

MS. BENSING: Yeah. Yeah, yeah, yeah. So it is literally just to explain like why he took a certain step, I mean, which is --

THE COURT: Okay. I will hear from the defense, if you want to be heard. But -- yeah. Why don't I hear you know.

MR. ROBOTTI: Just briefly, Your Honor.

So there may be a good faith basis based on something we don't know. Having reviewed the 302s, this witness has said he does not know who called him the Antichrist.

THE COURT: Okay. That he does not know that it was the defendants.

MR. ROBOTTI: So based on what we know, we don't think there's a basis to illicit this.

You know, I think there's an option here for the government to elicit something along the lines of he was called names or called, you know, inflammatory names, without going into "Antichrist," which is very, very inflammatory, Your Honor, especially for individuals who may be religious on the jury. I mean, that can have a huge prejudicial effect.

MS. BENSING: Your Honor, if I may respond.

Again, none of this -- whether the defendant said it or somebody else, none of this is coming in for its truth. It's literally for the effect on the --

THE COURT: Okay. But what I am hearing is a different argument about prejudice. Obviously it's not coming in for the truth, right? I don't think anyone's suggesting it is, right? I mean, it seems sort of silly to even argue that. I am not criticizing you, but we are talking about something different here.

MS. BENSING: Understood. But that's -- I don't understand the relevance of the defendants then, whether or not they said it or they didn't say it. Because the point is why he left that OneTaste community at the time, and so it is really kind of irrelevant who said it or not, if it contributed to why he left.

Again, this is not something we specifically intend to elicit, but it is something that could come up. And so I don't think it's --

THE COURT: What is it -- is Mr. Robotti's representation correct, and I have no reason to doubt him, that this is -- they have not been previously provided any 3500 material that indicates that he would say that either Ms. Daedone or Ms. Cherwitz used this term with respect to him.

MS. BENSING: I'm not sure whether or not that's -- again, I don't think it's relevant because we are not trying to elicit that they said that to him. That's --

THE COURT: Okay. I thought you just said that it would be -- that the testimony would be that the defendant said it to him.

MS. BENSING: So I think the testimony would come up to the question of why did he leave. And I think he would say that one of the contributing factors, potentially, about why he left -- there were multiple reasons for him leaving, so it may not come up, the government does not intend to specifically elicit it, but was this name calling, and specifically being called the Antichrist, which he took specific issue with that term specifically. It wasn't just like general name calling. He would testify that he had a specific issue with being called that in particular.

And I don't think it's unduly prejudicial, given the context and just explaining why he ended up departing.

THE COURT: Okay. Go ahead, Ms. Bonjean. Do you want to respond?

MS. BONJEAN: One last thing. It's on the same.

THE COURT: Yes.

MS. BONJEAN: So I believe the government's going to elicit testimony from Mr. Hubbard about and during this time period of 2006 to 2009 about how he produced these scenes,

which I think is also a BDSM type of -- I don't really understand it, but these scenes.

He expressly says in his 302 that the scenes were consensual. Exact words. Scenes were consensual.

So, again, I don't know if they are intending on eliciting that, but, again, and I don't know what the purpose would be if these scenes were consensual. He's not saying otherwise. So, again, I don't know what this has to do with a forced labor case, if -- and maybe they have a relevant purpose. But I am concerned.

And on that, one of the scenes includes like a communion, and I think that could be highly prejudicial. I don't think we need to know the details of all the scenes and whether there is a religious element in it. I also want to make sure the record is clear that that could really offend people.

THE COURT: Sorry, this is just testimony or video?

MS. BONJEAN: No, no, no. It's testimony --

THE COURT: Testimony.

MS. BONJEAN: -- about some communion scene. I don't -- there's plenty --

THE COURT: Is the government intending to elicit anything about a communion scene?

MS. BENSING: We do intend to elicit information about scenes. We do not specifically intend to elicit the use

of communion during a scene.

THE COURT: Will you avoid it?

MS. BENSING: Yes. But can we go instruct the witness?

THE COURT: Yes.

MS. BENSING: Okay.

THE COURT: But let's finish up here first.

MS. BONJEAN: But even the scenes, if they're consensual --

THE COURT: Okay. Let me -- I am hearing everybody's arguments on that one.

And on -- I have already said that the initials, at least as it's been proffered to me, that is not coming in. I am not going to preclude testimony if it comes up from this witness that he was called the Antichrist. I don't find that it's unduly prejudicial. And I think, you know, that term is used, you know, sometimes colloquially, and I just don't -- I don't find on the particular circumstances of this case, but I also understand the government is not affirmatively seeking to elicit that, but I will not preclude it because I do think it is relevant here.

Tell me, is there anything else that I need to know about this witness before -- I mean, I know we are still on the other witness, but I don't know that we'll have another break before Hubbard gets on.

MS. BENSING: I think those are the two issues that the defense raised.

Can we just go instruct the witness, consistent with the Court's rulings?

THE COURT: Can somebody do that while we are finishing with this witness?

MS. BENSING: Yes, yes, yes.

THE COURT: Okay.

MS. BENSING: I want to get permission to leave, with the Court.

THE COURT: Yes. You are talking -- yes.

MS. BENSING: Thank you.

MS. BONJEAN: And, again, I just want the record to be clear. We are objecting to any testimony about consensual scenes.

THE COURT: Okay. I mean, I am going to have to see if a foundation is laid and what the relevance is. But we haven't had the testimony yet.

MS. BONJEAN: That's fine.

THE COURT: You can object at the appropriate time --

MS. BONJEAN: That's fine.

THE COURT: -- if this ends up being --

MS. BONJEAN: I am flagging it for the Court.

THE COURT: I appreciate it.

MS. BONJEAN: Okay.

MR. ROBOTTI: Your Honor, we join the objection.

And just logistically, we are planning on playing some audio to refresh the witness' recollection or to seek to admit it --

THE COURT: Okay.

MR. ROBOTTI: -- for the witness?

THE COURT: You have a way to do that?

MR. ROBOTTI: He will have the same laptop setup. We have requested a laptop for Your Honor later this afternoon so you can simultaneously listen to it.

THE COURT: Thank you.

I mean, my concern is I can certainly pull up certain documents, but if you are really playing clips and moving it along, I'd rather be on your system of being able to watch when the witness is watching.

MR. ROBOTTI: Of course. And I am hopeful it will be here in time.

THE COURT: Okay. That's fine.

And you just said you're objecting to certain things. I mean, when the evidence is actually proffered, obviously, object. There's no need for, you know, an objection if this doesn't come up, obviously. But I know why you're doing it, and I hear you. But I don't want you to think that you don't need to object at the time.

MS. BONJEAN: Oh, I have every intention of objecting.

THE COURT: I imagine you do. I just wanted to -- and sometimes you have said in the past, you know, "for the reasons we said before." If you can just state your basis. But I understand your objections.

MS. BENSING: And, Your Honor, just with respect to the scenes --

THE COURT: Yes.

MS. BENSING: -- because some of this may come out through later witnesses as well.

THE COURT: Yes.

MS. BENSING: But these were things that were put on for Reese Jones, who was the primary investor in the early days of OneTaste, on whom a number of our victims were directed to perform sexual labor.

THE COURT: Okay.

MS. BENSING: And so we are establishing the initial relationship with respect to him and the services that OneTaste provided to him, which I think is extremely relevant to the theory of the government's case.

THE COURT: Okay. I mean, I'll have to see what the details are and what foundation you lay before I can make a determination of whether a particular testimony about a particular scene is admissible or not.

But I do want you to be mindful of the one issue that Ms. Bonjean raised about the communion, and that's the one you're going to talk to your witness about.

MS. BENSING: Yes.

THE COURT: And if there are other similar concerns you have, not -- putting aside your concern about consensual, but if there is other types of subject matter like the communion or something like that, raise it with the government. I think there will be another break before that comes up.

MS. BONJEAN: Okay. Great. I did raise it. There's one -- apparently there was an enema involved.

THE COURT: Okay.

MS. BONJEAN: So I will raise it -- I raised it with them. I mean, we will leave it at that.

THE COURT: All right. You will work out what you can. If you can't work it out, you will let me know, and I will let you know whether it is coming in or not.

Possibly not the best phrase to be using.

Okay. Why don't we -- the witness is ready, or no?

MS. BENSING: Yes.

THE COURT: Okay. Somebody go get the current witness, we will get the jury, and we will take it from there.

(Short pause; witness takes the stand.)

(Jury re-entered the courtroom.)

THE COURT: Everyone may be seated. I hope everyone had a good lunch.

And we will continue with the cross-examination.

CROSS-EXAMINATION, (cont'd)

BY MS. BONJEAN:

Q Good afternoon, Ms. Halpern.

A Good afternoon.

Q One second before we get started.

(Short pause.)

Q Okay. I want to draw your attention back to your direct examination, when you were asked to look at a couple of clips of Ms. Daedone giving a lecture during CP6. You remember that, right?

A I do.

Q And, first, you have heard Ms. Daedone give lectures on a number of occasions, right?

A Yes.

Q She has a very distinct style of speaking, correct?

A She does.

Q Sometimes it's very metaphorical, right?

A Can be.

Q Sometimes it's very stream of conscious, correct?

A Can be. Yeah.

Q It's storytelling, right?

A Sure.

Q And sometimes it's not really clear on its face like what the point is until the very end, right?
A Sometimes.
Q And the government showed you just a couple fairly short clips of some fairly -- what appeared to be controversial things, right?
A Yes.
Q Okay. And those were controversial statements that I think even at the time you thought they were a little controversial, right?
A Yes.
Q Okay. And that's sort of her signature, right? She made controversial statements, correct?
A She did sometimes, yes.
Q I mean, building a company around female orgasm is in and of itself controversial, correct?
A To some.
Q Yeah. I mean, to most, right?
A To many.
Q Yeah.
And you testified that, you know, these statements were like, you know, troubling to you, right?
A They are.
Q And your takeaway was somehow that she was condoning perpetrators of sexual assault, right?

A That's my takeaway.
Q Okay. But you understood, I think, but correct me if I'm wrong, that what Ms. Daedone was saying was that labels of victim and perpetrator don't help us get past the problems of victim and perpetrating, right?
A Labels don't help us get past? That's one portion of what she was saying, I believe.
Q And in the context of that, she shared her own personal stories, right?
A She did.
Q And that's not something she typically did, did she?
A She did that quite a bit.
Q Not her stories of, for instance -- not her personal story of having a father who went to prison for child molestation, right?
A It was a fairly well-known fact.
Q Well, you seemed -- when you spoke to the government back in 2018, you doubted the truth of that; do you remember that?
A I still don't know. I mean, I haven't looked into it. I don't know if that's true. But I have heard her say, of course.
Q You have no reason to believe this is a lie of some sort, right?
A No. No.
Q And in that speech, which by -- strike that.

Before you looked at those clips, you testified that you watched the whole hour and a half or hour 20 minutes presentation she gave, right?
A I was there.
Q But you also -- well, you don't remember the details all these years later, correct?
A I can't remember every word, of course.
Q Right.
But you testified, when the government asked you, that you did look at it before you came and testified, right?
A Before I came into court?
Q Yes.
A Yes.
Q Did you watch the whole hour and 20 minutes, or just the clips the government wanted you to see?
A I did not watch the whole hour and 20 minutes.
Q Right.
So it is now what 2025?
A Yes, it is.
Q And this lecture was given, what, 12 years ago, something like that?
A Right.
Q And you didn't rewatch the whole thing from beginning to end, right?
A No, I did not.

Q And you watched a couple clips that the government pulled out for you to see, correct?
A I did.
Q And do you recall back when she gave this lecture that she talked about all the darkness that she had seen in her life?
A Yes.
Q Okay. And she talked about the potential violence she faced when she was working in doing sex work or stripper, you know, when she was working as a stripper, right?
A Yes.
Q I mean, that's the word she used. Do you remember that?
A Yeah.
Q And she discussed how being in a turned up state is what she felt kept her safe, right?
A That's being in a turned on state is part of what she discussed.
Q Right. And turned on, we already discussed, is the state of flow. It is not just being like sexual, right?
A Again, it has many meanings.
Q Right.
A Those are two of them.
Q Right. That's one of the meanings, right?
A Being sexually turned on, being in a flow state. Both of those.

Q Right. And that's being in a state of like attentiveness, correct?
A That's another meaning of it, yes.
Q Right.
And that's the word she used, right?
A Correct.
Q Okay. And that is a possible meaning that she used when she said how to keep herself safe in the face of potential violence, right?
A Yes. I think she also said "turn my pussy on."
Q Turned on, meaning her sexual power, correct?
A Yes. I believe that's how she meant it.
Q You're the one that -- you listened to her speak on numerous occasions, correct?
A Of course.
Q You used the words, "turn my pussy on," frequently, right?
A Absolutely.
Q It didn't mean just like I want to, you know, have sex, correct?
A As I said, it means a lot of things.
Q It means a lot of things, right?
And when you listen to those clips, you took one meaning, right?
A No. I don't agree.

Q Well, you took the meaning that somehow she was being apologetic for the acts of violence, right?
A No. I took the meaning that she was using that story of something that she had personally gone through as something to illustrate to others what is possible. Not that we would go through that exact same thing, of course, but that we could attempt to kind of gain that same power in an unsafe situation.
Q Right.
She was discussing that if you dig into that power, which she finds -- you know, which she has said was from her pussy or whatever word, but that that is what kept her safe, right?
A That's what she said.
Q Right. And as someone who has contended with violence, don't you think she has the right to share what she believes kept her safe?
MS. FARRELL: Objection.
THE COURT: Sustained.
Q I want to play you -- I am going to ask you to look at another clip.
A Please.
Q But before we do that, she also discussed labels. She does not want to live her life labeled as a victim. That was a big part of this discussion, right?

A Yes, she does not.
Q She doesn't want to, correct?
A Correct.
Q And she has communicated that, right?
A Yes.
Q And she's not saying you don't have to identify yourself as a victim, she's saying that doesn't work for me, right?
A I disagree.
Q Well, are you -- did she go over and make you identify as something?
A No, she did not physically walk over and make me identify as something.
Q Right.
You have free thought. You can identify the way you want, right?
A She's the leader of an organization, talking about her ideas and teaching them.
Q Right. Right.
And there's a lot of controversial figures in life who have unusual ideas, right?
A That is true.
Q You don't have to adopt all of them, do you?
A You do not.
Q Okay. That's called free will, right?
A That's what it's called.

Q Okay.

MS. BONJEAN: I'm going to ask that we play -- this is already admitted into evidence, Your Honor. The government introduced this entire hour and 20 minute discussion, and I think that was at -- let me get the right -- it's Government Exhibit 3875. And I'm going to play one portion, one clip in which we have identified or marked as Defense Exhibit 21-DG.

Q Now, we are not going to listen to the hour and 20 minutes. It's available. But do you recall when the government had you look at that clip where Ms. Daedone was talking about -- we are going to move some of that stuff out, my idea of victim, and then she talked about, is really the nascent invitation to learn the deeper power of surrender? Do you remember that?

A I remember.

Q Okay.

THE COURT: Let me just stop you for one moment, Ms. Bonjean. Just a very technical matter.

You are going to put in one clip. Do you want to be offering that as a separate exhibit?

MS. BONJEAN: Yeah, I think so.

THE COURT: Okay. I think that's probably easiest.

MS. BONJEAN: Yes. And that's why I marked it, Your Honor.

THE COURT: Okay. Just, you said 21-DG.

MS. BONJEAN: DG.

THE COURT: Right. Okay.

And I take it there's no objection because it's part of what was already in evidence.

MS. FARRELL: Correct.

THE COURT: Okay. So I will just admit Defense Exhibit 21-DG.

Go ahead.

MS. FARRELL: It may be helpful for the record if we have the time stamp.

MS. BONJEAN: The time stamp?

THE COURT: Yes. That would be helpful.

MS. BONJEAN: I think I do have it. Give me one second.

It is, I believe --

THE COURT: We can come back to that.

MS. BONJEAN: Yes. I don't know the exact time.

THE COURT: It will probably show up when you play it.

MS. BONJEAN: Probably. And, if not, I will get it.

THE COURT: Okay. Go ahead.

MS. BONJEAN: Are we ready?

(Video played.)

BY MS. BONJEAN:

Q Little more context, right?

A Very much so.
Q Okay. So, again, this is stemming from her own personal experience, right?
A Yes.
Q And, I mean, I have to unpack a lot what Ms. Daedone says. And she does speak in a particular way. And that's dense, right?
A I think so.
Q Okay. But you can gather from that that she's talking about it's not quite as simple as victim and perpetrator, right?
A She's talking about victim and perpetrator, and it's also -- it's this very complex thing that's happening, where then like these beautiful ideas become then being a perpetrator again. It's sad.
Q That's your interpretation?
A That is my interpretation.
Q Okay. Because that's the beauty of having free thought, right? You get to have an interpretation?
A Of what happened to me.
Q I'm not talking about what happened to you. I am talking about just her ideas, right? You could interpret what she said for yourself, right?
A Sure.
MS. BONJEAN: And let's pull up Defense Exhibit

21-J, as in "jam."

THE COURT: Is that part of the video?

MS. BONJEAN: That is at a different defense exhibit that has already been admitted into evidence.

Q We're going back to this release of liability form that you signed. And in connection with the coaching program, right?

A Right.

Q And Ms. Daedone's speech was part of the coaching program, right?

A It was.

Q And on the first page, if you pull out the --

MS. BONJEAN: Keith, if you can pull out the "I understand, acknowledge, and agree to each of the following."

Q And the first thing that you agreed to is that the content of the course is controversial, right?

A It just says: I understand and acknowledge. Yes.

Q And that the concepts, notions, ideas, suggestions, and recommendations from the sponsors of the course --

A The sponsors in this case are OneTaste, correct?

Q You signed it. What do you think it was?

THE COURT: Why don't you show her the whole document. She can't see the whole document. It's not on the screen for her. Maybe give her a paper copy.

MS. BONJEAN: Sure.

A I signed a piece of paper in 2013. I mean, it's a contract.

(Document handed to witness.)

A Thank you very much.

Okay. OneTaste is referred to as the sponsors. Thank you.

Q Okay. Yeah.

You signed it in 2013 because you're talking -- you're giving testimony about what happened in 2013, right?

A That's correct.

Q Okay.

A 2012. Excuse me.

Q 2012, 2013. Both, right?

And this document you signed that includes this assumption of risk that any concepts, notions, ideas, suggestions or recommendations from the sponsors and anyone acting on behalf of the sponsors, that I accept and/or apply to my life, I do of my own free will, right?

A That's what it says.

Q And I know you didn't actually watch the whole hour and 20 minute discussion recently, but there's no part of that that said, hey, you should look -- you should look at this the way I look at it, right?

A Disagree.

Q You think -- I mean, I don't think we want to listen to

an hour and 20 minutes of this, but it's your testimony that she said "and you should -- and you should adopt my perspective"?
A I don't know if she said that, those words or not, but I do know that the implication is that she's teaching a course, right, and so the ideas are we're absorbing these ideas and trying them out in our own way.
Q Right. And you don't just accept everything anyone's ever told you in the context of a course, right?
A No.
Q I mean, you were an educated woman back in 2013. You had a college degree, right?
A I did.
Q When you went to your college courses, you didn't agree with every single thing your college professors told you, correct?
A No. They were also not forcible with me at all.
Q Well, Ms. Daedone wasn't forcible with you either, right?
A Disagree.
Q Well, what did she do to force you?
A There was no physical force. There was no her standing in a doorway physically blocking me. These are all ideas. These are all --
Q You're saying --
A -- words.

