

U.S. Department of Justice

United States Attorney
Eastern District of New York

KTF/NCG/SMF
F. #2018R01401

271 Cadman Plaza East
Brooklyn, New York 11201

September 4, 2025

By E-mail

Probation Officer Meghan Wing
United States Probation Office
Eastern District of New York
202 Federal Plaza
Central Islip, New York 11722

      Re:    United States v. Cherwitz, et al.
                Criminal Docket No. 23-146 (DG)

Dear Officer Wing:

      On June 9, 2025, following a jury trial, a jury in the above-captioned case convicted defendant Nicole Daedone of forced labor conspiracy. Following that verdict, the Court scheduled defendant Daedone's sentencing for September 26, 2025. A presentence investigation followed. On August 21, 2025, the United States Probation Office ("Probation") disclosed its Presentence Investigation Report ( "PSR") to the relevant parties.

      The government now respectfully writes with respect to the PSR for Nicole Daedone. Following its review of the PSR, the government hereby submits two objections to it. First, the government objects to Probation's failure to apply a two-level enhancement pursuant to United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") § 3B1.3 for Daedone's abuse of her position of trust within OneTaste. Second, the government objects to Probation's failure to apply a two-level enhancement pursuant to U.S.S.G. § 3C1.1 for Daedone's obstruction of justice with respect to the instant offense. For the reasons that follow, the PSR should be modified to impose those two enhancements.

I.      The Abuse of Position of Trust Enhancement

      The government respectfully objects to the PSR's failure to apply a two-level enhancement under U.S.S.G. § 3B1.3 for Daedone's abuse of a position of trust. As OneTaste's co-founder, former Chief Executive Officer, and self-styled spiritual guru, she wielded extraordinary authority over the organization and its members. That position of trust enabled her to direct and control victims' conduct and to commit the forced labor conspiracy for which she was convicted.

A.   Factual Background

As proven at trial, OneTaste, Inc. ("OneTaste") was a privately held sexuality-focused wellness company founded by Nicole Daedone and another individual in 2004 in San Francisco, California. PSR ¶ 4. Daedone served as OneTaste's Chief Executive Officer from approximately 2006 through 2017. Id. ¶ 7. Under her leadership, OneTaste marketed courses, coaching and "orgasmic meditation" ("OM") events from its headquarters in San Francisco and hubs in New York, London, and cities around the United States. Id. ¶ 4. The company grew into a multi-million-dollar enterprise.

From 2006 through May 2018, Daedone exercised day-to-day control over OneTaste's structure, messaging and personnel. She was also OneTaste's "leader" and "spiritual guru." In that role, Daedone occupied a unique position of trust over OneTaste's members. Daedone cultivated the image of a visionary mentor whose guidance promised empowerment, healing and safety, thereby encouraging participants to entrust her with their emotional, financial and physical well-being. Trial testimony of numerous victims, other individuals formerly in OneTaste, and one of Daedone's co-conspirators described a hierarchical organization in which Daedone's teachings were exalted, dissent was not tolerated, and members were expected to demonstrate absolute fealty to her ideology. See, e.g., id. ¶ 76.

As part of the intake and coaching model Daedone led, OneTaste collected deeply sensitive personal information—such as members' trauma histories and sexual experiences—that participants disclosed in reliance on Daedone's promise of healing. OneTaste leaders then used that confidential information to shape assignments, monitor compliance and exert influence.

The trust Daedone commanded extended into every aspect of participants' lives. Many participants lived in communal residences overseen by OneTaste, id. ¶ 5, with sleeping arrangements, id. ¶ 44, daily schedules and movements coordinated by leadership, id. ¶ 67. This communal setup normalized constant oversight and made members dependent on OneTaste for housing and basic needs—conditions Daedone and her co-conspirators leveraged to direct members' work and participation in company activities.

