

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

KTF/NCG/SMF  *271 Cadman Plaza East*
F. #2018R01401  *Brooklyn, New York 11201*

December 10, 2025

<u>By ECF</u>

The Honorable Diane Gujarati
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: <u>United States v. Nicole Daedone</u>
     <u>Criminal Docket No. 23-146 (DG)</u>

Dear Judge Gujarati:

  The government, pursuant to Federal Rule of Criminal Procedure 32.2, respectfully submits this letter and a proposed Preliminary Order of Forfeiture in the above-referenced case against defendant Nicole Daedone. In accordance with the jury's verdict after trial, the government seeks entry of a forfeiture money judgment in the sum of twelve million dollars ($12,000,000.00) along with two bank accounts, as set forth below.[1]

I. <u>Background</u>

  A. <u>The Indictment</u>

  On April 3, 2023, a grand jury sitting in the Eastern District of New York returned an indictment in the above-captioned matter charging Daedone with forced labor conspiracy, in violation of 18 U.S.C. §§ 1594(b). The indictment contained a criminal forfeiture allegation giving notice to the Defendant that, upon her conviction, the government would seek forfeiture in accordance with 18 U.S.C. § 1594(d) of: (a) any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of such offense, and any property traceable to such property; and (b) any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense, or any property traceable to such property. <u>See</u> Indictment ¶¶ 13-14.

---

[1] The government intends to credit the balances of the two seized bank accounts against any outstanding money judgment the Court imposes.

B.    The Seizure Warrants

On May 26, 2023, the Honorable James R. Cho, United States Magistrate Judge, issued warrants authorizing the seizure of: (i) any and all funds on deposit held in the name of Nicole Daedone in a Fidelity brokerage account ending in x9265 (the "Fidelity x9265 Account"), up to and including the sum of $782,359.00, and all proceeds traceable thereto; (ii) any and all funds on deposit held in the name of Nicole Daedone in a Fidelity brokerage account ending in x9298 (the "Fidelity x9298 Account"), up to and including the sum of $1,805,396.15, and all proceeds traceable thereto; and (iii) any and all funds on deposit held in the name of Nicole Daedone in a Wells Fargo account ending in x3986 (the "Wells Fargo x3986 Account"), up to and including the sum of $2,970,000.00, and all proceeds traceable thereto. See Case No. 23-MJ-511. The warrants were issued based upon a showing of probable cause to believe that these three accounts were subject to forfeiture, pursuant to 18 U.S.C. §§ 1594(d)(2) and (e)(1)(B), as property, real or personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of a violation of 18 U.S.C. § 1594(b). On that same date, law enforcement agents executed those warrants, which resulted in the seizure of approximately: (i) $782,359.00 from the Fidelity x9265 Account; (ii) $1,159,656.47 from the Fidelity x9298 Account; and (iii) $122,417.52 from the Wells Fargo x3986 Account.

On September 21, 2023, United States Magistrate Judge Cho reissued the seizure warrants for those same accounts, expanding the statutory grounds for the seizure based on a showing that the funds in those accounts were, in addition to the grounds set forth in the May 26, 2023 warrants, subject to forfeiture pursuant to 18 U.S.C. §§ 1594(d)(1) and 1594(e)(1)(A) as: (i) property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of a violation of § 1594(b), or property traceable to such property, and (ii) property, real or personal, constituting or derived from proceeds obtained, directly or indirectly, as a result of a violation of 18 U.S.C. § 1594(b). See Case No. 23-MJ-511.

C.    Daedone's Motion for the Release of Funds Subject to Seizure and the "Seized Assets"

On August 7, 2023, Daedone, through counsel, asserted that she lacked sufficient funds to retain counsel of her choice guaranteed by the Sixth Amendment to the U.S. Constitution and requested that the government release the funds subject to seizure to pay for such counsel. On August 22, 2023, Daedone, through counsel, provided a sworn financial affidavit, which was subsequently revised on August 24, 2023 and again on October 26, 2023, setting forth all assets in which she holds an interest.

