EMR:KTF/KCB/NCG/SMF
F. #2018R01401

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

RACHEL CHERWITZ and
NICOLE DAEDONE,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. <u>23-CR-146 (DG)</u>

<u>THE GOVERNMENT'S SENTENCING MEMORANDUM
AS TO DEFENDANT NICOLE DAEDONE</u>

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Kayla C. Bensing
Kaitlin T. Farrell
Nina C. Gupta
Sean M. Fern
Assistant U.S. Attorneys
    (Of Counsel)

Table of Contents

BACKGROUND ............................................................................................................... 3

   I.  The Offense Conduct ............................................................................................... 3

      A.  OneTaste's Beginnings ................................................................................ 5

      B.  OneTaste's Shift to Sales and Expansion ................................................... 7

      C.  The Defendant's Abusive Tactics of Coercion ........................................... 8

      D.  The Labor and Services Performed .......................................................... 12

      E.  The Benefits Daedone Accrued ................................................................ 13

   II.  Procedural History and Post-Conviction Statements ................................................ 13

LEGAL FRAMEWORK .................................................................................................... 16

   I.  The Sentencing Framework and Applicable Guidelines Calculations ........................ 16

      A.  The Government's Guidelines Calculation ............................................... 16

      B.  Probation's Guidelines Calculation ......................................................... 17

      C.  The Defendant's Guidelines Calculation ................................................. 18

   II.  Guidelines Disputes .................................................................................................. 18

      A.  The Dispute Between the Government and Probation Regarding § 3B1.3's Applicability ........................................................................................... 19

      B.  The Guidelines Disputes Between the Parties ......................................... 28

      1.  The Defendant's Guidelines Calculation Errs by Narrowly Construing the Scope of Relevant Conduct ....................................................................... 28

      2.  The Applicable Sentencing Guideline is § 2H4.1 ................................. 31

      3.  The § 2H4.1(b)(3) Enhancement for a Victim Being Held in a Condition of Involuntary Servitude for More Than One Year Applies ................................ 36

      4.  The § 2A3.1 Criminal Sexual Abuse Cross-Reference Applies ........................ 38

      5.  An Enhancement for the Defendant's Aggravating Role as a Leader Applies .... 48

      6.  Section 3C1.1's Enhancement for Obstruction of Justice Applies ..................... 53

7.    The Defendant Is Not a Qualifying Zero-Point Offender ..................................... 60

8.    The Defendant Is Not Entitled to a One-Point Reduction to Avoid a "Trial Penalty" ........................................................................................................... 63

9.    The Defendant Is Not Entitled to a Downward Departure Under § 5H1.11 ........ 68

C.    The Court Need Not Conduct a *Fatico* Hearing on Any Issue ............................ 68

D.    Conclusion ............................................................................................................ 72

III. The Section 3553(a) Sentencing Factors ....................................................................... 72

ARGUMENT ........................................................................................................................... 74

I.    The Court Should Impose a Sentence of 240 Months' Imprisonment ......................... 74

A.    The Nature and Circumstances of the Defendant's Egregious Conduct .............. 74

B.    The Defendant's History and Characteristics ..................................................... 80

C.    The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment ............................................ 81

D.    The Need for Deterrence ...................................................................................... 82

E.    The Need to Protect the Public ............................................................................ 83

F.    The Kinds of Sentences Available ....................................................................... 84

G.    The Need to Avoid Unwanted Sentencing Disparities ........................................ 84

II.    Supervised Release ........................................................................................................ 86

III. Financial Aspects of Sentencing ................................................................................... 86

CONCLUSION ........................................................................................................................ 88

Table of Authorities

Page(s)

Cases

Abdallah v. United States,
    No. 14-CV-4037 (JFB), 2015 WL 7454182 (E.D.N.Y. Nov. 24, 2015).................................... 34

Apprendi v. New Jersey,
    530 U.S. 466 (2000).......................................................................................................... 29, 30

Blakely v. Washington,
    542 U.S. 296 (2004).......................................................................................................... 29, 30

Corbitt v. New Jersey,
    439 U.S. 212 (1978).................................................................................................................. 65

Ellerby v. United States,
    187 F.3d 257 (2d Cir. 1998)..................................................................................................... 52

Gall v. United States,
    552 U.S. 38 (2007)............................................................................................................. 16, 73

In re Petition of OneTaste, Inc.,
    No. 24-MC-2518........................................................................................................................ 14

Kaplan v. United States,
    663 F. App'x 69 (2d Cir. 2016)................................................................................................ 35

Pipkins v. United States
    544 U.S. 902 (2005)................................................................................................................. 43

Rita v. United States,
    551 U.S. 338 (2007)................................................................................................................. 73

Shannon v. United States,
    512 U.S. 573 (1994)................................................................................................................. 31

United States v. Agudelo,
    414 F.3d 345 (2d Cir. 2005)..................................................................................................... 56

United States v. Ahders,
    622 F.3d 115 (2d Cir. 2010)..................................................................................................... 46

United States v. Al Fawadi,
    No. 22-1078-CR, 2024 WL 1364700 (2d Cir. Apr. 1, 2024) ................................................. 57

United States v. Alexander,
    860 F.2d 508 (2d Cir. 1988)..................................................................................................... 73

United States v. Alston,
    899 F.3d 135 (2d Cir. 2018)..................................................................................................... 22

United States v. Amato,
    46 F.3d 1255 (2d Cir. 1995)..................................................................................................... 32

United States v. Anselm,
    610 F. App'x 64 (2d Cir. 2015)........................................................................................... 22, 26

United States v. Archer,
    671 F.3d 149 (2d Cir. 2011)..................................................................................................... 49

United States v. Ayers
   416 F.3d 131 (2d Cir. 2005) ........................................................ 57, 59

United States v. Baker,
   200 F.3d 558 (8th Cir. 2000) ....................................................... 25

United States v. Baldrich,
   471 F.3d 1110 (9th Cir. 2006) ..................................................... 67

United States v. Benitez,
   531 F.3d 711 (8th Cir. 2008) ....................................................... 67

United States v. Betone,
   636 F.3d 384 (8th Cir. 2011) ....................................................... 42, 45

United States v. Blount,
   291 F.3d 201 (2d Cir. 2002) ........................................................ 52

United States v. Booker,
   543 U.S. 220 (2005) ................................................................... 16

United States v. Booth,
   996 F.2d 1395 (2d Cir. 1993) ...................................................... 26

United States v. Brinkworth,
   68 F.3d 633 (2d Cir. 1995) .......................................................... 50, 69

United States v. Bronfman,
   No. 18-CR-204, 2024 WL 1740484 (E.D.N.Y. Apr. 23, 2024) ............ 61

United States v. Cacace,
   796 F.3d 176 (2d Cir. 2015) ........................................................ 71

United States v. Canova,
   412 F.3d 331 (2d Cir. 2005) ........................................................ 68

United States v. Capanelli,
   270 F. Supp. 2d 467 (S.D.N.Y. 2003) .......................................... 34

United States v. Capri,
   111 F. App'x 32 (2d Cir. 2004) .................................................... 70

United States v. Carrozzella,
   105 F.3d 796 (2d Cir. 1997) ........................................................ 49

United States v. Cassiliano
   137 F.3d 742 (2d Cir. 1998) ........................................................ 56, 60

United States v. Castagnet,
   936 F.2d 57 (2d Cir. 1991) .......................................................... 23

United States v. Chapdelaine,
   989 F.2d 28 (1st Cir. 1993) ......................................................... 33

United States v. Cheatwood,
   No. 22-4652, 2025 WL 18098 (4th Cir. Jan. 2, 2025) ..................... 65

United States v. Chu,
   714 F.3d 742 (2d Cir. 2013) ........................................................ 64

United States v. Cordoba-Murgas,
   233 F.3d 704 (2d Cir. 2000) ........................................................ 29

United States v. Deas,
   768 F. App'x 81 (2d Cir. 2019) .................................................... 35

United States v. Denjen,
   101 F. App'x 362 (2d Cir. 2004) .................................................. 40

United States v. Dharia,
    No. 14-CR-390 & No. 15-CR-367, 2019 WL 1876831 (E.D.N.Y. Apr. 26, 2019) ................. 59
United States v. DiMassa,
    117 F.4th 477 (2d Cir. 2024) ........................................................................................... 66
United States v. Downing,
    297 F.3d 52 (2d Cir. 2002) ............................................................................................... 35
United States v. Dunnigan,
    507 U.S. 87 (1993) ........................................................................................................... 57
United States v. Duverge Perez,
    295 F.3d 249 (2d Cir. 2002) ............................................................................................. 70
United States v. Emery,
    991 F.2d 907 (2d Cir. 1993) ....................................................................................... 55, 57
United States v. Faibish,
    No. 12-CR-265 (ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) ................................. 69
United States v. Fatico,
    579 F.2d 707 (2d Cir. 1978) ................................................................................. 19, 68, 71
United States v. Figueroa,
    682 F.3d 694 (7th Cir. 2012) ........................................................................................... 52
United States v. Fish,
    295 F. App'x 302 (10th Cir. 2008) ............................................................................... 40, 41
United States v. Fishman,
    631 F. Supp. 2d 399 (S.D.N.Y. 2009) ............................................................................... 68
United States v. Flaming,
    133 F.4th 1011 (10th Cir. 2025) .................................................................................. 40, 42
United States v. Gavin,
    959 F.2d 788 (9th Cir. 1992) ....................................................................................... 41, 42
United States v. Gershman,
    31 F.4th 80 (2d Cir. 2022) .......................................................................................... 59, 60
United States v. Ghailani,
    733 F.3d 29 (2d Cir. 2013) ............................................................................................... 69
United States v. Gilmore,
    599 F.3d 160 (2d Cir. 2010) ............................................................................................. 39
United States v. Giordano,
    172 F. App'x 340 (2d Cir. 2006) ....................................................................................... 24
United States v. Gittens,
    701 F. App'x 786 (11th Cir. 2017) .................................................................................... 66
United States v. Glick,
    463 F.2d 491 (2d Cir. 1972) ............................................................................................. 31
United States v. Goffer,
    529 F. App'x 17 (2d Cir. 2013) ........................................................................................ 66
United States v. Gowing,
    No. 05-CR-782 (GBD), 2024 WL 3607112 (S.D.N.Y. July 30, 2024) ............................ 61, 63
United States v. Guang,
    511 F.3d 110 (2d Cir. 2007) ............................................................................................. 70
United States v. Guidry,
    817 F.3d 997 (7th Cir. 2016) ....................................................................................... 40, 41

United States v. Heffernan,
    43 F.3d 1144 (7th Cir. 1994)........................................................................ 82
United States v. Henzel,
    668 F.3d 972 (7th Cir. 2012)........................................................................ 41
United States v. Hotaling,
    No. 24-434, 2025 WL 2416346 (2d Cir. Aug. 21, 2025)............................ 59
United States v. Howard,
    28 F.4th 180 (11th Cir. 2022)...................................................................... 82
United States v. Hussey,
    254 F.3d 428 (2d Cir. 2001)........................................................................ 24
United States v. Iu,
    917 F.3d 1026 (8th Cir. 2019)................................................................ 42, 45
United States v. Jimenez-Rodriguez,
    No. 21-CR-1-2 (EK), 2024 WL 1199991 (E.D.N.Y. Mar. 20, 2024).......... 39
United States v. Johns,
    15 F.3d 740 (8th Cir. 1994).......................................................................... 41
United States v. Johnson,
    221 F.3d 83 (2d Cir. 2000)........................................................................... 42
United States v. Kennedy,
    233 F.3d 157 (2d Cir. 2000)......................................................................... 49
United States v. Kent,
    821 F.3d 362 (2d Cir. 2016)........................................................... 49, 51, 52
United States v. Khedr,
    343 F.3d 96 (2d Cir. 2003)..................................................................... 55, 60
United States v. Kuhlman,
    711 F.3d 1321 (11th Cir. 2013).................................................................... 82
United States v. Kukoyi,
    126 F.4th 806 (2d Cir. 2025).................................................................. 33, 35
United States v. Laljie,
    184 F.3d 180, (2d Cir. 1999)........................................................................ 22
United States v. Lancaster,
    112 F.3d 156 (4th Cir. 1997)........................................................................ 67
United States v. Law,
    990 F.3d 1058 (7th Cir. 2021)................................................................ 41, 44
United States v. Lee,
    818 F.2d 1052 (2d Cir. 1987)....................................................................... 69
United States v. Lucas,
    157 F.3d 998 (5th Cir. 1998)................................................................... 40, 41
United States v. Lutchman,
    910 F.3d 33 (2d Cir. 2018)...................................................................... 34, 35
United States v. Malki,
    609 F.3d 503 (2d Cir. 2010)......................................................................... 58
United States v. Martin,
    No. 23-6091, 2024 WL 5001844 (2d Cir. Dec. 6, 2024) ............................ 61
United States v. Medina,
    74 F.3d 413 (2d Cir. 1996)............................................................... 34, 35, 40

United States v. McPartland,
   No. 17-CR-587 (JMA), 2021 WL 3409229 (E.D.N.Y. Aug. 4, 2021) ...................................... 50

United States v. Molina,
   106 F.3d 1118 (2d Cir. 1997) ...................................................................................................... 40

United States v. Monsalve,
   342 F. App'x 451 (11th Cir. 2001) ....................................................................................... 41, 44

United States v. Nicolescu,
   541 F. App'x 93 (2d Cir. 2013) .................................................................................................. 35

United States v. Ntshona,
   156 F.3d 318 (2d Cir. 1998) ...................................................................................................... 24

United States v. Olvera,
   954 F.2d 788 (2d Cir. 1992) ...................................................................................................... 71

United States v. Ortiz Socias,
   No. 21-CR-173 (RA), 2024 WL 4698714 (S.D.N.Y. Nov. 5, 2024)............................................ 70

United States v. Padilla,
   961 F.2d 322 (2d Cir. 1992) ......................................................................................... 29, 30, 42

United States v. Phillips,
   431 F.3d 86 (2d Cir. 2005) ........................................................................................................ 71

United States v. Pipkins,
   378 F.3d 1281 (11th Cir. 2004) ................................................................................................. 42

United States v. Pipkins
   412 F.3d 1251 (11th Cir. 2005) ................................................................................................. 43

United States v. Plaza,
   752 F. App'x 37 (2d Cir. 2018) .................................................................................................. 46

United States v. Portillo-Valenzuela,
   20 F.3d 393 (10th Cir. 1994).................................................................................................... 67

United States v. Prescott,
   920 F.2d 139 (2d Cir. 1990) ...................................................................................................... 69

United States v. Pugliese,
   805 F.2d 1117 (2d Cir. 1986) .............................................................................................. 69, 70

United States v. Ransom,
   756 F.3d 770 (D.C. Cir. 2014) ................................................................................................... 25

United States v. Reed,
   49 F.3d 895 (2d Cir. 1995) ........................................................................................................ 55

United States v. Riley,
   452 F.3d 160 (2d Cir. 2006) ...................................................................................................... 57

United States v. Rocha,
   145 F.4th 1247 (10th Cir. 2025)................................................................................................ 64

United States v. Rosa,
   17 F.3d 1531 (2d Cir. 1994) ........................................................................................... 33, 34, 35

United States v. Rubenstein,
   403 F.3d 93 (2d Cir. 2005) ........................................................................................................ 49

United States v. Ruggiero,
   100 F.3d 284 (2d Cir. 1996) ............................................................................................... 29, 69

United States v. Sabhnani,
   599 F.3d 215 (2d Cir. 2010) ...................................................................................................... 87

United States v. Santoro,
   302 F.3d 76 (2d Cir. 2002) ................................................................... 24, 26
United States v. Sarlo,
   269 F. App'x 30 (2d Cir. 2008) .................................................................. 42
United States v. Saunders,
   973 F.2d 1354 (7th Cir. 1992) ................................................................... 67
United States v. Si Lu Tian,
   339 F.3d 143 (2d Cir. 2003) ...................................................................... 50
United States v. Sisti,
   91 F.3d 305 (2d Cir. 1996) ........................................................................ 60
United States v. Skys,
   637 F.3d 146 (2d Cir. 2011) ................................................................. 48, 50
United States v. Slevin,
   106 F.3d 1086 (2d Cir. 1996) .................................................................... 68
United States v. Spencer,
   129 F.3d 246 (2d Cir. 1997) ...................................................................... 51
United States v. Sterkaj,
   138 F.4th 95 (2d Cir. 2025) ....................................................................... 66
United States v. Stewart,
   686 F.3d 156 (2d Cir. 2012) ...................................................................... 22
United States v. Tapia,
   No. 21-1674, 2023 WL 2942922 (2d Cir. Apr. 14, 2023) ......................... 30
United States v. Tavberidze,
   769 F. Supp. 3d 264 (S.D.N.Y. 2025) ....................................................... 64
United States v. Tejeda,
   No. 11-CR-1015 (DC), 2024 WL 1676329 (S.D.N.Y. Apr. 18, 2024) ........ 60
United States v. Thorn,
   317 F.3d 107 (2d Cir. 2003) ...................................................................... 23
United States v. Trevino,
   7 F.4th 414 (6th Cir. 2021) ........................................................................ 65
United States v. Vargas,
   961 F.3d 566 (2d Cir. 2020) ...................................................................... 63
United States v. Vasquez,
   791 F. Supp. 348 (E.D.N.Y. 1992) ............................................................ 33
United States v. Walker,
   191 F.3d 326 (2d Cir. 1999) ...................................................................... 25
United States v. Ware,
   No. 04-CR-1224 (RWS), 2009 WL 102215 (S.D.N.Y. Jan. 14, 2009) ....... 70
United States v. White,
   240 F.3d 127 (2d Cir. 2001) ............................................................ 29, 45, 46
United States v. White,
   869 F.2d 822 (5th Cir. 1989) ..................................................................... 67
United States v. Whitten,
   610 F.3d 168 (2d Cir. 2010) ...................................................................... 66

United States v. Wright,
   160 F.3d 905 (2d Cir. 1998) ............................................................................ 22
United States v. Zagari,
   111 F.3d 307 (2d Cir. 1997) ............................................................................ 55

Statutes

18 U.S.C. § 7 .................................................................................................... 39
18 U.S.C. § 1589 .............................................................................. 32, 35, 36, 37
18 U.S.C. § 1589(a)(2) ...................................................................................... 37
18 U.S.C. § 1593(a) .......................................................................................... 87
18 U.S.C. § 1594(b) ..................................................................................... passim
18 U.S.C. § 2241 .............................................................................................. 61
18 U.S.C. § 2242 ........................................................................................ passim
18 U.S.C. § 2242(1) .................................................................................... passim
18 U.S.C. § 3553(a) .......................................................................................... 72
18 U.S.C. § 3553(a)(2) ...................................................................................... 73
18 U.S.C. § 3559(a)(3) ...................................................................................... 86
18 U.S.C. § 3583(b)(2) ...................................................................................... 86
18 U.S.C. § 3661 .............................................................................................. 73
18 U.S.C. § 3664(d)(5) ...................................................................................... 87

## PRELIMINARY STATEMENT

Throughout the pendency of this case, including in a five-week trial, this Court has seen extensive evidence demonstrating defendant Nicole Daedone's calculated and predatory criminal conduct.  As proven at trial, for more than a decade, the defendant led an insidious criminal conspiracy.  As the co-founder and leader of OneTaste, Inc. ("OneTaste"), a purported sexual wellness company, she recruited individuals with promises of growth and community, only to exploit them—for their labor and their money.

Daedone's conduct was intentional and methodical.  It left scores of victims financially, emotionally and psychologically scarred.  Together with her co-defendant, Rachel Cherwitz, and other OneTaste leaders, Daedone engineered a system that coerced individuals, primarily women, into providing unpaid or grossly underpaid sexual and menial labor.  Daedone and her co-conspirators exercised control through economic pressure, psychological manipulation, physical exhaustion and emotional degradation, leaving behind a trail of financial ruin and lasting trauma.

This Court heard firsthand from many of the victims who testified about their exploitation in detail.  Many more have since written to the Court, describing the enduring trauma and scars – emotional, psychological, physical and financial – that continue to define their lives long after the defendants' conspiracy.

This case is serious.  It destroyed livelihoods, corrupted trust and weaponized intimacy.  Daedone indisputably sat at the top of this conspiracy, and the sentence imposed on her should reflect the immeasurable damage she caused.  To protect the public, to provide just punishment for years of exploitation, to reflect the seriousness of Daedone's crime and to provide specific and general deterrence, the Court should impose a sentence of 240 months'

imprisonment.  The Court should also order payment of restitution, as set forth in a separate

submission, and a fine.  For reasons also set forth in the government's separate forfeiture

submission, the Court should impose a forfeiture money judgment of $12 million to ensure that

Daedone does not retain the profits of her exploitation.