Q -- she forced you by ideas? Is that your testimony?
A It's an interesting way to put it.
That's how brainwashing works, to me.
Q Okay. You went to a course that you signed up for, right?
A Freely. Yes.
Q A course you desperately wanted to participate in, right?
A Absolutely.
Q You sat there and listened to someone tell you about the way she processes her own, quote-unquote, trauma, right?
A Which are beautiful ideas.
Q Right. They are beautiful ideas.
And you decided to interpret it the way you wanted to, correct?
A Correct.
Q And that's your idea of force?
A That is not my idea of force. The force happens outside of the coaching program, when it's real life in living and working there.
Q Okay. We're focused on these words, though.
A Okay.
Q You testified that her words caused you harm, right? Do you remember you testifying to that?
A That's my belief.
Q Okay. And you didn't have to follow any of her words,

right?
A No one was physically --
Q It's a yes or no.
A -- making me do that.
THE COURT: Let her answer the question.
Q You didn't have to, right?
A I'm sorry, I didn't have to what?
Q You didn't have to buy into her teachings or beliefs, right? No one forced you to?
THE COURT: Just ask one question at a time, please, and let her answer.
What is the one question you want to ask, Ms. Bonjean? There were two there.
Q No one required you to say "I adopt this perspective that Ms. Daedone told me of this coaching program," right?
A I don't agree because there were -- I mean, we saw all this paperwork of actually agreeing to follow these ideas. So it's more muddy than that.
Q In fact, you signed the exact opposite in Defense Exhibit 21-J. Do you want to look at it again?
A Where am I looking?
Q You're looking at the assumption of risk and about -- yeah. We will just -- I will just -- why don't you read the fourth bullet point out loud.
A That while sponsors believe that the content of the

course to be valuable, sponsors do not guarantee it will solve any particular issue or problem I may have. I, alone, will decide and accept responsibility for how and what purpose I apply the content of this course.
Q Okay. Read the next one.
A That I may not agree with all the content of the course and accept that possibility.
Q And how about the next one?
A That the participants in the course may come from diverse backgrounds and hold belief and opinions different than mine.
Q How about the next one.
A That certain participants may make statements or take actions that I disagree with or find offensive.
Q And let's just do one more.
A That certain participants may disagree with or find offensive statements I make or actions I take.
Q Okay. So you assumed the risk, you signed that document, and laid out here is an acknowledgment that you might hear some ideas that really challenge your belief systems, right?
A I have no problem with this or any of the ideas.
Q I'd ask that you just answer the question, okay?
A Uh-huh.
Q You signed this document, which acknowledged that during the coaching program you might hear ideas that challenged your belief systems, right?

A Yes.
Q That's kind of one of the things that you signed up for when you got involved in OneTaste, right?
A Certainly.
Q And you've even acknowledged here that Ms. Daedone's speech was a little more complex than just like rape is good, victim's not good, or anything like that, right?
A Of course.
Q Okay. Now, you can put that aside if you want.
I assume you believe in the proposition that in this country we should be able to express controversial ideas, right?
A I do.
Q Now, you discussed your --
MS. BONJEAN: I don't know, Your Honor, if you want to put the lights up. I'm done with the --
THE COURT: Yes, I think we should. Thank you.
Q So you testified about how things came to a point and you wanted to -- you wanted to stay involved with OneTaste, but you wanted to go back to -- you wanted to go to San Francisco, right?
A Right.
Q And you testified yesterday, I think it was yesterday, that, you know, you were welcome back and they -- Justine Dawson was pretty helpful, right?

A Yes.
Q And then I think shortly thereafter you were -- you left your position in the sales arena, right? Or was that before you left? I wasn't clear on that.
A I requested to be terminated, and that's when my time doing sales ended.
Q And you said you requested to be terminated so you could get severance, right?
A So I could get severance and unemployment, yes.
Q Right.
A And I discussed that openly with Rob Kandell.
Q Right. And he obliged, correct?
A Yes, he did.
Q Didn't have to oblige, right?
A No, he did not.
Q You were on probation already, correct?
A That's right.
Q And you could have been fired for cause, right?
A Sure.
Q And they said, no, we'll make it so you can get your severance and you can still apply for unemployment, right?
A Yes. Which I appreciated.
Q And as part of your separation agreement or severance agreement, there was a section related to, you know, if there was any conflict, you could bring in arbitration. Do you

remember all that part of it?
A Not specifically, but I'm sure that's in there.
Q Let me see if we can look at it.
MS. BONJEAN: I think it's Government Exhibit 3766. I believe that's in evidence.
THE COURT: Yes. 3766 is in evidence.
Q Do you recall looking at this, Ms. Halpern, previously? The terms of your separation?
A Yes.
MS. BONJEAN: And if we can go sort of -- scroll to the end of this document.
Q Do you see paragraph 9 there?
A Yes.
Q Paragraph 9 relates to if there's any claim that you ultimately bring or brought against the company, that you would agree to arbitrate, right?
A Sorry. I'm still reading.
Q Sure. Take your time.
A Can you repeat your question?
Q You see there's this arbitration agreement that basically says, if there's any sort of claim you want to bring, a legal claim against this organization, you agree to arbitrate, right?
A I don't really know what arbitration means, to be honest.
Q Okay.

A That's what it says here.
Q Right.
Suffice it to say, you didn't invoke your right to arbitrate any claim, right?
A I did not.
Q Okay.
MS. BONJEAN: You can take it down.
Q Now, you previously testified that -- and just for, I guess -- the date of that, I think, I think you signed that February 7-ish of 2013? Does that sound about right?
We can bring it back up so we can look at the date. I apologize. I should have kept it up there.
MS. BONJEAN: Go to the last page.
THE COURT: It is on the header of every page, it looks like.
MS. BONJEAN: Right.
Q So the terms of the separation agreement, this was signed in and around February 7 of 2014, right?
A Yes. That's earlier than my memory. I wonder if I stayed a couple of weeks. I don't know. But, yes, that's what it's dated.
Q Okay. Hold on one second.
You testified that when you were parting ways, you had a text communication with Ms. Daedone, right?
A Yes.

Q And you also testified that during this text communication, she said "I release you," right?
A That's what I remember.
Q Okay. Were those her exact words?
A It's just from my memory. I don't have that text anymore.
Q Okay. By the way, you lead me to a good question I forgot to ask you.
You gave some text exchanges or e-mail over to the government, right?
A Correct.
Q But you didn't actually give your communications with Ms. Daedone to the government, right?
A I had deleted them.
Q Okay. So you deleted some, but kept others?
A That's right. I deleted the ones that I thought might be upsetting to look at.
Q Well, let's talk about whether this was actually upsetting to look at. I am going to have you look at --
MS. BONJEAN: Only for the witness, please, Defendant's Exhibit 21-EI.
THE COURT: DI, do you mean? I don't think I have an EI?
MS. BONJEAN: It is Defendant's Exhibit 21-I.
THE COURT: I have a DI that I was given today. Is

that it?

MS. BONJEAN: Yes. Correct.

THE COURT: Go ahead. 21-DI. And you want to just show it to the witness.

A If you can zoom in.

Q Yes. I will do my best, and I have a paper copy in case. You can --

A Great. Thank you.

Q And let me know when you have had a chance to read through it.

A Okay.

Q She never said "I release you," did she?

A Yeah, it was a misquote. What I was remembering --

Q Hold on.

A Oh.

Q She never said that, right?

A Right. What she said was "I will release your" -- "I will reset your compass." That's what I was remembering as "release."

Q Right.

She said, I will -- she didn't say "I will reset your compass." That's not what she said, right?

A It says: I will reset your compass. Toward the bottom.

Q What did she say before that?

A Thank you for your service. It has been much

appreciated. I will reset your compass. Best of luck.
Q And you told her you loved her, didn't you?
A It's because I did.
Q And she said maybe your purpose is music, right?
A She did.
Q She said, maybe it's not orgasm, maybe it's music, right?
MS. FARRELL: Objection, Your Honor. Hearsay. The defendant's statements.
THE COURT: Sustained.
MS. BONJEAN: I didn't even hear the basis.
MS. FARRELL: Hearsay.
THE COURT: Hearsay as to the defendant's statement. But you can ask another question.
Q It was actually a very lovely exchange, wasn't it?
A I don't know that I would characterize it that way.
Q Well, she wished you well, right?
A Yes.
Q She basically and generally said --
MS. FARRELL: Objection, Your Honor.
MS. BONJEAN: Well, I mean, Your Honor, it's contradictory to what she testified to.
THE COURT: You can ask questions. Continue. Overruled. Continue.
Q She thanked you for your work at OneTaste, right?
A Yes.

Q She asked you to share what you were feeling, right?
A Yes. She said, what shifted in you.
THE COURT: Well, I don't want the witness reading from something that's not in evidence. But you can certainly ask her the questions.
Q Just if you -- just answer my questions.
I am speaking generally because I can't quote directly from it.
A Uh-huh.
Q But would you agree that she asked you, like, what's going on? How are you feeling? Or what -- you used the word "shifted," but she asked you about what was going on for you, right?
A Right.
Q She gave you some words of encouragement, didn't she?
A I don't know exactly what you are referring to.
Q She told you to use your energy in another way, right?
A She said maybe -- yeah. Maybe that's the way to go, kind of thing.
Q And that was your passion for music, correct?
A Yeah.
Q And you basically said, I still have orgasm in my bones forever, right?
A There's a lot here. Yeah. Perhaps.
Q You said you never wanted to lose that, right?

A I did -- yeah. I didn't.
Q Okay. And you said, I love you, right?
A And I did.
Q Okay.

MS. BONJEAN: You can take that down.

If I can have one second, Your Honor.

THE COURT: Yes.

(Short pause.)

MS. BONJEAN: I have nothing further.

THE COURT: Any redirect examination?

MS. FARRELL: There is, Your Honor. If I may just have a moment.

THE COURT: Yes.

(Short pause.)

MS. FARRELL: Sorry, Your Honor. I want to pull up a copy of that exhibit we just saw, for the witness, please.

THE COURT: Defense Exhibit 21-DI?

MS. FARRELL: Correct.

THE COURT: Okay.

MS. FARRELL: Thank you.

THE COURT: Just for the witness, right?

MS. FARRELL: Yes.

REDIRECT EXAMINATION

BY MS. FARRELL:

Q So I just want to ask you a few follow-up questions about

this, Ms. Halpern.
A Okay.
Q I believe when Ms. Bonjean was asking you and described it as like a lovely exchange, you said I don't quite see it that way.
Can you explain?
A Yes. The reason I keep getting upset is because I did love these people very dearly, and there can be love, and there can be admiration, and there can be respect and all those things. And also a great deal of darkness and abuse. Those things existed concurrently. So I don't -- what I am saying is, yes. All of this is absolutely true. She said kind things to me, and it was in one sense a lovely exchange. What is so sad and dark underneath it is that there was this other side to it of this hatred and abuse that also happened. They are both true.
MS. FARRELL: If we can switch to the Elmo, please.
Q So Ms. Bonjean, and I believe Ms. Cohen, too, referred to this Exhibit 21-J, the release of liability form.
Just a very brief question. What are the dates of the release?
A September 7, 2012 to September 9, 2012.
Q Just factually, this is a narrow date range; is that correct?
A Correct. It's two days.

Q Ms. Bonjean and Ms. Cohen also asked you about a speech you gave at the end of CP6 in which you talked about cancelling your bank account. Do you know what I am talking about?
A I do.
Q And you listened to that today, right?
A Yes.
Q And there was a part of it that wasn't covered that I would like to cover with you?
A Sure.
Q Did you also say that people stopped talking to you once you didn't pay the thousand dollars?
MS. BONJEAN: I am going to object because --
THE COURT: What's the basis? Just ground.
MS. BONJEAN: This is hearsay.
MS. FARRELL: It's a rule of completeness, Your Honor.
THE COURT: Sustained -- excuse me. Overruled.
MS. BONJEAN: There was no --
THE COURT: Overruled.
MS. BONJEAN: We didn't get to put it in.
MS. FARRELL: Thank you.
Q Did you also say that when you withdrew the thousand dollars --
THE COURT: Let me just stop. There was questioning

on this during cross-examination, correct?

MS. FARRELL: Exactly, Your Honor.

MS. BONJEAN: There was questioning by impeachment. But we didn't -- she's referencing things we didn't -- we didn't get to put the whole thing in.

THE COURT: Correct.

Overruled.

MS. FARRELL: Thank you, Your Honor.

Q In your speech, did you also say that when you withdrew that 1,000 -- or stopped that $1,000 payment, people at OneTaste stopped talking to you?

MS. BONJEAN: I am going to object, Your Honor. This is not proper rehabilitation. The jury should be able to hear --

THE COURT: Excuse me. Excuse me.

Overruled.

You may continue.

A Right. In that clip that I watched, yes. What happened was, when I took that -- when I stopped the bank account and got scared and didn't -- and couldn't pay and didn't want to pay anymore, yes, I said that Rachel stopped texting with me and I -- like I wasn't hearing from anybody from OneTaste anymore.

To be clear, they weren't like shunning me, it was just a tactic that they used to take away attention from

somebody when they're resisting.

MS. BONJEAN: Object. It's the state of mind of these --

THE COURT: Sustained.

Q When you worked in sales at OneTaste, did you use a technique of taking attention away from someone in order to tempt them into reengaging?

A Yes, I did.

Q Okay. And who did you learn that tactic from?

A From Rachel.

Q So the defense also showed you Defense Exhibit 21-L. I'm showing you it on the Elmo, dated January 28, 2013. Do you see that?

A I do.

Q And this was -- it sort of outlined the financial agreement?

A Right.

Q And it discusses the rebates received?

A Yes.

Q So at this point in 2013, January 2013, had you already made a number of substantial payments towards CP5?

A Oh, that makes sense. I was wondering. Yes. Yes.

Q So what do you mean it makes sense?

A I was wondering what these rebates were. I was confused by that.

Q And so having been refreshed on that, what do you believe it to be now?
A I am not entirely sure because I am not looking at all of it at once. But I think that probably includes payments that I had already made. It wasn't like just a discount.
Q Thank you.
Switching gears again, we looked at a bunch of photos today and yesterday while you were on cross-examination, correct?
A Right.
Q And a number of the photos we looked at were you with other CP6 students?
A Yes.
Q Was that your testimony?
A Right.
Q Now, while you were at CP6, were you an employee of OneTaste?
A Yes.

(Continued on the next page.)

REDIRECT EXAMINATION
BY MS. FARRELL: (Continuing)
Q Were all of the CP6 students OneTaste employees?
A No.
Q Were many of them simply OneTaste clients?
A Yes.
Q And you were on the sales team at the time; is that correct?
A Correct.
Q Was it part of your job to try to enroll these CP6 students into future courses?
A Hm. Good question.
Um, I'm not sure. Because I made the decision for myself that I wanted to try my best to kind of be a student when I was in the immersions and then be a salesperson outside of the immersions. There might have been some crossover. I'm not entirely sure.
Q Was it encouraged by OneTaste that the CP6 students socialize?
MS. BONJEAN: Objection, foundation.
THE COURT: Sustained.
Q Did you socialize with other CP6 students?
A Of course.
Q Including in the pictures that we saw?
A Absolutely.

Q I believe you testified that part of your job was to be a turned-on woman. Am I accurately stating that?
A Right.
Q And did that include your outward facing appearance to the world?
A Yes.
Q Was part of your job to post on social media?
A Yes. Very much.
Q Would you typically post -- what kind of photos would you post of yourself?
A Only the most turned on, happy. It was -- we were -- we were representations of people who are deep into OneTaste practice and so to show ourselves being happy and, quote, turned on was expected certainly.
Q And did that include that video, that sweet video we saw of you and your friends singing?
A Yeah.
Q Was that a parody of a song?
A Yeah. Yes, it was.
Q Do you recall what the song was that you were parodying?
A It was Blurred Lines.
Q And what is that song?
A It's funny in retrospect because it's about -- like, there's been a lot of discussion about that song being about, like, if you consent. It just happened to be that way. It's

ironic.
Q And was Margaret Pixley in that video with you?
A She was.
Q Have you spoken to Margaret Pixley in the last five years?
A No.
Q Ten years?
A No.
Q Since you left?
A No.
Q We looked at a number of disclosures and policies on cross-examination. How, if at all, did the various disclosures and policies differ from your reality at OneTaste?
A Right. There's what's on paper. There is, you know, whatever legalese is in like an Apple agreement or something that you're just signing and then there's the reality of what's actually happening in real life.
Q Which was what?
MS. BONJEAN: Objection. Vague.
THE COURT: Sustained.
Q What was the reality in real life as compared to the policies?
MS. BONJEAN: I'm going to object still on those grounds, foundation and vague.
THE COURT: Sustained.

Q Switching gears.
You testified you were happy? On cross.
A Yes.
Q You also testified that you were brainwashed?
A Yes.
Q How do those two things work together?
MS. BONJEAN: Objection. That calls for an expert opinions, I guess, but I think it's objectionable.
THE COURT: Sustained.
Ask your next.
Q So same premise, but I want to be clear that I'm asking from your perspective.
MS. BONJEAN: Same objection.
THE COURT: Overruled.
A Yes, I think those, those things are inextricably linked. Because I was -- I mean, I was so happy. Like, I loved it there. I loved my friends. I loved -- I loved Rachel. I loved Nicole. And so the happiness was real. And all those videos, like, that's what's making me emotional looking at it. It was nice. Like, I had a great time.
And what was -- the reason I left was not because I didn't agree with any of it or that the -- you know, what I signed was incorrect or anything like that. The reason I left was because I couldn't -- I couldn't withstand the berating and the sexual abuse and the emotional abuse and the

psychological abuse that was happening behind closed doors; that is not included in any of the things that I signed. That's the brainwashing.

So the happiness is part of the brainwashing. Right? Like, it's -- that's -- because people don't stay in places where they're not happy.

MS. COHEN: Objection, Your Honor.

MS. BONJEAN: Objection.

THE COURT: I'm going to sustain just the last comment.

Ask your next question.

MS. FARRELL: Thank you, Your Honor.

Q The sexual abuse and other -- I'm sorry, I don't recall exactly what your testimony was, but the --

MS. COHEN: Objection, Your Honor.

MS. BONJEAN: Objection, Your Honor.

MS. FARRELL: I'm just trying to follow up on her answer, Your Honor.

THE COURT: Just ask the next question.

Q The negative things that you just listed, how, if at all, did that affect your provision of labor and services for the company at the time that you were there?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A Let me just think on that for a second.

It's just, it's such a big -- it's just all kind of linked together.

I -- I mean, I think in some ways I was less able to do my job well because I was, you know, in those moments where things were really bad. I was so confused and unhappy. So that took away from, you know, being able to do my job. And also, at the same time, like I -- I started to emulate those things as well. Like, I started to -- you know, I definitely looked at what Rachel was doing, for example, and trying to kind of be like that because that's what I thought we -- you know, that's what we were kind of supposed to do.