Daedone also controlled core employment conditions. After securing members' allegiance, she and others within OneTaste directed a seven-day-a-week workweek with little or no pay, id. ¶ 52, changed roles and locations on short notice, id. ¶ 50, and encouraged members to incur debt to finance costly courses, id. ¶ 47. These practices, combined with the collection of intimate personal information and communal living arrangements, consolidated Daedone's influence over members' livelihoods and social networks. Id. ¶ 42.

Daedone's claimed spiritual authority also extended into members' sexual conduct, including assignments that served OneTaste's business interests. Daedone, together with Cherwitz, groomed and directed members to engage in sexual acts—including with current and prospective investors and clients—for OneTaste's financial benefit. These assignments were framed as spiritually beneficial but in fact were designed to advance OneTaste's financial and reputational interests. Id. ¶ 59. Witnesses testified that they were coerced into becoming

2

"handlers" for OneTaste investors, including living with one of them and performing demeaning tasks at his direction. Id. ¶ 15-16.

In short, Daedone's position as OneTaste's leader was not simply administrative. She stood at the apex of the organization as its spiritual and managerial authority, with discretion over members' livelihoods, housing, finances and intimate relationships. Participants relied on her to guide them toward personal growth and entrusted her with their deepest vulnerabilities. Instead of safeguarding that trust, Daedone exploited it to coerce labor, extract money, and direct sexual conduct—all while cloaking the exploitation in the guise of spiritual mentorship. That reliance made her victims more compliant, less likely to question directives, and less able to detect or report the wrongs committed against them, thereby facilitating both the commission and concealment of the forced labor conspiracy with which Daedone was convicted of committing.

B. Legal Standard

United States Sentencing Guidelines Section 3B1.3 instructs a sentencing court to increase a defendant's offense level by two levels if it finds that she "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3 (further noting that the enhancement applies where the position of public or private trust made the detection of the offense or the defendant's responsibility for the offense more difficult); see also United States v. Alston, 899 F.3d 135, 151 (2d Cir. 2018). The Guidelines define a position of public or private trust as "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." Id. cmt. n.1.

Whether a position is one of "trust" within the meaning of § 3B1.3 is to be viewed from the perspective of the offense victims. See United States v. Anselm, 610 F. App'x 64, 67-68 (2d Cir. 2015); United States v. Wright, 160 F.3d 905, 910 (2d Cir. 1998). A position of trust exists where the defendant occupied a role imbued with discretionary authority or responsibility for the well-being of victims. Wright, 160 F.3d at 910-11. "[T]he primary trait that distinguishes a position of trust from other positions is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." Anselm, 610 F. App'x at 67-68 (citing United States v. Laljie, 184 F.3d 180, 194) (2d Cir. 1999); see also United States v. Stewart, 686 F.3d 156, 178 (2d Cir. 2012); United States v. Castagnet, 936 F.2d 57, 61-62 (2d Cir. 1991) ("If one party is able to take criminal advantage of the relationship without fear of ready or quick notice by the second party, the second party has clearly placed a level of trust in the first."). Moreover, a position of trust does not require "a legally defined duty such as fiduciary duty." United States v. Thorn, 317 F.3d 107, 120 (2d Cir. 2003). It is possible for a defendant to abuse a position of trust whether or not she is a leader of the criminal enterprise. See U.S.S.G. § 3B1.3.

C. Discussion

Defendant Nicole Daedone's role as the founder and leader of OneTaste placed her squarely within the kind of position of trust contemplated by U.S.S.G. § 3B1.3. Daedone was not simply an organizer of a business enterprise—she was an authority figure upon whom victims relied for their physical, emotional and financial well-being. Victims joined OneTaste—

and remained with it—because they trusted Daedone's representations and relied on her judgment. Members of OneTaste entrusted Daedone with intimate access to their personal, financial and emotional lives—access premised on her purported benevolence and expertise.