On August 22, 2023, the government filed a bill of particulars for forfeiture of specific property giving notice to Daedone that the government intended to seek forfeiture, pursuant to 18 U.S.C. § 1594(d), of all right, title and interest in the following assets: (i) approximately $122,417.52 seized from the Wells Fargo x3986 Account; (ii) approximately $1,159,646.47 seized from the Fidelity x9298 Account; and (iii) approximately $782,359.00 seized from the Fidelity x9265 Account. See ECF No. 40.

2

On November 7, 2023, Daedone and the government reached a stipulation (the "Stipulation") by which, in full and complete satisfaction of Daedone's Sixth Amendment claim, the government released to Daedone the sum of $877,582.48 seized from the Fidelity x9298 Account and the sum of $122,417.52 seized from the Wells Fargo x3986 Account. Following the release of those funds, the specific funds remaining and subject to seizure are: (i) $782,359.00 held in the Fidelity x9265 Account; and (ii) $282,073.99 held in the Fidelity x9298 Account. Collectively, the funds in these accounts represent the "Seized Assets."

The Stipulation, which is attached hereto as Exhibit A, further provided that, "in the event that the Court imposes a forfeiture money judgment against defendant Nicole Daedone" following her conviction of any offense charged in the above-captioned indictment and for which forfeiture is statutorily authorized, Daedone consents to the forfeiture of the remaining funds, up to the amount of the forfeiture money judgment and entry of a preliminary order of forfeiture, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, forfeiting the remaining funds. See Stipulation ¶ 4. In other words, if the Court were to impose a forfeiture money judgment greater than the value of the Seized Assets, Daedone has consented to forfeiture of the Seized Assets to be credited towards the amount of the forfeiture money judgment.

    D.    <u>The Jury Verdict</u>

On June 9, 2025, following a five-week jury trial, Daedone was found guilty of forced labor conspiracy. Shortly before the jury began deliberating and consistent with Federal Rule of Criminal Procedure 32.2(5), counsel for Daedone and for defendant Cherwitz elected to have Your Honor determine the forfeitability of the Seized Assets: (i) $782,359.00 held in the Fidelity x9265 Account; and (ii) $282,073.99 held in Fidelity x9298 Account. See Tr. 5261.

II.    <u>Statutory and Procedural Framework</u>

    A.    <u>Federal Rule of Criminal Procedure 32.2</u>

Rule 32.2 of the Federal Rules of Criminal Procedure governs the criminal forfeiture sought by the government in this case. See, e.g., <u>United States v. Capoccia</u>, 503 F.3d 103, 109 (2d Cir. 2007) (quoting Fed. R. Crim. P. 32.2(b)(1)), <u>aff'd after remand</u>, 2010 WL 4942213 (summary order) (2d Cir. Dec. 7, 2010). Rule 32.2(b)(1) provides, in pertinent part:

> As soon as practicable after a verdict . . . of guilty . . . on any count in an indictment . . . regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay. The court's determination may be based on . . . evidence or information submitted by the parties and accepted by the court as relevant and reliable.

3

Fed. R. Crim. P. 32.2(b)(1).  See United States v. Galestro, No. 06-CR-285 (ARR), 2008 WL 2783360, at *11 (E.D.N.Y. 2008) (finding that where the government seeks forfeiture of only a personal money judgment, defendant has no right to a jury and there is no need for pre-trial disclosures).  Rule 32.2(b)(1)(A) requires the Court, as soon as practicable after conviction, to determine what property is subject to forfeiture.

If the government seeks forfeiture of specific property, the Court must determine whether the government has established the requisite nexus between the property and the offense.  Fed. R. Crim. P. 32.2(b)(1)(A).  Forfeiture is appropriate upon a court finding of nexus, or connection, between the property and the criminal violations.  Id.  The Court may determine whether specific property is subject to forfeiture "based on evidence already in the record," Fed. R. Crim. P. 32.2(b)(1)(B), including testimony at the earlier trial.  See Capoccia, 503 F.3d at 109-10.  If the forfeiture of specific property is contested, on either party's request, the court must conduct a hearing after conviction.  Fed R. Crim. P. 32.2(b)(1)(B); United States v. Kenner, 443 F. Supp. 3d 354, 361 n.6 (E.D.N.Y. 2020).