# BACKGROUND

I.    The Offense Conduct

OneTaste was a privately held sexuality-focused wellness company founded by Nicole Daedone and Robert Kandell in 2004 in San Francisco, California.  See Presentence Investigation Report ("PSR") ¶ 4.  The company operated through various related entities and, at different points in time, maintained operations in Brooklyn, New York; San Francisco, California; Las Vegas, Nevada; Los Angeles, California; Boulder, Colorado; Austin, Texas; New York, New York; and London, United Kingdom.  Id.

From 2006 through approximately 2018, OneTaste offered hands-on classes on "orgasmic meditation" ("OM"), which was a partnered practice typically involving the methodical stroking of a woman's genitals for fifteen minutes.  OneTaste also operated communal residences known as OM houses.  PSR ¶ 5.

Nicole Daedone served as OneTaste's Chief Executive Officer from approximately 2006 through 2017.  PSR ¶ 7.  She resigned from her position on March 2, 2017, but remained involved in a variety of OneTaste events, courses and projects until at least July 5, 2018.  Id.

As proven at trial, between 2006 and May 2018, Daedone, together with her co-defendant, Rachel Cherwitz, OneTaste's former Head of Sales, and others participated in a scheme to obtain the labor and services of a group of OneTaste participants by subjecting them to economic, sexual, emotional and psychological abuse, surveillance, indoctrination and intimidation.  Daedone and Cherwitz executed the charged conspiracy with agents and co-conspirators who were members of OneTaste's "inner circle" and who each maintained senior positions at and acted as agents on behalf of OneTaste, including: Joanna Van Vleck, who also previously served as the CEO, President, and Director of Marketing at OneTaste; Yia Vang, a

3

senior executive at OneTaste whose responsibilities included, among other things, management of OneTaste's payroll; Robert Kandell, a co-founder, former Chief Operating Officer and senior executive at OneTaste whose responsibilities included managing OneTaste's finances; Rachael Hemsi, a senior executive at OneTaste who for a time served as OneTaste's Head of Sales and oversaw a communal home in San Francisco; and Aubrey Fuller, a senior executive at OneTaste. PSR ¶ 10.

Daedone and Cherwitz, together with members of the OneTaste inner circle, conspired to obtain the labor and services of at least the following OneTaste participants:

- Christina Berkley, a former OneTaste student and staff member who worked for OneTaste between approximately 2006 and 2010, in both San Francisco and New York;

- Ayries Blanck, a former OneTaste student and member of OneTaste's sales team who worked for OneTaste as an independent contractor from approximately 2013 through early 2015, including in New York City;

- Dana Gill, a former OneTaste student and staff member who worked for OneTaste, including by serving as Yia Vang's apprentice, from approximately 2009 through 2013, primarily in San Francisco;

- Anthia Gillick, a former OneTaste student and part-owner of the OneTaste NYC affiliate who became involved in OneTaste beginning in 2013 through 2015 in New York;

- Becky Halpern, a former OneTaste student and member of OneTaste's sales team who worked for OneTaste as an independent contractor from approximately 2010 through 2014, including in New York City;

- Lyndsi Keves, a former OneTaste student and staff member who worked for OneTaste, including by assisting with sales, from approximately November 2016 through October 2017, primarily in New York City.

- Lianna Lifson, a former OneTaste student and staff member who worked for OneTaste, including by serving positions in the kitchen, in event logistics, and in sales, from approximately 2008 through 2012, primarily in San Francisco, Boulder, Colorado and New York;

- Michal Neria, a former OneTaste student and member of OneTaste's sales team who worked for OneTaste from approximately 2014 through 2015, including in New York City;

- Max Pixley, a former OneTaste student and staff member who began working for OneTaste in 2012, including by assisting with event production and sales, primarily in New York City; and

- Michelle Wright, a former OneTaste student and staff member who worked for OneTaste, including by running errands, working as a chef in the communal home kitchen, working in video and event production, sales, and as a city lead, beginning in 2010 through 2014, primarily in San Francisco and Las Vegas;

PSR ¶ 12.

Daedone, together with Cherwitz and their co-conspirators, manipulated and exploited the OneTaste participants by causing them, and conspiring to cause them, serious harm – including psychological, financial, sexual and reputational harm sufficiently serious under the surrounding circumstances to compel a reasonable person of the same background and in the same circumstances to perform or continue performing such labor and services, id. ¶ 13, as detailed below.

A.    OneTaste's Beginnings

OneTaste began in 2006 in a small communal warehouse in San Francisco known as the "Warehouse." Id. ¶ 14. In its early days, OneTaste struggled to make money. Tr. 3322. Beginning in 2006, Daedone sought to finance OneTaste through the capital investment of a wealthy entrepreneur, Reese Jones. Tr. 844-45, 3304-06. Daedone, with others, worked to keep Jones satisfied and interested in OneTaste by, among other things, orchestrating elaborate sexual scenes for him and coercing a series of women to serve as his unpaid or underpaid "handlers." The women directed to serve as Jones's handlers – who were primarily young women who had joined OneTaste looking for community – were coerced into providing him with daily sexual services, including stroking his penis to climax, using sex toys on him, walking him around

naked on a leash, and "topping" him. Tr. 1085-86, 1228, 1247, 1270, 1294-99, 1596, 2318-19, 2402-07, 2412, 3272, 3313-15; PSR ¶ 15.

    In exchange, Jones financed OneTaste (and Daedone personally), and, for several years, OneTaste was dependent on him for its survival. Tr. 3303-04, 3310, 3321-35. Beginning in 2007 and through 2011, while Jones was being sexually and otherwise serviced by women on OneTaste's behalf, Jones invested at least $800,000 in the company. PSR ¶ 16. He also provided equipment, advice, housing and hotels to OneTaste staff and financially supported Daedone's lifestyle. Throughout the entirety of the time that Jones made payments to OneTaste and Daedone personally, he was sexually serviced by women at OneTaste. Tr. 3314-15.

    Multiple witnesses testified at trial about the circumstances that led each of them to serve as Jones' handler. They cited "brainwashing," psychological abuse, financial coercion, employment retaliation, threats, and emotional and sexual abuse perpetrated by Daedone, Cherwitz and other OneTaste leaders. See, e.g., Tr. 1015, 1056, 1077, 1229, 1270, 1287, 1300, 1301, 1308, 2350, 2404, 2410, 2422, 2320, 2784, 2319, 3313-15. Both Daedone and Cherwitz knew that several of Jones's handlers did not want to sexually service him. See GX 4501-K-D, 2148-D, 1258-D-R, Tr. 2422-2425; PSR ¶¶ 22-23. For instance:

- Christina Berkley served as Daedone's assistant, which required her to be on call 24/7, and as Jones's handler. PSR ¶ 18. When Daedone offered Berkley these positions, she asked Berkley, "How good are you at sucking cock?" Tr. 1077. As Jones' handler, she masturbated Jones to climax every morning. She also sexually serviced him. Berkley testified that during this time she felt "brainwashed" and, because of Daedone and others' psychological abuse, was "totally ready and willing to do everything." Tr. 1201.

- Michelle Wright also served as Jones's handler. PSR ¶¶ 19-20. Specifically, in 2011, Daedone asked Wright and her romantic partner to live in Jones's home, cook for him, and make sure that he had what he needed. Wright testified that she understood that request to include sexual services. Thereafter, Yia Vang and another OneTaste participant took Wright to Jones's house where they showed Wright how to "jerk [] off" Jones and how to put a dildo in his anus. Tr. 2319. Wright testified that she did this

work in response to a variety of fear tactics, like "ostracization" and control, and other psychological abuse and financial dependency. Tr. 2320-21.

- Dana Gill was recruited to become Jones's handler in December 2012 after Wright moved to Las Vegas and after Gill suffered a miscarriage. PSR ¶ 21. Gill moved into Jones's home, where she was shown Jones's sex toys, advised on how to use them on Jones, and instructed to "top" him and walk him on a leash. Gill testified that she did this because she suffered from a variety of harms, including economic and psychological harm. Tr. 1226-28.

B.    OneTaste's Shift to Sales and Expansion

By 2011, Jones began demanding repayment of certain loans that he had made to OneTaste. Tr. 3335-39. To make money and fuel OneTaste's growth, Daedone directed Cherwitz to engage a full-fledged sales team dedicated to selling increasingly expensive courses. Id. Men willing to pay for certain courses, typically taught by Daedone, Cherwitz, or other OneTaste leaders, could expect to have their penises stroked or their prostates massaged, or otherwise engage in OM, often by female OneTaste workers. Tr. 1342, 1721, 1856, 3783, 3956-59; PSR ¶ 24. Daedone set aggressive sales goals, and Cherwitz implemented them. Tr. 3414-15; PSR ¶ 25.

By the spring of 2012, OneTaste became profitable, in large part due to its expensive coaching program. Tr. 3347. Using the money from these and their predecessor courses, OneTaste leaders, including Daedone, Cherwitz, and Kandell, continued paying Jones back for his loans to OneTaste, and Daedone also continued directing women to provide sexual services to Jones. Cherwitz checked in on and received reporting from women sexually servicing Jones, see, e.g., Tr. 2410-11, GX 2148-D, and she knew many of these women were struggling. See, e.g., GX 1258-D-R. By June 2013, OneTaste had finished repaying Jones. See GX 1263. In August 2014, Daedone texted another OneTaste participant, "when I paid him [Jones] off that ended all 'favors.'" GX 1604-D-R.

But even after the sexual favors to Jones ended, sexual services for prospective clients, VIPs, and other community members at OneTaste continued.  Over the next several years, Daedone and Cherwitz instructed female workers to engage in various unpaid sex acts with clients or prospective customers.  Tr. 114-15, 1280-81, 1282-83, 1687-88, 1691-92, 1721-22, 2347-48, 2419, 2709, 2133, 2164, 3957, 3958-59; PSR ¶ 26.  They also instructed employees to have sex with one another and to use dating sites to identify men for sexual acts and involvement in OneTaste.  Tr. 3959-64.  Daedone and Cherwitz insisted that employees engage in these sex acts even if they found them disgusting; those who resisted were punished with negative employment consequences, shunning, sexual abuse and threats of physical violence, among other things.  Tr. 257, 260-61, 297-306, 1268, 1679-80, 1722, 1734-35, 2347, 2419-41, 2444-48, 2458, 3002.

As money came in from the sale of OneTaste courses, OneTaste rapidly expanded, opening in cities throughout the United States, including Las Vegas, Nevada; Los Angeles, California; Boulder, Colorado; Austin, Texas; Philadelphia, Pennsylvania; Brooklyn, New York; and New York, New York; and in London, United Kingdom.  PSR ¶ 27.

C.      The Defendant's Abusive Tactics of Coercion

Nearly every trial witness described how Daedone, Cherwitz, and their co-conspirators engaged in a campaign of indoctrination, grooming, isolation, manipulation, use of past trauma, monitoring, public shaming, relationship disruption, sexual abuse, physical exhaustion, and financial harm to force the labor of certain employees.  PSR ¶¶ 28, 69-80.  The totality of these coercive tactics caused the victims to perform labor and services under serious harm and threat of the same.  Id.  Daedone and Cherwitz knew the harm and trauma they were causing their victims.  Id. ¶ 29.

*Psychological Harm*

Every victim who testified described the serious psychological harm they experienced while at OneTaste, including the specific harm the defendants inflicted on them, Tr. 1014-16, 1608, 1639-40, 1742-43, 1748-49, 2963, 3806; DX 3EA, and how that harm in turn caused them to provide labor or services to OneTaste.  Tr. 118-122, 1287, 1919-20, 2102-03, 2320-23; GX 4513-A-R, 4514-A-R.  It is not possible to recount within this memorandum all of the testimony given over a five-week trial of the serious harm caused by the defendants, and the means with which the defendants conspired to break down the victims psychologically, physically and financially – and thus the government incorporates by reference the totality of the trial transcript, including the governments' summation arguments – but every one of the victims described a version of the defendants' "slow whittling down of who I was and how I saw the world and my own personal boundaries," Tr. 1639-40 (Max Pixley testimony), and causing an "immense amount of anxiety and depression and various forms of . . . . physical and emotional and psychological stress."  Tr. 2320 (Michelle Wright testimony).  Certain of the tactics that contributed to this psychological harm – which the victims testified caused them to work or continue working for OneTaste – included the following:

- Public shaming and verbally abusing their victims to coerce them to perform labor and services for OneTaste.  Tr. 298, 1121-22, 1695, 2409, 2963; GX 2000-D-R; PSR ¶ 30.

- Indoctrinating the victims to believe that Daedone was a guru and spiritual leader, and that they should do as Daedone and her leadership team said.  See, e.g., Tr. 213, 1243-44; 122, 1945, 2684, 3938; PSR ¶ 35.

- Isolating their victims so that they believed that OneTaste was all they had.  See, e.g., Tr. 254-56, 1051-52, 1066, 1259, 2154, 2448-49, 2770; PSR ¶ 35.

- Shunning people who left OneTaste, which made those at OneTaste believe they too would lose everything if they left.  See, e.g., Tr. 372, 1080, 1125, 2422, 2998-9; PSR ¶ 96.

- Keeping tabs on their victims and controlling nearly every aspect of their lives, including requiring employees to surveil and report on one another to Cherwitz and Daedone, see, e.g., Tr. 1698, 1839, 3930; GX 2676; directing their victims to prepare "fear inventories" or "withholds" of their deepest fears and read them to the executive team, including directly to Cherwitz, Tr. 1229; PSR ¶ 41, and directing victims to attend addiction meetings, such as Alcoholics Anonymous and Narcotics Anonymous, even if they were addicted to neither, see Tr. 2774-75; PSR ¶ 39.

- Using workers' past trauma against them.  See, e.g., Tr. 149-50; 3949-50; PSR ¶ 38.

- Disrupting intimate relationships between OneTaste participants to further their own goals.  Tr. 1040, 1120, 1312, 2449 3277; GX 3212-R; PSR ¶ 36.

- Using the information they obtained, combined with their positions of power and leadership over the victims, to employ tactics of manipulation as a means of directing labor, Tr. 3381, including techniques such as "[t]hreats," "fear of losing position," and retaliatory employment decisions, Tr. 3382-3385; see also id. at 3383-84; id. at 3289, 3384-85 (Kandell testimony describing Daedone using a "carrot and a stick effect" to cause fear of being kicked out of the inner circle and employing other tactics to force people to work harder and longer hours, beyond their own self limits, and to manipulate people to provide sexual services).

<em><u>Financial Harm</u></em>

Many of the victims in this case also suffered extreme financial harm.  See PSR ¶¶ 46-56.  Victims testified that they were driven into debt because of OneTaste's expensive courses and the defendants' sales tactics, which the victims took because the defendants made their victims believe that they needed to take more OneTaste courses to reach enlightenment and sexual wellness.  See, e.g., Tr. 1056, 1270, 2123, 2319, 2344, 2694-96, 2784, 2977; PSR ¶ 48. The defendants also pressured their victims to pay for programs that they could not afford.  PSR ¶ 49.  The defendants portrayed financial issues as a "third-dimensional problem" and taught that money was just an illusion.  PSR ¶ 46.  And meanwhile, the defendants paid the victims little to nothing while the victims worked around the clock for the defendants.  See, e.g., Tr. 2102; GX 856, 1283-D-R, 1331-A-R, 1332-A-R, 2200; PSR ¶ 52.  Witnesses testified that they were constantly in debt to OneTaste in light of such financial tactics, which made it difficult for them

10

to leave and kept them working for OneTaste.  See, e.g., Tr. 2102, 2123, 2319, 2784; GX 3501-3, 3501-5.

*Sexual Abuse*

In addition to grooming the victims to participate in sexual acts, the defendants also subjected them to sexual abuse, contributing to both physical and psychological harm.  See, e.g., Tr. 290-91, 304-5, 1227, 1280-83, 1596, 1688-89, 2319, 2350, 2356, 2407-09; PSR ¶¶ 57-66.  The defendants directed women to sexually service Jones, VIP clients, prospective clients, and community members.  See id.; PSR ¶¶ 58-59.  Many of these sexual acts were non-consensual, PSR ¶ 61, and were obtained by lowering OneTaste participants' barriers and making it more likely that OneTaste participants would have sex and OM with others, which, in turn, would generate sales.  PSR ¶ 58.  As Michelle Wright testified, sexually servicing Jones contributed to "wearing [her] down emotionally," felt "degrading," and "removed [her] from reality," leaving her "numb" and unable to feel the effects until much later, which included depression, anxiety, and trauma.  Tr. 2412-13.  Cherwitz also forcibly massaged Becky Halpern's genitals without her consent during an OM demonstration after Halpern explicitly said she did not want to participate.  Tr. 304-06.

Sex was also used as a means of encouraging productivity, PSR ¶ 63, and as a means of working through trauma, id. ¶ 66.  These tactics ensured that OneTaste participants would continue to have sex for Daedone's financial benefit.  Id. ¶ 59.

*Physical Exhaustion*

Finally, every victim testified to being physically exhausted and overworked while at OneTaste.  PSR ¶ 67.  OneTaste participants were expected to work from early in the morning to late at night, and were discouraged from taking vacations or breaks.  The defendants

11

also subjected their victims to rigid schedules and to respond immediately to text message threads.  Id.  Victims who failed to meet these requirements were targeted with criticism and discipline.  Id.  For example, Michelle Wright and Lianna Lifson, who both served as city leaders for OneTaste in Las Vegas and Boulder, respectively, testified regarding the abusive employment conditions they experienced.  Tr. 2425-26, 2107, 2137.  Lifson testified that she was frequently sick from how much she was working and developed shingles.  Tr. 2155-56.  Anthia Gillick similarly testified regarding the hours she worked, the sleep deprivation, and the impact that her physical exhaustion had on her psychological state, as did many of the other victims.  Tr. 3927; 244, 252, 2425-26, 2107, 2137, 2794.

Daedone and Cherwitz, together with their co-conspirators, also subjected OneTaste participants to micro-regulation by governing minute aspects of their everyday life. PSR ¶ 68. They controlled how OneTaste participants dressed, restricted access to mainstream activities, and imposed strict conditions on their sexual activities and relationships.  Id.

D.    The Labor and Services Performed

As proven as trial, an object of the defendants' conspiracy was to obtain the forced labor and services of a select group of OneTaste participants to financially benefit OneTaste and, in turn, so that Daedone and Cherwitz would benefit financially or increase their power and status within the company.  The labor and services obtained included: domestic services; administrative and personal services; sales, marketing, pitching and recruitment work; video and website production; the operation of certain OneTaste locations; and the performance of physical labor to maintain OneTaste's properties.  PSR ¶ 82.  However, the labor and services obtained were also sexual in nature.  Id. ¶ 83.  This included the provision of OM and other sex acts to OneTaste customers, investors, and OneTaste members and employees.  Id.  Daedone and

Cherwitz instructed their victims to have sex with potential clients and other OneTaste employees and/or members, including performing oral sex and using sex toys.  Id. ¶ 84. Daedone also supplied women to Reese Jones to sexually service him and arranged for various sexual scenes for him to elicit investments in OneTaste.  Id. ¶ 86-87.

     E.    The Benefits Daedone Accrued

     Daedone benefitted from the systematic exploitation of these employees.  With Daedone at the helm and Cherwitz leading the sales team, OneTaste grew into an international, multi-million-dollar company; when the business sold in 2017, Daedone made $12 million.  GX 4056; Tr. 4318.  And many of the benefits from the scheme were not strictly financial: for years, Daedone was waited on hand and foot by OneTaste adherents, see, e.g., Tr. 1663.

II.    Procedural History and Post-Conviction Statements

     On or about April 3, 2023, a grand jury sitting in the Eastern District of New York returned an indictment (the "Indictment") charging Daedone and Cherwitz with forced labor conspiracy, in violation of 18 U.S.C. § 1594(b).  See ECF No. 1.

     Trial began on May 5, 2025.  Over approximately five weeks, the government presented testimony from 16 witnesses, including one of the defendant's co-conspirators; numerous victims; an FBI agent; and an FBI forensic accountant.  As the Court subsequently noted, many of the victims who testified at trial did so despite being in "fear" of the defendants and their supporters.  June 9, 2025 Tr. of Proc. ("Bond Hearing Tr."), at 27.  The Court also noted that during trial, Daedone made "extreme" "gestures" and spent a significant portion of the trial "turned toward her supporters."  Id. at 26-27.  The Court noted that many of her supporters

"tried" to "obstruct the trial," id. at 28,[1] and intimated that, given Daedone's influence over her

supporters, she could have at any time "impressed upon [them] the need to refrain from

inappropriate conduct." Id. at 26. Likewise, in the lead up to trial, someone leaked materials

that were under a protective order to an attorney associated with Daedone, who subsequently

referenced those materials in a threatening letter to a supervising Assistant U.S. Attorney.[2]  The

Court has not yet made a finding as to who violated its Order. Similarly, an agent of Daedone's

made threatening comments in the press, including writing an article that bore a swastika over

the Department of Justice seal. Id. at 31.