Q And did what you described as, quote, brainwashing affect your willingness to provide work?

MS. COHEN: Objection, Your Honor.

MS. BONJEAN: Objection.

THE COURT: Overruled.

A Absolutely.

Q In what way?

A Because there were a lot of things -- there were a lot of things that I wouldn't have done that I -- that I don't believe to be ethical, that I wouldn't have done without that, what I'm calling, brainwashing.

Q You were asked questions about your prior job at the gym.

A Mm-hm.

Q And whether being at OneTaste was like the gym; is that

right?
A Right.
Q Or like yoga?
A Right.
Q So, focusing really on this concept of it being like the gym.
Did you have a boss at the gym?
A Yes.
Q Did your boss at the gym teach you spiritual philosophy?
A No.
Q Was your boss at the gym someone you viewed as a spiritual leader?
A No.
Q Was your boss at the gym someone you idolized?
A No.
Q Was your boss at the gym someone you said I love you to?
MS. COHEN: Objection, Your Honor.
THE COURT: Basis?
MS. COHEN: Relevancy.
MS. BONJEAN: Relevance.
THE COURT: Overruled.
MS. BONJEAN: And leading.
THE COURT: Overruled.
Q Was your boss at the gym someone you said I love you to?
A No.

Q Did your boss at the gym tell you to make out with certain people?

MS. COHEN: Objection.

THE COURT: Overruled.

A No.

Q Did your boss at the gym rub your genitals without your permission?

MS. COHEN: Objection.

MS. BONJEAN: Objection.

THE COURT: Overruled.

A No.

Q Did your boss at the gym call you a virus?

A No.

Q Did your boss at the gym ever instruct the rest of the staff at the gym to ignore you?

A No.

MS. FARRELL: No further questions, Your Honor.

THE COURT: I will allow brief recross-examination, if there is any.

RECROSS-EXAMINATION

BY MS. COHEN:

Q Ms. Halpern, you never heard the term "rubbing your genitals" when you were at OneTaste, correct?

A No, I didn't.

Q It was called stroking, correct?

A By OneTaste. In the OneTaste parlance.
Q Yes. OneTaste cold it stroking, right?
A Correct.
Q The Government calls it rubbing, correct?
THE COURT: No, you missed the answer. I think you were too busy asking your next question. You missed her first answer to the question you asked.
Q OneTaste used the term "stroking," correct?
A Right.
Q The Government used the word "rubbing," correct?
A A lot of people called it that.
Q At OneTaste, they called it stroking, correct?
A Right. That's the --
MS. FARRELL: Objection. Asked and answered, Your Honor.
THE COURT: Overruled.
Q Right?
A That was the correct -- the OneTaste correct way to say it, yes.
Q In fact, you met -- we talked about this yesterday.
You met with the Government over ten times before you testified today, right?
A Right.
Q And during the time that you met with them, they took your -- they took notes, right?

A Sure.
Q And you never used the term "rubbing," correct?
A I don't remember. I don't know.
Q Rubbing -- sorry.
"Stroking" was a term used at OneTaste, right?
A Yes.
Q Okay. You testified that you were -- you felt you were brainwashed, right?
A Yes.
Q And you also met with the Government, again, on countless times in this case, right?
A Not countless, but I don't know how many.
Q Well, at least 11 times, correct?
A I don't know, but many.
Q Well, we can...
You said yesterday you met with them in 2018, correct?
MS. FARRELL: Objection, Your Honor. We're getting outside of the scope. The recross should be focused on --
THE COURT: I will allow this question, but you do have to keep it to the scope redirect. I will allow this question and we'll see where it goes.
Q The Government met with you over and over and over again, correct?
A I met with the Government.

Q And during this time, you did not -- the first time you met with the Government, you didn't tell them you were brainwashed, correct?
A The first time I met with them?
Q Yes.
A I don't recall what I said in that meeting specifically to brainwashing.
Q Well, you met with them back in 2018, right?
A Yes, I did.
Q And that was closer in time to the events that we're talking about, right?
A Yes, I did.
Q And you also met with them in August of 2022.
Do you remember that?
A When they walked through my door and said FBI, I said of course you're here, come on in.
MS. BONJEAN: Objection.
Q That wasn't my question.
MS. COHEN: Move to strike.
Q The question was, you met with --
THE COURT: Give me one moment, please. You've got to wait.
I will strike that answer. Ask your next question.
Q You met with them in March of 2023?
A I don't remember specifically what dates I met with them,

but sure.

Q You met with them in 2024, November, right?

A I've met with them consistently from 2018 to now, yes.

Q So as I said, many times, right?

A Correct.

Q And you didn't use the term "brainwashing" while you were meeting with the Government, correct?

A I don't know if I used it or didn't.

Q Now, you testified today about being forced to do certain things, right?

A Yes.

Q And you had testified earlier about being instructed to make out with a colleague.

Do you remember that?

A I do.

Q And the Government asked you what would happen if you didn't, right?

A Yes.

Q And you testified --

MS. FARRELL: Objection. I don't think that was the redirect.

THE COURT: Are you referring to something that was not on cross-examination but on direct examination?

MS. COHEN: I'm referring to on the redirect just now.

THE COURT: Sorry. The redirect, okay.

MS. COHEN: Yes.

I'm referring to the redirect about being forced. And I'm referring --

THE COURT: Go ahead.

MS. COHEN: -- to her prior testimony about whether she was forced to do something.

THE COURT: Go ahead. You can ask the question.

Q And right in your testimony previously you said to answer that, that it would be a long conversation, correct?

A I'm sorry, I'm a little lost. Can you start over?

Q You said today, you were talking about various things that you were forced to do. Right?

A Yes.

Q And you also had previously testified that you were forced to make out with a colleague. That was one of the things?

A No. I testified that Rachel said: You should go make out with Ruwan.

Q Okay. And the Government had also asked you what would happen if you didn't do that?

A Right.

Q And you testified that it would be a long conversation, right?

A That's one of the things I said, among many other things.

Q And you were asked several questions about what happens at the gym and what happens with yoga, right?
A Yes.
Q And again here, towards the latter half of OneTaste, you were trying to learn to be a coach, right?
A Yes.
Q You wanted to coach other people on OM, correct?
A Right.
Q And in order to be able to do that, you have to take it to the next level; isn't that right?
A I don't know what you mean by "next level."
Q Let me rephrase that.
You have to do things that are more intense than your average person who comes in to learn how to do OM, right?
A I don't think that's a prerequisite for OM coaching.
Q So that anyone who comes in and takes an introductory course at OM could then go and be a coach?
A No. Anyone who takes the coaching program can be a coach.
Q Correct.
And after you graduate from the coaching program, right, you can become a coach?
A Yes.
Q And in order to lead as a coach, you have to actually have some more -- even more intensive work, correct?

A I don't know what you mean by "intensive work."
Q Well, you have to be able to handle a wide variety of situations?
A Sure.
Q Right? Right?

These OM demonstrations, as you already testified before, can create all kinds of emotions, right?
A Like being stroked without one's consent? I don't know what you're referring to.
Q That's not what I was referring to.

THE COURT: I think the questions --

MS. FARRELL: My objection is scope again.

THE COURT: Yes.

MS. FARRELL: I think we're way past redirect.

THE COURT: Yes. I'm going to sustain the objection.

I also think your questions just are, frankly, not clear. I think you need to ask some clear questions so that the witness could answer.

MS. COHEN: I'd also instruct Mr. Paralegal here not to be commenting.

THE COURT: I don't think you instruct anybody anything.

MS. COHEN: No, I'm asking you. Because he's looking back and making comments.

THE COURT: You know what, ask your next question or this will be over.

MS. COHEN: Okay.

Q In February of 2014, you signed a severance. February 7th. We saw that just earlier.

A Yeah.

Q And you also talked about posting things in order to make sales, right?

A Yes.

Q And you posted -- we talked about your hub post, the OM Hub post, on February 2nd of 2014, right?

MS. FARRELL: Objection, Your Honor. This is not within the scope of the redirect at all.

THE COURT: Yes. Sustained.

MS. COHEN: Your Honor, it was about the posts that were made.

THE COURT: Sustained.

Q You continued to post while you were at CP6, correct?

You posted while you were at CP6?

A Yeah.

Q And you posted after that as well, correct?

A Of course.

THE COURT: Are you done, Ms. Cohen?

MS. COHEN: Yes.

THE COURT: Okay. Ms. Bonjean, do you have any

recross?

RECROSS-EXAMINATION

BY MS. BONJEAN:

Q You don't have a scientific term for brainwashing, do you?

A What does that mean?

Q Do you have a definition for the word "brainwashing"?

A Do I have a definition?

Q Can you provide me with an accepted definition for the word "brainwashing"?

A I can provide you with my own definition.

Q I'm not interested in your own. I'm interested in an accepted definition of the word "brainwashing." Do you have one to provide?

A I'm not claiming to be an expert.

Q Okay. So this is just you using it for, like, your -- you know, to make a point, right?

A I'm saying that's my understanding and that's my experience.

Q Right. But again, just based on your own definition that none of us know what that is, right?

A I think it's a common word that people understand.

Q Is it?

I mean, what's -- then I'll go back to my original question: What is the definition of brainwashing?

A And I'll say again: I'm not claiming to be an expert.
Q So you don't have a definition for the word "brainwashing," right?
A Do you want my definition?
Q I want to know if you have an accepted, widely-accepted definition for the word "brainwashing" to provide us.
A We're just repeating the same.
Q So that's a no?
A A no to what question?
Q Whether you can provide us with an accepted definition of the word "brainwashing," meaning accepted amongst the public and all of us here in this room, other than your personal definition.
A No. What I can provide is my own personal definition, yes.
Q And what you've described to us is that after -- well, strike that.
How many times do you think you OM'd during your three and a half years at OneTaste?
A Many.
Q Many, right? Tons, correct?
A Of course.
Q And you loved it, right?
A Depends what OM you're talking about.
Q I'm talking about the practice of OM that you learned and

embraced. You enjoyed it, right?
A There were many OMs that I enjoyed and many that I did not.
Q And you now look back and you regret your time, at least in part, at OneTaste, right?
A That is a big oversimplification.
Q Is that a yes?
A No.
Q So you don't regret it?
A No, I actually don't regret it.

MS. BONJEAN: Okay. No further questions.

MS. FARRELL: Nothing further.

THE COURT: Okay. The witness is excused.

THE WITNESS: Thank you.

Thank you, Your Honor.

(Witness steps down.)

THE COURT: Government, call your next witness.

MR. FERN: The Government calls Christopher Hubbard.

THE COURT: Sir, you can just walk up here.

(Witness takes the stand.)

THE COURTROOM DEPUTY: Please step up. Remain standing. Raise your right hand.

(Witness sworn/affirmed.)

THE COURTROOM DEPUTY: Please be seated.

State your full name for the record. Spell your

last name slowly. Please talk into the microphone. Thank you.

THE WITNESS: My name is Christopher Hubbard. That's H-u-b-b-a-r-d.

THE COURT: Good afternoon.

Mr. Fern, are you ready to proceed?

MS. FARRELL: May I just approach the board, Your Honor?

THE COURT: Yes.

MR. FERN: Yes, Your Honor.

And before we begin, I believe the parties have agreed to several pieces of evidence to move into evidence.

THE COURT: Give me the numbers, please.

MR. FERN: Government Exhibits 380 --

MS. BONJEAN: I'm sorry. Can we wait one second just to make sure? Because I'm not sure --

THE COURT: Yes.

MS. BONJEAN: One second. I'm sorry.

(Pause in proceedings.)

MS. BONJEAN: You can go ahead.

MR. FERN: 380, 208, 207, 61, and 236.

MS. BONJEAN: 36?

MR. FERN: 236.

THE COURT: So the Government is offering those five exhibits.

Is there any objection?

MR. ROBOTTI: No objection, Your Honor.

MS. BONJEAN: No objection.

THE COURT: So Government Exhibits 380, 207 -- excuse me. Let me start again.

380, 208, 207, 61, and 236 are admitted.

(Government Exhibits 380, 208, 207, 61, and 236 received in evidence.)

THE COURT: You may proceed.

MR. FERN: Thank you.

**CHRISTOPHER HUBBARD,** having been first duly sworn/affirmed, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. FERN:

Q Can you please state and spell your full name for the record?

A My full name is Christopher, C-h-r-i-s-t-o-p-h-e-r.

Q And your last name?

A Hubbard, H-u-b-b-a-r-d.

Q Do you know someone named Nicole Daedone?

A I do.

Q How do you know Nicole Daedone?

A We were involved in the same organization for a couple of years a while ago.

Q What organization is that?

A OneTaste.
Q And when was the last time you saw Nicole Daedone?
A Yesterday. Briefly.
Q And before yesterday, when was the last time?
A Like 15, 16 years ago.
Q Do you know someone named Rachel Cherwitz?
A I do.
Q How do you know her?
A Also from OneTaste.
Q What other names, if any, did you know her by?
A When she was at OneTaste, I knew her by Raheli or Heli as a -- what's the phrase -- just a sweet way to say the same name.
Q And when was the last time you saw Rachel Cherwitz?
A Over 15, 16 years ago.
Q During what period of years were you involved in OneTaste?
A Approximately in 2006/2007 through 2009. There's a lot of "ish" on that.
Q Understood.
At the time you were at OneTaste, how, if at all, did Nicole Daedone describe it?
A A whole myriad of ways.
The very first description was it was kind of like a Buddhist, meditation, sexuality, female empowerment kind of

thing. And that's what hooked me.

And then there were a variety of other descriptions and permutations after that.

Q Like what?

A The most, I guess, poignant one would be as a sex cult.

MR. ROBOTTI: Objection.

MS. BONJEAN: Objection.

Q He described --

THE COURT: The question --

MS. BONJEAN: There's no foundation.

THE COURT: Excuse me.

Let me look at the question again. Give me one moment.

The question that you had originally asked is: At the time you were at OneTaste, how, if at all, did Nicole Daedone describe it?

MR. FERN: Yes.

THE COURT: Is that the answer that is being given at this time?

MR. FERN: He said there are a myriad of ways.

THE COURT: Yes.

MR. FERN: He gave one way.

I asked what other ways.

THE COURT: Okay. And he is still describing...

MR. FERN: The same answer to the first question.

THE COURT: Then overruled.

MS. BONJEAN: He said "permutations," Judge, so I'm objecting on foundation.

THE COURT: Okay. Sustained on foundation.

You can ask another question.

BY MR. FERN:

Q During your time at OneTaste, what role did Nicole Daedone play at the company?

A Primarily, she was the leader of OneTaste.

Q And during your time at OneTaste, what role did Rachel Cherwitz have at the company?

A Initially, when she joined, she was like most the rest of us, just a member of OneTaste.

And eventually, she was in charge of the New York center and then in charge of like -- I don't know if in charge of, but she was involved in enrollment of some of the programs.

Q And what is your current affiliation with OneTaste?

A I have no affiliation with OneTaste.

Q When you first became involved in OneTaste, what was the highest level of education you had completed?

A Some college.

Q Where were you living when you became involved in OneTaste?

A I was living in Albany, California, which is in the

East Bay, which is east in the Bay Area, just kind of east of San Francisco.

Q And what had brought you to that area?

A I was on the end of a divorce and my then ex-wife wanted to move to the Bay Area. And the part of the divorce decree agreement was that I would support the family's move to the Bay Area, so I went to Albany and got a house for them to move into.

Q How old were you at the time, approximately?

A Wow. Early forties, probably.

MR. FERN: One second.

Q And what were you doing for work at the time?

A I was a -- I believe my title was senior developer, for a small tech company that was doing mailing, postage kind of things for corporations.

Q And can you describe how you first became involved in OneTaste?

A I would go out to social events in the area and people would ask me what I was looking for. And I told them what I was interested in and a lot of people recommended OneTaste, so I went to an event they had. I think it was called The Garden of Central Delights or something along those lines. It was a dinner with women on tables being -- and sushi was put on. And that was the dinner that us guests paid for.

Q What year was that?

A I don't remember exactly. I would guess 2006.
Q And how did your progression with OneTaste evolve from there?
A In the bathroom they had a little flier that talked about 16-minute orgasms, which was something that I was interested in from different activities I had done in my past. And eventually -- I don't know if I went to one of those demonstrations or I went to an in-group, but I started attending some of the programs and liked -- really, really liked what I saw.
THE COURT: I'm sorry. I missed a word. You said something before "group". What was the word?
MR. FERN: He said in-group.
THE COURT: I-n?
MR. FERN: I-n.
THE COURT: Okay. Go ahead.
Q Mr. Hubbard, how, if at all, are you familiar with orgasmic meditation?
A Orgasmic meditation is one of the activities or, arguably, the primary activity around female sexuality and female orgasms that OneTaste was proposing or promoting as one of, like, its core value.
Q And what is orgasmic meditation?
A So, it's changed since I last was involved. So what it was, because I don't know what it is --

Q What was orgasmic meditation at the time that you were involved in OneTaste?
A At the simplest level, it's one person stroking a woman's clitoris for 15 minutes and you basic -- you sit on her right side and you stroke the upper-left quadrant of her clitoris.
And it's -- I can get into more detail if you want.
Q That's okay.
What role, if any, did orgasmic meditation play at OneTaste throughout your time there?
A It was kind of central. Pretty much every morning we would do two OMs as a group with each other. One of the core workshops -- I don't know if "core" is the right word, but one of the workshops they offered was a workshop about OMing. And then it was something that as a community we would do with each other during the day if we wanted to.
Q When did you first meet Nicole Daedone?
A So, I've got two memories of meeting Nicole and I don't know which one came first.
One of them was in the foyer of the warehouse and she was sitting, talking with Kevin Kanarek (ph.) and they were discussing what it was like --
MS. BONJEAN: I'm going to object on hearsay, potentially.
THE COURT: Overruled.
Q You can answer.

A Okay. They were talking about the dynamic of --

THE COURT: Let me -- I think you're going to have to ask a specific question.

Q The question was: When did you first meet Nicole Daedone?

A Okay. She was having a conversation in the foyer of the warehouse or in an around the center, which was just a couple of doors down. I don't remember which one came first.

MS. BONJEAN: Objection. Nonresponsive.

THE COURT: Overruled.

Q Where was this?

A In San Francisco.

MS. BONJEAN: And objection on foundation.

THE COURT: Overruled.

Q At the time you first met Nicole Daedone, what, if anything, was her association with OneTaste?

A She was basically the leader of OneTaste. She and Rob Kandell were more co-leaders when I first started. At least that's what it felt like to me. And then -- yeah.

Q You mentioned Rob Kandell. I'd like to show you a series of photographs that are already in evidence.

MR. FERN: Mr. McNett, can you bring up Government Exhibit 221.

(Exhibit published.)

THE COURT: Mr. D'Agostino.

THE COURTROOM DEPUTY: Yes.

THE COURT: The witness is asking for water.

THE WITNESS: Is that okay?

THE COURTROOM DEPUTY: Yes.

THE COURT: Go ahead.

BY MR. FERN:

Q If you look at your screen, Government Exhibit 221 should appear.

A Mm-hm.

Q Who is that?

A That's Rob Kandell.

Q And what was Mr. Kandell's role at OneTaste at the time that you were there?

A He was either co-leading with OneTaste or he was Nicole's close second.