But, instead of honoring that trust, Daedone weaponized it. She used her authority to coerce labor, demand financial resources, and subject members to psychological control. Indeed, just as a doctor who exploits patient confidences, see United States v. Ntshona, 156 F.3d 318, 321 (2d Cir. 1998), a financial advisor who defrauds her clients, see United States v. Hussey, 254 F.3d 428, 432 (2d Cir. 2001); United States v. Santoro, 302 F.3d 76, 80 (2d Cir. 2002), a public official who betrays the public's trust, see United States v. Giordano, 172 F. App'x 340, 344 (2d Cir. 2006), or an attorney who exploits a client's faith, see United States v. Walker, 191 F.3d 326, 338 (2d Cir. 1999), is held accountable for abusing discretionary authority, Daedone should be held accountable for her abuse of her position of trust: she preyed upon her victim's most intimate and personal details.[1] Victims came to Daedone seeking meaning and protection; she exploited that reliance to bind them to OneTaste while profits inured to her and she concealed her exploitation from outsiders. Daedone accomplished this in several ways.

First, the evidence showed that victims disclosed highly sensitive trauma histories and sexual experiences to Daedone or her co-conspirators. OneTaste used those confidences as tools of control. That mirrors the precise concern underlying § 3B1.3: the exploitation of discretionary access to information that makes detection and resistance more difficult.

Second, Daedone stood at the apex of a system of coercion that controlled members' housing, employment conditions and finances—areas of life that demanded trust in her judgment. Victims reasonably relied on her claimed expertise as a teacher and submitted to sudden relocations, uncompensated work and financial obligations to OneTaste. By using her discretionary authority to entrench dependence, she significantly facilitated both the commission and concealment of the offense. Daedone had the discretion and lack of supervision that provided her with "the freedom to commit a difficult-to-detect wrong," and she took full advantage of that freedom to force her victims to work for her. See Anselm, 610 F. App'x at 67-68.

---

[1] The abuse of trust enhancement can apply even when a defendant is not in a traditional fiduciary role with respect to the victim, such as an attorney-client, doctor-patient or investment advisor-client relationship. See, e.g., United States v. Ransom, 756 F.3d 770, 775-76 (D.C. Cir. 2014) (in sentencing defendant for fraud in connection with the operation of his property management company, district court did not err in holding that adjustment was justified because he was vice president of company with whom defrauded apartment owners dealt and whom they trusted); United States v. Baker, 200 F.3d 558, 564 (8th Cir. 2000) (not clearly erroneous for district court to conclude that an insurance agent who persuaded her elderly clients to give her personal control over their premium payments, and then misappropriated those monies, occupied and abused a position of private trust).

Third, Daedone extended her authority into victims' intimate lives, directing sexual conduct under the guise of spiritual advancement. Just as a teacher who exploits students who rely on their expertise and judgment, see United States v. Booth, 996 F.2d 1395, 1396 (2d Cir. 1993), or a doctor who abuses patients' confidences, see Ntshona, 156 F.3d at 321, abuses a position of trust, Daedone manipulated members' faith in her guidance to coerce sexual acts for OneTaste's financial benefit. Indeed, instead of honoring that trust, Daedone weaponized it to coerce labor, demand financial resources, and subject members to reputational and physical harm.

Finally, the trust Daedone commanded was not incidental to the offense, but central to its commission and to the conspiracy's durability. Victims remained compliant, and, in one case, failed to seek appropriate medical care, see PSR ¶ 77, precisely because they believed Daedone was leading them through a transformative process for their benefit. This dynamic both facilitated the forced labor scheme and concealed it from outsiders, as members' blind reliance made them unlikely to question directives or seek help. Thus, the conspiracy's durability depended on Daedone's ability to cloak exploitation in the guise of mentorship and spiritual advancement.

In sum, Daedone's abuse of her position as OneTaste's spiritual leader and chief executive epitomizes the conduct § 3B1.3 seeks to punish. She was entrusted with her victims' most personal vulnerabilities and used that trust to perpetuate, deepen and conceal their exploitation. For those reasons, Probation should impose the two-level enhancement § 3B1.3 demands.