Rule 32.2(b)(2)(A) requires entry of a preliminary order of forfeiture, and Rule 32.2(b)(4)(A) requires the forfeiture to be included in the oral pronouncement of sentence and written judgment.  See Libretti v. United States, 516 U.S. 29, 38-39 (1995) (criminal forfeiture is part of a defendant's sentence); United States v. Bodouva, 853 F.3d 76, 78-79 (2d Cir. 2017) (noting that district courts have no discretion to reduce or eliminate mandatory forfeiture and that criminal forfeiture is distinct from restitution).

B.  Section 1594's Forfeiture Provisions and Property Subject to Forfeiture

Here, the government seeks criminal forfeiture pursuant to Title 18, United States Code, Section 1594(d), which mandates that a defendant convicted of forced labor conspiracy "shall forfeit to the United States" any property (i) "involved in, used, or intended to be used to commit or facilitate the commission of such violation, and any property traceable to such property" or (ii) "constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation, or any property traceable to such property." Id. § 1594(d); see also United States v. Monsanto, 491 U.S. 600, 607 (1989) (statutes using "shall forfeit" are mandatory where the statutory nexus is established); see Pacheco v. Serendensky, 393 F.3d 348, 355 (2d Cir. 2004) (noting that the purposes of criminal forfeiture are "to punish, deter and disempower criminals").

Section 1594(e)(1) enumerates that (i) "any property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of any forced labor violation or (ii) "any property, real or personal, which constitutes or is derived from proceeds traceable to" any forced labor violation is subject to forfeiture.  Courts have broadly construed the language that property or proceeds constituting or derived from an offense is subject to forfeiture.  See United States v. Peters, 732 F.3d 93, 101-02 (2d Cir. 2013) (holding that forfeiture extends to "receipts" rather than simply "profits").  In general, proceeds are property that a person would not have "but for" the criminal offense.  United States v. Grant, No. 04-CR-1192, 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008); Kenner, 443 F. Supp. 3d at 363.  The type of property subject to forfeiture can include specific property and/or a forfeiture money judgment.

1. Specific Property Subject to Forfeiture

Where, as here, the government has restrained specific property and seeks its forfeiture post-conviction, the Court can order the forfeiture of specific property traceable to the criminal scheme. Property is "traceable" to forfeitable property (and thus forfeitable) when the acquisition of the property is attributable to the criminal scheme rather than from money obtained from untainted sources. Kenner, 443 F. Supp. 3d at 364; see e.g., United States v. Zvi, 168 F.3d 49, 56 (2d Cir. 1999) (permitting forfeiture of funds legitimately obtained through defendants' sale of gold jewelry prior to the commission of fraud involving faked robbery of jewelry store because "the proceeds from the pre-robbery sale of gold represented the defendants' take from the scheme"); United States v. Nicolo, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009) (monies paid to a defendant as a result of the scheme are "proceeds" subject to forfeiture, without regard to whether the victim received anything in return).