On June 9, 2025, the jury returned a verdict of guilty on the sole count of the

Indictment. The next day, the Court determined that the defendant did not meet her burden that

she should be released pending sentencing, and the defendant was remanded to custody. See

PSR ¶ 3. The Second Circuit subsequently affirmed the Court's remand decision.

---

[1]      For instance, the Court noted that one of the defendants' supporters was "making
faces" at witnesses. Tr. 3908. The Court also admonished individuals sitting in the public gallery
not to "intimidate and/or deter the presence of any member of the public or courthouse staff." Tr.
930.

[2]      As the Court well knows, the defendant also sought to dismiss the indictment
based on purported intrusions into the attorney-client privilege, submitting numerous affidavits
in support of the same. See, e.g., See In re Cherwitz, No. 25-553 (2d Cir.), Dkt. Entry 2.1 at 46,
64 (Van Vleck and Vang affidavits). The Court has repeatedly ruled that no such violations have
been established. See Sept. 27, 2024 Tr. of Proc., at 24-26; Feb. 26, 2025 Tr. of Proc., at 8-10.
Recent public reporting suggests that OneTaste did not retain outside counsel to assess its legal
risk until 2019, and that at least certain documents assessing its risk were created for, and shared
with, a public relations firm rather than an attorney. See Ellen Huet, Empire of Orgasm, 338-342
(2025). Indeed, this Court has held that "far from demonstrating that the documents at issue
were communications between a client and its attorney for the purpose of obtaining or providing
legal advice . . . declarations filed by [OneTaste] cast serious doubt on certain of [OneTaste's]
arguments about the creation, nature, and/or purpose of the various documents and at least
certain of the declarations appear to have been designed to obfuscate," further observing that any
reference to the public relations firm Trident was "conspicuously absent" from an affidavit
submitted in connection with the same. See In re Petition of OneTaste, Inc., No. 24-MC-2518
(DG) (E.D.N.Y.), Mem. & Order dated July 1, 2025 (ECF No. 41) at 10-11 & n.1.

Even after her conviction, Daedone refused to accept responsibility for her actions. Indeed, on or about July 7, 2025, in the aftermath of the jury's verdict in a separate case, United States v. Combs, No. 24-CR-542 (AS) (S.D.N.Y), Daedone minimized the jury's verdict in her case, stating: "Diddy basically gets off while Rachel [Cherwitz] and I get convicted for what could be twenty years, . . . [t]hat should tell you everything you need to know about how we [society] view women's sexuality." Nicole Daedone Rips Sean Combs Verdict as Double Standard, NBC News (July 7, 2025), https://www.nbcnews.com/business/business-news/nicole-daedone-rips-sean-combs-verdict-double-standard-rcna217276. She also stated: "The case operated at an emotional level, not a legal or rational one. It made perfect sense to me: a self-possessed sexual woman is presumed guilty; in the current culture she can never be proven innocent." Id.

Likewise, in an interview with The New Yorker, Daedone reverted to the same tactics that the Court found threatened the safety of the community, writing of her time at the Metropolitan Detention Center: "I rested. I rested as I suspect those who put us in here will not likely ever again." Thessaly La Force, "The Orgasm Expert Who Ended Up on Trial," The New Yorker (Aug 29. 2025), https://www.newyorker.com/news/our-local-correspondents/the-orgasm-expert-who-ended-up-on-trial.

## LEGAL FRAMEWORK

I.    The Sentencing Framework and Applicable Guidelines Calculations

For her conviction of forced labor conspiracy in violation of 18 U.S.C. § 1594(b), the defendant faces a sentence of up to twenty years' imprisonment.

The United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines"), while advisory, are still a strong source of guidance for sentencing courts following Booker and its progeny.  See United States v. Booker, 543 U.S. 220, 264 (2005) (holding that while the Guidelines are not mandatory, they remain in effect and must be "consult[ed]" and "take[n] into account" at sentencing).  "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" as the "starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007).

A.    The Government's Guidelines Calculation

The government respectfully submits that the defendant's applicable Guidelines range of imprisonment is 240 months' imprisonment, based on the following Guidelines offense level:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §§ 2X1.1(a); 2H4.1(a)(1)) | 22 |
| Plus: Victims Held in Condition of Involuntary Servitude For More than One Year (U.S.S.G. § 2H4.1(b)(3)(A)) | +3 |
| Adjusted Offense Level: Another Felony Offense Committed in Connection with the Offense (U.S.S.G. § 2H4.1(b)(4)(B); U.S.S.G. § 2A3.1(a)(2)) | <u>32</u> |
| Plus: Aggravated Role as Organizer or Leader (U.S.S.G. § 3B1.1(a)) | +4 |
| Plus: Abuse of Position of Trust (U.S.S.G. § 3B1.3) | +2 |
| Plus: Obstruction of Justice (U.S.S.G. § 3C1.1) | <u>+2</u> |
| **Total:** | **<u>40</u>** |

16

This calculation is based principally on the cross-reference in § 2H4.1 to § 2A3.1 for the commission of another felony offense, which, in this case, is a violation of 18 U.S.C. § 2242(1).  U.S.S.G. § 2H4.1(b)(3)(B) & cmt. n.2 (hereinafter, the "§ 2A3.1 Criminal Sexual Abuse Cross-Reference").  Section 2242(1) proscribes knowingly "engaging in, or causing another person to engage in, a sexual act with another person by threatening or placing the victim in fear (other than by threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping)" and the applicable Guidelines for a violation of 18 U.S.C. § 2242 is § 2A3.1(a)(2).  Because the evidence presented at trial, including in support of the offense of conviction, plainly establishes that the defendant's conduct meets this definition, the Court should apply the § 2A3.1 Criminal Sexual Abuse Cross-Reference, as detailed supra in connection with the defendant's Guidelines objections.

The defendant has not demonstrated any acceptance of responsibility for her conduct, so no adjustment under U.S.S.G. § 3E1.1 is warranted.  The adjusted offense level is 40.  Because the defendant's criminal history category is I, her corresponding Guidelines range of imprisonment is 292 to 365 months.  Since this Guidelines range of imprisonment exceeds the statutory maximum, the defendant's effective Guidelines range is 240 months' imprisonment.

B.    Probation's Guidelines Calculation

In the PSR and the Second Addendum to the PSR, Probation calculated the defendant's Guidelines range of imprisonment as 235 to 240 months' imprisonment, based on the following Guidelines offense level:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2H4.1(a)(1)) | 22 |
| Plus: Victims Held in Condition of Involuntary Servitude For More than One Year (U.S.S.G. § 2H4.1(b)(3)(A)) | +3 |
| Adjusted Offense Level: Another Felony Offense Committed in Connection with the Offense (U.S.S.G. § 2H4.1(b)(4)(B); | <u>32</u> |

U.S.S.G. § 2A3.1(a)(2))

| | |
|---|---|
| Plus: Aggravated Role as Organizer or Leader (U.S.S.G. § 3B1.1(a)) | +4 |
| Plus: Obstruction of Justice (U.S.S.G. § 3C1.1) | <u>+2</u> |
| **Total:** | **<u>38</u>** |

<u>See</u> Second Addendum to the Presentence Report at 16-17.

Probation's and the government's Guidelines calculations differ in only one respect: whether a two-level enhancement under U.S.S.G. § 3B1.3 for the defendant's abuse of a position of trust applies, addressed in more detail below.

### C.    The Defendant's Guidelines Calculation

In the defendant's sentencing submission, ECF No. 471, the defendant calculates the relevant Guidelines range as 21 to 27 months' imprisonment.  Def't Sent. Mem., ECF No. 471, at 6.  The defendant requests a sentence of no greater than one year.  <u>Id.</u> at 45.  For the reasons set forth below, the Court should adopt the government's Guidelines' calculation and reject the defendant's inaccurate calculation, which grossly minimizes her culpability.

## II.    Guidelines Disputes

In addition to the dispute between the government and Probation regarding § 3B1.3's applicability, the government and the defendant (together, the "parties") have five general categories of Guidelines disputes:

- <u>First</u>, the parties dispute the standard by which the government must prove the applicable enhancements pursuant to U.S.S.G. § 2H4.1 and whether the defendant is entitled to a three-level reduction pursuant to U.S.S.G. § 2X1.1(b)(1);

- <u>Second</u>, the parties dispute the applicability of various enhancements and cross-references under U.S.S.G. § 2H4.1, including enhancements for the criminal sexual abuse the defendant perpetrated and for holding victims in a condition of involuntary servitude;

- <u>Third</u>, the parties dispute whether the enhancements for the defendant's aggravating role in the offense conduct and for the defendant's obstruction of justice apply;

- <u>Fourth,</u> the parties dispute whether various reductions, such as reductions for being a zero-point offender and acceptance of responsibility, apply; and

- <u>Finally</u>, the parties dispute whether any hearing pursuant to <u>United States v. Fatico</u>, 579 F.2d 707 (2d Cir. 1978) (a "<u>Fatico</u> hearing"), is required.

For the reasons described below, the Court can and should consider the defendant's criminal sexual abuse – as well as her role in the forced labor conspiracy and subsequent obstruction of the government's investigation into it – without holding an additional evidentiary hearing. First, consideration of this relevant conduct under U.S.S.G. § 1B1.3 is not only appropriate, but essential. Second, applying the corresponding Chapter Three enhancements properly captures the full scope of the defendant's culpability, including her central role in orchestrating the forced labor scheme and her deliberate efforts to obstruct justice. Third, the defendant is not entitled to any reduction of her offense level as she does not qualify as a zero-point offender and has not accepted responsibility. Finally, the defendant has already had ample opportunity to confront and challenge the same evidence and testimony on which the government now relies. To convene an additional evidentiary hearing would serve no legitimate purpose; it would squander judicial resources and effectively give the defendant a second chance to relitigate issues that were fully and fairly resolved at trial.

A.    <u>The Dispute Between the Government and Probation Regarding § 3B1.3's Applicability</u>

The government objects to the Probation Department's failure to include an enhancement for Daedone's abuse of her position of trust under U.S.S.G. § 3B1.3. As OneTaste's co-founder, former Chief Executive Officer and self-styled spiritual guru, Daedone wielded extraordinary authority over the organization and its members. That position of trust

enabled her to direct and control victims' conduct and to commit the forced labor conspiracy for which she was convicted. That authority was not rooted merely in charisma or personality, but in institutionalized discretion she embedded into OneTaste's hierarchy, coaching model and intake process – discretion that victims reasonably understood as conferring responsibility for their emotional safety, sexual boundaries and financial well-being.

### i.    Factual Background

As established at trial, from 2006 through May 2018, Daedone exercised day-to-day control over OneTaste's structure, messaging and personnel. She was also OneTaste's leader and spiritual guru. In that role, Daedone occupied a unique position of trust over OneTaste's members. Daedone cultivated the image of a visionary mentor whose guidance promised empowerment, healing and safety, thereby encouraging participants to entrust her with their emotional, financial and physical well-being. Trial testimony of numerous victims, other individuals formerly in OneTaste, and one of Daedone's co-conspirators described a hierarchical organization in which Daedone's teachings were exalted, dissent was not tolerated, and members were expected to demonstrate absolute fealty to her ideology. See, e.g., id. ¶ 76.

As part of the intake and coaching model Daedone led, OneTaste collected deeply sensitive personal information – such as members' trauma histories and sexual experiences – that participants disclosed in reliance on Daedone's promise of healing. OneTaste leaders then used that confidential information to shape assignments, monitor compliance and exert influence (and, ultimately, drive sales).

The trust Daedone commanded extended into every aspect of participants' lives. Many participants lived in communal residences overseen by OneTaste, id. ¶ 5, with sleeping arrangements, id. ¶ 44, daily schedules and movements coordinated by leadership, id. ¶ 67.

Victims were conditioned to defer to Daedone's judgment in matters touching their livelihoods, intimate lives and personal identities.

Daedone also controlled core employment conditions. After securing members' allegiance, she and others within OneTaste directed a seven-day-a-week workweek with little or no pay, id. ¶ 52, changed roles and locations on short notice, id. ¶ 50, and encouraged members to incur debt to finance costly courses, id. ¶ 47. These practices, combined with the collection of intimate personal information and communal living arrangements, consolidated Daedone's influence over members' livelihoods and social networks. Id. ¶ 42. Daedone's claimed spiritual authority also extended into members' sexual conduct, including assignments that served OneTaste's business interests.

Daedone's exercise of authority mirrors the therapeutic relationships courts have found to qualify under § 3B1.3, where a defendant cultivates a role as a therapist to promote personal transformation and then uses that entrusted discretion to exploit victims' vulnerabilities. Here, Daedone, together with Cherwitz, groomed and directed members to provide labor, including by engaging in sexual acts with current and prospective investors and clients, for OneTaste's financial benefit. Daedone framed these assignments as spiritually beneficial, but they in fact advanced OneTaste's financial and reputational interests. Id. ¶ 59. As described in detail above, witnesses testified that they were coerced into becoming "handlers" for OneTaste investors, including living with one of them and performing demeaning tasks at his direction. Id. ¶¶ 15-16.

In short, Daedone's position as OneTaste's leader was not simply administrative. She stood at the apex of the organization as its spiritual and managerial authority, with discretion over members' livelihoods, housing, finances and intimate relationships. Participants relied on

her to guide them toward personal growth and entrusted her with their deepest vulnerabilities. Instead of safeguarding that trust, Daedone exploited it to coerce labor, extract money and direct sexual conduct – all while cloaking the exploitation in the guise of spiritual mentorship. That reliance made her victims more compliant, less likely to question directives, and less able to detect or report the wrongs committed against them, thereby facilitating both the commission and concealment of the forced labor conspiracy with which Daedone was convicted of committing.

ii.    Applicable Law

United States Sentencing Guidelines § 3B1.3 instructs a sentencing court to increase a defendant's offense level by two levels if it finds that she "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3 (further noting that the enhancement applies where the position of public or private trust made the detection of the offense or the defendant's responsibility for the offense more difficult); see also United States v. Alston, 899 F.3d 135, 151 (2d Cir. 2018). The Guidelines define a position of public or private trust as "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 cmt. n.1.

Whether a position is one of "trust" within the meaning of § 3B1.3 is to be viewed from the perspective of the offense victims. See United States v. Anselm, 610 F. App'x 64, 67-68 (2d Cir. 2015); United States v. Wright, 160 F.3d 905, 910 (2d Cir. 1998). A position of trust exists where the defendant occupied a role imbued with discretionary authority or responsibility for the well-being of victims. Wright, 160 F.3d at 910-11. "[T]he primary trait that distinguishes a position of trust from other positions is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." Anselm, 610 F. App'x at 67-68 (citing United States v. Laljie, 184 F.3d 180, 194 (2d Cir. 1999)); see also United States v. Stewart, 686 F.3d 156, 178

22

(2d Cir. 2012); United States v. Castagnet, 936 F.2d 57, 61-62 (2d Cir. 1991) ("If one party is able to take criminal advantage of the relationship without fear of ready or quick notice by the second party, the second party has clearly placed a level of trust in the first.").  Moreover, a position of trust does not require "a legally defined duty such as fiduciary duty."  United States v. Thorn, 317 F.3d 107, 120 (2d Cir. 2003).  It is possible for a defendant to abuse a position of trust whether or not she is a leader of the criminal enterprise.  See U.S.S.G. § 3B1.3.

   iii.   <u>Discussion</u>

   Nicole Daedone's role as the founder and leader of OneTaste placed her squarely within the kind of position of trust contemplated by U.S.S.G. § 3B1.3.  Daedone was not simply an organizer of a business enterprise – she was an authority figure upon whom victims relied for their physical, emotional and financial well-being.  Victims joined OneTaste – and remained with it – because they trusted Daedone's representations and relied on her judgment.  Members of OneTaste entrusted Daedone with intimate access to their personal, financial and emotional lives – access premised on her purported benevolence and expertise.

   Probation's conclusion that Daedone's authority derived from coercion or charisma misapprehends the sequence established at trial: victims first voluntarily entrusted Daedone with discretion over their emotional, financial and sexual well-being because they believed she possessed unique expertise.  That trust then facilitated Daedone's coercive scheme.  Section 3B1.3 applies precisely to this dynamic – where initial reliance on the defendant's judgment enables later abuse and makes detection of wrongdoing more difficult.  That Daedone "used threats of force, threats of serious harm, and coercion along with her power and intimidation, to force the victims to remain employed by OneTaste," see Second Addendum to the Presentence Report at 12, does not erase that the foundation of those threats and coercion was premised on the victims' trust in and reliance on Daedone that she cultivated and exploited.  The

abuse of trust enhancement must apply where victims voluntarily grant a defendant discretionary authority over their well-being (such as a patient seeing a therapist), even if that initial trust later enables coercion or abuse.

Here, Daedone's victims did not view her merely as a CEO or charismatic speaker. They viewed her as a guide and protector – someone with unique insight into their emotional and sexual health who could be trusted with their most personal vulnerabilities. See, e.g., Tr. 1072, 1085 (Berkley noting that she "trusted" Daedone completely); Tr. 1332 (Gill noting that she "trusted" people who were in positions of power over her, including Daedone); Tr. 4232; GX 906 (Gillick writing "[i]t's hard to speak up to your teachers and people you respect when they are saying 'this is the best for a person' and you trust them"). That perspective is especially important where, as here, the victims joined OneTaste because they believed Daedone possessed specialized knowledge or insight that could be relied upon to guide their emotional, sexual and psychological development and well-being. That trust was the gateway through which Daedone exercised discretionary power to decide members' housing, work assignments and sexual obligations – areas of life over which victims reasonably believed she had superior insight and authority.

As this Court well knows from presiding over the trial, rather than honoring that trust, Daedone weaponized it. She used her authority to coerce labor, demand financial resources, and subject members to psychological control. Indeed, just as a doctor who exploits patient confidences, see United States v. Ntshona, 156 F.3d 318, 321 (2d Cir. 1998), a financial advisor who defrauds her clients, see United States v. Hussey, 254 F.3d 428, 432-33 (2d Cir. 2001); United States v. Santoro, 302 F.3d 76, 80 (2d Cir. 2002), a public official who betrays the public's trust, see United States v. Giordano, 172 F. App'x 340, 344 (2d Cir. 2006), or an attorney

who exploits a client's faith, see United States v. Walker, 191 F.3d 326, 338 (2d Cir. 1999), is held accountable for abusing discretionary authority, Daedone should be held accountable for her abuse of her position of trust: she preyed upon her victims' most intimate and personal details.[3] The common threat in these cases is not licensure but exploitation of entrusted discretion over another's welfare.  Victims came to Daedone seeking meaning and protection; she exploited that reliance to bind them to OneTaste while profits inured to her.  Daedone accomplished this in several ways.

   First, the evidence showed that victims disclosed highly sensitive trauma histories and sexual experiences to Daedone or her co-conspirators.  OneTaste used those confidences as tools of control, impairing victims' ability to detect or resist abuse and thus satisfying the Guideline's requirement that the position "significantly facilitated" the offense.  That mirrors the precise concern underlying § 3B1.3: the exploitation of discretionary access to information that makes detection and resistance more difficult.

   Second, Daedone stood at the apex of a system of coercion that controlled members' housing, employment conditions and finances – areas of life that demanded trust in her judgment.  These domains are classic indicators of discretionary authority, not mere interpersonal influence.  Victims reasonably relied on her claimed expertise as a teacher and as someone with

---

[3]  The abuse of trust enhancement can apply even when a defendant is not in a traditional fiduciary role with respect to the victim, such as an attorney-client, doctor-patient or investment advisor-client relationship.  See, e.g., United States v. Ransom, 756 F.3d 770, 775-76 (D.C. Cir. 2014) (in sentencing defendant for fraud in connection with the operation of his property management company, district court did not err in holding that adjustment was justified because he was vice president of company with whom defrauded apartment owners dealt and who they trusted); United States v. Baker, 200 F.3d 558, 564 (8th Cir. 2000) (not clearly erroneous for district court to conclude that an insurance agent who persuaded her elderly clients to give her personal control over their premium payments, and then misappropriated those monies, occupied and abused a position of private trust).

superior knowledge about their development, and submitted to sudden relocations, uncompensated work and financial obligations to OneTaste. While Daedone eventually reinforced that control through coercion, the coercion succeeded only because victims had first ceded discretion to her in trust. By using her discretionary authority to entrench dependence, she significantly facilitated both the commission and concealment of the offense. Daedone had the discretion and lack of supervision that provided her with "the freedom to commit a difficult-to-detect wrong," and she took full advantage of that freedom to force her victims to work for her. See Anselm, 610 F. App'x at 67-68. The defendant abused her relationship of trust and confidence with her victims – who revered her, Tr. 2117– which enabled the defendant to force her victims to work for her and escape detection by silencing dissent and creating an environment in which her victims did not seek outside help. See Santoro, 302 F.3d at 79.