Q I'd like to show you what's in evidence as Government Exhibit 380.

(Exhibit published.)

Q Do you recognize this picture?

A Yes. That's Ken Vanosky.

Q And what was his role at OneTaste at the time that you were there?

A As I understood it, he was the CFO.

Q And I'd like to show you what's in evidence as Government Exhibit 207.

(Exhibit published.)
Q Do you recognize this person?
A Yes, I do.
Q Who is that?
A Chris Kosley.
Q And what is Mr. Kosley's role at OneTaste at the time you were there?
A When I was there, he was just another resident of OneTaste.
Q I'd like to show you now Government Exhibit 208, which is in evidence.
(Exhibit published.)
Q Do you recognize this person?
A Yes, I do.
Q Who is it?
A Christina Berkley.
Q And what was her role at OneTaste at the time that you were there?
A Also a resident.
Q Do you see Nicole Daedone in the courtroom today?
A Yes, I do.
Q Can you describe her by an article of clothing that she is wearing?
A She is wearing a -- it looks like a nice caftan throw and she's standing to your right.

MR. FERN: Your Honor, I'd ask the record reflect that the witness has identified the defendant, Nicole Daedone.

THE COURT: Yes.

Q Mr. Hubbard, I had asked you earlier how Nicole Daedone had described OneTaste to you at the time that you were there.

How did she describe OneTaste at that time that you were there?

MS. BONJEAN: Objection to the foundation.

THE COURT: Overruled.

A Again, she -- the -- what the description of -- or the -- how we interacted with or viewed OneTaste changed while I was there. Initially, it started as this exploration of what is spirituality and sexuality.

Q How else did she describe OneTaste?

A And then it --

MS. BONJEAN: Foundation.

THE COURT: Overruled.

MR. ROBOTTI: Objection. Time period.

THE COURT: I'm sorry, I didn't hear you.

MR. ROBOTTI: Time period.

THE COURT: Oh. Do you want to ask another question.

Q How else, at the time that you were at OneTaste, did Nicole Daedone describe OneTaste?

MR. ROBOTTI: Same objection.

MS. BONJEAN: Same objection.

THE COURT: Overruled.

Q You can answer.

THE COURT: You can answer. "Overruled" means you can answer.

THE WITNESS: Okay.

A Eventually, one of the ways that it was -- Nicole described it and we all described it was it was a sex cult. We said that in public.

Q And what did you take that to mean?

A Honestly, mostly, it was -- my -- how I took it to mean, it was mostly just a way to get a rise out of the people that we met.

Q In what way?

A It's kind of a controversial statement.

Q Do you see Rachel Cherwitz in the courtroom today?

A Yes, I do.

Q Can you describe her by an article of clothing that she is wearing?

A Yeah. She's got a black blazer on.

MR. FERN: Your Honor, I ask that the record reflect that the witness has identified the defendant, Rachel Cherwitz.

THE COURT: Yes.

Q Mr. Hubbard, did there come a time when you began living

with other OneTaste community members?
A I'm sorry, can you ask the question in a different way?
Q Are you familiar -- how, if at all, are you familiar with something called the Warehouse?
A When I moved into OneTaste, which basically meant I had a bed in the warehouse and everyone who'd been living residentially in the Center also moved the Warehouse.
Q What is the Warehouse?
A The Warehouse was a large building down the street from the Center. Big, open floor plan with a mezzanine deck that we built above the back end of it. And it had a, kind of an upstairs area near the front.
Q And what, if anything, was the process to move the Warehouse?
A Well, there was a process to be invited into the community and then you would end up in the Warehouse after that. The process -- if that's what you're asking about.
Q I had just asked about the process to move into the Warehouse at this point.
A So getting moved into the Warehouse basically meant I was invited into the community and then I would be assigned a bed in the Warehouse.
Q I would like to show you what has been marked as Government Exhibit 61, which is in evidence.
(Exhibit published.)

Q Do you recognize this?
A For the most part, yeah. I mean, the construction's been moved on since then.
Q What is this?
A This is a picture of a section of Folsom Street, looking north, in San Francisco. It's not all of Folsom, that section of the block. There's two alleyways, one to the left between the green building and the brown building, is all the way far left. And then there's another alleyway which is off-picture.
Q What are these buildings that are depicted in the photograph?
A Starting from the far left is what eventually became known as the Hotel, which was after my time.

The green building, which used to be kind of a purple color, is the Center.

The gray building that you can see there is an apartment, that you can see above the dumpster that's on the picture.

And then below that is the area that we called the Massage Studio or the Yoga Studio, depending on the time frame.

The next building over is -- it's got a label on, Extreme Pizza. And for a while we had control of the bottom two floors. We didn't really do anything with the bottom floor, but on the middle floor or the second floor we had a

residential and a conference room or classroom.

And then the next building over, which is mostly obscured by a Ginkgo tree, is the Warehouse, the entrance of the Warehouse.

(Continued on the next page.)

BY MR. FERN:

Q Approximately how long after your initial introduction to OneTaste did you move into the Warehouse?

A Three to six months.

Q During your time living at the Warehouse, where was Nicole Daedone living? When you first moved into the Warehouse, where was Nicole Daedone living?

MS. BONJEAN: Objection to the time the year even, please.

THE COURT: Overruled.

A When I first moved into the Warehouse, Nicole was living in the Warehouse or had a bed there.

Q When, if ever, did that change?

A At some point she moved out and I don't know where she moved to, it was assumed in the community that she was moving in with Reese Jones but I never saw that.

MR. ROBOTTI: Objection to assumed.

THE COURT: Sustained. I'll strike that answer.

BY MR. FERN:

Q While you were at OneTaste, what positions, if any, did you hold?

A Eventually I was given the title of CTO.

Q What is that?

A Chief Technology Officer.

Q What were some your duties as Chief Technology Officer?

A Primarily working on the web and Internet related kind of stuff, and doing some audio visual help -- not visual, just audio help with the podcast that we were doing.
Q What was the importance, if any, of that position?
A To OneTaste or to me? To me to felt great to be acknowledged. I don't know that I contributed greatly to OneTaste.
Q What did you understand the importance of that position to be to OneTaste?
MS. BONJEAN: Objection.
THE COURT: Overruled.
A They had, I was basically being paid full-time to work on lots of projects mostly around tech, but not all around tech.
Q At the time that you were working as the Chief Technology Officer at OneTaste, did you have any other outside employment?
A No.
Q While you were living at the Warehouse, what process, if any, was there for bringing people into the OneTaste community?
A If somebody wanted to live at the -- if somebody wanted to be a resident in the community, like me, I went through this process, there would be a community meeting in the center, upstairs in the center. And whoever was around,

which was usually most of the community at the time, would sit in a kind of a horseshoe circle kind of thing, I would be at the head of it. They would ask me any questions that they wanted. That would go on as long as it would go on. And then I would be asked to walk around the block and they would sit around and confer with each other, kind of like you all are doing now. And if anybody in the community didn't want me there, it would be a no and I wouldn't be invited in. If everybody unanimously agreed, then I would be invited in.

Q What sorts of questions were asked of you when you joined?

A Honestly, I don't remember what was asked of me. I was way too aggravated.

Q Who, if anyone, ran the screening process?

A Generally Nicole.

Q How if at all are you familiar with the term research partners?

A Research partner was a phrase that we used in OneTaste to describe the pairings that were in place. So I would be like, I'm now so and so's research partner. We would share a bed, typically we would OM together but not necessarily. The intent, as I understood it, was relationships can be messy and we're trying to research what it's like to be in a relationship.

Q Besides OMing were there any other expectations of research partners?

MR. ROBOTTI: Objection.

MS. BONJEAN: Objection.

MR. ROBOTTI: Foundation.

THE COURT: Sustained.

BY MR. FERN:

Q What, if at all -- what else did you do, if anything, with your research partner?

A It depended on my research partner. It depended on who the research partners were. So in my case specifically, with most of my research partners I also was a lover, we would engage in other sexual activities in addition to OMing.

Q During your time at the Warehouse how many research partners did you have?

MS. BONJEAN: Objection. Relevance.

MR. ROBOTTI: Join.

THE COURT: Overruled.

BY MR. FERN:

Q More than --

A More than six.

Q How did you receive a research partner?

A Generally they would tell me at some point during the day that they were now my research partner.

MR. ROBOTTI: Objection to "they."
THE COURT: Yes, sustained.
BY MR. FERN:
Q Who would tell you -- who, if anyone, would assign you a research partner?
A It was my understanding that Nicole would be.
MS. BONJEAN: Objection to --
THE COURT: Overruled. Let him finish the answer.
A My understanding is that Nicole would assign the research partners.
MS. BONJEAN: Objection to the understanding.
THE COURT: Overruled. Overruled. Next question.
BY MR. FERN:
Q How, if at all, are you familiar with the term bridge walking?
A Bridge walking was a term that we used kind of idiomatically. It wasn't a formal thing. It was a conceptual idea. There is somebody who isn't inside of the community of OneTaste, we want to bring them in. And somebody or somebodies could be assigned to bridge walk them. You would look for any of the obstacles in the way of their path into OneTaste and try to help them through.
Q Were you ever asked to bridge walk anyone?
A Sort of. That wasn't really what I was doing.
Q What do you mean?

A I was more doing like building websites that kind of stuff as opposed to community outreach.

Q You were ever asked to bridge walk anyone?

A Nobody ever asked me, hey, Chris, would you bridge walk Sam or whatever. It was more like, we want your help to bring this person into OneTaste, which is bridge walking.

Q Based on your personal observations and your personal experience, what types of people were asked to be bridge walked into OneTaste?

MS. BONJEAN: I'm going to object, again, on foundation.

THE COURT: Overruled.

A So you're asking for a pattern. I don't know if there was a like a deliberate or intended group demographic we were going after. My view at the time was the people who would come to the in group that looked interesting to us were mostly white young and affluent mostly, but not always, were people that we wanted in the community. The more dynamic, the more interesting they were as human beings, obviously, the more we would want them.

Q Based on your personal observations and experience, why were those types of people important to the community?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection. Assumes facts.

THE COURT: Overruled.

A Well, if you're building a community you want people with skills and resources to help build up the community. And we really, really wanted to build up the community.
Q Based on your experience, what do you believe to the assets that you personally brought to OneTaste?
A Well, the ones that were used was my construction skills. I helped build out the Warehouse, a little bit of cooking, a lot of tech.
THE COURT: Mr. Fern, we're going to need a break, an afternoon break. I can give you a few more minutes if you think that's helpful, or break now.
MR. FERN: Now is a good breaking point.
THE COURT: We'll come back at 20 after three.
The witness can step down, you'll return when we come back.
(Jury exits the courtroom.)
(Whereupon, the witness steps down.)
THE COURT: See everyone at 3:20.
(Brief recess.)
THE COURT: You may be seated.
MR. ROBOTTI: Just logistically, we put a laptop on the bench for you for this afternoon.
(Whereupon, the witness resumes the stand.)
(Jury enters the courtroom.)
THE COURT: Everyone may be seated. You may

resume the direct examination.

BY MR. FERN:

Q Mr. Hubbard, before I continue. Are you testifying here pursuant to subpoena?

A Yes.

Q Mr. Hubbard, how if at all are you familiar with something called the in/out game?

A The in/out game was an informal -- a name of an informal game that we played in the community. Where one person or one group of people would be on the inside of that game and everyone else would be on the outside of that game. Then people on the out would have to figure out ways to get to the inside of the game.

Q What role, if any, did that in/out game play at OneTaste?

A As a formal structure, not much. But as an informal cultural practice, it was fairly common.

You wanted to be, for example, on somebody's good graces. They would be on the in and you would have to -- or I would have to figure out how to get into their good graces to be in. If I was on the outside, then it just wasn't as much fun.

Q Can you just describe how it played out in practice?

A The best -- the best example I've got, which is not necessarily indicative of the culture, was a workshop that

Nicole and I led. Towards the end of the workshop, she drew a line on the carpet or the floor saying she and I and the other people beside us were in the in group and rest of the room were on the out, and what were they going to be do to be on the inside, on the in group. That's a more formal depiction of the in group.

But it would be more like day to day thing is. It was always a way to, informal way, to be in Nicole's good graces.

Q What affect, if any, did the in/out game have on you?

A Honestly, not a whole lot. It was agitating. But I was usually on the in group once I was established at OneTaste. When I was on the out, it was very distressing, but that was towards the end of my time at OneTaste.

Q Based on your personal experience and observations, what affect did the in/out game have on the culture at OneTaste?

A It was one of the aspects of the culture of OneTaste. And it was, in my opinion, just one of the many ways that we were used to control the community.

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Overruled.

BY MR. FERN:

Q Based on your personal experience and observations, at

OneTaste, who set that culture?
A The tone of the --
MS. BONJEAN: Objection.
THE COURT: Sustained.
BY MR. FERN:
Q How, Mr. Hubbard, if at all, are you familiar with withholds?
A Withholds were an activity that was most typically done after OMing, but not only done after OMing. And it's an activity -- do you want me to describe the activity.
Q What are withholds?
A When two people pair up an A and B. One person is going to be the person pulling withholds, the other person -- for example, A is pulling withholds and B is giving the withholds. A becomes the surrogate for a person in B's life that B tells them.
THE COURT: Is the word you're using withhold?
MR. FERN: Withhold.
THE COURT: Go ahead.
A For example, if I was pulling withholds with somebody and I was going to be B, they were pulling withholds with me, I would say: A I want you to my dad. Then A would say: Chris, tell me something you've withheld from your dad. Then I would say whatever I would say.
That would go on for however long it would go on,

couple minutes to even as long as, one session I had was half an hour.

The understanding was that all of the content of the withholds would be confidential. It would never be reshared with anybody else.

Q What was your understanding of the purpose of this withhold exercise?

A My understanding of the purpose of the withhold changed in my time at OneTaste.

When I first was at OneTaste it was my understanding that this was a way to clear negative emotions, negative energy, negative feelings about whoever withholds were being targeted, whoever the surrogate was. Overtime, my opinion changed so that it was a way to gather information about the community that could then be used to help manage the community.

Q What is the basis for that understanding?

A At some point when I was at OneTaste, I went to Rob Kandell and told him that I thought that the withholds process was --

MS. BONJEAN: Objection to hearsay.

THE COURT: Sustained.

You can ask another question on this topic.

MR. FERN: One second, your Honor.

BY MR. FERN:

Q Based on your personal experiences, Mr. Hubbard, why did your understanding of the purpose of withholds change?

MS. BONJEAN: Objection.

THE COURT: Overruled.

A At the time it seemed to me that some of the content of the withholds that I was sharing, specifically with Rob Kandell, would end up -- the content of those withholds would end up in conversation with Nicole that Nicole would initiate with me.

MS. BONJEAN: I'm going to object.

THE COURT: Overruled.

MS. BONJEAN: Foundation.

THE COURT: Overruled. Overruled.

Next question.

MS. BONJEAN: I'm objecting on --

THE COURT: You've objected and I overruled it.

MS. BONJEAN: I'd like to make a record, please. There is a Court of Appeals --

THE COURT: Overruled. Overruled. Overruled. Overruled. And please be quiet.

Next question.

MS. BONJEAN: I'm --

THE COURT: Please be quiet. I'll hear you at another time.

MS. BONJEAN: It's not a Court's record.

THE COURT: Next question.

Ms. Bonjean, please be quiet.

Go ahead.

BY MR. FERN:

Q Mr. Hubbard, based on your personal experience and observations what role, if any, did Nicole Daedone play in withholds?

A I don't have a recollection of her ever being involved in doing the participation of doing withholds. I didn't see that.

Q While you were living at the warehouse, were you required to pay rent?

A Yes.

Q How much was your rent?

A There was rent and food, and I don't remember what the two numbers added up to. It wasn't a whole lot of money for San Francisco.

Q What entity did you pay, if at all, did you pay rent to?

A As I recall it was Caravan Retreats Incorporated or Caravan Retreats LLC, one of those two.

Q What was your understanding of what Caravan Retreats Incorporated was?

A That it was the legal holding company for OneTaste.

Q During your time at OneTaste and based on your personal

observations, what kinds of services, if any, did people provide to Nicole Daedone?

MR. ROBOTTI: Objection.

MS. BONJEAN: Foundation.

THE COURT: You're asking about his personal observations?

MR. FERN: Yes.

THE COURT: Overruled.

A Sorry, will you ask the question again please?

Q Yes, sorry. During your time at OneTaste, and based on your personal observations, what kinds of services, if any, did people provide to Nicole Daedone?

MS. BONJEAN: Same objection.

THE COURT: Overruled.

A The most common that I would see would be people bringing her tea or bringing her meals, that kind of thing.

Q What was your understanding of why that was?

MS. BONJEAN: Objection foundation.

THE COURT: Overruled.

A Because she wanted tea and she was hungry.

Q What was your understanding of why the individuals who provided that tea to her did so?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

BY MR. FERN:

Q Based on your own personal observations, Mr. Hubbard, how often, if ever, did people say no to Nicole Daedone?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

BY MR. FERN:

Q Mr. Hubbard, when, if ever, did you say no to Nicole Daedone?

A There probably were a few, but the one that stands out for me was a conversation that a bunch of us were having at one of the big tables in the cafe in the center. And she I, don't know, I don't remember the content of the conversation, but she -- it didn't sound right to me, she ended the sentence either with like "right" or "yes", ending it like that. And I said, no. It didn't sound right to me. I didn't say no, it didn't sound right to me; I just said no. The table kind of froze for a second, then we left it off.

Q I'm showing you what has been marked for identification as Government's Exhibit 1019-R, which is not in evidence.

Your Honor, we handed a binder to your clerk yesterday.

THE COURT: Yes.

Q Do you recognize this? Mr. McNett, can you please enlarge it, the top?

A It's easier without the enlargement I can just read through. Thank you. It's really hard to read, sorry. Yes, I recognize this email.

MR. FERN: Your Honor, may I approach the witness and hand him a paper copy?

THE COURT: Yes.

Q Mr. Hubbard do you recognize this?

A Yes. This is the same thing that is on the screen?

Q Yes.

A Yes.

Q What is it?

A This is an email that I sent to presumably Nicole, it doesn't say that in the email, on January 30, 2009.

Q Is this at the top your email address?

A Yes, the Chris@wildcharacters.com, that's one of my email addresses.

Q Is this a true and accurate copy of the email that you sent?

A I believe so, yes.

MR. FERN: Your Honor, the Government offers Government's Exhibit 1019-R into evidence.

MR. ROBOTTI: Objection. Hearsay.

MS. BONJEAN: Objection, authenticity, hearsay --

THE COURT: Let me hear from the Government.

MR. FERN: It is not offered for the truth of the

material. It's merely to show that witness's state of mind at time he was writing the email. There is also, he testified that it is his email address.

MS. BONJEAN: Relevance also.

THE COURT: I'm going to sustain the objection.

Next question.

BY MR. FERN:

Q Mr. Hubbard, on the bottom of the first page who does it say wrote this email?

THE COURT: Don't ask him to read out something that's not in evidence yet. He can take a look at it and you can ask him a question.

MR. FERN: Sorry, your Honor.

THE COURT: That's okay. Go ahead.

BY MR. FERN:

Q Mr. Hubbard, who wrote the bottom email of this chain?

A Nicole Daedone.