II.     The Obstruction of Justice Enhancement

The government respectfully objects to the PSR insofar as it declines to apply a two-level enhancement under U.S.S.G. Section 3C1.1 for obstruction of justice. In particular, and for the reasons discussed below, defendant Daedone—by directing others, including her subordinates and co-conspirators, to delete incriminating text messages—engaged in conduct that squarely fits within the Guidelines' definition of obstruction.

In particular, the PSR's conclusion that the enhancement does not apply, see PSR ¶ 98 ("Although Daedone appears to have participated in obstructive conduct, prior to the investigation regarding her text messages, it does not rise to the level of obstruction of justice."); see also id. ¶ 102 ("The probation officer has no information that the defendant impeded or obstructed justice."), unduly narrows the scope of § 3C1.1, disregards the plain language of the commentary and ignores binding Second Circuit precedent. Daedone's conduct was not a mere afterthought or tangential attempt to preserve her own reputation—it was a calculated, deliberate strategy designed to conceal evidence, frustrate law enforcement and protect both herself and her criminal associates from accountability. This is precisely the type of conduct for which the enhancement was designed.

5

A.   Factual Background

As reflected in the PSR, the government's investigation was "unable to obtain Daedone's text messages and the investigation revealed an email thread wherein Daedone discuss[ed] deleting evidence due to legal repercussions." PSR ¶ 88. According to the PSR, "this occurred after the conspiracy ended but before Daedone was indicted." Id. Additionally, "at the time Daedone deleted the text messages, she was already aware that individuals began making complain[t]s against OneTaste." Id.

Despite the PSR's assertions, the trial record underscores that Daedone's efforts to delete incriminating evidence and to instruct others to follow suit was part of a deliberate campaign to obstruct justice. Specifically, GX 2075-D-R shows that on March 9, 2016, Daedone told OneTaste's Chief Executive Officer, Joanna Van Vleck, to "erase your texts. . . ." In response, Van Vleck promptly confirmed, "Got it. Will do," and then, "Done." The surrounding circumstances make plain that Daedone's order was driven by OneTaste's escalating legal troubles. As the same exchange reflects, Daedone expressed concern about OneTaste being "seen as prostitution," and Van Vleck directly asked her, "What would a prosecutor say the purpose of OM is[?]" Van Vleck further suggested that removing the financial component of the practice would eliminate "many of our risks," and that reframing OneTaste as devoted to "higher consciousness or spiritual awakening" would provide a "bit of protection from the 1st amendment."

These efforts were not merely attempted—they were effective. As Daedone admitted in January 2017 in GX 2256-D-R, she "erased everything when the legal scare last year." The record therefore demonstrates that Daedone's deletion of text messages and direction to others to do the same were integral to her broader strategy of concealing incriminating evidence and obstructing the investigation into OneTaste's unlawful conduct. Indeed, throughout the government's case-in-chief, not a single text message solely between Daedone and Cherwitz was introduced. In sum, Daedone's obstructive conduct thwarted the government's efforts to obtain such evidence.

B.   Legal Standard

Section 3C1.1 provides that a two-level increase applies "[i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." U.S.S.G. § 3C1.1. The facts necessary to support an obstruction of justice enhancement need only be proven by a preponderance of the evidence. United States v. Khedr, 343 F.3d 96, 102 (2d Cir. 2003).

While "[o]bstructive conduct can vary widely in nature, degree or planning, and seriousness," U.S.S.G. § 3C1.1 cmt. n.3, the commentary to Section 3C1.1 specifically lists "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding" as an example of covered conduct. Id. cmt. n.4(d). Thus, destruction of material evidence amounts to obstruction

6

of justice. The Second Circuit has consistently interpreted the enhancement to apply where the defendant "consciously acted with the purpose of obstructing justice." United States v. Zagari, 111 F.3d 307, 328 (2d Cir. 1997); United States v. Reed, 49 F.3d 895, 900 (2d Cir. 1995).