Strict tracing from a particular criminal act to a particular asset is not required if the totality of the circumstances establishes that the asset constitutes or is derived from proceeds. United States v. Guess, No. 10-CR-145, 2015 WL 1208882, at *2 (W.D.N.C. Mar. 17, 2015) (citing cases). For instance, proceeds from the sale of an enterprise are forfeitable in their entirety when the enterprise's value is tainted by criminal conduct. See, e.g., United States v. Milton, No. 21-CR-478 (ER), 2024 WL 779210, at *5-6 (S.D.N.Y. Feb. 26, 2024) (forfeiting entirety of defendant's ranch where defendant has invested certain untainted money in it); United States v. Bonventre, 646 F. App'x 73, 90 (2d Cir. 2016) (affirming district court's order of forfeiture based on gross proceeds where "the evidence showed that the criminal conspiracy at issue did not sell or provide 'lawful services . . . in an illegal manner' so as to require deduction of direct costs"). Similarly, forfeiture extends to the appreciation of funds acquired through illegal transactions because such funds are "derived from proceeds traceable" to the offense. United States v. Afriyie, 929 F.3d 63, 73 (2d Cir. 2019); United States v. Hatfield, 795 F. Supp. 2d 219, 227 (E.D.N.Y. 2011) ("A conspiracy's proceeds are subject to forfeiture. And a defendant incurs forfeiture liability for the proceeds of the entire conspiracy, including acts that the defendant was not personally responsible for.") (internal citations omitted).

The government has the burden of proof to establish the propriety of forfeiture by a preponderance of the evidence. See United States v. Finazzo, 682 F. App'x 6, 14-15 (2d Cir. 2017); United States v. Schlesinger, 396 F. Supp. 2d 267, 271 (E.D.N.Y. 2005); Capoccia, 503 F.3d at 116 (sentencing courts determine forfeiture by a preponderance of the evidence).

2. Forfeiture Money Judgments

Importantly, forfeiture under Rule 32.2 is not limited to specific property but can include the imposition of a personal money judgment. Where, as here, the government seeks a personal money judgment, the Court must determine the amount of money that the defendant will be ordered to pay. Schlesinger, 396 F. Supp. at 271. In making a forfeiture determination, the government is not required to provide a precise calculation of the proceeds subject to forfeiture. See United States v. Lizza Indus., Inc., 775 F.2d 492, 498 (2d Cir. 1985). Instead, proceeds can be reasonably estimated. See United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011) ("[T]he law does not demand mathematical exactitude in calculating the proceeds subject

5

to forfeiture."); United States v. Treacy, 639 F.3d 32, 48-49 (2d Cir. 2011) (the forfeiture money judgment can be conservatively estimated).

When deciding the appropriate forfeiture amount, the Court may rely on evidence that is "relevant and reliable," even though the same evidence would not be admissible in a proceeding governed by the Federal Rules of Evidence. See Fed. R. Crim. P. 32.2(b)(1)(B); see also United States v. Jafari, 85 F. Supp. 3d 679, 684-85 (W.D.N.Y. 2015) ("[C]ourts may consider hearsay and other inadmissible evidence so long as it is sufficiently reliable.") (citing Fed. R. Evid. 1101(d)(3); United States v. Stathakis, No. 04-CR-790, 2008 WL 413782, at *14 n.2 (E.D.N.Y. Feb. 13, 2008) ("[R]eliable hearsay is admissible."). After determining the amount of the money judgment to be forfeited, pursuant to Rule 32.2(b)(2)(A), the Court must promptly enter an order forfeiting this amount. United States v. Petrie, 302 F.3d 1280, 1284 (11th Cir. 2002).