       Third, Daedone extended her authority into victims' intimate lives, directing sexual conduct under the guise of spiritual advancement. Probation's suggestion that Daedone's influence stemmed merely from charisma ignores that victims' participation was grounded in a cultivated belief that Daedone possessed superior knowledge and could be trusted to guide their development. Just as a teacher who exploits students who rely on their expertise and judgment, see United States v. Booth, 996 F.2d 1395, 1396 (2d Cir. 1993), abuses a position of trust, Daedone manipulated members' faith in her guidance to coerce sexual acts and other labor for OneTaste's financial benefit. Indeed, instead of honoring that trust, Daedone weaponized it to coerce labor, demand financial resources, and subject members to reputational and physical harm.

       Fourth, contrary to defendant Daedone's arguments, Daedone was not simply a "CEO" who "wrote books and gave speeches." She cultivated a position of extraordinary trust

within the OneTaste community by presenting herself as a guru and gatekeeper of members' personal growth, conditioning followers to believe their advancement and worth depending on compliance with her directives.  See Tr. 1088; 3300; 3379-80.  That position of trust was the mechanism by which she extracted labor, suppressed dissent and concealed the coercive reality of OneTaste's operations.  The jury's conspiracy finding confirms that Daedone's authority was instrumental to the offense.  Whether people were theoretically "free to reject [Daedone's] ideas" is a red herring because the offense conduct was not grounded in abstract philosophy but in the coercive environment Daedone deliberately engineered.

Finally, the trust Daedone commanded was not incidental to the offense, but central to its commission and to the conspiracy's durability.  Victims remained compliant, and, in at least one case, failed to seek appropriate medical care, see PSR ¶ 77, precisely because they believed Daedone was leading them through a transformative process for their benefit.  This dynamic both facilitated the forced labor scheme and concealed it from outsiders, as members' blind reliance made them unlikely to question directives or seek help.  Thus, the conspiracy's durability depended on Daedone's ability to cloak exploitation in the guise of mentorship and spiritual advancement.

In sum, the record shows that Daedone's influence rested on a foundation of trust and discretionary authority that she later reinforced with coercion – not the other way around.  Section 3B1.3 applies precisely to such abuse of confidence, where a defendant's misuse of entrusted discretion renders the offense more pervasive and more difficult to detect.  For those reasons, the Court should impose the two-level enhancement § 3B1.3 demands.

B.    <u>The Guidelines Disputes Between the Parties</u>

The remainder of the errors the defendant asserts in the government's and Probation's Guidelines calculations reflect a fundamental misunderstanding of the governing legal framework and the nature of the relevant offense conduct. These disputes are outlined below.

1.    <u>The Defendant's Guidelines Calculation Errs by Narrowly Construing the Scope of Relevant Conduct</u>

As an initial matter, the defendant appears to dispute the extent to which the Court may consider evidence of the proven conspiracy, including relevant conduct, and what that conduct entails in this case. Indeed, throughout her submission, the defendant ignores relevant conduct entirely. When conducting a Guidelines calculation, the sentencing range "<u>shall</u> be determined" by considering all "relevant conduct," which is broadly defined in § 1B1.3 of the Guidelines. U.S.S.G. § 1B1.3(a) (emphasis added). That section explains that relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection nor responsibility for that offense." <u>Id.</u> § 1B1.3(a)(1). Relevant conduct also includes, for a conspiracy or any other jointly undertaken criminal activity, "all acts and omissions of others that were – (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity" whether they occurred during the offense, in preparation for the offense, or when attempting to avoid detection for the offense. U.S.S.G. § 1B1.3(a)(1)(B). Thus, though the Court must first identify the Guideline applicable to the offense of conviction, it must then consider relevant conduct, including uncharged conduct and reasonably foreseeable conduct by co-conspirators, in applying the Guidelines based on evidence proven by a preponderance.

United States v. Padilla, 961 F.2d 322, 325-26 (2d Cir. 1992); see also United States v. White, 240 F.3d 127, 136 (2d Cir. 2001) (court may make factual findings based on relevant conduct when sentencing a defendant without violating a defendant's due process rights).

As the Second Circuit has made clear, at sentencing, judges are not limited to considering the facts found by the jury or admitted by the defendant but instead are obligated to make findings at sentencing using a preponderance standard.  See, e.g., United States v. United States v. Cordoba-Murgas, 233 F.3d 704, 708-09 (2d Cir. 2000) (proof by a "preponderance of the evidence" is the applicable burden of proof when a sentencing judge is asked to assess disputed facts relevant to sentencing); United States v. Ruggiero, 100 F.3d 284, 290-91 (2d Cir. 1996) (same); see also U.S.S.G. § 6A1.3 cmt. ("The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.").

Despite these clear instructions, including as outlined in the Guidelines themselves, the defendant nonetheless alleges that the government is seeking to punish her for crimes for which she was not convicted.  Not so.  The defendant's concerns regarding being punished for a crime that raises her adjusted offense level without a jury finding the defendant guilty of that offense is at best a misguided reference to the Supreme Court's holding in Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).  Apprendi and its progeny only applies when a sentencing court's findings increase the penalty faced by the defendant above the statutory maximum for a given count, and not when they affect the length of a sentence within the statutory range.  See White, 240 F.3d at 135-36.

The defendant's reliance on Blakely v. Washington, 542 U.S. 296 (2004), is

similarly misplaced.  See Def't Sent. Mem., ECF No. 471, at 13.  Under Blakely, constitutional problem arises when a judicially-found fact "increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Id. at 302 (citing Apprendi, 530 U.S. at 490).  In Blakely, the Supreme Court noted that the "'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."  Id. at 303.  Blakely is inapposite here, where Congress has proscribed a twenty-year statutory maximum sentence (and without a mandatory minimum) and the Court's factfinding merely guides the Court's exercise of discretion within that range.  See Padilla, 961 F.2d at 325-26.

The defendant further complains that she was entitled to notice of allegations that significantly increase her punishment.  Def't Sent. Mem., ECF No. 471, at 15.  First, the case on which the defendant relies, United States v. Tapia, No. 21-1674, 2023 WL 2942922 (2d Cir. Apr. 14, 2023), concerns acquitted conduct, which is not at issue here.  Second, the defendant was given adequate notice of the allegations of which she now complains.  Paragraph 6 of the Indictment alleged: "In or about and between 2006 and May 2018, the defendants, NICOLE DAEDONE and RACHEL CHERWITZ, together with others, obtained the labor and services of a group of OneTaste members by subjecting them to economic, sexual, emotional and psychological abuse; surveillance; indoctrination; and intimidation."  (emphasis added).  Paragraph 9 of the Indictment alleged: "As part of their employment at OneTaste, some of the OneTaste members engaged in sexual activity at the direction of the defendants NICOLE DAEDONE and RACHEL CHERWITZ.  For example, DAEDONE and CHERWITZ, together with their co-conspirators, recruited and groomed OneTaste members to engage in sexual acts with OneTaste's current and prospective investors, clients, employees and beneficiaries, for the

financial benefit of OneTaste and, in turn, the defendants. . . ."  The defendant cannot now feign ignorance of these explicit allegations of sexual abuse.

Lastly, the defendant's focus on the government's jury addresses is misplaced for several reasons.  Def't Sent. Mem., ECF No. 471, at 8-9 & 16.  Judicial fact-finding by a preponderance of the evidence does not violate the Sixth Amendment.  As such, prosecutorial argument in summation and rebuttal is properly confined to the elements of the charged offense; indeed, it is outside the purview of the jury to consider punishment in its deliberations.  See Jury Instructions, ECF No. 407, at 27.  The defendant's arguments improperly conflate guilt-phase elements with sentencing factors.  See Shannon v. United States, 512 U.S. 573, 579 (1994); see also United States v. Glick, 463 F.2d 491, 494 (2d Cir. 1972) (the jury's "function was to decide guilt or innocence and [] sentencing was the judge's province and his alone").  The government's role in addressing the jury in summation and rebuttal was not to anticipate or litigate sentencing enhancements; it was to tie the trial evidence to the elements of the charged offense and to demonstrate guilt beyond a reasonable doubt.  Ultimately, any Guideline enhancements must be properly based on factual findings by the Court based on a preponderance of the evidence; the defendant's argument effectively seeks to resurrect the mandatory Guidelines regime the Supreme Court has rejected in Booker and its progeny.  Regardless, as detailed below, the Guidelines enhancements advocated for by Probation and the government are well-founded in the trial and other evidence before this Court.

      2.    The Applicable Sentencing Guideline is § 2H4.1

This Court should apply U.S.S.G. § 2H4.1 as the applicable guideline for a defendant convicted of forced labor conspiracy and should determine any applicable enhancements under a preponderance of the evidence standard.  Nothing in § 2X1.1 alters that burden or creates a diminished Guidelines range simply because the defendant was only charged

31

– and convicted – of forced labor conspiracy.  And, because § 2X1.1(b)(2)'s three-level reduction applies only to incomplete conspiracies that were interrupted well before the substantive offense could be completed, a defendant who, together with her co-conspirators, performed all or nearly all of the acts necessary to bring about the forced labor offense is not entitled to that reduction.

i.    <u>Applicable Law</u>

In determining the applicable base offense level for forced labor conspiracy, in violation of 18 U.S.C. § 1594(b), the Sentencing Guidelines instruct a sentencing court to look to U.S.S.G. § 1B1.2(a), which explains: "if the offense involved a conspiracy, attempt, or solicitation, refer to § 2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense."  U.S.S.G. § 1B1.2(a) & cmt. n.1. Conspiracy under § 1594(b) is not covered by a specific guideline in the Statutory Index, so a sentencing court must follow U.S.S.G. § 2X1.1 to determine the appropriate base offense level. Section 2X1.1(a), in turn, directs courts to apply "[t]he base offense level from the guideline for the substantive offense."  U.S.S.G. § 2X1.1(a).  For substantive forced labor, in violation of 18 U.S.C. § 1589, the applicable sentencing guideline is § 2H4.1.

In addition, § 2X1.1(a) adopts by cross-reference all the adjustments of § 2H4.1, even where the offense conduct causing the adjustment was intended but unachieved.  <u>See United States v. Amato</u>, 46 F.3d 1255, 1261-62 (2d Cir. 1995) ("Section 2X1.1(a), when applied to robbery conspiracies, adopts by cross-reference all the adjustments of § 2B3.1, even where the offense conduct causing the adjustment was intended but unachieved."); U.S.S.G. § 2X1.1(a) (indicating that the applicable offense level for an inchoate offense is "the base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any <u>intended offense conduct</u> that can be established with reasonable certainty") (emphasis added);

32

see also id. § 1B1.5 ("[a]n instruction to use the offense level from another offense guideline refers to the offense level from the entire offense guideline (i.e., the base offense level, specific offense characteristics, cross references, and special instructions")).

Contrary to the defendant's assertions otherwise, § 2X1.1(a)'s reasonable-certainty standard is specific to findings of intended, but unexecuted, conduct. See, e.g., U.S.S.G. § 2X1.1 cmt. n.2; United States v. Vasquez, 791 F. Supp. 348, 353-54 (E.D.N.Y. 1992). It does not apply only to conduct that actually took place. Rather, the defendant's base offense level is to be based on the guideline for her substantive offense (in this case, § 2H4.1), and should also be adjusted based on any intended (but unrealized) offense conduct established "with reasonable certainty." See U.S.S.G. § 2X1.1(a) & cmt. n.2. ("But the only specific offense characteristics from the guideline for the substantive offense that apply are those that are determined to have been specifically intended or actually occurred"); see also United States v. Kukoyi, 126 F.4th 806, 812 (2d Cir. 2025); United States v. Rosa, 17 F.3d 1531, 1549-50 (2d Cir. 1994). Indeed, it makes sense that the Sentencing Commission would direct the sentencing court to apply "any adjustments . . . for any intended offense conduct that can be established with reasonable certainty" because, "unless otherwise specified," the Sentencing Guidelines' definition of the "relevant conduct" that may be considered in determining whether an adjustment applies is limited to conduct that has occurred. U.S.S.G. § 1B1.3(a)(1).

Here, the government can establish by a preponderance of the evidence that the relevant conduct on which the sentencing enhancements at issue are based actually happened. See Rosa, 17 F.3d at 1550 (citing cases); cf. United States v. Chapdelaine, 989 F.2d 28, 35 (1st Cir. 1993) ("The requirement of 'reasonable certainty' 'goes to what with reasonable certainty can be determined to be the conspirator's intent.'"). With respect to

intended conduct, "reasonable certainty" is not a heightened burden of proof; rather, it is a limiting principle designed to prevent speculation about hypothetical acts that conspirators might have taken had the offense progressed further. See, e.g., United States v. Capanelli, 270 F. Supp. 2d 467, 474 (S.D.N.Y. 2003).

A defendant convicted of conspiracy is entitled to a three-level reduction from the base offense level of the underlying substantive offense "unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control." U.S.S.G. § 2X1.1(b)(2); United States v. Lutchman, 910 F.3d 33, 39 (2d Cir. 2018) ("The "relevant question" in determining whether that reduction applies is "whether the conspiracy ripened into a substantially completed offense or came close enough to fruition."). The background commentary to § 2X1.1 confirms that the three-step reduction is appropriate only if "the arrest occurs well before the defendant or any co-conspirator has completed all the acts necessary for the substantive offense." Id. § 2X1.1; Rosa, 17 F.3d at 1550-51. "Whether the reduction is granted depends solely on the conduct of the defendant," Abdallah v. United States, No. 14-CV-4037 (JFB), 2015 WL 7454182, at *10 (E.D.N.Y. Nov. 24, 2015) (citing Medina, 74 F.3d at 418), and not on charging decisions. When the conspirators' acts satisfy the elements of the substantive crime – or come right up to its accomplishment – the offense is treated as complete for guideline purposes and the three-level reduction has no application.

Thus, the Guidelines explicitly contemplate situations such as this one in which a defendant was convicted of an inchoate offense, but where a court can find based on a preponderance of the evidence that the conspiracy ripened into a completed offense. Numerous

courts have declined to impose the reduction despite the defendants being found guilty only of an inchoate offense.  See, e.g., United States v. Deas, 768 F. App'x 81, 82-83 (2d Cir. 2019) (attempt); Lutchman, 910 F.3d at 39 (conspiracy); Kaplan v. United States, 663 F. App'x 69, 71 (2d Cir. 2016) (conspiracy); United States v. Nicolescu, 541 F. App'x 93, 99 (2d Cir. 2013) (attempt and conspiracy); Medina, 74 F.3d at 418-19 (attempt and conspiracy).

ii.        Discussion

As a threshold matter, under the governing framework, § 2X1.1(a) directs this Court to apply the base offense level and all applicable adjustments from the guideline for the substantive offense of forced labor, 18 U.S.C. § 1589, which is § 2H4.1 – including all specific offense characteristics, cross-references and adjustments.

Under § 2H4.1's framework, the government need only prove the facts supporting the application of particular enhancements by a preponderance of the evidence because they are based on completed conduct, not intended conduct.  See Rosa, 17 F.3d at 1550.  As described herein, each of the applicable enhancements – such as the use or threat of serious harm to hold a victim in a condition of involuntary servitude and the commission of another felony offense in connection with the forced labor offense – are based on actual occurrences and is supported by the trial and evidentiary record, with citations provided as appropriate.  Kukoyi, 126 F.4th at 812; U.S.S.G. § 1B1.3(a)(1).  The Guidelines require no heightened certainty for establishing the intent to commit the completed acts.  Cf. United States v. Downing, 297 F.3d 52, 65 (2d Cir. 2002) ("[W]hen specific offense characteristics have not actually occurred, they should be applied only if the district court determines that they were 'specifically intended.'").

Finally, because the conspiracy was completed, no three-level reduction applies. In this case, the defendant – together with her co-defendant and her co-conspirators – completed

all the acts necessary to complete the crime of forced labor, in violation of 18 U.S.C. § 1589. The defendant points to no impediment to the completion of their crime; rather, she hinges her argument on the fact that she was only charged – and the jury only convicted her – of forced labor conspiracy. That fact is unavailing. As the trial record makes clear, numerous victims were compelled to work under threat of economic, psychological and reputational harm. See, e.g., Tr. 149-50; 254-56; 298; 372; 1051-52; 1056; 1080; 1121-22; 1125; 1259; 1270; 1695; 2102; 2123; 2409; 2422; 2963; 3949-50; PSR ¶¶ 12-13. The work included sexual and non-sexual services that the defendant knew her victims did not want to perform, PSR ¶¶ 22-23, over years-long periods of time. Tr. 1250, 1326, 1015, 1100, 1129, 2319, 2318.

3.    The § 2H4.1(b)(3) Enhancement for a Victim Being Held in a Condition of Involuntary Servitude for More Than One Year Applies

The Court should impose a three-level sentencing enhancement under § 2H4.1(b)(3)(A) because the record demonstrates that numerous victims were held in a condition of involuntary servitude for more than one year. Section 2H4.1(b)(3)(A) instructs a sentencing court to increase a defendant's offense level by 3 if "any victim was held in a condition of peonage or involuntary servitude for more than one year." Application Note 1 defines "peonage or involuntary servitude" to include forced labor. U.S.S.G. § 2H4.1 cmt. n.1.

In this case, the trial record establishes that the defendant's scheme subjected numerous victims to such extended conditions of control and exploitation. Multiple witnesses, including Christina Berkley, Michelle Wright and Dana Gill, described being compelled to provide unpaid labor and sexual services for years, often under constant threat of economic, psychological, and reputational harm. See, e.g., Tr. 149-50; 254-56; 298; 372; 1051-52; 1056; 1080; 1121-22; 1125; 1259; 1270; 1695; 2102; 2123; 2409; 2422; 2963; 3949-50. The jury's conspiracy verdict reflects that the defendants agreed to and executed a scheme to compel such

labor, and the Court may appropriately credit this evidence to find, by a preponderance, that victims were held in involuntary servitude for more than one year.  That the defendants were convicted of conspiracy does not prevent the Court from considering such evidence.  Most notably, Dana Gill worked for OneTaste between 2009 and 2013, Tr. 1250, 1326; Christina Berkley worked for OneTaste from 2007 to 2010, Tr. 1015, 1100, 1129; and Michelle Wright worked for OneTaste for "at least four years," Tr. 2319, from 2010 to 2014, Tr. 2318.  For nearly five years, Wright did not leave OneTaste because "it was kind of unthinkable to leave.  And if you were there, you were expected to help and do things.  Like, that was just the agreement, that if you were part of the community, you were going to be of service to it."  Tr. 2439; see also Tr. 2448 (noting that "you didn't leave, you didn't take vacations, you didn't step out to make a phone call to your friend.").  And, for Gill, leaving "didn't feel" like an option.  Tr. 1408.  Just one victim suffices for the Court to impose the enhancement; here, multiple victims were held in a condition of involuntary servitude for more than a year.

The defendant's argument that the victims were "free to leave" is no more relevant to application of the Guidelines enhancement as it was to the defendants' numerous pretrial and jury arguments regarding the same.  Forced labor within the meaning of 18 U.S.C. § 1589 includes providing or obtaining the labor or services of a person by any one, or by any combination of, specifically enumerated prohibited means, including serious harm or threats of serious harm.  See 18 U.S.C. § 1589(a)(2).  The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.  Id. § 1589(c)(2).  In this case, as proven at trial

the defendant compelled labor through threats, manipulation and coercion.  The question is not whether the victim could physically walk away from a building; it is whether the defendant's scheme compelled continued labor.  In this case, the victims testified that they were forced to work because they were subject to, inter alia, economic domination, psychological manipulation and reputational threats.  See PSR ¶ 28.

Nonetheless, regardless of whether the Court imposes this enhancement, because the defendant's adjusted offense level is driven by U.S.S.G. § 2H4.1(b)(4)(B), which cross-references and applies the § 2A3.1 Criminal Sexual Abuse Cross-Reference, U.S.S.G. § 2A3.1(a)(2), the applicability of this separate Guidelines provision is immaterial; it ultimately drops out of the defendant's Guidelines computation.