THE COURT: When you say the bottom, there are four pages to this exhibit, right?

MR. FERN: Yes.

BY MR. FERN:

Q Mr. Hubbard, do you recognize what is on page two of this printout, the top?

A Well, I know what it is.

Q What is it?

A An email header showing who the email was sent from, the date, the subject, and to whom also it was sent.
Q Turning back to the top page one, do you recognize that?
A What do you mean by that, please?
Q Do you recognize portion of the exhibit on the bottom of the printed page one?
A It looks like when you embed an email in a reply, that's what it looks like, part of an email threaded conversation.
Q Is this an email that was forwarded to you?
A Yes.
Q By who?
A Nicole.
Q Is it a fair and accurate --
A Sorry --
THE COURT: Why don't you give him a minute or so, it's a long document, then you can ask your questions.
MR. FERN: Yes, your Honor.
A Presumably the actual forwarding information would be in the redacted part.
Q Do you recognize whether this is an email that was forwarded to you?
A It had to be forwarded to me somehow. I can't tell from this document who did that.

MR. ROBOTTI: Objection to speculation.

THE COURT: It doesn't sound like he's speculating to anything. I'm going to overrule that.

What is your question. Next question?

BY MR. FERN:

Q Does the email that was sent to you by Nicole Daedone fairly and accurately depict an email that was sent to you by her?

THE COURT: I'm going to stop you there. Because this document appears to contain various different entries. So when you say the email, you need to be more clear what you're talking about. I'm not going to -- go ahead ask your next question.

BY MR. FERN:

Q Are there two emails in this chain from Nicole Daedone?

MR. ROBOTTI: Objection to leading.

THE COURT: Sustained.

Q Mr. Hubbard, did there come a time, when if ever, did you inform Ms. Daedone about the culture at OneTaste?

MR. ROBOTTI: Objection, vague.

THE COURT: Overruled.

A As is indicated in this email.

MR. ROBOTTI: Objection.

THE COURT: No, don't read from or refer to the content of something that is not in evidence yet. Ask your

next question.

THE WITNESS: I apologize.

BY MR. FERN:

Q Mr. Hubbard, when if ever, did you express concerns about the culture of OneTaste?

A There were a number of times expressing the culture of OneTaste both with Nicole Daedone, Rob Kandell and Ken Vanosky. I remember sitting with Nicole in the house in Stinson Beach, and talking with Rob about it in the center. My concerns about the use of the withholds was a part of the culture, I was concerned about its use.

Q When, if ever, did you express concerns about a culture mandated behavior?

MR. ROBOTTI: Objection.

MS. BONJEAN: I didn't hear that, sorry.

THE COURT: Repeat the question.

BY MR. FERN:

Q When, if ever, did you express a concern of culture of mandated behavior?

MS. BONJEAN: It's leading.

THE COURT: It's not, but I'll sustain an objection on other grounds.

Next question.

BY MR. FERN:

Q Mr. Hubbard, are you familiar with the term mandated

behavior?
A In its colloquial sense, sure.
Q When, if ever, did you use it?
A When I responded to an email that I received asking about what I thought about six-points of changes or ideas about OneTaste culture.
Q What, if anything, did you express in that email?
MR. ROBOTTI: Objection.
THE COURT: Sustained.
BY MR. FERN:
Q What, if anything, did you express in general?
MS. BONJEAN: Objection.
THE COURT: Sustained.
BY MR. FERN:
Q Mr. Hubbard, you testified that you had concerns about the culture of OneTaste. What concerns did you raise specifically?
A Going back early one of my, one of the things -- one of the ideas I was trying to get conveyed is that you only get to people's yes if they have a free no. If somebody can't freely say no, then they also can't freely say yes, they can't consent. So somebody who doesn't have the ability to not consent, can also not consent, that would an example.
There was -- another example would be, it's going back so far -- one of the ways to get people to do stuff is to --

MS. BONJEAN: I'm going to.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

Ask the next question, please.

MR. FERN: One second, your Honor.

THE COURT: Yes.

BY MR. FERN:

Q Mr. Hubbard, what other concerns did you express?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Sustained.

You can lay a different foundation.

I'm sustaining that objection.

BY MR. FERN:

Q To who, if anyone, did you express concerns, other concerns?

MR. ROBOTTI: Objection.

MS. BONJEAN: -- grounds.

THE COURT: I can't hear.

MS. BONJEAN: I'm objecting on foundation.

THE COURT: Overruled.

A Honestly, anybody that would listen.

Q Such as who?

A Ken Vanosky, Rob Kandell, Bruce Abramson, Bob Gower, Nicole Daedone, and so on.

Q With respect to Nicole Daedone, what concerns specifically did you express to her?
A It would be nicer to -- I don't know how to say this -- my concern was that it would be detrimental --
MS. BONJEAN: I'm going to object to the non-responsiveness. The question was, what did he say.
THE COURT: Sustained.
BY MR. FERN:
Q What concerns, if any, did you express to Nicole Daedone?
A I expressed a concern about trying to force people to do stuff as opposed to encouraging or enrolling them to do stuff.
Q I'd like to show what you is in evidence as Government Exhibit 284. Who is this?
A This is Reese Jones.
Q What relationship, if any, did he have with Nicole Daedone?
A As I understood it, she ended up living with him or one of his houses. And for a while he was described as her partner.
Q What was your understanding of Mr. Jones' background?
A Primarily he'd been a successful investor in tech, in networking startups.
Q What was your understanding of where he lived?

A I knew of one property on Rushing Hill in San Francisco.
Q How did Mr. Jones first come to your attention?
A Very first time I even heard of him, Nicole Daedone and Beth Crittenden were writing and email to him and I happen to be walking past them in the center. And I believe Beth asked me to read it and give them my suggestions. And in my opinion --
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Sustained.
BY MR. FERN:
Q You mentioned Beth Crittenden, who is she?
A She was another member of OneTaste.
Q Did there come a time when you and Nicole Daedone first spoke about Reese Jones?
A In that example, yes, that was when she first mentioned Reese Jones to me.
Q What, if anything, did she tell you about him?
A That we -- she had met the guy, that she wanted to bring him into OneTaste and she wanted help seducing him.
Q What do you mean by seduce?
A He wasn't a member of OneTaste, and we wanted to get him in as a, if not a member at least a fixture at OneTaste. I don't know what the word would be.

Q How, if at all, was the term seduced used at OneTaste?
A It wasn't widely used.
Q What was your understanding of the purpose -- what was your understanding of the purpose of seducing Reese Jones?
A He was very affluent and he was going to be the one to bank roll OneTaste.
Q At any point, what, if anything, did Nicole Daedone ask you to do with respect to Reese Jones?
A Initially was to help edit and/or write the emails that were being sent to Reese, and eventually write them myself. After that, we started doing some activities on his behalf and I was engaged in doing some of those.
Q What account did you use to write the emails that you just testified about?
A I used two accounts. I created an account, a gmail account I believe, then I also had access to an email account that Nicole had created.
Q What did you understand the purpose of the first gmail account that you just testified to to be?
A The purpose of the account that I created was to create an assistant for the character that Nicole had created.
Q What was the name of that character?
A My character was Martin Follet.
Q What did you understand to be the purpose of that second account that you created -- not that you created,

sorry, that second account that you testified to the one that --
A Are you asking about the account that Nicole created?
Q Yes.
A We were using, I guess for lack of a better word, false identities as a way to get his attention and to start the said reduction.
Q What, if anything, did you understand to be the reason why she was giving you access to this account?
A The emails that I helped edit and write he seemed to respond to more quickly, so it seemed like I was being more effective than not.
Q What role, if any, did Nicole Daedone play in these emails?
A At the beginning she would mostly author them, I would edit them or make suggestions or she would just send them. And then when I was writing them she would review them and make sure they were okay. And then when I was writing them or sending them, she would tell me what the content of the email should be and kind of like what kind of affect she wanted the email to produce.
Q I'm showing you just -- I'd like to show you just for identification what is marked as Government Exhibit 2430-R. Can you read that?
A Yes.

Q Do you recognize this?
A Yes.
Q What is it?
A This is a draft of an email that I sent to Nicole that was the beginnings of a kind of a luncheon activity that we were planning and designing for Mr. Jones.
Q Is that your email address?
A Chris@wildcharacters.com is one of my email addresses.
Q Does this appear to be a true and accurate copy of an email, a draft of an email that you sent?
A This is a lot blurrier, but yeah.

MR. FERN: The Government offers Government Exhibit 2430-R into evidence.

MR. ROBOTTI: Objection, hearsay.

MS. BONJEAN: Join, authenticity.

MR. FERN: It is not offered for its truth.

MS. BONJEAN: Then relevance.

THE COURT: Overruled.

Government Exhibit 2430-R is admitted.

(Government Exhibit 2430-R, was received in evidence.)

BY MR. FERN:
Q Mr. Hubbard, can you generally describe this email? Do you need a paper copy?
A I can read it, I'll just go back and forth a little

bit. It's a draft of an email that the alter ego -- that's the wrong phrase, but I'll go with it -- for Nicole would send to Mr. Reese stating that my alter ego, the Martin Follet, would be the one contacting him in the future.
Q What was the purpose of this email?
A My understanding is that we were trying to get his attention and he wasn't responding quickly enough, so we were trying to do the in on him and pushing him out. If he responded quickly, then he could can get back in again.
Q Approximately how many emails like this did you write?
A Dozens, that wasn't the detail I tracked at the time.
Q Thank you, Mr. McNett. You can take that down.
What, if any, social media profiles did you create with the pseudonym that we just saw in this email?
A I created a Facebook profile for Martin Follet with a back story and enough plausible details in there that if somebody researched it it might look real for a few minutes.
Q What was Nicole Daedone's role with respect to that social media profile to that Facebook profile?
A She wanted me to create an assistant for the Ms. Jeu account. So the Martin Follet is the one that I created that I was asked to make.
Q What was your understanding of why?
A Again, we wanted to know, get Reese's attention. And if the boss wasn't contacting him but the assistant or

secretary was, then he might feel compelled to be more --

MR. ROBOTTI: Objection.

THE COURT: Sustained, that last part.

BY MR. FERN:

Q Mr. Hubbard, how if at all are you familiar with the term scenes?

A Scenes were things that we did at OneTaste primarily around the bringing Reese into OneTaste.

Q In general, what are scenes?

A In general, like in the world?

Q In the context of OneTaste, what are scenes?

A Experience that have been created for another person that usually involve props and all kinds of fun, mischief things that we run the subject through.

Q Where does the term scenes come from?

A My knowledge of the term, scenes predates OneTaste from the BDSM community, where in the BDSM clubs, for example, I could be in a scene with somebody.

Q What is BDSM?

A BDSM is an abbreviation for Bondage Dominance Sadism and Masochism.

Q What role, if any, did these scenes play at OneTaste?

A We ran Reese through half a dozen or so different fairly elaborate scenes. I think they were one of the things that brought him in.

Q What was your understanding of the purpose of these scenes with respect to Mr. Jones?
A It was the thing that got his attention. And he couldn't get anywhere else in his life.
MR. ROBOTTI: Objection to that last part.
THE COURT: Yes, sustained.
MR. ROBOTTI: We move to strike.
THE COURT: I'll sustain that last part that he just said.
Go ahead. I'll strike that last part.
BY MR. FERN:
Q How, if at all, did you help set up these scenes?
A Initially I was one of the half a dozen or so people who would script the scene, put together like who was going to do what activity and what props we needed. Some of us would actually go out and source those props for the scene. In some scenes I would be one of the people in the engaged in the actual scene itself. Later on, I took more of a directive role and I helped coordinate the people who were actually participating in the scene with Reese.
Q Who else, if anyone, helped set up these scenes?
A I don't want to dox anybody.
MS. BONJEAN: Objection.
MR. ROBOTTI: Objection.
THE COURT: Non-responsive. I'll sustain the

objection.

He can answer the question.

A Beth Crittenden, Jessica, I apologize, I sincerely don't remember her last name, Yia Vang. I'm having to go in my memory back through all the different scenes to see if I can remember who was involved. There was one scene there was a lot of people involved.

Q What role, if any, did Nicole Daedone play in setting up these scenes?

A Mostly it was the broad strokes, we want to do a scene that has these themes. And we would put together a script or a plan and that would be proposed to her. Then she would add her refinements or her edits to it, and we would go back and forth until she said it was an acceptable scene, and then we would do it.

Q Approximately how many scenes were you involved in setting up for Reese Jones on behalf of OneTaste?

A There was the really elaborate ones, then there were the scenes with him just he and I; between the two of them, a couple dozen.

Q Can you describe some of the more elaborate scenes?

A We did a scene where he was sat down at lunch across from somebody would wouldn't speak. And this lady had a duffel bag of clothes that I purchased from Goodwill or something like that. And in the envelope was a letter that

basically said we've already ordered for you, enjoy your meal. When you're done, go to the restroom, change out of the clothes you're in, put on all of these clothes, take nothing with you. I think there was a second envelope where he was told he was going to panhandle in Union Square until he had gotten $20. That's an example. It was one of the very early ones.

Q Can you describe another example?

A Sure. We did a Wizard of Oz thing. We got a whole bunch of bricks, painted them yellow, he had to follow the yellow brick road. I set up a king size bed in the back of the yoga studio that could spin around. We had like strobe lights and sound affects that would create the feeling, or hopefully, of being inside a twister, like in the Wizard of Oz when Dorothy was in the twister.

Then we did the big one. Was the Wiz -- the seven deadly sin scene. Where we had a groups from the community working on each of the seven deadly sins. And we would run them from area to area, which was a place for him to experience and explore that particular sin.

Q What role, if any, did sex play in these scenes?

A Most of the scenes involved, most of the scenes involved him either giving or receiving some form of sexual activity.

Q How many people were involved in these scenes?

A It varied by scene. For example, there were many scenes it was just he and I. And then there were significantly smaller number that involved 25 people ish.
Q For the examples that would involve 25 people ish, from where were those people drawn, the people who participated?
A From the community.
Q And how long did it take to create these scenes?
MR. ROBOTTI: Objection, vague.
THE COURT: Sustained.
Q Where did these scenes take place?
A Most of the scenes took place in one of the buildings that you saw earlier in the photograph.
Q Mr. Hubbard, when you testified just a few minutes ago that the participants were drawn from the community, did you mean the OneTaste community?
A Yes, I did the OneTaste community.
Q What, if any, process was there for reviewing the scenes?
A For reviewing the scenes?
Q Uh-huh.
A I didn't script -- I didn't write down most the scenes, that would have been Jessica or Beth, for example. They would take them to Nicole or email them to Nicole, then they would review them. Then bring us bring back to the group the changes that Nicole would have liked to have seen in --

bring back the changes Nicole would like for the scene to have -- I can't say this, sorry. Nicole would be given a chance to review the scene and she would make whatever changes or corrections, then that would be brought back to the group that was tasked with putting on the scene.

Q You mentioned the name Jessica. What is her last name?

A I apologize right now, I can't remember her name. Show me a picture, I'll pick her out.

Q What was her role at OneTaste, if you remember?

A Another person in the community. She eventually married Patricia.

Q How are OneTaste members assigned to -- how would OneTaste members in your experience know what role they were to perform in these scenes?

MS. BONJEAN: Objection.

MR. ROBOTTI: Objection.

THE COURT: Overruled.

A An example would be we need somebody to be in this role. As a group we would kind of think about who we thought would be best suited within the community to do that role. And then we would either suggest that person to Nicole, or Nicole would also have done that thinking on her own recognizance and told us who she would like to be in that role. We would go and say, we're doing a scene we want you in this role. And generally people would say yes.

Q At the time that you involved in OneTaste, what was your understanding of the nature of Nicole Daedone and Reese Jones' relationship?
A Generally he was -- they were partners once he was kind of fully brought in and established in the community.
Q How, if at all, did that relationship, based on your understanding, change over the course of your time at OneTaste?
MS. BONJEAN: Objection.
MR. ROBOTTI: Join.
THE COURT: Sustained.
BY MR. FERN:
Q Mr. Hubbard, when if ever, did you move out of the Warehouse?
A I moved out of the Warehouse to come here to help run the center with Rachel Cherwitz.
Q Why did you move to --
A Nicole asked me to.
MR. FERN: Sorry, your Honor, one second.
Q And by here, where do you mean?
A New York City. I guess not here.
Q You testified earlier that you are no longer affiliated with OneTaste, when did your affiliation change?
A As in when did I stop being affiliated with OneTaste?
Q Yes.

A Roughly, 2009. I had moved out of OneTaste.

MS. BONJEAN: Objection to the narrative.

THE COURT: Sustained.

Q What happened?

A I moved out of OneTaste.

Q What happened when you moved out of OneTaste. Why did you move out of OneTaste?

A I moved from New York to Seattle to do some personal legal fights for my family. And I was up in Seattle until that finished, then I came -- I want back to San Francisco but I did not move back into a OneTaste property or OneTaste residential area.

(Continued on next page.)

(Direct examination, cont'd)

BY MR. FERN:

Q How, if at all, are you familiar with something called the taboo course?

A A taboo course is a course that OneTaste offered -- possibly still offers, I don't know.

I got a call like on a Saturday afternoon, Saturday evening. Nicole asked me if I would help her lead the taboo course with her the next day. She had been leading it on Saturday, and she asked for my help to do it on the next day, on Sunday, and I agreed.

Q And what was your role in the taboo course?

A As I understood it, my role was just to entertain the participants and basically scare the crap out of them. Because it's a taboo course.

Q And how, if at all, are you familiar with the coaching program?

A The coaching program, my -- a bunch of my friends went through. The concept of the coaching program was something that started --

MR. ROBOTTI: Objection.

THE COURT: Sustained as to the last part.

Q How, if at all, are you familiar with the concept of a coaching program?

A Initially Nicole came to me and asked me to create or

design a coaching program for OneTaste, and I started doing that, and they -- she changed direction. She brought in another person to create a different coaching program for OneTaste. And I believe that became the foundation of the OneTaste coaching program.

Q What do you mean by change directions?

A I was no longer designing a coaching program for OneTaste.

Q And what made you decide to leave OneTaste?

A Well, initially, I left OneTaste because I wanted to go do a legal fight in Seattle. And, in my mind, I wasn't so much leaving OneTaste as I was going to try and resolve something I needed to get resolved personally. And I was assuming that I was going back to OneTaste after that.

Q You had testified a few moments ago that Nicole -- the coaching program changed directions. What, if anything, did Nicole Daedone tell you about why she was changing directions?

A She didn't tell me why she changed directions. It was just, we're doing Bryan's thing now.

Q And what was your direction?

A I was contacting some of the country's leading experts in particular fields of domain. So people who were, for example, voice coaches, or people who worked on presentation and like body image, that kind of stuff.

I was also -- I'd also reached out to a couple

professional organizations of coaches, who would hopefully certify the coaches that we had created to be nationally certified coaches, and whatever that meant.

Q And what was your understanding of Bryan's direction?

MS. BONJEAN: Objection. Hearsay.

MR. ROBOTTI: Join.

THE COURT: Sustained.

Next question.

Q What, if anything, was your understanding of the direction that OneTaste chose to go in?

MR. ROBOTTI: Objection.

MS. BONJEAN: Objection. Calls for hearsay.

THE COURT: Overruled.