  C. Discussion

  Here, the two-level increase for obstruction of justice applies. First, Daedone's obstruction was not incidental or peripheral—it was integral to the operation and concealment of the OneTaste conspiracy. Ostensibly, the text messages she directed others to delete contained the very contemporaneous communications that would have revealed the power dynamics, coercion, and exploitation at the core of the forced labor scheme. By instructing subordinates and co-conspirators to delete these records, Daedone deprived investigators of evidence that was uniquely probative, not only of her own role but also of the structure and scope of the conspiracy. This conduct made it more difficult for the government to reconstruct timelines, corroborate victim accounts and identify additional culpable actors. In short, her obstruction did not merely inconvenience the investigation; it materially impeded it.

  The Second Circuit has recognized that such conduct warrants the enhancement. In United States v. Agudelo, the enhancement was upheld even where the obstructed individuals were "only potential co-defendants or witnesses." 414 F.3d 345, 351 (2d Cir. 2005). Daedone's deletion orders fall squarely within this framework, as they were intended to ensure the government would lack critical documentary proof.

  Second, the PSR errs by analyzing only whether Daedone obstructed her own prosecution. Instead, the Guidelines and case law are clear: when the conviction is for conspiracy, obstruction directed at protecting co-conspirators is part of the "instant offense." For instance, in United States v. Cassiliano, the Second Circuit explained that in conspiracy cases, the "instant offense" requirement is satisfied if the defendant obstructs justice on behalf of a co-conspirator. 137 F.3d 742, 746-47 (2d Cir. 1998). The rationale is straightforward: conspiracy is a joint offense, and shielding a co-conspirator from liability is tantamount to obstructing the investigation of one's own crime.

  That principle is directly applicable here. Daedone's deletion directives protected not only herself but also other senior participants in OneTaste. Those individuals were potential witnesses against her, but they were also independently culpable participants. By preventing investigators from accessing the communications that reflected their roles, Daedone obstructed justice as to her co-conspirators' liability. This obstruction impeded the government's ability to charge additional actors and obtain a full accounting of the harm inflicted on their victims. Indeed, the Second Circuit's reasoning in Cassiliano is especially apt: just as alerting a co-conspirator to an FBI investigation deprived the government of evidence it could have used against both the defendant and his associate, Daedone's deletion orders deprived investigators of the very material they needed to hold her co-conspirators fully accountable.

  Third, the PSR's implied suggestion that the timing of Daedone's conduct removes it from § 3C1.1 is legally incorrect. The Second Circuit has repeatedly held that obstruction may warrant the enhancement even if it occurs before formal charges are filed. For

7

instance, in United States v. Ayers, the Second Circuit emphasized that obstructive conduct "which takes place prior to the start of a federal criminal investigation . . . can warrant an enhancement" where it obstructs the investigation of the charged offense. 416 F.3d 131, 134 (2d Cir. 2005); see also United States v. Al Fawadi, No. 22-1078-CR, 2024 WL 1364700, at *2 (2d Cir. Apr. 1, 2024) (conduct that predated the start of a criminal investigation properly forms the basis of an obstruction enhancement). Similarly, in United States v. Riley, 452 F.3d 160, 165-66 (2d Cir. 2006), the enhancement was upheld where a defendant instructed an associate to conceal firearms before the relevant charge was filed because the conduct nevertheless impeded the ongoing investigation.

Here, Daedone's obstruction is directly analogous. Her instructions were undoubtedly given in anticipation of, and in response to, scrutiny of OneTaste's practices. The orders were issued shortly after OneTaste encountered potential scrutiny that OneTaste was engaged in prostitution. They were specifically designed to preemptively frustrate the ability to collect evidence of the forced labor conspiracy with which she has been convicted. That is precisely the type of conduct that § 3C1.1 was meant to address. See United States v. Malki, 609 F.3d 503, 511 (2d Cir. 2010) (finding the obstruction enhancement supported by, among other things, the defendant deleting cell phone records and emails).