Regardless of whether specific assets are subject to forfeiture, if a court finds that an order of forfeiture is appropriate, but the defendant lacks the assets to satisfy the order, the court can award the government a forfeiture money judgment. 21 U.S.C. § 853; Fed. R. Crim. P. 32.2(b)(1)(1); see, e.g., Kenner, 443 F. Supp. 3d at 362; United States v. Roberts, 696 F. Supp. 2d 263, 269 (E.D.N.Y. 2010) (collecting cases), vacated on other grounds, 660 F.3d 149 (2d Cir. 2011); United States v. Awad, No. 06-CR-600, 2007 WL 3120907, at *4 (S.D.N.Y. Oct. 24, 2007), aff'd, 598 F.3d 76 (2d Cir. 2010); United States v. Bermudez, 413 F.3d 304, 307 (2d Cir. 2005) (affirming a forfeiture money judgment in the money laundering context up to the amount laundered, "even if [defendant] merely handled the laundered property – i.e., even if he never retained those funds and consequently never obtained proceeds from them"); United States v. Candelaria-Silva, 166 F.3d 19, 42 (1st Cir. 1999) ("[C]riminal forfeiture may take several forms . . . [including] an in personam judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense"); Jafari, 85 F. Supp at 685 (money judgment includes gross proceeds of a fraud). "The only determination that must be made when the government seeks a money judgment is the amount that the defendant will be ordered to pay." United States v. Perkins, 994 F. Supp. 2d 272, 275 (E.D.N.Y. 2014); Roberts, 696 F. Supp. 2d at 270 ("[I]f the government does not seek specific property, but rather a personal money judgment, the court itself determines the amount of money that the defendant will be ordered to pay."); United States v. Bourne, No. 08-CR-888 (NGG), 2012 WL 526721, at *2 (E.D.N.Y. Feb. 15, 2012) (finding that entry of money judgment is mandatory, even if defendant has no assets).

III.   The Evidence

By 2017, after more than a decade of controlling OneTaste as its founder and chief executive officer, Daedone – who owned nearly 100% of OneTaste – sold the company to a group of private buyers. See GX 4056; 5005. The sale represented the culmination of years in which Daedone oversaw the expansion of OneTaste into an international for-profit enterprise built on the very coercive practices a jury has now found constituted a forced labor conspiracy.

Daedone realized substantial personal profit by selling OneTaste, Inc. for $12 million. See, e.g., GX 4056, Tr. 4297-4304; 4315-4319. This was testified to by FBI forensic accountant Mark Lubin at trial. In short, accountant Lubin testified that, between March and May 2017, Daedone received $12 million as set forth in the OneTaste sales contract, which was

6

subsequently transferred into the Wells Fargo x8202 Account. Tr. 4297-4304; 4315-4319. In addition, although not testified to at the trial, trial exhibits also revealed that the proceeds of the OneTaste sale was layered through multiple financial accounts that belonged to or which were beneficially owned by Daedone. See GX 867 (attached hereto as Exhibit B); 4437; 4447; 4449; 4452; 4454; 4458. Specifically, in March 2017, Daedone transferred $7 million from the Wells Fargo x8202 Account to an account in her name at SEI Investments ending in x8067 (the "SEI x8067 Account"). In May 2018, Daedone further transferred $6.1 million from the SEI x8067 Account to an account at Fidelity in her name ending in x0331 (the "Fidelity x0331 Account"). Between June 2018 and August 2018, Daedone transferred $5.1 million from the Fidelity x0331 Account to multiple accounts at Fidelity that she beneficially owned, ultimately transferring $4.7 million in December 2018 to the Fidelity x9265 Account. Moreover, Daedone transferred approximately $900,000 between December 2018 and February 2019 from the Fidelity x0331 Account to the Fidelity x9265 Account. Finally, in January 2019, Daedone transferred $4.3 million from the Fidelity x9265 Account to the Fidelity x9298 Account. The Seized Assets were seized from the Fidelity x9265 Account and the Fidelity x9298 Account and are proceeds traceable to Daedone's sale of OneTaste.

In short, the trial record demonstrates that Daedone herself, and not merely OneTaste as a corporate entity, realized the benefit of this sale. Tr. 4319. Financial records testified to at trial confirm that following the closing of this transaction, $12 million was wired into a Wells Fargo account Daedone controlled ending in x8202 (the "Wells Fargo x8202 Account"). See GX 4468-R; 4467-R; 4465-R; 4469-R; 4466-R. Put simply, the money was not distributed but was retained by Daedone as the sole beneficiary of the sale. See Tr. 4319.