4.    The § 2A3.1 Criminal Sexual Abuse Cross-Reference Applies

The Court should apply the § 2A3.1 Criminal Sexual Abuse Cross-Reference pursuant to U.S.S.G. § 2H4.1(b)(4)(B), which directs sentencing courts to apply the offense level for "any other felony offense committed during the commission of, or in connection with," the forced labor offense, if that results in a higher offense level, plus two levels.  Here, this enhancement applies because the offense involved the defendant causing at least two victims – Christina Berkley and Michelle Wright – to engage in a sexual act with another person by threatening them or placing them in fear of serious harm, in violation of 18 U.S.C. § 2242(1).

i.    Applicable Law

Section 2H4.1(b)(4) directs that if "another felony offense was committed during the commission of, or in connection with, the peonage or involuntary servitude offense, increase to the greater of: (A) 2 plus the offense level as determined above, or (B) 2 plus the offense level from the offense guideline applicable to that other offense, but in no event greater than level 43."

Application Note 2 explains that for purpose of this cross-reference, "'any other felony offense' means any conduct that constitutes a felony offense under federal, state, or local law. . . ."

Here, that other felony offense is 18 U.S.C. § 2242(1), which criminalizes knowingly "caus[ing] another person to engage in a sexual act by threating or placing that other person in fear (other than by threatening or placing the victim in fear that any person will be subject to death, serious bodily injury, or kidnapping)."[4]  See United States v. Jimenez-Rodriguez, No. 21-CR-11-2 (EK), 2024 WL 1199991, at *2 n.1 (E.D.N.Y. Mar. 20, 2024) ("Sections 2241 and 2242 both contain references to conduct occurring in 'the special maritime and territorial jurisdiction of the United States or in a Federal prison,' but those jurisdictional elements are not required for application of Section 2A3.1") (citing United States v. Gilmore, 599 F.3d 160, 168 n.6 (2d Cir. 2010)); U.S.S.G. § 2H4.1 cmt. n.2 (referring, in its discussion of "any other felony offense," to Application Note 3 of U.S.S.G. § 1B1.5).[5]  For purposes of the Guidelines, therefore, the jurisdictional limitations of 18 U.S.C. § 2242 do not apply.

The applicable Guideline provision for a violation of 18 U.S.C. § 2242(1) is U.S.S.G. § 2A3.1(a)(2), which, in this case, sets a base offense level of 30.  See U.S.S.G.

---

[4]  This includes offenses, such as 18 U.S.C. § 2242, that would constitute a federal offense had the conduct taken place within the territorial or maritime jurisdiction of the United States.  See U.S.S.G. § 1B1.5, cmt. n.3.  There is no requirement that such conduct must necessarily occur in a coercive setting like a prison.  See 18 U.S.C. § 7.

[5]  As the Second Circuit has noted, use of the word "conduct" in Application Note 3 of § 1B1.5, as opposed to "offense," "seems to refer to the defendant's actions rather than to whether his actions occurred in circumstances that would give rise to federal jurisdiction." Gilmore, 599 F.3d at 168 n.6.

§ 2A3.1(a)(2); see also § 2G1.1(c) ("If the offense involved conduct described in . . . 18 U.S.C. § 2242, apply § 2A3.1 (Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse)."[6]

Section 2242(1) does not require that fear be limited to bodily harm. See United States v. Denjen, 101 F. App'x 362, 363 (2d Cir. 2004) (rejecting defendant's argument that § 2242 requires bodily harm and upholding conviction where victim complied with sexual demands "out of fear that, if she refused, she 'would have gotten other sanctions against her'"); United States v. Fish, 295 F. App'x 302, 305 (10th Cir. 2008) (rejecting argument that § 2A3.1 applies "only if the defendant placed the victim in fear of bodily injury"); United States v. Flaming, 133 F.4th 1011, 1024 (10th Cir. 2025) (bodily harm is sufficient but not necessary to satisfy § 2242). Courts have defined the word "fear" in § 2242 "broadly." United States v. Guidry, 817 F.3d 997, 1008 (7th Cir. 2016); accord, e.g., United States v. Lucas, 157 F.3d 998,

---

[6]       In the alternative, the conduct described herein likely violates other federal and California state criminal laws. If the Court disagrees with the government that the § 2A3.1 Criminal Sexual Abuse Cross-Reference should apply based on conduct violative of § 2242(1), the government requests additional time to brief the implications of other felony offenses.

The government also believes that Probation's narrow focus on two victims, rather than a broader focus on the entirety of the scheme in which numerous victims were forced to have sex with others, is inapposite. As the Second Circuit has made clear, "at sentencing, the defendant is responsible if an act performed in furtherance of a conspiracy by a co-conspirator was 'reasonably foreseeable,' regardless of whether the defendant acted to promote or facilitate it." United States v. Medina, 74 F.3d 413, 417 (2d Cir. 1996); see also United States v. Molina, 106 F.3d 1118, 1121 (2d Cir. 1997). Here, in addition to the criminal sexual abuse of Wright and Berkley, at minimum, Daedone could have also reasonably foreseen the criminal sexual abuse of Becky Halpern (in which Daedone's co-defendant, Rachel Cherwitz, forcibly touched Halpern's clitoris, see Tr. 302-06; PSR ¶ 31; see also Gov't's Sent. Mem. as to Cherwitz) and Dana Gill (in which Gill was forced by Daedone's co-conspirators to have sex with Daedone's romantic and business partner Reese Jones, see Tr. 1294-1304; PSR ¶ 19, of which Daedone was readily aware, see Tr. 2410-11; GX 2148-D; GX 1136; GX 1258-D-R). Likewise, Lianna Lifson performed oral sex on a student at Kandell's direction, Tr. 2164, and numerous victims testified to being forced to OM and to have sex with OneTaste customers and other OneTaste participants, see, e.g., PSR ¶¶ 60-61. Such conduct involves relevant conduct for which the defendant can be held accountable. See U.S.S.G. § 1B1.3(a)(1)(B).

1002-03 (5th Cir. 1998) (explaining that, for purposes of § 2242, the definition of fear is "very broad"); United States v. Henzel, 668 F.3d 972, 977 (7th Cir. 2012) (collecting cases and stating that "[i]n the § 2242 context we define the concept of 'fear' broadly"); United States v. Gavin, 959 F.2d 788, 791 (9th Cir. 1992) ("A reasonable construction of section 2242(1) is that it encompasses all fears of harm to oneself or another other than death, serious bodily injury or kidnapping. . . .  The possible range of 'harm,' like the possible range of 'fear,' is very large."). Indeed, the statute "requires only 'fear' in general," Fish, 295 F. App'x at 305, which can include, for example, fear that stems from mental or emotional control a defendant holds over a victim.  See, e.g., Lucas, 157 F.3d at 1002 (explaining that "fear can be inferred from the circumstances, particularly a disparity in power between the defendant and victim"); Guidry, 817 F.3d at 1008 (upholding cross-reference based on § 2422 where three victims "testified they were afraid of [the defendant] and what would happen if they did not do what he said" and the evidence showed the defendant "exercised mental and emotional power over his victims, in addition to physical violence, in order to induce them to work as escorts"); Henzel, 668 F.3d at 977 (same where twelve-year-old "was afraid of the defendant" and feared the defendant "would react badly if she did not meet his demands" and the defendant had "mental and emotional power" over her); United States v. Johns, 15 F.3d 740 (8th Cir. 1994) (finding that victim was in "fear" for purposes of § 2242 when defendant dominated every aspect of victim's life and became "enraged when [his rules] were not followed" and told the victim if she did not follow his commands, she would suffer spiritual harms); United States v. Law, 990 F.3d 1058, 1065 (7th Cir. 2021) (upholding cross-reference based on evidence that the defendant placed victims in fear of "physical, financial and psychological harms"); United States v. Monsalve, 342 F. App'x 451, 454 (11th Cir. 2001) (upholding cross-reference where defendant placed victims in fear of

deportation); United States v. Iu, 917 F.3d 1026, 1031 (8th Cir. 2019) (pointing to behavior "aimed at frightening [the victim] to the point that she acquiesced to sexual activity with him" to satisfy the fear requirement of § 2242); United States v. Betone, 636 F.3d 384, 388 (8th Cir. 2011) (relying on statements such as "[y]ou don't want to do that, because it's the worst thing you can do for yourself right here and right now," and the victim's testimony that he was afraid to resist or leave to establish fear).

To satisfy the "fear" element of the § 2A3.1 Criminal Sexual Abuse Cross-Reference, a defendant also does not have to "specifically intend to place a victim in fear." Flaming, 133 F.4th at 1024. Instead, the statute focuses on the victim's state of mind because of the defendant's actions. See Gavin, 959 F.2d at 790-91 (observing that the legislative history focuses on whether "the threat or intimidation created in the victim's mind an apprehension or fear of harm to self or others" and upholding § 2242 conviction over vagueness challenge where defendant placed victim in fear but did not threaten her with harm).

In assessing whether the cross-reference applies, the Court should look not only to the offense of conviction but to all relevant conduct. See U.S.S.G. § 1B1.3(a)(1)(A), (B) & (a)(3); see Padilla, 961 F.2d at 326 (noting that district courts should consider all relevant conduct for cross-references). Where the cross-reference is satisfied, the Court must apply it. See United States v. Sarlo, 269 F. App'x 30, 31 (2d Cir. 2008) (noting that application of a cross-reference is "mandatory" and "not a matter within the discretion of the sentencing court"); United States v. Johnson, 221 F.3d 83, 97-98 (2d Cir. 2000) (noting that the Guidelines mandated application of a cross-reference); United States v. Pipkins, 378 F.3d 1281, 1301 (11th Cir. 2004) ("A district judge confronted with [overlap between cross-reference and enhancement] is not free to choose between the enhancement and the cross-reference: when there is overlap, the judge

must apply the cross-reference"), judgment vacated, 544 U.S. 902 (2005), and opinion reinstated, 412 F.3d 1251 (11th Cir. 2005).

    ii.    Discussion

The evidence here demonstrates precisely the type of coercion § 2242(1) encompasses. Daedone caused Christina Berkley and Michelle Wright to engage in sexual acts with Reese Jones by placing them in fear of the repercussions if they said no. Christina Berkley feared that she would be "shunned or kicked out of the community" and Michelle Wright feared she would lose her job and "sense of safety," among other things. PSR ¶ 96.

Berkley testified that she engaged in sexual acts with Jones because she was "brainwashed" into believing that "she had to get on board or else she would be kind of shunned or kicked out of the community." PSR ¶ 18. Berkley testified that when Daedone instructed her to engage in sexual acts with Jones, Daedone asked Berkley if she was good at "sucking cock." Tr. 1077. Berkley was not attracted to Jones but felt she had no choice. Tr. 1084-85 (Berkley testifying that she "stroked" Reese Jones because she "trusted" Daedone, "wanted [Daedone's approval" and believed she "wouldn't be in this training position, top training position if [she] didn't do it."). She also felt that she would have been removed from her role if she said no. Tr. 1085. Berkley felt that if she refused Daedone's mandates, she would be excommunicated and would lose her only home, her sole means of income, and her only source of community and companionship. Tr. 1071-72. As Berkley relayed with respect to others with whom she was directed to have sex, Daedone would have shamed and threatened Berkley if Berkley refused. Tr. 1073. Berkley also testified that she engaged in these sex acts in response to this "covert influenced [sic] setup" and "psychological tools," including "gas lighting, and suggestion and humiliation." Tr. 1202-04

Wright testified that she sexually serviced Jones because she was manipulated and

abused. PSR ¶ 20. She testified that she performed sexual acts on Jones because she was "very afraid of the repercussions of saying no." Id. ¶ 73; Tr. 2409 (explaining that she felt she had no choice but to have sex with Jones). Performing these sex acts with Jones wore Wright down emotionally; she found it degrading and it numbed her. Tr. 2412-13. Wright described the ways that Daedone employed a combination of economic duress, indoctrination, isolation, surveillance, shame and humiliation to get Wright to engage in sexual labor on Daedone's behalf. Tr. 2319-21. When Wright's romantic partner left OneTaste and Wright told Daedone that Wright's romantic partner, MC, had been harmed by being forced to sexually service Jones, Daedone responded, "If I ever see that little cunt again, I'll smash her head against the sidewalk." PSR ¶ 73.

Such fears constitute the type of harm that satisfies § 2242(1). See id. ¶¶ 18, 19, 73, 96. In Berkley's case, her fear of being shunned or expelled from OneTaste qualifies because, as courts have recognized, intimidation that threatens social, financial and reputational ruin under § 2242 is sufficient to establish coercion. See Law, 990 F.3d at 1065; see also Second Addendum to the Presentence Report at 7-9. The fear of being shunned or expelled from one's community and means of livelihood strips the victim of identity, belonging and social survival, leaving compliance as the only option. Wright's fear of losing her job falls squarely within precedent holding that economic harms – including loss of livelihood, stability or housing – constitute the type of fear that compels compliance and therefore satisfies § 2242(1). At OneTaste, work and housing were intertwined with membership, meaning that refusal risked not only a paycheck but also housing and economic stability. Such coercion is precisely the type of non-physical intimidation Congress intended § 2242 to reach. See Monsalve, 342 F. App'x at 454 (deportation); Law, 990 F.3d at 1065 (financial harm). Finally, Michelle Wright's testimony

that she feared for her "sense of safety" reflects the kind of mental apprehension that courts, including in Iu, 917 F.3d at 1031, and Betone, 636 F.3d at 388, have found sufficient to establish coercion where victims comply not because they consent but because intimidation renders refusal impossible.  In sum, each of these fears falls squarely within precedent recognizing that reputational, economic and psychological harm are coercive harms that establish a violation of 18 U.S.C. § 2242(1).

The defendant contends that applying this cross-reference is tantamount to a "bait and switch" by the government, that the government now seeks to punish the defendant for a crime for which she was not convicted, and that doing so deprives the defendant of an opportunity to defend herself against the allegations.  The defendant's arguments are misplaced.  First, the defendant is not entitled to a jury trial on Guidelines enhancements, nor is she insulated from judicial fact-finding about relevant conduct.  See White, 240 F.3d at 135-36.  Daedone had a full and fair opportunity to challenge the government's evidence at trial through cross-examination and continues to have that opportunity through briefing at sentencing.  The application of the enhancement here therefore does not deprive her of the ability to "defend against" allegations relevant to her sentencing exposure.  Indeed, the defendant Daedone was given ample notice of the allegations concerning sexual abuse for which she now claims ignorance.  See, e.g., Indictment ¶ 6 (alleging defendants subjected victims to, among other things, sexual abuse), ¶ 9 (alleging that defendants recruiting and groomed victims to engage in sexual acts with OneTaste's current and prospective investors).  In any event, these topics were in fact a central part of the trial; indeed, the government is relying on trial testimony and exhibits to establish the § 2A3.1 Criminal Sexual Abuse Cross-Reference.  Second, applying this enhancement reflects the Guidelines' core principle that sentencing should account for all

relevant conduct.  See U.S.S.G. § 1B1.3.  The cross-reference to § 2A3.1 properly captures the gravity of that conduct and ensures that the sentence imposed reflects the full scope of the harm caused.  See White, 240 F.3d at 136; United States v. Ahders, 622 F.3d 115, 120 (2d Cir. 2010) (relevant conduct includes both charged and uncharged conduct); United States v. Plaza, 752 F. App'x 37, 46 (2d Cir. 2018) (upholding application of murder cross-reference in determining that an uncharged murder was "relevant conduct" to defendant's participation in a narcotics conspiracy).

The defendant's citations to a recent, non-binding decision in United States v. Combs, No. 24-CR-542 (S.D.N.Y.), warrant no different conclusion.  There, Judge Subramanian noted that, in applying the § 2A3.1 Criminal Sexual Abuse Cross-Reference pursuant to 18 U.S.C. § 2242(1), § 2242(1) requires an "imminent concrete threat of harm, such as bodily harm."  Importantly, Judge Subramanian's analysis was based on "acquitted conduct."  United States v. Combs, No. 24-CR-542, Oct. 3, 2025 Tr. of Proc., at 15 & 16 ("[I]in light of the dramatic impact of an application of the cross-reference, the constitutional questions raised by Sand, the acquitted conduct guideline, and general principles of lenity, the Court declines to apply the cross-reference.").

But in any event, Judge Subramanian's discussion in Combs does not support the defendant's narrow reading of 18 U.S.C. § 2242(1) or the § 2A3.1 Criminal Sexual Abuse Cross-Reference.  As Combs made clear, the court was analyzing a highly specific record involving isolated threats: threats to release sex tapes, id. at 15, and unspecified threats concerning a victim's home, id.

Properly understood, Combs underscores – not undermines – the applicability of the § 2A3.1 cross-reference here.  First, Judge Subramanian did not hold – and did not suggest –

46

that § 2242(1) <u>requires</u> bodily harm or that harm is limited to physical injury.  <u>Id.</u> at 14 ("The text of Section 2242 suggests that a narrow reading, one that requires an imminent concrete threat of harm, <u>such as</u> bodily harm, makes more sense.") (emphasis added).  Judge Subramanian found the cross-reference inappropriate because the threats at issue were not tied to compelling sexual acts and arose outside a hierarchical or coercively structured environment.  The opposite is true in this case.  The defendant used targeted, credible threats – loss of housing, status, livelihood, community, and spiritual belonging, among others – to compel Wright and Berkley to engage in sex acts with another person.  These threats were not abstract or incidental; they were central tools of control within a rigid, dependency-based system designed to ensure obedience to sexual demands.  That conduct falls squarely within the type of coercive, sexually exploitative harm that § 2242(1) and § 2A3.1 are meant to capture.

The defendant's claim that ostracism, expulsion, or loss of livelihood "could never" cause a person to submit to unwanted sexual activity is contradicted by both the law and the evidence.  The OneTaste victims described a community in which Daedone's threats carried existential weight – social, financial, and psychological – making resistance practically impossible.  Under the correct legal framework, Daedone's conduct easily satisfies the threshold for "threats of harm," and <u>Combs</u> provides no basis for concluding otherwise.  Moreover, even if the Court were to adopt the defendant's view that § 2242(1) requires an "imminent" harm, the threats Daedone used to compel sexual acts readily satisfy that standard. In coercive environments like OneTaste, "imminence" does not require a countdown clock or the prospect of immediate physical injury.  Rather, a harm is imminent when the victim reasonably understands that the consequence will follow promptly and predictably upon refusal.  Here, Daedone's threats were not hypothetical future possibilities.  Members who declined sexual directives were swiftly

removed from the community, stripped of status and housing, publicly shamed, or cut off.  The
victims understood this not as a distant risk, but as a near-certain and immediate consequence for
noncompliance, because they had repeatedly observed Daedone impose those penalties on
others.

     5.    <u>An Enhancement for the Defendant's Aggravating Role as a Leader
Applies</u>

The Court should apply the four-level sentencing enhancement under U.S.S.G.
§ 3B1.1(a) because Daedone was an organizer and leader of a criminal activity that involved five
or more participants and was otherwise extensive.  The trial record establishes that Daedone was
not merely the founder of OneTaste in title, but the forced labor conspiracy's architect and chief
decision-maker.  <u>See</u> PSR ¶ 97.

     i.    <u>Applicable Law</u>

Under § 3B1.1, a defendant may receive an aggravating role enhancement as long
as the criminal activity involves "more than one participant."  <u>United States v. Skys</u>, 637 F.3d
146, 156 (2d Cir. 2011) (quoting U.S.S.G. § 3B1.1 introductory commentary); <u>see also</u> U.S.S.G.
§ 3B1.1 cmt. n.2 ("To qualify for an adjustment under this section, the defendant must have been
the organizer, leader, manager, or supervisor of one or more other participants.").

An organizer or leader receives four points where criminal activity involved either
five or more participants or was otherwise extensive.  U.S.S.G. § 3B1.1(a).  In determining
whether a defendant is an organizer, leader, manager or supervisor, the Guidelines instruct the
court to consider factors such as "the exercise of decision making authority, the nature of
participation in the commission of the offense, the recruitment of accomplices, the claimed right
to a larger share of the fruits of the crime, the degree of participation in planning or organizing

the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1 cmt. n.4.

A participant is an individual who is "criminally responsible for the commission of the offense, but need not have been convicted."  U.S.S.G. § 3B1.1 cmt. n.1.  Even where there are not five or more knowing participants, the organizer or leader enhancement is still appropriate where the criminal activity was "otherwise extensive."  U.S.S.G. § 3B1.1(a).  In determining whether a scheme is "otherwise extensive," the Second Circuit focuses "primarily on the number of people involved, . . . rather than other possible indices of the extensiveness of the activity."  United States v. Carrozzella, 105 F.3d 796, 802 (2d Cir. 1997), abrogated in part on other grounds, United States v. Kennedy, 233 F.3d 157, 160-61 (2d Cir. 2000).  In this analysis, courts are to consider "all persons involved during the course of the entire offense."  U.S.S.G. § 3B1.1 cmt. n.3.  Specifically, courts should consider: "(1) the number of knowing participants in the criminal activity; (2) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (3) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme."  United States v. Kent, 821 F.3d 362, 368 (2d Cir. 2016).  In the end, the district court determines whether the scheme was "the functional equivalent of one involving five or more participants."  Id. (emphasis omitted); see, e.g., Archer, 671 F.3d 149, 166 (2d Cir. 2011) (affirming otherwise extensive enhancement where there were three knowing participants and a "fair number" of unknowing participants); United States v. Rubenstein, 403 F.3d 93, 99 (2d Cir. 2005) (same where there were two knowing participants and seven unknowing participants).  As an example of criminal activity that could be otherwise extensive, the Guidelines describe "a fraud that involved only three participants but used the unknowing services of many outsiders[.]"  U.S.S.G. § 3B1.1 cmt. n.3.