A My -- so Bryan Franklin was -- mostly he was a corporate coach, and he had been trained by his mom. He and I had been trained for a while. And it was mostly, in my opinion, not a particularly good coaching program. It didn't produce coaches.

Q In your opinion, why wasn't it a good program?

MR. ROBOTTI: Objection.

MS. BONJEAN: Objection.

THE COURT: Sustained.

MR. FERN: One second, Your Honor.

(Short pause.)

MR. FERN: No further questions, Your Honor.

THE COURT: Okay. Any cross-examination? Will it be Ms. Bonjean or Ms. Cohen? Oh. I'm sorry. Mr. Robotti.

Mr. Robotti. Go ahead.

CROSS-EXAMINATION

BY MR. ROBOTTI:

Q Good afternoon, Mr. Hubbard.

A Good afternoon.

Q My name is Mike Robotti. I'm one of Rachel Cherwitz' lawyers.

A Nice to meet you.

Q So you were never pressured into anything at OneTaste, right?

A Incorrect.

Q Well, you met with the government a number of times in this case; isn't that right?

A Yes. I have met with the government four times, five times.

Q Okay. Including in September of 2021?

A Yes.

Q September 9 of 2021, does that ring a bell?

A No. That's the middle of COVID so it's a whole different world for me.

Q Okay. And this was your first meeting with the government, in September of 2021?

Okay. And at your first meeting with the

government, which was closer in time to the events that occurred here, correct?
A I don't understand your question.
Q Is 2021 closer in time to 2006 to 2009 than today?
A Yes. Of course.
Q So the first meeting was closer in time to the events we are talking about today, correct?
A Yes.
Q Okay. And during that meeting with the government in September of 2021, you told the government that you were never pressured into anything at OneTaste; is that correct?
A I don't recall saying that.
MR. ROBOTTI: Can we pull up 3500-CHU-1.
We can provide the Court with a copy as well.
THE COURT: Sorry, CHU?
MR. ROBOTTI: Yes. CHU-1.
THE COURT: At some point you will have to explain to me the numbering system.
MR. ROBOTTI: This one is the government system.
THE COURT: Okay. Whoever. Will have to explain to me the numbering system. But I just wanted to make sure I heard.
MR. ROBOTTI: And this is just for the witness, sorry, and the parties.
Can we go to page 4. And the second paragraph

there, can you blow that up.
Q Just take a moment to read that.
A I have read it.
Q Does that refresh your recollection that on September 9 of 2021, you told the government that you were not pressured into anything at OneTaste?
A I think the context on this is incorrect.
Q So the question was, does that refresh your recollection about this statement?
A Yes.
Q Okay. And it is accurate that on September 9, 2021, you said to the government that you would not pressured into anything at OneTaste?

THE COURT: I'm just going to stop you because the document I have has a different date. So maybe I'm not looking at the right document. Is it 3500-CHU-1?

MS. BONJEAN: Uh-huh.

MR. ROBOTTI: Yes, Your Honor.

THE COURT: And the date you're saying is what?

MS. BONJEAN: September 1, 2021.

MR. ROBOTTI: Apologies, Your Honor. So it would be September 1, 2021.

THE COURT: Okay. I have the right document. That's not the date you were saying.

MR. ROBOTTI: That's correct, Your Honor.

Apologies.

THE COURT: Okay. I have the right document. Go ahead. You might want to ask your questions again.

Q So to correct the date, September 1 of 2021, you met with the government on that date, correct?

A I met with the government during the middle of COVID. The exact date I would not have remembered.

Q Okay.

MR. ROBOTTI: Can we just show the witness the first page of the document?

Q And, Mr. Hubbard, do you see the top of left there, the first paragraph, the date?

A I do.

Q And does that refresh your recollection as to the date of the meeting?

A Not really, but sure.

Q Okay. Is it your recollection that the date of the meeting is around September of 2021?

A Absolutely.

Q And going back to the original point, did this document refresh your recollection that on that date you told the government that you were never pressured into anything at OneTaste?

A It refreshed my recollection, and I believe that statement is taken out of context.

Q Okay. But you did say it?
A I do not believe I said that, no.
Q So the document that you were looking at is incorrect?
A The document -- my recollection is they are asking about the scenes, and was I pressured into doing the scenes. And the answer to that is, no, I was not pressured into doing the scenes.
Q Okay. So your testimony today is you were not pressured into doing the scenes, correct?
A Correct.
Q And according to you, this document is incorrect when it says you were not pressured into doing anything at OneTaste?
A May I see the text again, please.
Q Sure.
MR. ROBOTTI: Can we go back to page 4.
MS. BONJEAN: Your Honor, can we remove the blue arrow on the screen. Is it possible to remove that?
THE COURT: Somebody might be able to. Let me find out. Okay.
MS. BONJEAN: Thank you.
A Okay. Thank you. I have read it.
Q Okay. So the question stands: Did you say this during that meeting with the government or not?
A I do not recall saying this.
Q So your position is that this document is incorrect?

A Yes.

MR. FERN: Objection.

THE COURT: Basis?

MR. FERN: It unfairly characterizes the testimony.

MR. ROBOTTI: He just testified to the question.

THE COURT: Well, he gave an answer, and then you asked the same question again.

Overruled.

Q All right. So you chose to live at the OneTaste residence nicknamed "the Warehouse," correct?

A Correct.

Q And you chose to participate in OneTaste, correct?

A I don't know what that means, but I did live in -- at OneTaste.

Q So in 2006 when you first moved into the residence known as the Warehouse, you chose to do that, correct?

A Yes.

Q And you were not forced into anything against your will while you were there, correct?

A Incorrect.

Q As we just said -- noted, you stated that you were never pressured into anything?

A I did not say that.

Q Would you say that you were not forced to commit any labor against your will?

A Repeat the question, please.
Q You were not forced to commit any labor against your will, correct?
A That's a hard one to answer. There were definitely things I did I wasn't particularly keen on.
Q Okay. The question was, you were not forced to commit any labor against your will, correct?
A Give me a second to go back and try to think this through.
THE COURT: That's fine. Take a minute.
THE WITNESS: Thank you.
THE COURT: Are you ready to answer, sir?
THE WITNESS: Yes, I am.
THE COURT: Okay. Go ahead. You can answer the question.
A I don't have any memories of being forced to do any specific actions against my will.
Q And, in fact, you said on direct examination that you were able to say "no" to Nicole Daedone; is that correct?
A No, I said that I had said "no."
Q Well, isn't it true that you told the government that you often said "no" to Nicole Daedone, correct?
A I don't recall saying that.
Q Do you recall saying to the government that people at OneTaste wanted you out of the community because you could say

"no" to Nicole Daedone?
A I may have said that to the government. That is a theory I have.
Q So aside from just saying "no" on one occasion to Nicole Daedone, you said it regularly to her; is that correct?
A That is incorrect.
Q You said it on more than one occasion?
A Maybe. But not many.
Q And at the time when you met Rachel Cherwitz, she was inferior to you in the organization, right? A subordinate?
A I honestly don't remember whether I had been made CTO at that point. Like the timing of when Rachel came in and when I was CTO. Even though I had the title "CTO," there wasn't a lot of trappings that came along with that.
So I would -- to answer your question, I would categorize it as, no, I was not senior to Raheli -- Rachel. Sorry.
Q And I would like to set aside the community at the residence versus the company. Those are two different things, correct?
A Not really, no.
Q Well, the company has specific titles, right, and is a money making organization, correct?
A Yeah. I had no visibility into that stuff.
Q Okay. But you had a specific role within the company,

correct?
A I had a title within the company.
Q Okay. That title was director of technology, correct?
A I thought it was CTO. That's my recollection.
Q Okay. So it was chief technology officer, according to your recollection?
A Yes.
Q All right. And when you first met Rachel, she did not yet work for the organization, right?
A Yes. Of course. She just arrived.
Q She just arrived.
And when she joined the organization, she joined as a very low level employee, correct?
A No, I don't think she was an employee when she joined.
Q Sorry.
When she joined the company after you met her, she was a low level employee, correct?
A I have no idea.
Q Okay. You were management. You were chief technology officer, right?
A Yeah. I think you're not really understanding what my role in OneTaste was.
Q I am trying to characterize -- understand your role, sir, which was chief technology officer, correct?
A That was the title I had.

Q And that is a management title, correct?
A In most of the world, yes.
Q Okay. And at OneTaste as well, right?
A No.
Q Okay. So your position is is that you were not senior to Ms. Cherwitz in the company?
A In any meaningful way? On any -- in any domain? No.
Q And your title was not senior to her title when she joined the company?
A There was never a time that I thought I could direct her activities.
Q You ultimately made the decision to leave OneTaste, right?
A Yes.
Q And you decided you no longer wanted to participate in OneTaste; is that correct?
A That also happened, yes.
Q So you left OneTaste, right?
A Yes.
Q You made the choice to leave OneTaste, correct?
A Yes.
Q And that was an option you had throughout your time at OneTaste, correct?
A Yeah. Technically. Came with some -- there would be more consequences depending on when I left.

Q Well, you ultimately made the choice to leave in 2009, right?
A Actually, I think it was slightly before that, but, yes, it was in that area.
Q And you made that decision because you had a personal issue to take care of, correct?
A Yes.
Q And that was a choice you were able to make, right? You walked out the door, correct?
A Uh-huh.
Q All right. So let's talk about the Warehouse.
So you began living at a building known as the Warehouse in around 2006, correct?
A Yes.
Q That was a residence where people who worked at OneTaste lived, correct?
A That was a residence where the members of OneTaste lived.
Q And certain of the people who lived at the Warehouse worked for the company OneTaste, correct?
A Presumably, yeah. I mean, mostly it was the community, rather than the company that we were engaged with.
Q Okay. So there were people who lived at the Warehouse who did not work for the company OneTaste; is that correct?
A I wouldn't have insight. I don't know about the legal structure of the OneTaste company.

Q Okay. You had a formal position at the company, correct?
A No. I had a formal title.
Q Formal title.
So you worked for and were paid by the company, correct?
A Yes.
Q Okay. Were there people at the Warehouse who did not work for and get paid by the company, to your knowledge?
A There were people at the Warehouse who did not, to my knowledge, did not get paid to be there. They -- rather, they paid to be there.
Q So those people at that time did not work for the company OneTaste?
A Yes. They worked for the community OneTaste.
Q So, again, we're saying there's a separation, correct, between the company OneTaste and the community; is that right?
A You're saying that. For me, at the time, there was no real distinction there.
Q You did not know Nicole Daedone when you first moved in to the Warehouse, correct?
A I may have met her at like an in-group before I moved in. I've got two memories of her, and I don't have them in sequence, from those very early days.
Q You met around that time?
A Yes.

Q When you first moved in, you did not know Rachel Cherwitz, correct?
A She -- when I moved in, Rachel Cherwitz was not there. She had not yet arrived.
Q So it was someone else aside from Rachel and Nicole who told you about OneTaste; is that right?
A Yeah. Absolutely. Out in the world, I would meet people when I was like blues dancing or going to a concert, and they would point me towards OneTaste.
Q And you originally did a weekend getaway for orgasmic meditation? Does that sound familiar?
A Yeah. It was -- I think it was like called Basic Sensuality or something like that.
Q And that was where you first experienced the practice of orgasmic meditation; is that right?
A When I first experienced the practice of it? I had heard about it, but I think that was the first time I had actually seen it in action.
Q And so fair to say that it interested you and intrigued you?
A Absolutely.
Q And in response to that weekend, you decided that you wanted to pursue it further, correct?
A Yeah. I signed up for whatever the next workshop courses they had in their curriculum.

Q And one of the things that attracted you to OneTaste was that it had attractive people; is that right?
A Yes.
Q You helped build the living space at the Warehouse; is that right?
A Yes.
Q You installed the bathrooms and the showers, a loft?
A I helped with all those things. Caleb was also involved.
Q And you had some background in construction work, right?
A Right.
MR. ROBOTTI: I would like to show you, just for the witness, Defense Exhibit 4-F.
Q Do you recognize this?
A Yes, I do.
Q And what is it?
A This is a photograph that's been taken from the loft or the mezzanine in the back of the Warehouse, looking towards Folsom Street.
Q And is that a fair and accurate depiction of the Warehouse?
A Of that top of the staircase, yeah.
Q That portion of the Warehouse?
A Yeah. Yeah.
Q All right.
MR. ROBOTTI: Your Honor, defense moves Defense

Exhibit 4-F into evidence.

MR. FERN: No objection.

THE COURT: Defense Exhibit 4F is admitted.

(Defense Exhibit 4-F received in evidence.)

Q All right. And on the left here, we can see beds and curtains; is that correct?

A Yes. Left and right.

Q So this is a living area within the Warehouse; is that correct?

A Yes. This is, basically, the -- you know, now what we would call a dormitory.

Q And you lived at the Warehouse for about two years?

A I lived in a couple different buildings at OneTaste, and I don't know how long I was specifically in the Warehouse.

Q Okay. So was it about 2007 to 2009?

A No. Because part of that time frame I was here.

Q Or 2006 to 2008?

A Ish. But not all of that is in the Warehouse. We also had other buildings that were also residence.

Q The Warehouse was a large building, correct?

A Yes.

Q You described it as a beautiful building on the inside?

A I don't recall describing it that way.

Q Did you give an interview to the BBC in 2020?

A Yeah, I did.

Q Okay. Did you describe it as a beautiful building on the inside to the BBC?
A I may have. I'd have to listen to the BBC thing. That was --
MS. BONJEAN: Judge, objection.
THE COURT: Overruled.
BY MR. ROBOTTI:
Q Well, would it refresh your recollection if we played that audio for you?
A Yes, it would.
MR. ROBOTTI: Okay. Can we play Defense Exhibit 16-AA for the witness.
This is the audio. Perhaps you can show him, Mr. Garland, how to use that.
THE COURT: AA, the two letters?
MR. ROBOTTI: 16-AA.
THE COURT: 16-AA.
(Exhibit played for witness only.)
A I did, in fact, say that.
MR. ROBOTTI: Okay. Give the Court one second to listen.
THE COURT: I have it.
MR. ROBOTTI: Did you have a chance to listen to it Your Honor?
THE COURT: It is on.

MR. ROBOTTI: Great.
Q So you did, in fact, describe it as a big beautiful building, correct?
A I did.
Q You also mentioned it had skylights, correct?
A Uh-huh.
Q Correct?
There were queen and king mattresses set up inside, correct?
A I don't remember if they were queen and king, or if they're all queen or all king. I knew there was at least one single.
Q Okay. And there were about 25 other people that lived there, correct?
A When I moved in, the number was lower than that. But I don't know what the exact count was.
Q During the time period, would it be fair to say, when you lived there, would it be fair to say the average was about 25 people?
A Living inside the Warehouse?
Q Correct.
A I'd say more like 18 to 20, just given the count on the beds.
Q Okay. And you've mentioned that beds were assigned as part of living there; is that right?

A Yes.
Q And that was part of what you signed up for going into the Warehouse, correct?
A I don't remember knowing what I was exactly signing up for. But yeah. Sure.
Q Did you know going into the Warehouse that people were assigned beds?
A When I first met the folks at OneTaste, they were living in the Center, not in the Warehouse.
Q Okay. And when you moved into the Warehouse, did you know how -- that's how it was going to be set up?
A Around the time I was planning to move, yeah. But prior to that, I mean, it wasn't really a detail I cared about.
Q But when you learned about it, you chose to live there, you chose to stay there, correct?
A Yes.
Q And the reason these beds were assigned were to push boundaries and norms; is that fair to say?
A It certainly did that.
Q Okay. So it's fair to say it did do that for you?
A Yes.
Q And that's one of the reasons you were at the Warehouse, right, was to push boundaries and norms, correct?
A No. That's not why I was at the Warehouse.
Q Did you, in fact, feel that you improved as a person as a

result of this practice of sharing beds? Did it benefit you?
A No. Not really. You're in a big room with people who snore, it is not really beneficial.
Q Well, you told the BBC, correct, that this was one of your favorite parts about OneTaste, was the communal living; is that correct?
A Yeah, it was one of my favorite parts about communal living.
Q And that you found it really fascinating about humans being actual humans, right?
A You're quoting me, and I have long forgotten whatever I said to the BBC.
Q Well, if you would like to listen to the clip again, sir, to refresh your recollection, you may do so.
A Okay. Do you know what the time stamp would be that I am looking for?
Q It was 16-AA. You should just be able to listen to that clip.

THE COURT: Are you asking him if he said something, or are you just asking him whether he found it fascinating? Because your question was not whether he said it. I am not sure what you're asking him.

Can you pose the question again.

MR. ROBOTTI: Sure.

Q So my question was whether you found something

fascinating about humans being actual humans at the -- when you lived at the Warehouse.

THE COURT: He's listening.

(Witness listens to exhibit.)

A It is right at the end. Yes.

Q Okay. So you did say that to the BBC a few years ago, correct?

A Yes.

Q So Rachel Cherwitz moved into the Warehouse about a year after you, right?

A I don't remember the time frame, but she did move in to OneTaste after I had.

Q All right. You recall that she just showed up from Texas, correct?

A I don't know where she showed up. I don't know where she came from. I know she showed up with two other guys.

Q And one of those was Kal Holczler; is that correct?

A Yes. That's correct.

Q And after meeting Rachel and hearing about her story, she was welcomed to the Warehouse with some enthusiasm, right?

A Of course.

Q And she indicated she was interested in OneTaste?

MS. BENSING: Objection. Hearsay.

MR. ROBOTTI: Effect.

THE COURT: Sustained.

Q So Rachel was welcomed by the community, correct?
A She was invited to join the community. Yes.
Q And that was after she told her story about why she was there, correct?
A As I recall, she went through the same interview process that I went through, which isn't so much telling your story, it's just answering people's questions.
Q And so one of the things she said during that interview process was that she had just driven up from Texas, correct?
MR. FERN: Objection. Hearsay.
MR. ROBOTTI: The effect of the interview process.
THE COURT: Sustained.
Q Rachel had a shaved head; is that correct?
A I don't remember. I remember at some point she had a shaved head, but I don't know if she had it when she arrived.
Q She had a lot of energy and enthusiasm; fair to say?
A Yes. Not atypical to the people around, but, yes.
Q And, as we mentioned, she was invited to live there after this interview process, correct?
A Nobody said no.
Q And based on your interactions with Rachel, your understanding was that she began doing the OM practice; is that right?
A Yeah. Everybody did.
Q Okay. And, in fact, you engaged in the OM practice with

her?
A Yes.
Q Many times?
A Uh-huh. Yes.
Q And based on your practice with her, your understanding was she found the OM practice beneficial; is that right?
A I certainly hope so, and I have no idea.
Q Now, it was based on your observations with her?
A Again, I sincerely hope so, and I have no idea. I don't know that she and I ever talked about how she was benefiting by OMing with me. I don't think we ever had that conversation.
Q Okay. But based on your observations of her during the OM experience, did it appear beneficial to you?
MR. FERN: Objection. Asked and answered.
THE COURT: You just asked if it'd feel beneficial to him.
Q Did it appear beneficial to her?
THE COURT: Overruled.
You can answer.
A Again, I don't know if her OMing with me was beneficial for her. Again, I hope it was, but that's not information I have.
Q So afterwards you and Rachel lived together for a year or two; is that right?