Fourth, the PSR's implicit assertion that Daedone's directive to delete messages was unrelated to the instant offense is contrary to the trial record; the prostitution inquiry referenced above to which Daedone cites in GX 2075-D-R was inextricably linked to the same underlying conduct that formed the basis of the charged forced labor conspiracy. Law enforcement complaints regarding OneTaste centered on coercive sexual and labor practices—conduct that could plausibly be investigated under various statutory frameworks, including prostitution, sex trafficking and forced labor. By attempting to conceal evidence of sexual exploitation, Daedone was obstructing the discovery of facts central to the forced labor conspiracy, regardless of the particular charging theory she feared. Indeed, the statements contained in GX 2075-D-R make plain that Daedone's order to "erase your texts" was driven by OneTaste's legal troubles and her concern about OneTaste being "seen as prostitution." In response, Van Vleck directly asked: "What would a prosecutor say the purpose of OM is[?]" These statements confirm that Daedone's obstruction was aimed at concealing evidence of the coercive system at the core of the conspiracy.

Moreover, the Guidelines make clear that obstruction encompasses efforts to impede the investigation of the offense of conviction as well as "closely related" offenses. See U.S.S.G. § 3C1.1. Here, prostitution liability and forced labor liability were not alternative, isolated matters, but two legal characterizations of the same exploitative system Daedone engineered. Courts have construed the term "instant offense" broadly, recognizing that obstructive conduct aimed at concealing overlapping or closely tethered misconduct falls squarely within § 3C1.1. See, e.g., Ayers, 416 F.3d at 134 (Section 3C1.1 applies so long as the obstructed investigation "plainly encompassed the conduct at issue in the federal crime of conviction"); United States v. Hotaling, No. 24-434, 2025 WL 2416346, at *4 (2d Cir. Aug. 21, 2025) (obstruction enhancement applied where defendant deleted evidence to try to thwart investigation into violating conditions of supervised release).

Finally, the record demonstrates that Daedone acted with specific intent to obstruct justice. As the Second Circuit has held, "[a]n obstruction of justice enhancement only applies if the [district] court finds that the defendant willfully and materially impeded the search for justice in the instance offense." United States v. Gershman, 31 F.4th 90, 103 (2d Cir. 2022). In determining the intent with which a defendant acted, a district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence. See United States v. Sisti, 91 F.3d 305, 313 (2d Cir. 1996); Khedr, 343 F.3d at 102.

In this case, Daedone's orders to delete text messages were not accidental or careless; they were deliberate instructions aimed at erasing incriminating communications regarding her, her co-conspirators, and OneTaste's legal liability. There is nothing more obstructive than a direct instruction to subordinates and co-conspirators to delete evidence of their internal communications. Indeed, she admitted to a senior member of OneTaste that she "erased everything" after the "legal scare last year." GX 2256-D-R. As Cassiliano explained, when the conduct is "so patently prejudicial to the investigation that . . . the conclusion that there was an intent to obstruct is virtually inescapable," the enhancement applies. 137 F.3d at 747. That description applies precisely to Daedone's conduct: her directives were calculated to prevent anyone scrutinizing OneTaste and to deprive them of evidence against her and her co-conspirators alike.

III. Conclusion

For the foregoing reasons, Probation should modify the PSR to impose two-level enhancements pursuant to U.S.S.G. §§ 3B1.3 (abuse of a position of trust) and 3C1.1 (obstruction of justice).

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:    /s/
Kaitlin T. Farrell
Nina C. Gupta
Sean M. Fern
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (by e-mail and ECF)
    Defense Counsel of Record (by e-mail and ECF)