Moreover, the $12 million Daedone received was not merely incidental to her role as a shareholder or executive; it was the direct monetization of a business model sustained through coercion, forced labor and sexual exploitation. The financial windfall Daedone secured from OneTaste's sale is thus inseparable from the harm inflicted on her victims. As set forth in the victims' testimony, they were compelled to work long hours without pay, pressured to perform services under threat of psychological, economic and reputational harm and forced into a system that substituted spiritual rhetoric for fair compensation. Tr. 1691-92; 2350; 2425-26; 2107; 2137; 2164; 2419; 3289; 3964; GX 2030-D; GX 856. This coerced labor reduced OneTaste's operating costs, allowed the company to expand rapidly and gave the false appearance of financial success that directly enhanced its market value at the time of the sale. See Tr. 3417; GX 1544; 4501-D-D. Without the exploitation of her victims, OneTaste could not have secured the investment funding or projected the financial viability that made it attractive to potential buyers. As a result, the proceeds of the sale of OneTaste Daedone received is directly traceable to the offense conduct.

IV.  Daedone Must Forfeit the $12 Million Realized from the Sale of OneTaste and the Seized Assets Traceable to these Funds

As discussed above, the $12 million from the sale of OneTaste, including the Seized Assets, are proceeds of Daedone's conviction, and as a result, constitutes property subject to mandatory forfeiture under 18 U.S.C. §§ 1594(d)(1)-(2) & 1594(e)(1)(A)-(B).

7

In particular, Section 1594(d)(1) directs that a defendant convicted of forced labor conspiracy "shall forfeit to the United States" that defendant's "interest in any property, real or personal, that was involved in, used, or intended to be used to commit or facilitate the commission of such violation, and any property traceable to such property." Section 1594(d)(2) directs that a defendant convicted of forced labor conspiracy, "shall forfeit to the United States any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation, or any property traceable to such property." Section 1594(e)(1)(A) directs that "any property, real or personal, involved in, used, or intended to be used to commit or to facilitate the commission of any violation of [Chapter 77], and any property traceable to such property" shall "be subject to forfeiture to the United States and no property right shall exist in them." Section 1594(e)(1)(B) directs that "any property, real or personal, which constitutes or is derived from proceeds traceable to any violation of [Chapter 77]" "shall be subject to forfeiture and no property right shall exist in them."

The trial record and financial evidence establish that the $12 million Daedone received from the sale of OneTaste are proceeds inseparable from her convicted criminal conduct. The nexus between the coerced labor that underpinned OneTaste's growth and the eventual financial windfall Daedone secured by selling OneTaste is more than sufficient to establish that the proceeds she received from the sale satisfy the statutory requirements of 18 U.S.C. §§ 1594(d) & (e).

As discussed herein, a portion of the $12 million Daedone received from her sale of OneTaste is currently subject to seizure. While Daedone spent a majority of it, the government seized $1.064 million, which represents specific property subject to forfeiture. In addition to seeking forfeiture of that specific property, the government seeks an order imposing a forfeiture money judgment on Daedone for $12 million and, pursuant to the Stipulation, crediting the Seized Assets towards that judgment.

A. <u>OneTaste Itself Was Used to Facilitate the Commission of the Forced Labor Conspiracy</u>

As described above, Sections 1594(d)(1) and 1594(e)(1) subject to forfeiture property involved in, used, or intended to be used to commit or to facilitate the commission of a forced labor conspiracy, and any property traceable to such property. The scope of forfeiture is therefore not limited to the immediate proceeds of forced labor, but encompasses instrumentalities of the offense, including assets without which the criminal scheme could not have succeeded.

OneTaste itself falls squarely within this category. Daedone wholly owned OneTaste and later sold it to private investors. But, long before the sale, OneTaste functioned as the indispensable vehicle of her criminal enterprise. It provided the corporate structure, business identity, physical premises and financial infrastructure through which Daedone recruited victims, compelled and coerced their labor, and monetized their work. OneTaste was not a passive asset incidentally linked to the conspiracy; it was the instrumentality through which the forced labor scheme was executed. As such, OneTaste was "property involved in" and "used to commit or facilitate" the forced labor conspiracy. See, e.g., <u>United States v. Sabhnani</u>, 599 F.3d 215, 262 (2d Cir. 2010); <u>United States v. Collado</u>, 348 F.3d 323, 325 (2d Cir. 2003) (affirming forfeiture