Before imposing this enhancement, the court "must make specific findings as to why a particular subsection of the § 3B1.1 adjustment applies." Skys, 637 F.3d 146 at 156. The court's analysis "is not limited to defendant's role in the count of conviction; rather, the court may take all 'relevant conduct' into account." United States v. Brinkworth, 68 F.3d 633, 641 (2d Cir. 1995).

        ii.        Discussion

The trial evidence overwhelmingly demonstrated that Daedone, as founder and chief executive of OneTaste, was the central figure directing its criminal operations. Witness testimony established that Daedone personally set the company's philosophy, training methods, and business model, and that she recruited and delegated responsibilities to enforcers – including co-defendant Cherwitz and senior managers – who in turn supervised dozens of employees and community members. Daedone exercised decision-making authority over finances, dictated the handling of recruits and victims, and ordered subordinates to enforce compliance with the company's demands. Such conduct falls squarely within the factors enumerated in Application Note 4 to § 3B1.1, which include decision-making authority, nature of participation, recruitment of accomplices, control over others, claimed right to a larger share of the fruits of the crime, and degree of responsibility for the criminal scheme. See also United States v. Si Lu Tian, 339 F.3d 143, 156 (2d Cir. 2003) (looking to "the degree of discretion exercised by [the defendant], the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy"); United States v. McPartland, No. 17-CR-587 (JMA), 2021 WL 3409229, at *6 (E.D.N.Y. Aug. 4, 2021).

Further, the record leaves no doubt that the conspiracy "involved five or more participants or was otherwise extensive." These include the defendants themselves, Joanna Van Vleck, a director of strategic execution for OneTaste who previously served as its CEO,

President and Director of Marketing; Yia Vang, a senior executive at OneTaste whose responsibilities included, among other things, management of OneTaste's payroll; Rachael Hemsi, a senior executive at OneTaste who for a time served as OneTaste's Head of Sales and oversaw a communal home in San Francisco; Robert Kandell, a co-founder, former Chief Operating Officer and senior executive at OneTaste whose responsibilities included managing OneTaste's finances; Maya Block, a senior sales executive at OneTaste; Eli Block, a senior sales executive at OneTaste; Aubrey Fuller, a senior executive at OneTaste; and Marcus Ratnathicam, a senior executive at OneTaste. Indeed, with respect to several of these individuals, the Court found at trial that the government proved they were Daedone and Cherwitz's co-conspirators. See Tr. 4681-82 (the Court finding the government met its burden with respect to each of the coconspirator statements admitted at trial pursuant to Federal Rule of Evidence 801(d)(2)(E)).

Even if the Court does not find all these people to be knowing participants, the enhancement would still apply. All that is needed for an "otherwise extensive" scheme is at least one knowing criminal participant (at minimum here, Joanna Van Vleck), and a number of unknowing participants to form the "functional equivalent" of five knowing participants. Kent, 821 F.3d at 368.

In addition to the individuals described above, there is an even larger contingent of the defendants' employees who may not have realized the extent of the criminal scheme but nevertheless facilitated the forced labor conspiracy. As just one example, the cadre of salespeople across the country who pressured victims to sign up for OneTaste courses and go into debt and who were essential to the forced labor scheme by inflicting economic harm on victims would qualify. Accordingly, the scheme was "otherwise extensive." See United States v. Spencer, 129 F.3d 246, 253-54 (2d Cir. 1997) (affirming otherwise extensive enhancement where

there were three knowing participants in addition to the defendant and a "large number . . . of employees" who "were also essential to the scheme").

Although the Second Circuit focuses primarily on the number of knowing and unknowing participants when determining whether an activity is "otherwise extensive," it has not ruled out that there can be other relevant factors to consider in the analysis. Kent, 821 F.3d at 368. The majority of circuits consider factors such as the geographical extent of the activity as relevant to the analysis. United States v. Figueroa, 682 F.3d 694, 696 (7th Cir. 2012). Here, the activity was undoubtedly extensive, involving, for example, hubs and locations in London, Boulder, New York, Austin, Los Angeles and San Francisco, and spanning multiple years and harming many victims. See Second Addendum to the Presentence Report at 9.

The defendant was also a leader or organizer under § 3B1.1(a), rather than a manager or supervisor. The defendant was the indisputable leader of OneTaste. Relatedly, the defendant claimed a "larger share of the fruits" of the forced labor conspiracy, culminating in her sale of the company for $12 million.

Titles alone may not be dispositive, but the evidence shows that Daedone was not merely a titular head – she was the architect, leader, and driving force of the forced labor conspiracy, and the § 3B1.1(a) enhancement is correctly applied. See also Second Addendum to the Presentence Report at 9 (noting that Probation did not rely on the terms "guru" or "sex cult leader" in applying the enhancement).[7]

---

[7]    In the alternative, the defendant is at minimum a manager or supervisor and her offense level at base should be increased by three levels. See U.S.S.G. § 3B1.1(b). A defendant is a "manager or supervisor" of criminal activity if "[s]he 'exercise[d] some degree of control over others involved in the commission of the offense . . . or play[ed] a significant role in the decision to recruit or to supervise lower-level participants.'" United States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002) (quoting Ellerby v. United States, 187 F.3d 257, 259 (2d Cir. 1998)); see also U.S.S.G. § 3B1.1 cmt. n.2 ("[T]he defendant must have been the organizer, leader, manager,

6.      Section 3C1.1's Enhancement for Obstruction of Justice Applies

The government agrees with Probation that a two-level enhancement under U.S.S.G. § 3C1.1 applies because Daedone engaged in obstruction of justice. In particular, and for the reasons discussed below, defendant Daedone – by deleting her own incriminating text messages and by directing others, including her subordinates and co-conspirators, to delete theirs – engaged in conduct that squarely fits within the Guidelines' definition of obstruction.

Indeed, as the Second Addendum to the Presentence Report concludes, the text messages introduced at trial as GX 2075-D-R and GX 2256-D-R, which are referenced in the Second Addendum to the Presentence Report at 15-16, taken together, establish that the defendant attempted to obstruct justice prior to the start of the instant investigation and that the evidence that was deleted was material to the investigation, "as it caused the government and case agents issues in reconstructing timelines, corroborating victim accounts and indicting other individuals."  Id.

i.      Factual Background

As reflected in the PSR, the government's investigation was "unable to obtain Daedone's text messages and the investigation revealed an email thread wherein Daedone discuss[ed] deleting evidence due to legal repercussions."  PSR ¶ 88.  "[A]t the time Daedone deleted the text messages, she was already aware that individuals began making complain[t]s against OneTaste."  Id.

---

or supervisor of one or more other participants.").  Daedone's authority to assign tasks, oversee implementation and discipline subordinates demonstrates the type of managerial control § 3B1.1(b) contemplates.  Daedone's role cannot be characterized as that of a mere participant. Unlike lower-level members who simply complied with orders, Daedone had a defined leadership role that gave her authority over others, placed her at the center of OneTaste's coercive sales and labor operations – essential components of the forced labor conspiracy – and required her to coordinate multiple people and resources in pursuit of the conspiracy's goals.

The trial record underscores that Daedone's efforts to delete incriminating evidence and to instruct others to follow suit was part of a deliberate campaign to obstruct justice. Specifically, GX 2075-D-R shows that on March 9, 2016, Daedone told OneTaste's Chief Executive Officer, Joanna Van Vleck, to "erase your texts. . . ." In response, Van Vleck promptly confirmed, "Got it. Will do," and then, "Done." The surrounding circumstances make plain that Daedone's order was driven by OneTaste's escalating legal troubles. As the same exchange reflects, Daedone expressed concern about OneTaste being "seen as prostitution," and Van Vleck directly asked her, "What would a prosecutor say the purpose of OM is[?]" Van Vleck further suggested that removing the financial component of the practice would eliminate "many of our risks," and that reframing OneTaste as devoted to "higher consciousness or spiritual awakening" would provide a "bit of protection from the 1st amendment."

These efforts were effective. As Daedone admitted in January 2017 in GX 2256-D-R, she "erased everything when the legal scare last year." The record therefore demonstrates that Daedone's deletion of text messages and direction to others to do the same were integral to her broader strategy of concealing incriminating evidence and obstructing the investigation into OneTaste's conduct. Indeed, throughout the government's case-in-chief, the government did not introduce a single text message solely between Daedone and Cherwitz, and, it appears that none explicitly between Daedone and Cherwitz were produced by OneTaste in response to a subpoena. In sum, Daedone's obstructive conduct thwarted the government's efforts to obtain such evidence.

ii.    Applicable Law

Section 3C1.1 provides that a two-level increase applies "[i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of

conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense."  U.S.S.G. § 3C1.1.  Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered [by U.S.S.G. § 3C1.1] if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction.  Id. cmt. n.1; United States v. Emery, 991 F.2d 907, 911 (2d Cir. 1993) (noting that the Guideline "may be triggered if, notwithstanding the lack of an ongoing federal investigation, there is a close connection between the obstructive conduct and the offense of conviction").  The facts necessary to support an obstruction of justice enhancement need only be proven by a preponderance of the evidence.  United States v. Khedr, 343 F.3d 96, 102 (2d Cir. 2003).

While "[o]bstructive conduct can vary widely in nature, degree or planning, and seriousness," U.S.S.G. § 3C1.1 cmt. n.3, the commentary to § 3C1.1 specifically lists "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding" as an example of covered conduct.  Id. cmt. n.4(D).  Thus, destruction of material evidence amounts to obstruction of justice.  The Second Circuit has consistently interpreted the enhancement to apply where the defendant "consciously acted with the purpose of obstructing justice."  United States v. Zagari, 111 F.3d 307, 328 (2d Cir. 1997); United States v. Reed, 49 F.3d 895, 900 (2d Cir. 1995).

iii.    Discussion

Here, the two-level increase for obstruction of justice applies.

First, Daedone's obstruction was not incidental or peripheral – it was integral to the operation and concealment of the OneTaste conspiracy.  Ostensibly, the text messages she directed others to delete contained the very contemporaneous communications that would have revealed the power dynamics, coercion, and exploitation at the core of the forced labor scheme.

55

By instructing subordinates and co-conspirators to delete these records, Daedone deprived investigators of evidence that was uniquely probative, not only of her own role but also of the structure and scope of the conspiracy. This conduct made it more difficult for the government to reconstruct timelines, corroborate victim accounts and identify additional culpable actors. In short, her obstruction did not merely inconvenience the investigation; it materially impeded it.

The Second Circuit has recognized that such conduct warrants the enhancement. In United States v. Agudelo, the enhancement was upheld even where the obstructed individuals were "only [] potential co-defendant[s] or witnesse[s]." 414 F.3d 345, 351 (2d Cir. 2005). Daedone's deletion orders fall squarely within this framework, as they were intended to ensure the government would lack critical documentary proof.

Second, the Guidelines and case law are clear: when the conviction is for conspiracy, obstruction directed at protecting co-conspirators is part of the "instant offense." For instance, in United States v. Cassiliano, the Second Circuit explained that in conspiracy cases, the "instant offense" requirement is satisfied if the defendant obstructs justice on behalf of a co-conspirator. 137 F.3d 742, 746-47 (2d Cir. 1998). The rationale is straightforward: conspiracy is a joint offense, and shielding a co-conspirator from liability is tantamount to obstructing the investigation of one's own crime.

That principle is directly applicable here. Daedone's deletion directives protected not only herself but also other senior participants in OneTaste. Those individuals were potential witnesses against her, but they were also independently culpable participants. By preventing investigators from accessing the communications that reflected their roles, Daedone obstructed justice as to her co-conspirators' liability. Indeed, the Second Circuit's reasoning in Cassiliano is especially apt: just as alerting a co-conspirator to an FBI investigation deprived the government

of evidence it could have used against both the defendant and his associate, Daedone's deletion orders deprived investigators of material that would have held her co-conspirators fully accountable.

Third, the Second Circuit has repeatedly held that obstruction may warrant the enhancement even if it occurs before formal charges are filed.  For instance, in United States v. Ayers, the Second Circuit emphasized that obstructive conduct "which takes place prior to the start of a federal criminal investigation . . . can warrant an enhancement" where it obstructs the investigation of the charged offense.  416 F.3d 131, 134-35 (2d Cir. 2005) ("The 'willfulness' required by § 3C1.1 pertains to obstruction of 'the administration of justice,' not a particular investigation."); see also United States v. Al Fawadi, No. 22-1078-CR, 2024 WL 1364700, at *2 (2d Cir. Apr. 1, 2024) (conduct that predated the start of a criminal investigation properly forms the basis of an obstruction enhancement).  Similarly, in United States v. Riley, 452 F.3d 160, 165-66 (2d Cir. 2006), the enhancement was upheld where a defendant instructed an associate to conceal firearms before the relevant charge was filed because the conduct nevertheless impeded the ongoing investigation.  See also Emery, 991 F.2d at 911-12 (noting that the obstruction of justice enhancement rests on the rationale that "a defendant who commits a crime and then . . . [makes] an unlawful attempt to avoid responsibility is more threatening to society and less deserving of leniency than a defendant who does not so defy" the criminal justice process) (citing United States v. Dunnigan, 507 U.S. 87, 97 (1993)).

Here, Daedone's obstruction is directly analogous.  Her instructions were undoubtedly given in anticipation of, and in response to, scrutiny of OneTaste's practices.  The orders were issued shortly after OneTaste encountered potential scrutiny that OneTaste was engaged in prostitution.  They were designed to preemptively frustrate the ability to collect

57

evidence. That is precisely the type of conduct that § 3C1.1 was meant to address. See United States v. Malki, 609 F.3d 503, 511 (2d Cir. 2010) (finding the obstruction enhancement supported by, among other things, the defendant deleting cell phone records and emails)

Fourth, as the Second Addendum to the Presentence Report correctly notes, the prostitution inquiry referenced above to which Daedone cites in GX 2075-D-R was inextricably linked to the same underlying conduct that formed the basis of the charged forced labor conspiracy. See Second Addendum to the Presentence Report at 16. Law enforcement complaints regarding OneTaste centered on coercive sexual and labor practices – conduct that could plausibly be investigated under various statutory frameworks, including prostitution, sex trafficking and forced labor. By attempting to conceal evidence of sexual exploitation, Daedone was obstructing the discovery of facts central to the forced labor conspiracy, regardless of the particular charging theory she feared. Indeed, the statements contained in GX 2075-D-R make plain that Daedone's order to "erase your texts" was driven by OneTaste's legal troubles and her concern about OneTaste being "seen as prostitution." In response, Van Vleck directly asked: "What would a prosecutor say the purpose of OM is[?]" These statements confirm that Daedone's obstruction was aimed at concealing evidence of the coercive system – including Daedone's facilitation of prostitution – at the core of the conspiracy.

Moreover, the Guidelines make clear that obstruction encompasses efforts to impede the investigation of the offense of conviction as well as "closely related" offenses. See U.S.S.G. § 3C1.1. Here, prostitution liability and forced labor liability were not alternative, isolated matters, but two legal characterizations of the same exploitative system Daedone engineered. Courts have construed the term "instant offense" broadly, recognizing that obstructive conduct aimed at concealing overlapping or closely tethered misconduct falls

squarely within § 3C1.1.  See, e.g., Ayers, 416 F.3d at 134 (Section 3C1.1 applies so long as the obstructed investigation "plainly encompassed the conduct at issue in the federal crime of conviction"); United States v. Hotaling, No. 24-434, 2025 WL 2416346, at *4 (2d Cir. Aug. 21, 2025) (obstruction enhancement applied where defendant deleted evidence to try to thwart investigation into violating conditions of supervised release).

Fifth, the deleted texts were plainly material because they went to the heart of the offense conduct.  By instructing co-conspirators and Daedone's subordinates to erase messages, Daedone sought to eliminate evidence that could corroborate victims' accounts and expose the inner workings of the OneTaste forced labor conspiracy.  Under Second Circuit law, materiality requires only that the obstructive act have the potential to influence the investigation or prosecution of the offense, not that it actually succeeds in doing so.  See U.S.S.G. § 3C1.1 cmt. n.4(D); id. n.6.; United States v. Gershman, 31 F.4th 80, 103-04 (2d Cir. 2022) (noting that the threshold for materiality is "conspicuously low" and concluding that § 3C1.1 "establishes no general requirement that the obstruction succeed.").  In the context of deleted evidence, materiality is especially clear: Daedone's directive was not a generalized call to tidy up communications, but a targeted order aimed at exchanges with co-conspirators.  Such communications – which could not be recovered by virtue of their destruction – likely discussed how to manage subordinates or address legal risks – which were directly relevant to proving the existence, scope and concealment of the conspiracy.  Cf. United States v. Dharia, No. 14-CR-390 & No. 15-CR-367, 2019 WL 1876831, at *4 (E.D.N.Y. Apr. 26, 2019) (imposing obstruction of justice finding without particular findings about the content of the specific documents a defendant hid).  The text messages' deletion had the clear potential to impede investigators and prosecutors.

Finally, the record demonstrates that Daedone acted with specific intent to obstruct justice. As the Second Circuit has held, "[a]n obstruction of justice enhancement only applies if the [district] court finds that the defendant willfully and materially impeded the search for justice in the instance offense." United States v. Gershman, 31 F.4th 90, 103 (2d Cir. 2022). In determining the intent with which a defendant acted, a district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence. See United States v. Sisti, 91 F.3d 305, 313 (2d Cir. 1996); Khedr, 343 F.3d at 102.

In this case, Daedone's orders to delete text messages were not accidental or careless; they were deliberate instructions aimed at erasing incriminating communications regarding her, her co-conspirators, and OneTaste's legal liability. Instructing subordinates and co-conspirators to delete their internal communications ranks among the most egregious types of obstructive conduct. Indeed, she admitted to a senior member of OneTaste that she "erased everything" after the "legal scare last year." GX 2256-D-R. As Cassiliano explained, when the conduct is "so patently prejudicial to the investigation that . . . the conclusion that there was an intent to obstruct is virtually inescapable," the enhancement applies. 137 F.3d at 747. That description applies precisely to Daedone's conduct: her directives were calculated to prevent scrutinization of OneTaste and to conceal evidence against her and her co-conspirators alike.

7.    The Defendant Is Not a Qualifying Zero-Point Offender

The defendant argues that she is entitled to a two-level decrease in her offense level because she qualifies as a zero-point offender under U.S.S.G. § 4C1.1. Section 4C1.1 provides a decrease of two levels for offenders who have no criminal history points and whose offense did not involve specific aggravating factors. See United States v. Tejeda, No. 11-CR-1015 (DC), 2024 WL 1676329, at *2 (S.D.N.Y. Apr. 18, 2024). As relevant here, if "the defendant [] personally cause[d] substantial financial hardship," U.S.S.G. § 4C1.1(a)(6), "the

offense [] result[ed] in death or serious bodily injury," id. § 4C1.1(a)(4), or "the defendant [] receive[d] an adjustment under § 3B1.1 (Aggravating Role)," id. § 4C1.1(a)(10), she does not qualify for the adjustment.

"Serious bodily injury" is "deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law." U.S.S.G. § 1B1.1 cmt. n.1(L); see also United States v. Martin, No. 23-6091, 2024 WL 5001844, at *4 (2d Cir. Dec. 6, 2024).

To determine whether a defendant's acts or omissions resulted in "substantial financial hardship," a court "shall consider, among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the Commentary to § 2B1.1." U.S.S.G. § 4C1.1(b)(3). These factors include whether the offense resulted in the victim: (i) becoming insolvent; (ii) filing for bankruptcy under the Bankruptcy Code (Title 11, United States Code); (iii) suffering substantial loss of a retirement, education, or other savings or investment fund; (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans; (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and (vi) suffering substantial harm to his or her ability to obtain credit. "Substantial financial hardship might also be present where the number of victims is high, the amount lost is high, or the victims are particularly vulnerable." United States v. Gowing, No. 05-CR-782 (GBD), 2024 WL 3607112, at *2-3 (S.D.N.Y. July 30, 2024); see also United States v. Bronfman, No. 18-CR-204, 2024 WL 1740484, at *1 (E.D.N.Y. Apr. 23, 2024) (finding that taking advantage of immigration status or financial difficulties might qualify as causing substantial financial hardship).