A No.
Q While at the Warehouse?
A To the extent to which we were all like she and I were members of the community, we lived together with the rest of the community.
Q Okay. So the two of you lived together at the Warehouse for a year or two, correct?
A Again, I wouldn't characterize it that way.
Q You lived in the same location as Rachel Cherwitz for a year or two, correct?
A Yes.
Q Fair to say that you had a somewhat tumultuous relationship with Rachel?
A Not until the very end, no.
Q But you have described in your meetings with the government your relationships as Rachel with -- to Rachel as tumultuous; is that right?
A I may have done so. I'd have to look at the transcripts.
MR. ROBOTTI: Can we pull up 3500-CHU-1, for the witness. Page 8.
Q And just looking at the top line there, does that refresh your recollection as to whether you described your relationship with Rachel Cherwitz as tumultuous.
A No, it does not.
Q So you do not recall saying that to the government?

A I do not remember saying these words to the government. That is correct.
Q So this is another error on this report?
MR. FERN: Objection.
THE COURT: Yes. Sustained.
Q Is it fair to say that sometimes you and Rachel got along, sometimes you didn't?
A Of course.
Q And beyond your OM practice, you also had a sexual relationship; is that right?
A Occasionally, yes.
Q But fair to say you were not the best of friends?
A I don't think that characterizes it correctly. So I don't know -- it's not that we weren't the best of friends. We were definitely friends. There were lots of times that we did all kinds of fun activities together.
Q So sometimes you had a good relationship, sometimes you had a bad relationship?
A We had a relationship, and sometimes it was good, and sometimes it was challenged.
Q Understood.
All right. So let's talk a little bit about what it was like to live at the Warehouse. So at the Warehouse you were free to come and go as you pleased?
A Yeah.

Q You had your own key?
A Yes.
Q And everyone else had a key?
A Yes.
Q Residents were not locked in from the outside, correct?
A Yeah, no.
Q People not associated with OneTaste were free to come visit?
A Not into the Warehouse, no.
Q No?
A They can visit in the Center, but not in the actual like belly of the beast kind of thing.
Q So it is your position nobody from outside the Warehouse could ever come inside the Warehouse?
A No, that's not my position. I said people from the outside weren't generally allowed into the Warehouse.
Q So people were, but you're saying just not generally; is that correct?
A I don't know of an example of somebody from the outside going into the Warehouse. Generally, it was you'd meet them in the Center or upstairs of the Warehouse. Not actually back in the Warehouse.
Q All right. And it's accurate to say that no one at OneTaste told you not to associate with outside friends or family; is that correct?

A I don't recall anyone telling me to not associate with friends and family from the outside.
Q So you could go visit your family, if you wanted to?
A Yeah.
Q You could visit friends throughout the city, correct?
A I didn't have any, but, yeah.
Q You could have mail delivered, correct?
A Not to the Warehouse. We had a -- there was a -- you couldn't see it in the picture, but beneath what I called the residential to the right of the Center, there was a mailroom stop place in there, and a lot of us got our mail delivered to that, which was not a OneTaste property.
Q So you could get mail, though, right?
A Of course.
Q You had --
A But not at OneTaste.
Q You, yourself, could physically go get mail, correct?
A Uh-huh.
Q You had a personal phone?
A Yes.
Q And you could use that to call anyone you wanted to, correct?
A Uh-huh.
Q Text anyone you wanted to, right?
A Yes.

Q You had a personal computer?
A Yes.
Q You were able to access the Internet with that?
A Mostly, yes.
Q Okay. You could send e-mails?
A Yes.
Q Sign on to social media?
A As social media was coming into being, yes. Mostly social media didn't exist back then.
Q And no one took your identification away from you, correct?
A That's correct.
Q You had your license and your passport; is that right?
A I don't actually know if I had a passport at that time, but my driver's license, yes.
Q You had your wallet, correct?
A Yes.
Q You could travel around the city of San Francisco?
A Yes.
Q Later around the city of New York?
A Not so much New York.
Q You could travel around the city of New York when you were here?

MR. FERN: Objection, Your Honor. Relevance.

THE COURT: Overruled.

A I -- we didn't travel around New York when I was here very much, and I am not sure why. I don't -- to this day, I don't remember why we didn't.
Q Okay. But you had the ability to come and go as you pleased in New York, correct?
A Yeah. Technically.
Q And, generally speaking, you could go to bars, restaurants, sporting events, all those things?
A Technically, yes, I could do that.
Q And, technically, you could go to bars, restaurants, and sporting events, right?
A Yes.
Q Okay. People were not threatened with physical violence if they tried to leave the Warehouse, correct?
A I do not recall anyone being threatened with physical violence when they wanted to leave the Warehouse, and I was not threatened with physical violence when I wanted to leave the Warehouse.
Q Right. And you could also have a job outside OneTaste, if you wanted, right?
A Me, not so much, but, in general, some people did have jobs outside of OneTaste.
Q So people who were living in the Warehouse had other jobs, correct?
A Some people did, yes.

Q And if you wanted to move out, that was always an option for you, right?
A Yes.
Q And, in fact, you did ultimately move out, correct?
A I did ultimately move out, yes.
Q And other people moved out of the Warehouse?
A Yeah.
Q And people moved in, new people came in, right?
A Uh-huh.
Q All right. So even though you were free to come and go as you pleased, you stayed because you were having fun, right?
A I stayed because I was having fun? No, I stayed because I believed in the vision.
Q Okay. You were finding the OM practice beneficial, correct?
A To me, not really. But the vision, as I understood it, was for women to be empowered all across the country. And I thought that was -- I think that's important.
Q Okay. So one of the reasons you stayed was because you believed in the vision?
A Yes.
Q You believed in OneTaste?
A I believed in the stated vision of OneTaste.
Q Okay. But is it fair to say you also had fun while you lived there, right?

A Sometimes I had fun, yes.
Q Okay. You got along with some of the people in the community, correct?
A Mostly, I did not.
Q Okay. But there were people you were friends with in the community, correct?
A Yes.
Q And on occasion you had fun with them?
A Yes.
Q And you OM'd with a number of different women while you were at OneTaste, correct?
A Pretty much all of them.
Q How many would that be?
A 30, 25, 30, something like that.
Q And in addition to the OM practice, you also had sexual relationships with the women there, right?
A I had sexual relations with some of the women there, yes.
Q And so one of the reasons you stayed, right, was because you were having sexual relationships with women, right?
A Not so much. It was mostly -- I thought we were going to make a difference in this country, and I wanted to be a part of that.
MR. ROBOTTI: Just a moment, Your Honor.
THE COURT: Sure.
Q So next door to the Warehouse there was what was called

an urban retreat center, correct?
A For a little while, yeah.
Q A two-story building?
A Three-story building.
Q Okay. Two floors for OneTaste, or OneTaste had the whole thing?
A OneTaste, as I understood it, had access to the bottom two floors, and I don't think we ever did anything with the bottom floor.
Q And this was a community center; is that right?
A Initially the front half of the second floor was built out as residential, and the back half was a course room classroom.
Q All right. I would like to show you what's been marked as Defense Exhibit 4-A-2.
All right. Do you recognize these photos?
A No, not really. I recognize most, but not all of the people, and I recognize the location on one of them and possibly two of them.
Q All right. So is this top left the Center?
A Top left is the corner of Folsom and whatever that street is Russ or Moss.
Q The rest of the photos are people from OneTaste; is that fair?
A The top right photo is definitely folks from OneTaste.

Bottom left, I don't recognize her. And then the bottom right photo there are three faces I don't recognize.

MR. ROBOTTI: Your Honor, defense offers Defense Exhibit 4-A-2.

MR. FERN: Objection. Foundation. And it is outside the scope.

THE COURT: Well, the witness can't identify certain people, so the objection is sustained.

MR. ROBOTTI: All right. Could we redact out the -- everything but the top left photo.

THE COURT: Are you able to do that?

MR. ROBOTTI: Yes. I am asking my paralegal to do so.

Q You recognize the top left photo as the Center, correct?

A I recognize the building as being the Center, yeah.

MR. ROBOTTI: So we offer Defense Exhibit 4-A-2, the redacted version into evidence.

MR. FERN: Objection. I would ask for voir dire on --

THE COURT: Go ahead and voir dire. Go to the podium, please.

VOIR DIRE EXAMINATION

BY MR. FERN:

Q Mr. Hubbard, do you recognize the two individuals in this picture?

A Can you pull it up for me? Zoom in on them?

So right now I do not recognize them, but if you pull it up, I might be able to.

I believe that's Kevin Kanarek who's sitting, and I do not recognize the person behind him.

MR. ROBOTTI: I don't think it's a requirement he recognize everyone, Your Honor.

THE COURT: You maintain an objection?

MR. FERN: Yes, Your Honor.

THE COURT: Yes, sustained.

CROSS-EXAMINATION (Cont'd)

BY MR. ROBOTTI:

Q Showing you what's been marked as Defense Exhibit 4-A-4.

Do you recognize this?

A That is the interior of the Center, but it looks like it predates me.

Q Do you recognize this as being the same Center as from when the time you were there?

A Yes.

MR. ROBOTTI: All right. The defense offers 4-A-4 into evidence.

MR. FERN: Objection.

THE COURT: Basis?

MR. FERN: Predates him.

THE COURT: Overruled. Defense Exhibit 4-A-4 is

admitted.

(Defense Exhibit 4-A-4 received in evidence.)

MR. ROBOTTI: May we publish?

THE COURT: Yes.

Q This is the inside of the Center, correct, sir?

A Yeah. That looks like the exterior wall that's along the side street, which is either Russ or Moss. I just don't remember which one. Looking back in the back is the cafe.

Q So the Center had a lot of different activities, multi-use space there?

A A little bit when I first moved in, and then mostly it was just what we were doing at OneTaste.

Q And so it had a cafe; is that right?

A Yes. Which became the kitchen for the community.

Q It had a yoga studio?

A They did yoga -- I didn't see this, but they did yoga upstairs, or so I was told, and then later we had a yoga studio next door. Not in this building.

Q Sold books at the book store?

A Before my time. I didn't see a book store.

Q Were there live events there and other activities?

A My first activity there was the dinner that I had mentioned earlier, the Garden of Earthly Delights or whatever it was called. Almost all of this would have been covered up so I wouldn't have seen any of this stuff. There weren't a

lot of non-OneTaste activities when I was around.

Q Okay. And is it fair to say, though, that OneTaste advertised about the Center?

A I don't know. Did they?

Q Can I show you Defense Exhibit 4-A-3.

Do you recognize this?

A No, I do not.

Q Does that appear to be an advertisement for the Center at OneTaste?

MR. FERN: Objection, Your Honor.

THE COURT: Overruled.

A It looks like a screen capture of a flyer that would have been designed or created.

Q Okay.

A I just don't remember ever seeing it.

Q Can I show you Defense Exhibit 4-A-8.

Do you recognize that as a naked yoga story?

A I definitely see what's on the picture. I don't remember seeing this cover of a magazine, I'm assuming, and then there's people that I don't recognize, looks like they are doing some kind of yoga --

MR. FERN: Objection.

A -- somewhere.

THE COURT: Are you offering this document?

MR. ROBOTTI: This was to refresh his recollection,

Your Honor.

THE COURT: Of what?

MR. ROBOTTI: About the marketing activities of OneTaste.

THE COURT: So what's the question to him?

Q The question is, do you recall OneTaste marketing its various events at the Center?

A I don't -- I don't think I have ever seen this.

Q Do you separately recall there ever being instances in which OneTaste marketed the Center?

MR. FERN: Objection. Beyond the scope.

THE COURT: Overruled.

A The one piece of marketing materials that I remember seeing, they had a little flyer in the restroom at the Center when I did the dinner for the Garden of Earthly Delights. I don't remember seeing marketing materials or advertisements out in the world.

Q Do you remember your wife teaching naked yoga classes?

MR. FERN: Objection.

THE COURT: Basis?

MR. FERN: Relevance and beyond the scope.

MR. ROBOTTI: He's denying there's marketing activities.

THE COURT: Overruled. I mean, sorry. Sustained. Sustained.

Next question.

BY MR. ROBOTTI:

Q All right. Let's show you -- do you remember attending Halloween parties at the Center?

A Yes.

MR. ROBOTTI: Can we show, just for the witness, Defense Exhibit 16-A-1.

And this will be just for the witness, the video, Mr. Garland.

THE COURT: It is a video?

MR. ROBOTTI: Yes, Your Honor.

THE COURT: Okay.

MR. ROBOTTI: And we're going to play just from the 7:35 seconds, if we can.

(Witness watches video.)

A I did that.

Q Do you recognize yourself in that video?

A Yes.

Q And is that at an event at the Center, a Halloween party?

A Yes.

MR. ROBOTTI: The defense offers Defense Exhibit 16-A-1?

MR. FERN: Objection. Relevance. And this is way beyond the scope.

THE COURT: Sustained, objection.

Q Fair to say you attended a Halloween party and had a lot of fun at it?

MR. FERN: Objection.

THE COURT: Overruled.

A I definitely attended a Halloween party, yes.

Q Were you in a wig at the Halloween party?

A Yes.

Q Were you laughing and having fun?

A I was definitely laughing. I don't know if it was fun or embarrassment.

Q Okay. You chose to wear the wig?

A Yes.

Q You got dressed up?

A I got a lot of help. Yes.

Q Okay. You were there with other people who were also dressed up?

A Yes.

Q So you were having fun, right?

Hesitancy to acknowledge you are having fun, sir?

A I would say it was not what I would normally consider fun.

Q Is it fair to say that you also had a lot of positive things to say about your time at OneTaste while you were there?

A Yes, of course.

Q All right. In particular, you spoke on video about your time at OneTaste in 2007; do you recall that?
A No. Actually, I forgot all about that.
Q Okay. But do you recall it now?
MR. FERN: Objection.
THE COURT: I think he's answered. Ask the next question.
Q Do you recall, sitting here today, that you spoke on video in 2007 about your experience?
MR. FERN: Objection. He said -- he answered yes originally to the question.
THE COURT: Ask your next -- actually, he can answer it.
Overruled.
A I don't recall being interviewed on video. But did it happen? Quite probably.
Q All right. So I'd like to show you Defense Exhibit 16-L.
MR. ROBOTTI: That's a video, Mr. Garland.
MS. FARRELL: Your Honor, I'm sorry. Objection. I have to make a record. He asked him if he nice things about OneTaste, and he answered yes. So now we're going through the process of impeaching him even though --
THE COURT: Well, I don't know what Mr. Robotti is doing. He hasn't offered this. He's asked the witness to listen to it. I am going to allow him to do that. But if he

offers it and there's an objection, I will take it up then.

Go ahead. You wanted the witness to listen to it, correct?

MR. ROBOTTI: That's correct, Your Honor.

THE COURT: Okay. 16-L?

THE WITNESS: DX 16-L?

Q And if we could --

THE COURT: Mr. Robotti, you want 16-L?

MR. ROBOTTI: 16-L. Correct. And the portion I'd like to play for the witness is from 1:20 to 2:40.

A Where do you want me to end?

Q 1:20 to 2:40.

A Okay.

(Witness watches video.)

(Continued on the next page.)

CROSS-EXAMINATION

BY MR. ROBOTTI: (Continuing)

A I stopped at 2:40.

Q Do you recognize that as a video of yourself in approximately 2007?

A Yeah. I was so young.

Q And did you give that video while you were at OneTaste?

A Yes.

Q And this was part of a video project that people at OneTaste were doing at the time; do you recall that?

A I still honestly don't remember doing this.

Q Okay. But you agree that you were at OneTaste while this was happening?

A Yeah, I mean, that's me and that's the Center.

Q And during this video interview, you talked about the benefits that you felt while you were at OneTaste?

MS. BENSING: Objection. Hearsay.

THE COURT: Sustained.

Q Is it fair to say that while you were at OneTaste in 2007, you had positive views about your experience there?

A Yeah, that's fair to say.

Q You felt that OneTaste was unlike anything you had ever seen or experienced?

A That's what I said.

Q Okay. And you had been looking for a group of women that

were really turned on, that's why you joined?
A Yeah, that's what I said.
Q And when you found it, you felt this is it, correct?
A Mm-hm.
Q And you said you really enjoyed, what you called, the authentic unpredictability; is that right?
MS. BENSING: Objection. Hearsay.
THE COURT: Yes, sustained.
Q Is it fair to say that once you joined OneTaste, you enjoyed the authentic unpredictability of it?
A Um, yeah. Yeah, that's fair to say.
Q Okay. Is it fair to say that while you were there, you liked that you never quite knew what was going to happen?
A For the most part, yes.
Q And you described OneTaste -- or you felt OneTaste was a roller coaster all the time, right?
A Yes, that's what I said.
Q A lot of fun, right?
A Um...
In a way, yeah.
Q So, at the time, you felt it was a lot of fun, right?
A Not like that kind of fun, but yeah.
Q Really intense and a hell of a ride; is that fair?
A Mm-hm.
Q And your desire while you were at OneTaste was to support

women in their expansion; is that fair?
A Yes.
Q And what had been missing in your life before OneTaste was that you did not have an appreciation and understanding of women in your life; is that right?
A That seems consistent with what I said. It doesn't quite hit the mark of what I meant to say, but it's very close.
Q And while you were at OneTaste, what you really wanted was to support women, right?
A Mm-hm. Yes.
Q And that's why you were there?
A Yes.
Q And you thought it was spectacular to be around a group of women you could empower and support, right?
A Yes.
Q And that's why you were there, right?
A Yes, that's why I was at OneTaste.
Q And you previously had thought that women didn't like sex; is that fair?
A At one point in my life, yes, I did think that.
Q And through OneTaste, you had learned that women love sex, right?
A No. Women are -- what I learned when I was at OneTaste is that women are not a monolith. Individuals who have sex, some individuals do not. Some individuals are women and some

individuals are not.
Q So it's fair to say at OneTaste you learned how to better relate with women?
A I sure hope so.
But it's more that I could now see the individual rather than the gender, personally.
MR. ROBOTTI: All right. I'd like to show you -- or play for just the witness the second clip of this same exhibit.
THE COURT: I think you need to ask a question first.
MR. ROBOTTI: Yes, Your Honor.
Q Now, do you recall, in this interview, describing your goals for --
MS. BENSING: Objection.
THE COURT: Yes, sustained.
Q Do you recall in 2007 what your goals were for your time period, the next year at OneTaste?
A I do not recall what my goals were for 2007.
Q And would the video from that time period refresh your recollection?
A We can try it.
Q All right. So I'm going to show you the second clip of the same exhibit, which will be from 5:08 to 6:58.
A Excuse me, 5:08 to?

Q Mr. Garland could help you. 5:08 to 6:58.

MR. ROBOTTI: It's 16-L, Mr. Garland.

A Sorry, where am I ending?

Q It should end at the end there, which is 6:58.

A Okay.

Q So does that refresh your recollection about your goals for your time at OneTaste at that point?

A Well, again, I still don't remember this recording session. Obviously it happened, I just don't remember it.

Q All right. But is it fair to say that in 2007, you were at OneTaste because you wanted to help women in the community, develop a culture where women are equal to men in all ways?

A That is what I said, yes.

Q So that your daughter and daughter's daughter could have freedom of expression that they should have?

A That is also what I said, yes.

Q And you wanted to play with women and be around as fully as you can, right?