8

of a house used to facilitate distribution of controlled substances); see also United States v. Tate, No. 15-CR-265, 2017 WL 374480, at *1 (W.D.N.C. Jan. 25, 2017) (ordering forfeiture of phones pursuant to 18 U.S.C. § 1594(d)(1) used to commit sex trafficking); United States v. Luong, No. 20-CR-79, 2021 WL 10428312, at *1-2 (W.D.N.C. Mar. 16, 2021) (describing Section 1594's standard for forfeiture in forced labor case). And, when Daedone ultimately sold this asset for $12 million, the proceeds of that sale necessarily became property "traceable" to that very enterprise built on forced labor.

In short, the sale of OneTaste transformed the corporate vehicle of the offense into liquid proceeds, but it did not sever the connection between the forced labor conspiracy and the resulting funds. To the contrary, the transaction crystallized the value Daedone extracted from her criminal conduct. Accordingly, both the OneTaste asset itself and the $12 million realized from its sale fall within the plain reach of 18 U.S.C. §§ 1594(d)(1) and (e)(1); the $12 million represents property involved in, used, or intended to be used to commit or to facilitate the commission of a forced labor conspiracy, in violation of 18 U.S.C. § 1594(b) and the Seized Assets represent property traceable to such property. As such, the Court should impose a forfeiture money judgment for the $12 million representing proceeds traceable to the sale of the corporate vehicle Daedone used to facilitate the forced labor conspiracy.

      B.      <u>Daedone's $12 Million Sale Proceeds Constitute Property Derived from Proceeds Traceable to the Forced Labor Conspiracy Proceeds from the OneTaste Sale</u>

Title 18, United States Code, Section 1594(d)(2) requires forfeiture of "any property, real or personal, constituting or derived from, any proceeds that [a defendant] obtained, directly or indirectly, as a result of [a Chapter 77] violation, or any property traceable to such property." Likewise, 18 U.S.C. § 1594(e)(1)(B) subjects to forfeiture "any property, real or personal, which constitutes or is derived from proceeds traceable to any [Chapter 77] violation." Courts consistently hold that proceeds constitute or are derived from a criminal violation when they are property a defendant would not have obtained "but for" the offense of conviction. Grant, 2008 WL 4376365, at *2 n.1. In this case, these provisions reach not only the immediate profits extracted from forced labor but also any subsequent assets derived from those tainted proceeds.

Here, the record demonstrates that OneTaste's valuation and its ability to command a $12 million sale price constituted and was derived from coerced labor, uncompensated services, and sexually exploitative practices that Daedone orchestrated. Victims testified that they were compelled to act as "handlers" for an investor whose capital funded OneTaste's early expansion. See Tr. 846; 1014; 1077; 1095-97; 1270; 1294; 1297; 1299; 1301; 2318; 2402; 2404; 2407; 3271-72; 3313. These acts were coerced, not voluntary, GX 2148-D; Tr. 1300-01, and they generated investment capital that sustained OneTaste's operations. Other victims testified to performing uncompensated or grossly underpaid labor, see, e.g., Tr. 149-50; 254-56; 298; 1051-52; 1054; 1056; 1080; 1121-22; 1259; 2102; 2123; 2319; 2340-43; 2784; 3949-50; GX 856 (setting forth wages victims actually received); GX 1283-D-R; GX 1331-A-R; GX 1332-A-R; GX 2200, which slashed operating costs, bolstered revenue, and projected a false image of profitability. See Tr. 3303-04; 3310; 3314; 3321-26; 3336-37; 3347-48; 3379-80; 3413. Thus, absent this conspiracy, OneTaste would have collapsed; the $12 million sale price was itself derived from the exploitation of victims.