In this case, the defendant does not qualify for the zero-point offender adjustment for three reasons.

First, for the reasons stated above, the Court should impose an aggravating role adjustment under § 3B1.1.

Second, the offense resulted in "serious bodily injury" insofar as the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2242. As discussed above, the § 2A3.1 Criminal Sexual Abuse Cross-Reference, which is premised on the defendant or her co-conspirators having violated § 2242, applies here.

Third, the defendant personally caused substantial financial harm. The defendant included vulnerable OneTaste participants, including OneTaste employees, to relinquish their available assets or to incur debt. PSR ¶ 46. This included facilitating OneTaste participants to open lines of credit to finance expensive OneTaste courses they could not afford. Id. Daedone personally caused such hardship because she set sales quotas for Cherwitz to fill, which, in turn, placed pressure on Cherwitz to bring in sales and to pressure the sales team to engage in high-pressure sales tactics. Id. Together with Cherwitz, Daedone described financial issues as "third-dimensional problem[s]" and that money was just an illusion. Id. And meanwhile, Daedone paid her victims little to nothing. See, e.g., Tr. 2102; GX 856, 1283-D-R, 1331-A-R, 1332-A-R, 2200; PSR ¶¶ 52-53. For instance, Daedone was aware that some employees were paid "not in the monetary sense" but "in many dimensions." PSR ¶ 46. Witnesses testified that they were constantly in debt to OneTaste in light of such financial tactics, which made it difficult for them to leave and kept them working for OneTaste. See, e.g., Tr. 2102, 2123, 2319, 2784; GX 3501-3, 3501-5. Daedone, Cherwitz, and their co-conspirators also prevented OneTaste participants who worked for commissions from closing large sales such that they could not earn their way out of

debt.  See PSR ¶ 50.  Consequently, given the number of victims and the financial difficulties these victims suffered as a result of the defendant's actions, the defendant is similarly disqualified from receiving this adjustment.  See Gowing, 2024 WL 3607112, at *2-3.

        8.      <u>The Defendant Is Not Entitled to a One-Point Reduction to Avoid a "Trial Penalty"</u>

Because the defendant has failed to accept responsibility for her conduct, this Court should not reduce her offense level by any amount.

        i.      <u>Applicable Law</u>

"Section 3E1.1 of the Guidelines provides, in two subsections, for reduction of a defendant's offense level by up to three levels for acceptance of responsibility."  <u>United States v. Vargas</u>, 961 F.3d 566, 571 (2d Cir. 2020).  First, if the defendant clearly demonstrates acceptance of responsibility for her offense, her offense level should be decreased by two levels.  See U.S.S.G. § 3E1.1(a).  Second, if the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection is level 16 or greater and the government indicates that the defendant has timely notified authorities of her intention to a plea of guilty, her offense level should be decreased by one additional level.

Section 3E1.1(a) most commonly applies in cases where a defendant pleads guilty and accepts responsibility for his or her conduct as part of that plea agreement.  However, Application Note 2 to § 3E1.1 notes:

      this adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.  Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction.  In rare situations, a defendant may clearly demonstrate an acceptance of responsibility for [her] criminal conduct even though [she] exercises [her] constitutional right to trial.  This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (<u>e.g.</u>, to make a

> constitutional challenge to a statute or a challenge to the applicability of a statute to [her] conduct. In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

In any event, a defendant bears the burden of demonstrating that she qualifies for a reduction under U.S.S.G. § 3E1.1. See United States v. Chu, 714 F.3d 742, 747 (2d Cir. 2013).

Most recently, United States District Judge Jed Rakoff, Southern District of New York, held in a non-binding decision that the one-level reduction for timely acceptance of responsibility under § 3E1.1(b) creates an impermissible trial penalty in violation of the Sixth Amendment to the United States Constitution, requiring the remedy of a one-level reduction in the Guidelines offense level for all defendants who do not qualify under § 3E1.1(b). See United States v. Tavberidze, 769 F. Supp. 3d 264 (S.D.N.Y. 2025).

ii.    Discussion

The defendant is entitled to no reduction in her offense level pursuant to U.S.S.G. § 3E1.1 because: (i) she has never accepted responsibility for her criminal conduct; (ii) she put the government through the burden and expense of not only a trial, but also of the intensive preparation required for a scheduled trial; and (iii) relies on an erroneous, non-binding decision issued in the Southern District of New York.

First, the defendant to this day has failed to accept responsibility for her conduct. Indeed, the second sentence of the defendant's sentencing memo notes: "[Daedone] vehemently maintains her innocence." See Def't Sent. Mem., ECF No. 471, at 1.

Second, rather than, as Application Note 2 suggests, going to trial to assert and preserve issues that do not relate to her factual guilt, the defendant here contested her guilt, including by cross-examining each government witness, forcing several witnesses to relieve some of the most heinous events in their lifetime. See United States v. Rocha, 145 F.4th 1247,

1264 (10th Cir. 2025) ("[a]lthough a defendant has a constitutional right to trial, exercising that right will commonly render him ineligible for a § 3E1.1 reduction); United States v. Cheatwood, No. 22-4652, 2025 WL 18098, at *5 (4th Cir. Jan. 2, 2025) (denial of § 3E1.1 reduction affirmed where the defendant cross-examined each of the government witnesses and raised evidentiary objections to the documentary evidence the government sought to introduce); United States v. Trevino, 7 F.4th 414, 432 (6th Cir. 2021) ("Even where a defendant does 'admit substantial elements of the crime charged,'" § 3E1.1 does not apply "if the defendant contests even one factual element of the offense.").

In any event, as Application Note 2 instructs, the Court would still need to look to the defendant's pre-trial statements and conduct to evaluate whether she accepted responsibility for her conduct.  Here, the record is clear: the defendant continues to maintain her innocence and, even following her conviction, has provided statements to the media attempting to cast doubt on her conviction.  See, e.g., Nicole Daedone Rips Sean Combs Verdict as Double Standard, NBC News (July 7, 2025), https://www.nbcnews.com/business/business-news/nicole-daedone-rips-sean-combs-verdict-double-standard-rcna217276; Thessaly La Force, "The Orgasm Expert Who Ended Up on Trial," The New Yorker (Aug 29. 2025), https://www.newyorker.com/news/our-local-correspondents/the-orgasm-expert-who-ended-up-on-trial.

Finally, this Court is not bound by the district court decision in Tavberidze, and, in any event, that decision is contrary to law.  Importantly, § 3E1.1(b) comports with the Sixth Amendment.  The Supreme Court has "unequivocally recognize[d] the constitutional propriety of extending leniency in exchange for a plea of guilty and of not ex-tending leniency to those who have not demonstrated those attributes on which leniency is based."  Corbitt v. New Jersey, 439

U.S. 212, 224 (1978); see also, e.g., United States v. Sterkaj, 138 F.4th 95, 101 (2d Cir. 2025)

("[I]t is one thing to extend leniency to a defendant who is willing to cooperate with the

government; it is quite another thing to administer additional punishment to a defendant who by

his silence has committed no additional offense."); United States v. DiMassa, 117 F.4th 477, 484

(2d Cir. 2024) ("We have long held that a district court may properly treat a guilty plea as a

recognition of fault and that a show of lenience to those who exhibit contrition by admitting guilt

does not carry a corollary that the Judge indulges a policy of penalizing those who elect to stand

trial.").

   Applying this distinction, the Second Circuit has held, in a summary order, that

§ 3E1.1 does not create an impermissible punishment for exercising one's right to go to trial;

rather, it provides a benefit for acceptance of responsibility, which does not run afoul of the

constitutional right to stand trial:

> [The defendant] contends that he was improperly punished for
> exercising his constitutional right to stand trial. His argument is
> premised on the district court's decision not to apply the acceptance
> of responsibility deduction pursuant to U.S.S.G. § 3E1.1. We
> maintain a distinction between increasing the severity of a sentence
> for a defendant's failure to cooperate and refusing to grant leniency.
> [Whitten, 610 F.3d at 195]. Here, the district court distinguished
> between the two and indicated that [the defendant] was being denied
> a benefit, but was not being punished. We find that [the defendant]
> was not punished for standing trial.

United States v. Goffer, 529 F. App'x 17, 19 (2d Cir. 2013).

   Indeed, every other Court of Appeals that has addressed constitutionality of

§ 3E1.1 has also upheld it, including in response to Sixth Amendment challenges.  See, e.g.,

United States v. Gittens, 701 F. App'x 786, 789 (11th Cir. 2017) (per curiam) (reaffirming that

"the denial of a § 3E1.1 reduction is not impermissible punishment for the exercise of Fifth or

Sixth Amendment rights"); United States v. Benitez, 531 F.3d 711, 717 (8th Cir. 2008) (rejecting argument that § 3E1.1 is "unconstitutional on the ground that it has a chilling effect on a defendant's exercise of his Sixth Amendment right to trial"); United States v. Baldrich, 471 F.3d 1110, 1115 (9th Cir. 2006) (rejecting claim that § 3E1.1(b) "is unconstitutional because it penalizes defendants for exercising their constitutional right to go to trial and deprives defendants of the right to effective assistance of counsel"); United States v. Lancaster, 112 F.3d 156, 159 (4th Cir. 1997) ("[The defendant] is not being punished for choosing to assert his constitutional rights . . . ; he merely does not reap the benefit of the additional one-point reduction given to others who volunteer information about their conduct in a more timely manner."); United States v. Portillo-Valenzuela, 20 F.3d 393, 395 (10th Cir. 1994) (upholding constitutionality of § 3E1.1 and explaining that "denying the reduction for acceptance of responsibility is not a penalty for exercising any rights" because "[t]he reduction is simply a reward for those who take full responsibility"); United States v. Saunders, 973 F.2d 1354, 1362 (7th Cir. 1992) (holding that "the approach embodied in § 3E1.1 does not constitute a per se policy of punishing those who elect to stand trial, despite the fact that leniency is more often granted to defendants who accept responsibility by pleading guilty"); United States v. White, 869 F.2d 822, 826 (5th Cir. 1989) (per curiam) (rejecting contention that § 3E1.1 "places an unconstitutional premium on the exercise of an accused's right to a trial by jury under the sixth amendment" and explaining that "[t]he fact that a more lenient sentence is imposed upon a contrite defendant does not establish a corollary that those who elect to stand trial are penalized").

The unbroken line of cases uniformly upholding § 3E1.1 is plainly correct: § 3E1.1, including subsection (b), comports with the Sixth Amendment because it provides a

reward for accepting responsibility, not a penalty for going to trial. See United States v. Powell, No. 24-1461, Dkt. Entry 74.1 (2d Cir. Oct. 29, 2025) (summary order) (affirming denial by a district court of a reduction under § 3E1.1 where the defendant argued his failure to receive a deduction was tantamount to a "trial penalty").

Accordingly, this Court should not reduce the defendant's offense level by one point because she has failed to accept responsibility for her conduct.

9.      The Defendant Is Not Entitled to a Downward Departure Under § 5H1.11

The defendant is not entitled to a downward departure pursuant to U.S.S.G. § 5H1.11, which was deleted from the Sentencing Guidelines effective November 1, 2025. See U.S.S.G. Amendment 836; see also 18 U.S.C. § 3553(a)(4)(A)(ii) (instructing courts to apply the Guidelines "in effect on the date the defendant is sentenced"); U.S.S.G. § 1B1.11(a). Because that provision has now been deleted, this Court lacks authority to do so. Instead, the Court can fully consider and weigh the defendant's charitable activities in connection with its analysis of the § 3553(a) factors.[8] See United States v. Fishman, 631 F. Supp. 2d 399, 404 (S.D.N.Y. 2009).

C.      The Court Need Not Conduct a *Fatico* Hearing on Any Issue

Under United States v. Fatico, 579 F.2d 707 (2d Cir. 1978), courts are obligated to resolve factual disputes before imposing a sentence. However, a sentencing "court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes. All that is required is that the court afford the defendant some opportunity to rebut the government's allegations." United States v.

---

[8]      Then-§ 5H1.11 provided in relevant part that: "civic, charitable or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." As such, the guideline generally discouraged departures on the grounds provided by the defendant. See United States v. Canova, 412 F.3d 331, 358 (2d Cir. 2005).

Slevin, 106 F.3d 1086, 1091 (2d Cir. 1996) (internal quotation marks and citations omitted). "[T]he procedure followed in resolving disputed factors at sentencing rests in the district court's sound discretion." United States v. Prescott, 920 F.2d 139, 144 (2d Cir. 1990); see also United States v. Ghailani, 733 F.3d 29, 54 (2d Cir. 2013) (district courts have discretion to hold – or forgo – a Fatico hearing depending on the circumstances).

When deciding between a Fatico hearing and another means of resolving a factual dispute, a court should consider "the nature of the dispute, its relevance to the sentencing determination, and applicable case law." U.S.S.G. § 6A1.3 cmt.; see also United States v. Brinkworth, 68 F.3d 633, 640 (2d Cir. 1995) (upholding trial court's decision not to grant a Fatico hearing where the court reviewed the legal memoranda of the parties, the grand jury testimony, and heard oral argument at sentencing).

The decision to hold or not to hold a Fatico hearing turns largely on whether the contested information is relevant to the trial court's potential sentence. See U.S.S.G. § 6A1.3 cmt. If it is, then it need only be proven by a preponderance of the evidence. See United States v. Ruggiero, 100 F.3d 284, 290 (2d Cir. 1996). Even then, a hearing may be unnecessary. United States v. Faibish, No. 12-CR-265 (ENV), 2015 WL 4637013, at *1-2 (E.D.N.Y. Aug. 3, 2015). "[O]ral and written statements" and a chance to submit evidence constitute "adequate opportunity" to challenge a sentence. See United States v. Brinkworth, 68 F.3d 633, 641 (2d Cir. 1995). Courts may also allow defendants to submit affidavits, letters, legal memoranda or argument. See United States v. Pugliese, 805 F.2d 1117, 1123 (2d Cir. 1986); United States v. Lee, 818 F.2d 1052, 1056 (2d Cir. 1987). There is no requirement that there be cross-examination of witnesses. Pugliese, 805 F.2d at 1123. Because sentencing is not meant to be a "mini-trial," evidentiary hearings are the exception rather than the rule. See id. Instead, the key

is whether the information upon which a sentence is based is reliable and accurate. Id. at 1123-24.

Evidentiary hearings regarding disputes that do not turn in any way on the credibility of any witness are disfavored. Cf. United States v. Duverge Perez, 295 F.3d 249, 254 (2d Cir. 2002); United States v. Ortiz Socias, No. 21-CR-173 (RA), 2024 WL 4698714, at *2 (S.D.N.Y. Nov. 5, 2024).

In the instant matter, the defendant asserts that a Fatico hearing is necessary to dispute "the enhancements proposed by Probation and endorsed by the Government." See Def't Sent. Mem., ECF No. 471, at 10. The defendant fails to appreciate that the evidence upon which the government intends to rely is largely from the trial record. The defendant, through extensive testimony and robust cross-examination, already had a meaningful opportunity to rebut the allegations she now contests; she should not be given a second bite at the apple. See, e.g., United States v. Guang, 511 F.3d 110, 122 (2d Cir. 2007) (affirming district court's refusal to hold a Fatico hearing where: (i) trial court heard extensive trial testimony, observed the demeanor of the witnesses and assessed their credibility, (ii) defendants had notice of the proposed enhancements, including the evidence upon which the enhanced were based, and had an opportunity to dispute the evidence; and (iii) the trial court reviewed the parties' submissions); United States v. Capri, 111 F. App'x 32, 35 (2d Cir. 2004) (finding that the district court did not abuse its discretion in denying the defendant's request for a Fatico hearing as to a dangerous weapon enhancement because "[c]ounsel [had] opposed the enhancement in written submissions and in oral argument"); United States v. Ware, No. 04-CR-1224 (RWS), 2009 WL 102215, at *2 (S.D.N.Y. Jan. 14, 2009). She also had the opportunity to make extensive argument in her Rule 29 motion. Daedone thus had ample and sufficient opportunity to rebut the government's

allegations.  See Fatico, 579 F.2d at 713 (noting that precedents require only that reliability of evidence be "ensured through cross-examination or otherwise").  Given the government's reliance on evidence presented at trial, there is no basis to conclude that the evidence is not reliable or accurate, particularly given the opportunity for extensive cross-examination and objections to the introduction of evidence.  Further, to the extent the government may make arguments based on evidence outside the trial record, such assertions will be submitted through reliable means that she can challenge through written submission or a sentencing hearing.  See United States v. Olvera, 954 F.2d 788, 792 (2d Cir. 1992) (upholding district court's denial to require confidential informant to testify at Fatico hearing where government produced other reliable evidence the district court described as "some very objective evidence.").  In this case, there is simply no basis to allow the defendant to essentially retry the case against her.  To do so would be a waste of judicial resources.

Moreover, nothing in the defendant's non-specific request for a Fatico hearing establishes that an evidentiary hearing will provide additional clarity as to factual disputes relevant to the Court's determination of her sentence, particularly given the opportunity already provided to her at trial and in post-conviction litigation, as well as the opportunities that are afforded to her to make both written and oral arguments to the Court at her sentencing.  See United States v. Cacace, 796 F.3d 176, 191 (2d Cir. 2015) ("a district court need not hold an evidentiary hearing to resolve sentencing disputes, as long as the defendant is afforded some opportunity to rebut the Government's allegations"); United States v. Phillips, 431 F.3d 86, 93 (2d Cir. 2005) (finding that it could "easily dispose" of the defendant's argument that the district court should have held a Fatico hearing to resolve a five point sentencing enhancement as the defendant had the opportunity to oppose the enhancement in a letter to the district court and at

sentencing with the assistance of counsel); <u>see also</u> U.S.S.G. § 6A1.3 cmt. (explaining that while "the court must ensure that the parties have an adequate opportunity to present relevant information" regarding sentencing disputes, "[w]ritten statements of counsel or affidavits of witnesses may be adequate under many circumstances").  Accordingly, the Court should deny the defendant's motion for a <u>Fatico</u> hearing.

      D.    <u>Conclusion</u>

In sum, the defendant's adjusted Guidelines offense level is 40.  Because the defendant falls within Criminal History Category I, her effective Guidelines range of imprisonment is 240 months.

## III.    <u>The Section 3553(a) Sentencing Factors</u>

After calculating the Guidelines as the initial benchmark, the Court must consider the familiar sentencing factors of 18 U.S.C. § 3553(a) ("Section 3553(a) Factors" or "the Sentencing Factors").  These include "the nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1); "the kinds of sentences available," § 3553(a)(3); the Guidelines range itself, § 3553(a)(4); any relevant policy statement by the Sentencing Commission, § 3553(a)(5); "the need to avoid unwarranted sentenced disparities among defendants," § 3553(a)(6); "the need to provide restitution  to any victims," § 3553(a)(7); and the need to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which include the following four objectives:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense[s];
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the applicable Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the Sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives." Rita v. United States, 551 U.S. 338, 348 (2007). Should a court choose to vary from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Gall, 552 U.S. at 50.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

## ARGUMENT

The gravity of the defendant's crimes cannot be overstated. The defendant's conduct lasted more than a decade, spanned the country, and caused untold harm to numerous victims.

The victim impact statements provided to the Court – and the trial testimony in this case – make plain that Daedone left lasting devastation in the lives of those she manipulated and controlled. She sustained her criminal conspiracy by building a loyal cadre of followers, including her co-defendant, Rachel Cherwitz, who carried out her directives and insulated her from accountability. Cloaked in the language of personal growth, Daedone concealed her abuse behind a smokescreen of supposed "empowerment" programs; but she exploited these participants. It was an elaborate façade designed to normalize abuse, silence dissent, and protect Daedone's scheme from scrutiny.

As set forth below, the government respectfully submits that a sentence of 240 is necessary to provide appropriate punishment, protect the public from further crimes by Daedone, promote respect for the law, and discourage others from committing similar crimes.

I.    The Court Should Impose a Sentence of 240 Months' Imprisonment

A.    The Nature and Circumstances of the Defendant's Egregious Conduct

A primary consideration under § 3553(a) is the nature and circumstances of the offense, and here it warrants a sentence of 240 months' imprisonment. There is no question about the egregious nature of Daedone's crime. It was a worldwide scheme orchestrated over more than a decade. It involved threats, emotional control, and psychological, physical and financial damage. And, as demonstrated at trial, among the many heinous acts of manipulation, coercion and exploitation that Daedone or her co-conspirators committed were the following:

- directing victims to serve as "handlers" for OneTaste's main investor, Reese Jones, including cooking for him, sexually servicing him each day and performing other labor;

- coercing victims to allow OneTaste clients and prospective customers to stroke their clitorises;

- compelling victims to stroke OneTaste clients and prospective customers' penises, and to have sex with them;

- directing that victims incur massive debt to pay for OneTaste courses and to continue to remain part of the OneTaste community; and

- directing victims to work around-the-clock – including menial and sexual labor – for little or no pay.