A Um, I'd have to listen to it again, but that's close.

Q And you said your relationship to your desire was strong and ever-present?

MS. BENSING: Objection. Hearsay.

THE COURT: Sustained.

Q You felt, at that time, your relationship to your desire was strong and ever-present?

A I said something like that back then, yes.

Q And that was as a result of your work at OneTaste, correct?

A Actually, the -- that part was probably not as a result of OneTaste.

Q All right. And you knew -- you felt then that you knew exactly what you wanted at all times?

A I did think that, yes.

Q And you felt it in your body, like electricity buzzing all the time, right?

MS. BENSING: Objection. Relevance. Outside the --

THE COURT: Yes, this is going on and I'll sustain that objection.

Do you have another line of questioning that you're planning to get to?

MR. ROBOTTI: Yes, Your Honor.

I mean, this...

THE COURT: Go ahead.

Q Now, even after you left OneTaste, you still continued to do the OM practice; is that fair?

A No, it's not.

Q All right. Is it true that in 2020 you did an OM demonstration on the BBC?

A Yes.

Q So you continued to do the practice after you left

OneTaste, right?
A No, I did not.
Q Well, you did it on that particular instance in 2020, correct?
A Yes.
Q And that was with your wife, correct?
A Yes.
Q And that's Beth Aucoin?
A Yes.
Q And you met her while you were at OneTaste; is that right?
A That's correct.
Q And you demonstrated at that time, for an audience of about four and a half million people, how to do the OM practice; is that right?
MS. BENSING: Objection. Relevance.
THE COURT: Yes, sustained.
Q Is it fair to say that you have a competing business?
A With what?
Q With OneTaste.
A No.
Q Do you have a business about How to Train a Man?
A Two points. It was never a business. And that, the last time I did anything with that was like over a decade ago and it was not competing with OneTaste even back then.

Q And it's a program that you posted about as recently as 2020, correct?
A Yeah, I think during COVID I was planning to convert the How to Train a Man stuff to, like, an online course.
Q And that is a program where you train women about how to interact with men, right?
A It's a workshop with a series of exercises where women can practice techniques, based on behavioral psychology, on how to be more deliberate in their relationships with their partner.
Q And so similar to OneTaste, it is a training --
A How is that relate -- similar to OneTaste?
Q So similar to OneTaste, it is a wellness company where you've trained women about relationships, correct?
A I don't recall OneTaste training women about relationships.
Q And it is accurate that the same customers that you would be seeking for your program are also people who could be interested in OneTaste, right?
A Sure.
Q And that gives you a reason to go out and talk negatively about OneTaste in the Press; is that right?
A No.
Q And it's true that you have been talking negatively about OneTaste in the Press, right?

MS. BENSING: Objection.
THE COURT: Yes, sustained.
Q It also gives you an incentive to talk negatively about OneTaste here today, right?
A I'm not offering the How to Train a Man workshop, so I don't know how that would be a financial incentive for me.
Q It is something that you have done on and off over the last 15 years, correct, sir?
A Heavy emphasis on the "off" part and less on the "on."
Q Now, you testified on direct that you also participated in BDSM activities; is that right?
A I have in the past, yes.
Q And BDSM means bondage, discipline or --
A No. Bondage, dominance, sadism, masochism.
Q And that's a sexual practice, correct?
A Doesn't have to be.
Q It's something consenting adults are free to participate in?
A Yes.
Q To your knowledge, you've never broken any laws when you engaged in BDSM; is that right?
MS. BENSING: Objection.
THE COURT: Yes, sustained.
Q You participated in BDSM before OneTaste?
A Yes.

Q You participated while at OneTaste?
A Yes.
Q Now, you mentioned someone named Reese Jones, right?
A I did.
Q And that you worked with Nicole and other employees of OneTaste to put scenes on for him, right?
A I don't know that they were employees, but yes, I did work with Nicole Daedone to put on scenes with other members of the community.
Q And some of these scenes had a number of different people participating in them, correct?
A Some of them did, yes.
Q And Reese Jones was not the only person OneTaste created scenes for; is that right?
A To my knowledge, there's only one other person and there was only one other scene for that one person.
Q There were scenes produced for Om Rupani and Susanna Thomas (ph); is that correct?
A There was definitely -- I know of one scene for Om.
Did we do one for Katanic (ph)? Okay. You're telling me we did that, okay.
Q Is it correct? It's a question, sir. Do you recall that?
A It's entirely possible.
Oh, wait, Katanic. Oh, I do remember that one.

Yeah.
Q So there were scenes done for other people aside for Mr. Jones, right?
A They were not -- so I wasn't involved in the Om one, so I don't know what that one was like.
The Katanic one was a different animal than the ones we did for Reese.
Q And the scenes were basically a theatre; is that correct?
A They were a theatre?
Q They were kind of putting on a play?
A Oh, "theatre." Yeah.
Q And this is a play that kind of took place in various locations instead of on a stage, right?
A Yeah. I don't think we ever used a stage.
Q And these scenes could have sexual components as you testified about, correct?
A The scenes could have sexual components, yes.
Q But they did not always have sexual components, right?
A Right. My scenes with Reese generally did not include sexual content or activities.
Q And all these scenes were planned out ahead of time, right?
A The elaborate ones, yeah.
The ones that I did with Reese, not so much.
Q And people at OneTaste got together to discuss them?

A A subgroup of the people at OneTaste got together to plan them.
Q And that subgroup would discuss the theme of the scene; is that fair?
A Mostly, yeah. Yes, we would be told what the theme should be and we would come up with things to do that were consistent with that theme.
Q And they would discuss the different activities that would take place, right?
A Mm-hm.
Q And one of the purposes was to make sure that people would feel comfortable about what was about to happen, right?
A No. The purpose was to put together a script so we knew what props we needed and who was going to be involved and what the logistics were going to be.
Q And people would know ahead of time what they were getting into; is that fair?
A Yeah.
Q And all these scenes were consensual; is that correct?
A To the best of my knowledge. I don't know of anybody who didn't consent to participate in the scene.
Q And you consented to participate in the scenes as well, sir?
A Yes. In fact, I stopped -- I stepped out when I withdrew my consent.

Q And there were also safe words for these scenes; is that right?
A Typically, yeah. I don't know if the elaborate scenes they used had safe words.
Q In general, there were safe words for people at OneTaste, right? That was something you learned there?
A I did not learn safe words at OneTaste.
Q Were safe words in use at OneTaste?
A Not really.
Q Are you familiar with the green-yellow-red scheme?
A Yes.
Q And that's something that was used at OneTaste?
A It's used almost universally in BDSM.
Q It basically has the same meaning as stoplights, right?
A Yes.
Q And if someone said "red, that meant stop, right?
A It depends on what you negotiated with whom you're doing the scene, what "red" actually means. For some scenes it means stop and check in. Some scenes it means stop and the scenes stop.

THE COURT: Can I just stop you for a moment, Mr. Robotti.

It's 5:30 and I don't want to keep the jury really longer. If you're on this topic and have one or two questions, I'll let you do that. If not, we're going to end

for the evening.

MR. ROBOTTI: I have maybe two more, two or three more questions just on this to wrap up.

THE COURT: Okay.

MR. ROBOTTI: Very briefly.

THE COURT: Let's do that.

BY MR. ROBOTTI:

Q So, fair to say everyone who participated in these scenes was an adult?

A Oh, of course.

Q And as you mentioned, you just left some of the scenes where you didn't want to participate, right?

A I got to a point in my interactions with Reese that I was uncomfortable with where we were going, so I stepped back.

Q Okay. And other people had that same option too, right? They didn't want to participate in the scene, so they didn't have to?

A When I was running the scenes, which wasn't all of them, but when I was overseeing them, the thing that I would say to people was: If you get uncomfortable, please come talk to me before you bounce out so we can figure out how to make the scene work with you bouncing out.

MR. ROBOTTI: That should be it for today, Your Honor.

THE COURT: Okay. The witness can step down.

(Witness steps down.)

THE COURT: Okay. It's slightly after 5:30. I appreciate everybody's attentiveness. Happy Friday. I hope everybody has a wonderful weekend.

And I would ask you to please come promptly at 9:15. I know Monday mornings can be very difficult for all of us, but if you could really try. Everybody was wonderfully on time today, so please keep it up and have a wonderful weekend.

Let me just remind you again. As I told you before, I'm going to be reminding you of the same things over and over again.

Over this break, don't talk about the case with anyone, don't let anyone talk to you about it, including each other.

If anyone approaches you about the trial and tries to discuss it with you, please let me know through my deputy right away.

Don't read, listen to, watch any news or media reports of the trial.

Don't conduct any independent research about the case or the matters in the case or the individuals involved in the case.

Don't talk to any of the parties, witnesses, or the lawyers about anything.

And please keep an open mind.

But again, I appreciate your attentiveness, your promptness, and I wish you all the best weekend. And we will see you at 9:15 gathered in the jury room on Monday. Thank you.

(Jury exits.)

THE COURT: Everyone may be seated.

A couple of housekeeping matters.

One very minor thing, but Mr. Fern, you had offered exhibits that were already in evidence, 207 and 208. Just keep track of what has already come into evidence so that we're not confusing the record about what has already been admitted. Those were already in.

MR. FERN: Okay.

THE COURT: Minor point, but just keep track of it.

And I think it makes sense to have the parties come at -- be in the courtroom by 9:00 on Monday in case there are any issues.

MS. BENSING: Your Honor, can I raise three things?

THE COURT: Go ahead.

MS. BENSING: It will be pretty fast.

THE COURT: That's fine.

MS. BENSING: The first is just that we'll need to -- we did not expect this witness to still be on the stand, and so we'll need to speak to him about logistics. And so, we obviously will not discuss with him the substance of any

testimony or anything substantive at all, just logistical.

THE COURT: That's fine.

MS. BENSING: On that line, I do want to make a record that the trial is going, certainly from the Government's perspective, significantly slower than we anticipated and I just want to alert the Court of that fact. I think that the Government has been trying to get through its witnesses' directs swiftly. I think that there have been quite a few delays in the cross-examinations and cross-examinations that are going beyond the scope of the direct examination and I am concerned. We are now three days in, if you don't count jury selection, and we are still only on our second witness. We have a number of witnesses at this trial, and so I just want to alert the Court that we are behind schedule from the Government's perspective.

THE COURT: Okay. I think the parties need to figure out more efficient ways to present their evidence. If you want to refresh witnesses' recollection, it's just got to be done more quickly. So you have the weekend, you will be thinking about those issues, and we will be moving things along.

What was the rest of what you wanted to raise?

MS. BENSING: Just the third thing is just with respect to the ex parte privilege filing that the Government hasn't seen and with respect to the OneTaste custodian issue.

I think it can be something that we take up on Monday morning, but we do need to start -- be in a position to put that evidence on, Your Honor.

THE COURT: I'm considering all options, including Option No. 1.

MS. BENSING: Thank you, Your Honor.

MS. FARRELL: On that, Your Honor --

THE COURT: Yes.

MS. FARRELL: -- we found more case law on that point that we can either just e-mail to your deputy or put a letter in.

THE COURT: Right.

Has anything changed or is OneTaste still refusing to provide a competent records custodian who will not invoke privilege?

MS. FARRELL: So Mr. Pelletier offered up an additional custodian. The person is Kevin Williams, who you may recall was --

THE COURT: Oh, I remember Mr. Williams. Yes.

MS. FARRELL: Yes.

So our concern is that if Mr. Williams -- as you may recall, you asked him a number of questions that he did not answer and then gave a speech about his view of the Government's conduct.

THE COURT: I remember Mr. Williams and his speech,

yes.

MS. FARRELL: Our concern is that if we call him for this purpose, there may be problems, like veering on mistrial, and so our inclination is not to go with that option.

THE COURT: Mr. Williams is a lawyer, right?

MS. FARRELL: Correct.

THE COURT: Where is he born?

MS. FARRELL: I do not know.

THE COURT: Okay. If you want to give the Court more case law, you're welcome to do that.

MS. FARRELL: Thank you.

THE COURT: Okay. Does anyone to raise any other issues?

How much more time do you think, Mr. Robotti, on cross that you have?

MR. ROBOTTI: I don't think much more, Your Honor. Maybe a half-hour or so.

THE COURT: Okay. Are you going to try to be using more videos?

I understand why you would want to refresh with videos. It does take time and the jury is sitting there watching, you know, this man with the headphones on, right?

MR. ROBOTTI: I understand, Your Honor. I think with -- this witness has been fighting me on quite a bit of things, so I have to play the videos for him in order to get

the information. So I'm hopeful it won't be like this with other witnesses.

THE COURT: How many more videos do you have?

MR. ROBOTTI: I think I have refreshed him. Maybe one more on this, but I don't think there is more on that.

THE COURT: Okay.

And we will reconvene at 9:00 on Monday, you can come in. If you have any issues, let Mr. D'Agostino know and he'll let me know to come down.

MS. BONJEAN: Your Honor, I'm going to be dropping off a binder for you --

THE COURT: Okay.

MS. BONJEAN: -- for the next witness that has -- it's almost predominately impeachment. I'm not giving it to the Government right now.

THE COURT: Okay.

MS. BONJEAN: And if you don't want me to give it to you, I won't, but I'm not giving it --

THE COURT: That's fine.

But let me just talk about exhibits and exhibit lists. I've never received from parties exhibit lists for trial that are not complete. So, you know, I'm trying to keep track very carefully of what is coming in, but I've got various different lists from the Defense and then I've got the Government list, which I think does not have 3500 material on

it. So to the extent you are going to be using either of -- you know, any party is going to be using 3500 material, it should be on a list that I have. So I don't know how the parties want to kind of handle this, but I don't want to be shuffling through multiple versions of lists. So I am happy to take the Defense complete list for the Court. For the Court.

MS. BONJEAN: I don't know if I can give you that. We have 6,000 exhibits marked now.

THE COURT: Okay. I just mean -- okay.

MS. BONJEAN: I mean the Government gave us 6,000 exhibits.

THE COURT: But what I'm saying, Ms. Bonjean, is that I'm not going to require you to give a complete exhibit list to the Government at this time. I just need what you have as complete as you have it so that I can -- when the exhibits are coming in, I can check.

You know, for instance, I mentioned there was -- you know, the Government put in two exhibits today that were already in. I am keeping track of what is coming in. So I just want to have the list from the Defense. If you don't -- if you think there's some strategy that's going to be demonstrated by this, certainly I don't think there's any reason not to give it to me. And I really need it.

MS. BONJEAN: I'm not talking -- I'm just letting

the Court know so that if there's any suggestion that there's an ex parte communication --

THE COURT: No, it's not ex parte.

MS. BONJEAN: Okay.

THE COURT: You're giving me something earlier than you're going to be giving the Government. It's not going to be content substantive. You're not asking me to make a ruling. You are simply giving me, really for logistical reasons, lists.

And I don't want different lists every day. If there is a way to give me, even if it's overinclusive at this point, that has all the numbers letters. Somebody will explain to me why the numbers and letters are as they are, but maybe that's for some time other than Friday evening. But I do need to be able to follow along. So, that's how we're going to do that.

Anything else?

Ms. Cohen, you look like you're --

MS. COHEN: No, I was going to say, I think our problem was we had it numbered and then we saw your rules require letters, so there was --

THE COURT: Right.

MS. COHEN: Hence the confusion.

And there were a lot of exhibits, so.

THE COURT: Okay. Okay, that's fine. I just need a

list.

MS. COHEN: Yes.

THE COURT: And I think I have a pretty complete Government list, but I don't have a 3500 list. So I can take that.

MS. FARRELL: We'll get that to you.

And that's my fault. I found a document I wanted and stuck it in. I didn't realize you didn't have the list.

THE COURT: That's fine.

I mean, I can pull up everything as you're pulling it up, but I do sometimes like to look at the hard copies. And I excused the parties from giving me multiple copies, but I really do need at least one hard copy.

And I also think the witnesses sometimes need hard copies because some of these documents are miniscule. And if you're blowing up only a portion of it, I think some of the witnesses need to be able to look at the whole document to -- if you're trying to refresh their recollection, blowing up three sentences is just not going to cut it. So, you know, that might quicken the pace as well.

So I think everyone should kind of focus on that because we're -- you know, there is no reason why we should be on Witness 2, I think, at this point, frankly. So whatever the parties can do to move things along. And I really am talking about logistically now. I'm not talking even content.

So it's really just -- I think, you know, Ms. Bonjean, I think you were moving things along.

MS. BONJEAN: I went as fast as I could.

THE COURT: Yes, I know. And that's fine. But we need to keep that, keep that going.

And Mr. Robotti, maybe you could get a handle on some of your exhibits over the weekend and just make sure we -- when you come back on Monday we just do it. I'm not criticizing you for today, I'm just encouraging you to make sure that you have everything lined up, you know, get everything teed up on the computers.

Do you want this computer back from me?

MR. ROBOTTI: Yes.

THE COURT: I don't need it for the weekend, certainly.

MR. ROBOTTI: We'll take it back, Your Honor.

THE COURT: Okay.

MR. ROBOTTI: I think our plan is going to be every day load up whatever you need for the day and we'll deliver it up to Mr. D'Agostino.

THE COURT: Okay. That's very helpful.

MS. BONJEAN: It would be helpful if the Government told us who the next -- we only have -- we're only one witness down the --

THE COURT: Yes, but at the pace that it's going, I

mean --

MS. BENSING: We are genuinely a little bit stunned at the pace and so we are having to, like, shift schedule, like, logistics around. Like, we have to move around the next two witnesses, both of whom are -- they fall within the category of victim witness from the Government's perspective and so I think they may be lengthier. I hope not as lengthy as our first witness, but --

THE COURT: I mean, I've been giving the parties some leeway. But, you know, some of the cross is going beyond the scope and, you know, I think we're going to move things along.

Okay. Thank you, all. Have a good weekend.

MS. BENSING: Thank you, Your Honor.

MS. FARRELL: Thank you, Judge.

THE COURT: And I will give you back the computer.

(Matter adjourned to Monday, May 12, 2025 at 9:00 a.m.)

INDEX


| WITNESS | PAGE |
|---|---|
| REBECCA HALPERN | 627 |
| CROSS-EXAMINATION BY MS. COHEN | 627 |
| CROSS-EXAMINATION BY MS. BONJEAN | 658 |
| REDIRECT EXAMINATION BY MS. FARRELL | 781 |
| RECROSS-EXAMINATION BY MS. COHEN | 794 |
| RECROSS-EXAMINATION BY MS. BONJEAN | 803 |
| CHRISTOPHER HUBBARD | 807 |
| DIRECT EXAMINATION BY MR. FERN | 807 |
| CROSS-EXAMINATION BY MR. ROBOTTI | 861 |
| VOIR DIRE EXAMINATION BY MR. FERN | 892 |
| CROSS-EXAMINATION BY MR. ROBOTTI (cont'd) | 893 |

| EXHIBIT | RECEIVED |
|---|---|
| Defense Exhibit 21-AO | 632 |
| Defense Exhibit 21-BF | 637 |
| Defense Exhibit 21-AS | 638 |
| Government Exhibits 380, 208, 207, 61, and 236 | 807 |
| Government Exhibit 2430-R | 848 |
| Defense Exhibit 4-F | 875 |
| Defense Exhibit 4-A-4 | 894 |