9

Put simply, the sale price constitutes or is derived from the forced labor conspiracy because the very features that the buyers paid for, including OneTaste's apparent profitability and brand strength, were the direct product of coerced labor. The conspiracy provided OneTaste with artificially cheap labor, inflated revenues and a façade of financial health. The conspiracy also allowed OneTaste to obtain the investments needed to keep it afloat. In short, absent the forced labor conspiracy, there would have been no $12 million sale at all. Every facet of OneTaste's financial success was inextricably linked to the exploitation of Daedone's victims. The $12 million sale price was, in effect, the market's valuation of a criminal enterprise.

The fact that Daedone personally received the entirety of the $12 million sale price underscores the direct nexus between the offense conduct and the sale proceeds. Because she was the sole owner of OneTaste, the tainted value of the enterprise flowed exclusively to her. And, as the Second Circuit has made clear, forfeiture is not limited to profits net of expenses or to portions of proceeds unconnected to unlawful activity; it extends to "receipts," Peters, 732 F.3d at 101–02 (gross "receipts," not net profits, are forfeitable); Afriyie, 929 F.3d at 73 (forfeiture extends to the appreciation of tainted property), and to gross proceeds where the criminal conspiracy permeated the business, Bonventre, 646 F. App'x at 90. In fact, the Second Circuit in Bonventre upheld forfeiture of gross proceeds where the conspiracy was so pervasively unlawful that "lawful services" were not being sold "in an illegal manner," but rather the conspiracy itself created the enterprise's value. Id. at 90. Because OneTaste's core operations and valuation were sustained by criminal conduct, the sale price was entirely tainted, and the full $12 million constitutes forfeitable property. As such, the $12 million Daedone received from the sale of OneTaste is property constituting or derived from proceeds Daedone obtained, directly or indirectly, as a result of her violation of 18 U.S.C. § 1594(b), and the Seized Assets, as traceable to that $12 million, represent property traceable to such property. See 18 U.S.C. §§ 1594(d)(2) & (e)(1)(B).

Finally, forfeiture here does not require a strict dollar-for-dollar tracing of specific coerced acts to specific sale proceeds. Courts have rejected such a cramped view, recognizing that strict tracing is unnecessary when the "totality of the circumstances" establishes that the property was derived from the offense. See Guess, 2015 WL 1208882, at *2. Indeed, where the entire value of an enterprise is infused with criminality, courts have upheld forfeiture of the full value of the asset. See Milton, 2024 WL 779210, at *5.

V.   Conclusion

Here, the totality of the evidence demonstrates that without coerced labor and sexual exploitation, OneTaste would not have survived, much less eventually commanded a multimillion-dollar sale price. That sale price is thus "derived from" the forced labor conspiracy and as a result, is forfeitable pursuant to 18 U.S.C. §§ 1594(d)(2) and (e)(1)(B). In addition, because the OneTaste corporate asset itself was the vehicle used by Daedone to facilitate the forced labor conspiracy, the sale price is also traceable to property "involved in, used, or intended to be used to commit or facilitate" forced labor conspiracy and is forfeitable pursuant to 18 U.S.C. §§ 1594(d)(1) and (e)(1)(A).

10

For the reasons discussed above, the government respectfully requests that the Court enter the proposed Preliminary Order of Forfeiture, pursuant to 18 U.S.C. §§ 1594(d) & (e). As previously noted, the proposed Order requests the forfeiture of the Seized Assets, a criminal forfeiture money judgment against Daedone in the amount of $12 million and a credit to be applied to any outstanding money judgment in the amount of any forfeited Seized Assets determined by the Court. See also Stipulation ¶ 4 (Daedone consenting to the forfeiture of the Seized Assets, up to the amount of the forfeiture money judgment and entry of a preliminary order of forfeiture, pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure).

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:      /s/
Kaitlin T. Farrell
Nina C. Gupta
Sean M. Fern
Assistant U.S. Attorneys
(718) 254-7000

cc:   Clerk of Court (DG) (by ECF and e-mail)
      Counsel of Record (by ECF and e-mail)