The victims performed these acts, and others, out of fear of serious harm, including physical, psychological and financial harm. Indeed, those who resisted were punished with negative employment consequences, shunning, sexual abuse and threats of physical violence, among other things. Nearly every trial witness described how Daedone and her co-conspirators engaged in a campaign of indoctrination, grooming, isolation, manipulation, use of past trauma, monitoring, public shaming, relationship disruption, sexual abuse, physical exhaustion and financial harm to force their victims' labor.

As such, the forced labor conspiracy led by Nicole Daedone was a sophisticated, calculated scheme that spanned over a decade and left scores of victims financially, emotionally and physically devastated. Hers was a crime of exploitation masquerading as empowerment. Daedone leveraged her position as OneTaste's founder and leader to recruit individuals with promises of healing and community, only to strip them of autonomy and compel them into coerced labor.

What makes this conspiracy especially grave is not just the length of the scheme and the number of victims but also the uniquely insidious form of coercion Daedone deployed.

The trial record shows that Daedone fostered an environment where refusal to comply with demands – sexual or otherwise – was met with reputational, emotional and psychological harm. For her victims, these harms were every bit as powerful as physical restraint.

Daedone's conduct was all the more pernicious because she cloaked her exploitation in the language of intimacy and empowerment. Victims were pressured to work long hours with little to no pay and forced to perform demeaning acts; all the while, they were made to believe that their very worth and access to community depended on obedience. By entwining labor demands with personal identity and belonging, Daedone created a coercive framework that was uniquely difficult to escape. This psychological stranglehold amplified the harm: leaving was not simply quitting a job, but abandoning a community and forfeiting the promise of "healing" that had drawn victims in.

At the center of this scheme was the practice of orgasmic meditation, an exercise that was deeply personal and profoundly intimate. Regardless of whatever benefits orgasmic meditation may have provided its practitioners, Daedone's victims were conditioned to accept and normalize repeated sexual touch under the guise of therapy and empowerment. The intimate nature of this practice magnified the coercion. This entanglement of sexuality with labor demands not only stripped individuals of autonomy but also caused enduring trauma by exploiting their most private boundaries for organizational control and profit. This fusion of forced labor with sexual exploitation rendered the victims' experiences not only degrading but also deeply traumatizing in ways that extend beyond lost wages or long hours. The abuse of trust, intimacy and power in this context makes the gravity of this offense particularly stark.

Relatedly, the conspiracy's integration of sexual coercion into its labor structure magnifies the offense's egregiousness. Victims were told that compliance with sexual practices

was essential to their growth and to maintaining their status within the community. The defendant exploited among the most intimate of personal practices for her own financial benefit. This was not a one-time instance or any kind of accident or mistake; regardless of the defendant's own personal beliefs about sexual wellness, the defendant's scheme at the expense of her victims was intentional and orchestrated.

At trial, multiple victims testified about how the trauma they suffered at OneTaste has affected them. For instance:

- Becky Halpern testified that after she left OneTaste she was "in really bad shape, like really, really bad." Tr. 390. For instance, she was unable to get out of bed and was depressed and confused. For Halpern, it was "the worst mental health period of [her] life. Tr. 391; see also PSR ¶ 76.

- Christina Berkley testified that her time at OneTaste had a "very dramatic impact on [her] psychologically that then took many years to come out of. It changed my identity and sense of self. . . . [M]y sense of my own instinct and intuition and feelings of what is right and wrong and values slowly became formatted into the style of – like a box or algorithm that was the appropriate one, that was the OneTaste one." She also described the totality of the impact that her time at OneTaste had on her: "there was not going to be anywhere to go to where anyone would understand anything about me. All of my previous relationships were gone. What would I do for a living because this was – I wasn't going to be an escort again . . . . [The idea of leaving OneTaste] was, like, psychologically impossible." By the time Berkley left OneTaste, she had significant debt and had "survival level stress" such that her "hair started falling out." PSR ¶ 70.

- Dana Gill described how she became wholly dependent on OneTaste and that "[t]he trauma has not gone away. The pain . . . it is like death by a million paper cuts." She testified how her time at OneTaste "repulsed her" and, in hindsight, she saw "how far [her] values had been skewed." Tr. 1330. At the time she left OneTaste, she had no savings or income and was still recovering from a miscarriage. Tr. 1331. She remains traumatized, and is still "sorting through the trauma." Tr. 1332; see also PSR ¶ 74.

- Michelle Wright testified that during her time at OneTaste, "[t]he training from start to finish was about, like, being turned on. And what that meant in that world was being shiny, being bright, being your most powerful and empowered sexual self and, you know, being – we were, as employees of this company, we were meant to be representing people who were getting what they wanted, doing what they wanted without hesitation, without anything in the way. Like that was considered you were

awake, you were enlightened.  And the reality was like, I did not feel that way and I did not feel empowered. I felt manipulated and abused, and I was so trained not to pay attention to how I felt inside that I wasn't even – like I oftentimes wasn't even able to identify that that's how I was feeling."  Tr. 2424.

- Michal Neria testified that during her time at OneTaste she was "in constant panic, fear, shakiness" and at times suicidal.  After she left, she suffered from post-traumatic stress disorder and acute depression.  PSR ¶ 75.

- Lyndsi Keves described her emotional condition at the time she left OneTaste as "really hard."  Tr. 3030.  Indeed, Keves became emotional recalling how hard it was for her to admit that she had been so "manipulated" by "the entire culture of OneTaste."  Tr. 3030.  She noted how she "lost touch with [her]self."  Tr. 3030; see also PSR ¶ 80.

- Anthia Gillick described how she was "totally devasted" when she left OneTaste.  Tr. 3989.  She felt like there was no space for the things she wanted in life, like having a husband and children, or pursuits outside of OneTaste. Tr. 3990; see also PSR ¶ 77.

A sampling of some of the victim impact statements the government has received reinforces the harm Daedone caused.[9]  For example:

Dana Gill wrote that she is "still unpacking the harm caused by Rachel Cherwitz and Nicole Daedone.  Their manipulation and grooming of me was insidious . . ." She noted that Daedone and Cherwitz "continue to cause harm so long as they refuse to acknowledge the devastating harm they have caused myself and others, and will continue these manipulative and coercive practices as long as they are able."

Michael Neria described that the worst part of Daedone's crime was the way "she took advantage of women like [Neria] by targeting a common vulnerability. . . .  Nicole knowingly manipulated our very human need for healthy intimate relationships for her gain."

---

[9]    The government expects that some victims will attend the sentencing hearing in person and that, at that time, they will seek to address the Court orally.  The government will separately request that the Court allow other victims – who cannot attend the defendant's sentencing in person for varying reasons – to attend by telephone.

Neria left OneTaste "sexually traumatized, bereft of outside friends and family, and financially in debt." Recalling the harm she suffered, Neria noted that when she left OneTaste she:

> was suffering from Post Traumatic Stress Disorder and severe depression. My OneTaste partner and I filed for divorce less than two months after leaving; I had lost my apartment when I moved into the communal housing and had to move in with my parents right before my 30th birthday; my relationships with my parents and siblings was under extreme duress because of the fracture we experienced while I was in OneTaste; I didn't have a job; and was traumatized by my sexual encounters in OneTaste. I was plagued by recurring nightmares about Nicole and others in OneTaste and experienced panic attacks throughout the day. There were times during my first two years out of OneTaste that I contemplated suicide because of my experience there.

Michelle Wright has written to the Court explaining the toll her time at OneTaste has taken on her. She described an erosion of trust and a destruction of her capacity for safe, healthy relationships. Wright wrote that OneTaste "obliterated [her] creative, explorative bravery" and "replaced it with fear, shame, guilty, depression, anxiety, and all manner of traumatic after effects." Her experience has had an "irreparable" effect on her personal relationships and took away "precious time in [her] young life" that she cannot get back.

Other victims have relayed similar traumatic effects that Daedone's conduct had on them. All of these victim impact statements are attached hereto as Exhibits A through G.

A refrain that reverberates through all these statements is the total lack of trust that these victims now place in others. They speak of friendships that dissolved, families they could not reconnect with and the constant suspicion that every relationship carries hidden danger. For them, the ability to rely on another person for comfort, safety or intimacy has been corrupted. This total lack of trust is a central feature of the trauma she inflicted.

Finally, the seriousness of the offense is magnified by its scale and aftermath. Daedone's enterprise spanned states and continents, and ensnared scores of victims. Many left

79

OneTaste financially ruined, emotionally broken and alienated from their families. Meanwhile, Daedone reaped extraordinary personal gain, selling OneTaste for $12 million and pocketing the proceeds. This wealth was built directly on the backs of those coerced into labor. This combination of long duration, wide reach, calculated methods and lasting victim harm warrants a sentence that fully reflects its gravity.

> B.    The Defendant's History and Characteristics

Overall, Daedone's personal characteristics support a sentence of 240 months, and do not establish any extraordinary circumstances warranting a significant downward departure or variance from the applicable Guidelines range. The PSR does not reveal anything remarkable about Daedone's background that explains or mitigates the serious offense conduct described herein. Rather, Daedone's background reflects intelligence, charisma and entrepreneurial drive. Daedone could have used those traits to build a legitimate enterprise; instead, she weaponized those characteristics to manipulate her followers into coerced labor for her own profit. Daedone's lack of a prior criminal record does not mitigate her culpability in this case given the scale and deliberateness of her crime. Her crime was not a momentary lapse of judgment. Rather, this offense took place for more than a decade in a cold and calculated manner.

Daedone's background also underscores the serious risk of recidivism. The forced labor conspiracy of which she was convicted was not opportunistic or impulsive misconduct; it was a calculated business model sustained for years. Even after public scrutiny and litigation, Daedone did not accept responsibility and change course. Instead, she attempted to reframe her work as legitimate rather than reckoning with the harm caused. This unwillingness to acknowledge wrongdoing heightens the need for a substantial custodial sentence.

At the same time, the Court may consider that Daedone has had supporters who view her as transformative and charismatic. But this following is not evidence of redemption or goodwill; it was built on the very coercion and exploitation the jury found unlawful. Her ability to command loyalty is not a mitigating factor but part of what makes her particularly dangerous. Her loyal following is proof that she remains capable of reconstituting similar schemes if not deterred by meaningful punishment.

C.    <u>The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment</u>

The defendant's conduct, as set out in greater detail in the PSR, strikes at the heart of federal prohibitions on human trafficking and forced labor. Her criminal conspiracy was designed to compel victims with histories of trauma or who sought a path to a better life to work for OneTaste, including coercing her victims to perform intimate, sexual acts in service of OneTaste.

The seriousness of Daedone's criminal conduct demands a sentence that reflects the scale of the harm she caused, the centrality of Daedone's role in the conspiracy and the need to ensure that justice is served. The work that Daedone compelled her victims to perform nearly around the clock broke them and stripped them of their dignity. Daedone made numerous victims work for years. This duration of labor warrants the requested sentence. Indeed, a lenient sentence would risk trivializing the years of suffering endured by victims who were misled, coerced and exploited under Daedone's leadership.

Respect for the law is particularly salient in this case. Daedone portrayed herself as being above conventional norms. She offered purported enlightenment while simultaneously entrenching her followers in a web of coercion. A sentence of 240 months' imprisonment will send a clear message that such manipulation of vulnerable individuals will not be tolerated and

that leaders like Daedone cannot insulate themselves from accountability by repackaging abuse as enlightenment or personal growth.

Finally, just punishment requires that Daedone be held accountable for the cascading harms her conspiracy caused. Victims lost years of their lives, financial stability and personal dignity. Only a substantial term of imprisonment can begin to approximate just punishment for the breadth of that suffering.

D.    The Need for Deterrence

General deterrence is a primary consideration in cases involving organized exploitation. The requested sentence would deter others inclined to engage in similar offenses. Daedone's forced labor conspiracy was not a crime of passion; it was coordinated and calculated over a period of multiple years to maximize profits at the expense of her victims. General deterrence is more apt in cases where the crime is calculated and financially motivated. See United States v. Howard, 28 F.4th 180, 208-09 (11th Cir. 2022) (describing, in the context of a financial crime, how "[g]eneral deterrence is more apt, not less apt, in white collar crime cases" because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity,' which makes them 'prime candidates for general deterrence'") (quoting United States v. Kuhlman, 711 F.3d 1321, 1329 (11th Cir. 2013)). A sentence that serves as general deterrence of crimes that are complex and difficult to investigate is also warranted here. See, e.g., United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

Specific deterrence is equally critical. Daedone has not expressed genuine remorse or recognition of the harm her actions caused. To the contrary, she has sought to minimize her responsibility, recast the organization's legacy and has shown disdain for the criminal justice process. This suggests that absent a significant custodial sentence, Daedone would attempt to re-create similar structures in the future. Indeed, protecting future potential victims requires a sentence that deters her personally from reoffending.

Deterrence also aligns with the broader statutory goal of preventing the recurrence of forced labor conspiracies. The Court's sentence here will be closely observed by both victims and potential wrongdoers. Ensuring that the punishment reflects the gravity of the conduct reinforces the rule of law and discourages others from attempting to replicate such schemes.

E.    The Need to Protect the Public

The public requires protection from leaders who prey upon the vulnerable under the guise of self-help, therapy, or community. Daedone demonstrated a willingness to exploit the financial resources, sexuality, and labor of others in pursuit of her own wealth and influence. That danger does not dissipate simply because OneTaste has collapsed; the qualities that allowed her to orchestrate this conspiracy remain.

The risk to the public is compounded by the fact that Daedone cultivated a base of loyal adherents, some of whom may still view her as a leader or visionary. Without meaningful incarceration, she could seek to mobilize those individuals in new ventures, again placing them and others at risk of exploitation.

Thus, a substantial term of imprisonment is necessary to safeguard the public from further harm. The sentence must reflect not only her past actions but also the ongoing risk her manipulative skills pose if she is given the opportunity to operate freely.

F.    The Kinds of Sentences Available

While probationary or minimal custodial sentences are available in the abstract, they are plainly insufficient in this case. The Guidelines advise a lengthy custodial sentence, and the statutory scheme under 18 U.S.C. § 1594(b) contemplates significant terms of imprisonment for conspiracies of this magnitude.

Given the nature of the offense and the statutory requirements, only a term of imprisonment of 240 months can adequately reflect the seriousness of the crime and the other § 3553(a) considerations. Financial penalties, while available, cannot substitute for incarceration in a case where the offense involved long-term human exploitation.

G.    The Need to Avoid Unwanted Sentencing Disparities

Sentencing Daedone to a substantial term is also necessary to avoid unwarranted disparities with similarly situated defendants. Courts have consistently imposed lengthy sentences in cases where leaders of coercive enterprises exploited vulnerable individuals through forced labor, sexual coercion or psychological control.

For example, in United States v. Raniere, No. 18-CR-204 (NGG) (E.D.N.Y.), Keith Raniere, who led NXIVM and manipulated followers into uncompensated labor and sexual servitude, received a 120-year sentence. In United States v. Sabhnani, No. 07-CR-429 (ADS) (E.D.N.Y.), where domestic workers were forced into labor through threats and abuse, the lead defendant, Varsha Sabhnani, received a sentence of 11 years' imprisonment. In United States v. Majeed, No. 21-CR-20060 (JAR) (D. Kan.), Kaaba Majeed, the lead defendant, a high-ranking member of the United National of Islam ("UNOI") who, for over twelve years, conspired to enforce rules that required UNOI members to perform unpaid labor using beatings, threats,

punishments, isolation and coercion to compel the unpaid labor of over a dozen victims, was sentenced to 10 years' imprisonment.

These cases illustrate that the federal criminal justice system treats long-running, coercive exploitation enterprises with the utmost severity. Daedone's conduct falls squarely within this spectrum of seriousness. Like Raniere, she exploited the trust of followers to compel labor and sexual acts under the guise of personal growth. Like Sabhnani and Majeed, she exercised control through threats of financial, reputational and emotional ruin. The harms in each case are parallel: years of uncompensated labor, long-lasting trauma, and lives derailed by coercion. To impose a materially lesser sentence here would suggest that Daedone's brand of exploitation – couched in the rhetoric of "sexual wellness" and "enlightenment" – is less serious than other forms of forced labor, when in fact it was every bit as destructive.

The cases the defendant cites as comparable are largely inapposite – they concern one or few victims, spanned discrete, short lengths of time, and did not cause the irreparable harm that many of the defendant's victims suffered. The defendant's forced labor scheme involved a years-long, highly organized scheme led by a leader who leveraged psychological coercion, economic dependency and reputational threats. The harm here was not episodic – it was sustained, pervasive, and intentionally reinforced through policies, rituals, and leadership directives that ensured victims had no safe pathway out. Moreover, the defendant derived enormous financial and reputational benefits from the exploitation, far exceeding the scale or sophistication of the conduct in the comparator cases.

Avoiding disparity also means ensuring proportionality relative to her co-defendant. Rachel Cherwitz, while culpable, was subordinate to Daedone and did not serve as the conspiracy's architect or main beneficiary. Daedone, by contrast, conceived, directed, and

profited from the entire enterprise, culminating in her $12 million sale of OneTaste. The sentences imposed in comparable cases, coupled with the differences between Daedone and Cherwitz, where the government is requesting a sentence of 168 months' imprisonment, strongly support the requested sentence.

II.    Supervised Release

The defendant's conviction under 18 U.S.C. § 1594(b) is a Class C felony, see 18 U.S.C. § 3559(a)(3), and the maximum term of supervised release is three years. See 18 U.S.C. § 3583(b)(2). Under U.S.S.G § 5D1.2(a)(2), the Guidelines range of supervision is one to three years. To facilitate Daedone's reentry into the community, to ensure the safety of the community and to prevent Daedone from reoffending, the government respectfully requests the Court impose the maximum term of supervision. In addition to imposing the mandatory and standard conditions of supervised release, the Court should require Daedone to make full disclosure of her financial records; to be prohibited from maintaining or opening any additional financial accounts without knowledge of the Probation Department; and to provide truthful monthly statements of her income and expenses. This special condition will ensure that the defendant is complying with the full terms of any order of restitution and forfeiture money judgment the Court may impose.

III.    Financial Aspects of Sentencing

The Court is required to impose a special assessment of $100. In addition to ordering a $12 million forfeiture money judgment, as set forth the government's forfeiture submission to be filed today, the Court should order restitution to the defendant's victims, as the

government intends to set forth in another submission to be filed today.[10]  The Court should also impose a monetary fine within the applicable Guidelines range of $50,000 to $500,000.  <u>See</u> U.S.S.G. § 5E1.2(c)(3).  While the PSR suggests that Daedone appears unable to pay any fine, <u>see</u> PSR ¶ 173, it also notes that she earned significant income in 2023, <u>see</u> <u>id.</u> ¶ 162; is a plaintiff in ongoing litigation in the High Court of London, <u>see</u> <u>id.</u> ¶ 165, and could be awarded money damages; and incorrectly notes that the government "seized many of her assets," <u>id.</u> ¶ 164, when the government only seized approximately $2 million.  Daedone has not provided the Court with a sworn financial statement listing, among other things, her real estate holdings and where the remaining $10 million from her sale of OneTaste now lies.

---

[10]    Restitution in this case is mandatory pursuant to 18 U.S.C. § 1593(a).  <u>See United States v. Sabhnani</u>, 599 F.3d 215, 254 (2d Cir. 2010).  To date, the government has received affidavits of loss from ten victims.  The government has reached out to all the defendants' victims it has identified; however, to the extent other potential victims seek restitution, the government requests the Court set a date within 90 days of the defendant's sentencing to make a final determination of the victims' losses.  <u>See</u> 18 U.S.C. § 3664(d)(5).  The government respectfully requests permission to supplement its restitution filing with any additional claims it may receive.

## **CONCLUSION**

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of 240 months' imprisonment, to be followed by a supervised release term of three years.

Dated:     Brooklyn, New York
           December 10, 2025

                                        Respectfully submitted,


                                        JOSEPH NOCELLA, JR.
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York


                              By:     __/s/_____
                                        Kayla C. Bensing
                                        Kaitlin T. Farrell
                                        Nina C. Gupta
                                        Sean M. Fern
                                        Assistant United States Attorneys
                                        (718) 254-7000


cc:     Clerk of Court (DG) (by Email and ECF)
        Jennifer Bonjean, Esq. (by Email and ECF)
        U.S. Probation Officer Meghan Wing (by Email)